# United States Court of Appeals

*for the*

# Federal Circuit

IN RE: SIMON SHIAO TAM

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
TRADEMARK TRIAL AND APPEAL BOARD, SERIAL NO. 85/472,044

## BRIEF ON BEHALF OF APPELLANT

RONALD D. COLEMAN
JOEL G. MACMULL
GOETZ FITZPATRICK LLP
One Penn Plaza, Suite 3100
New York, New York 10119
(212) 695-8100

*Attorneys for Appellant*

April 21, 2014

**Form 9**

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re: Simon Shiao Tam _____ v. _____

No. 2014-1203

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

SIMON SHIAO TAM

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

SIMON SHIAO TAM

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Goetz Fitzpatrick LLP
Ronald D. Coleman
Joel G. MacMull

_____

| February 10, 2014 | /s/ Joel G. MacMull |
|---|---|
| Date | Signature of counsel |
| | Joel G. MacMull |
| | Printed name of counsel |

Please Note: All questions must be answered

cc: _____

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASE ................................................... viii

STATEMENT OF JURISDICTION .......................................................1

STATEMENT OF THE ISSUES ON APPEAL ......................................1

STATEMENT OF THE CASE ................................................................2

    A.    Prosecution History ............................................................4

STATEMENT OF FACTS .....................................................................6

    A.    The Facts Relied Upon by the PTO and the Board .............6

    B.    Facts Set Forth in the Record by the Applicant ..................8

    C.    The Board's Affirmation of the Refusal to Register ...........9

SUMMARY OF THE ARGUMENT .....................................................11

ARGUMENT .......................................................................................14

    I.    STANDARD OF REVIEW .................................................14

    II.    THE BOARD ERRED AS A MATTER OF LAW IN
           FINDING ON THE INADEQUATE RECORD BEFORE IT
           THAT THE MARK WAS DISPARAGING AND
           THEREFORE UNREGISTRABLE UNDER §2(a) OF THE
           LANHAM ACT .................................................................16

           A.    The Board Erred as a Matter of Law in Relying on
                "Recycled" Research Consisting of Outcome
                Determinative Reference Works and Slang Dictionary
                Definitions to Determine the "Likely Meaning" of the
                Mark .....................................................................17

                1.    The dated and obscure dictionary and reference
                      work definitions relied by the Examiner were
                      accorded improper weight by the Board, which
                      also erroneously disregarded contrary evidence
                      submitted by the Applicant ...........................20

                2.    The Board erred in considering the conclusions
                      of the slang dictionaries submitted by the
                      Examiner ......................................................21

i

B.    The Board Erred in Finding that Evidence Showed the Mark Would be Interpreted as an "Offensive" Reference to Those of Asian Descent ...................................... 25

1.    Applicant could have provided other more plausible interpretations of the Mark ............................ 26

2.    Even if the Mark is interpreted as an ethnic slur the PTO failed to show that it is considered disparaging by Asians by competent evidence .............. 29

3.    The record does not establish that a "substantial" number of Asian Americans find the Mark disparaging, nor does it reflect perceptions from a "composite" of that group ............................................ 33

4.    The Board's reference to and reliance on the Applicant's "past use" of the Mark was error ............... 38

III.    THE DISPARAGEMENT PROVISION OF §2(a) OF THE LANHAM ACT IS UNCONSTITUTIONAL ON ITS FACE .......... 43

A.    The Disparagement Standard of §2(a) is Unconstitutionally Vague ........................................ 47

IV.    EVEN IF THE "DISPARAGEMENT" PROHIBITION UNDER §2(a) IS NOT UNCONSTITUTIONAL, ITS APPLICATION BY THE BOARD HERE IS AN UNCONSTITUTIONAL DEPRIVATION OF THE APPLICANT'S RIGHT TO EQUAL PROTECTION UNDER THE LAW .......................................................... 50

A.    The Board's Order is Subject to the Equal Protection Clause ..... 50

B.    Racial or Ethnic Classifications are Inherently Suspect and are Subject to Strict Scrutiny ............................ 51

C.    The Board's application of the statute using vague and arbitrary guidelines is unconstitutional .................................... 53

CONCLUSION ................................................................. 57

REQUEST FOR ORAL ARGUMENT ................................................. 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adarand Constr., Inc. v. Pena*,
  515 U.S. 200 (1995)..................................................................................52

*Bartlett v. Strickland*,
  556 U.S. 1 (2009)......................................................................................51

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973)..................................................................................48

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980)..................................................................................44

*Dickinson v. Zurko*,
  527 U.S. 150 (1999)..................................................................................15

*Gratz v. Bollinger*,
  539 U.S. 244 (2003)..................................................................................53

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)..................................................................................47

*Hannegan v. Esquire*,
  327 U.S. 146 (1946) ......................................................................54, 55, 56

*Harjo v. Pro-Football, Inc.*,
  50 USPQ2d 1705, 1737, 1999 WL 375907 (TTAB 1999), *rev'd*,
  284 F. Supp. 2d 96....................................................................................43

*Hirabayashi v. United States*,
  320 U.S. 81 (1943)....................................................................................51

*In re DNI Holdings Ltd.*,
  77 U.S.P.Q.2d 1435, 2005 WL 3492365 (TTAB 2005) .............38, 39, 40, 41

*In re Fox*,
  702 F.3d 633 (Fed. Cir. 2012) ..................................................................14

*In re Future Ads LLC*,
  103 USPQ2d 1571 (TTAB 2012)..............................................................23

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ................................................................14

*In re Heeb Media LLC*,
    89 USPQ2d 1071, 2008 WL 5065114 (TTAB 2008) ..............................3, 34

*In re Hershey*,
    6 USPQ2d 1470, 1988 WL 252485 (TTAB 1988) .......................................48

*In re in Over Our Heads Inc.*,
    16 USPQ2d 1653, 1990 WL 354546 (TTAB 1990) ........................16, 28, 48

*In re Int'l Flavors & Fragrances, Inc.*,
    183 F.3d 1361 (Fed. Cir. 1999) ...................................................................15

*In re Lebanese Arak Corporation*,
    94 USPQ2d 1215, 2010 WL 766488 (TTAB 2010) ..............................16, 32

*In re Leo Quan Inc.*,
    200 USPQ 370, 1978 WL 21550 (TTAB 1978) ..........................................28

*In re Mavety Media Grp. Ltd.*,
    33 F.3d 1367 (Fed. Cir. 1994) ..........................................................*passim*

*In re McGinley*,
    660 F.2d 481 (C.C.P.A. 1981) .........................................................43, 47, 48

*In re Old Glory Condom Corp.*,
    26 USPQ2d 1216, 1993 WL 114384 (TTAB 1993) ..................16, 47, 48, 49

*In re Pacer Tech.*,
    338 F.3d 1348 (Fed. Cir. 2003) ............................................................15, 30

*In re Sang Su Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) ...................................................................14

*In re Squaw Valley Development Co.*,
    80 USPQ2d 1264, 2006 WL 1546500 (TTAB 2006) ...........................*passim*

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ........................................................................24

*Johnson v. Robison*,
    415 U.S. 361 (1974)......................................................................................51

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) .....................................................................................54

*Magic Wand Inc. v. RDB Inc.*,
    940 F.2d 638 (Fed. Cir. 1991) .....................................................................39

*Marshak v. Treadwell*,
  240 F.3d 184 (3d Cir. 2001) ........................................................43

*Metro Broadcasting, Inc. v. F.C.C.*,
  497 U.S. 547 (1990)..................................................................51

*Order Sons of Italy in Am. v. The Memphis Mafia, Inc.*,
  52 USPQ2d 1364, 1999 WL 977231 (TTAB 1999) ....................................28

*Orthoflex, Inc. v. ThermoTek, Inc.*,
  Case No. 3:11-CV-0870-D, --- F. Supp.2d ---, 2013 WL 6476371
  (N.D. Tex. Nov. 20, 2013)................................................... 24-25

*Palmore v. Sidoti*,
  466 U.S. 429 (1984)...................................................................51

*Pro-Football Inc. v. Harjo*,
  284 F. Supp. 2d 96 (D.D.C. 2003)........................................*passim*

*Pro-Football, Inc. v. Harjo*,
  415 F.3d 44 (D.C. Cir. 2005).........................................................31

*Regan v. Taxation with Representation of Washington*,
  461 U.S. 540 (1983) .................................................................54

*Revlon, Inc. v. Jerell, Inc.*,
  713 F. Supp. 93 (S.D.N.Y. 1989) ...............................................33

*Richardson v. Belcher*,
  404 U.S. 78 (1971)......................................................................51

*Shaw v. Reno*,
  509 U.S. 630 (1993)..................................................................51

*Shelley v. Kraemer*,
  334 U.S. 1 (1948)......................................................................51

*Speiser v. Randall*,
  357 U.S. 513 (1958)...................................................................56

*Spence v. Washington*,
  418 U.S. 405 (1974) ..................................................................54

*Texas v. Johnson*,
  491 U.S. 397 (1989)...................................................................54

*United States v. Paradise*,
    480 U.S. 149 (1987)...................................................................51

*Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*,
    703 F.2d 1372 (Fed. Cir. 1983) ....................................49

*Virginia v. Hicks*,
    539 U.S. 113 (2003)...................................................................48

*Weinberger v. Wiesenfeld*,
    420 U.S. 636 (1975)...................................................................50

*West Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)...................................................................54

*Wygant v. Jackson Board of Education*,
    476 U.S. 267 (1986)...................................................................52

*Zippo Mfg. Co. v. Rogers Imports, Inc.*,
    216 F. Supp. 670 (S.D.N.Y. 1963) ..............................45


**Statutes & Other Authorities:**

15 U.S.C. § 1052(a) .......................................................*passim*

15 U.S.C. § 1071(a)(1) ............................................................1

15 U.S.C. § 1071(a)(2) ............................................................1

15 U.S.C. § 1127.....................................................................42

28 U.S.C. § 1295(a)(4)(B) ......................................................1

37 C.F.R. § 2.122 ..................................................................27

37 C.F.R. § 2.122(a)..............................................................36

37 C.F.R. § 2.145(d) ...............................................................1

37 C.F.R. § 2.56(b)(2)............................................................18

37 C.F.R. § 2.61(a)................................................................18

Fed. R. Evid. 801(c)..............................................................36

Trademark Manual of Examining Procedure (8th ed., October 2011)
    § 704.01 ...................................................................... 18-19

Trademark Manual of Examining Procedure (8th ed., October 2011)
§ 1203.03 ........................................................................49

Trademark Manual of Examining Procedure (8th ed., October 2011)
§ 1203.03(c) ...................................................................20

Trademark Trial and Appeal Board Manual of Procedure § 1208
(3d ed. June 2013)..........................................................36

Trademark Trial and Appeal Board Manual of Procedure § 1208.01 ....................37

Trademark Trial and Appeal Board Manual of Procedure § 1208.03 ....................37

Central Intelligence Agency, *The World Factbook,* found at
https://www.cia.gov/ library/publications/the-world-
factbook/geos/us.html.....................................................33

Jeffrey Lefstin, *Does the First Amendment Bar Cancellation of Redskins*,
52 Stan. L. Rev. 66 (2000)..............................................47

Llewellyn J. Gibbons*, Semiotics of the Scandalous and the Immoral and
the Disparaging: §2(a)  Trademark Law After Lawrence v. Texas*, 9
Marq. Intell. Prop. L. Rev. 187, 233 (2005)..................................43

*Dictionary of American Slang* ...................................................22

*Forbidden American English*.....................................................22

*List of Ethnic Slurs* ...............................................................22

*McCarthy on Trademarks and Unfair Competition* § 2:1 (4th ed.)........................45

*Oxford English Dictionary*.........................................................9

*Slang and Euphemism*.............................................................22

*The American Heritage Dictionary of the English Language* .............................8, 20

*The Big Book of Being Rude* .....................................................22

*The Cassell Dictionary of Slang* .................................................22

*The Color of Words: An Encyclopaedic Dictionary of Ethnic Bias in the
United States*.................................................................22

*Unkind Words* .....................................................................22

## STATEMENT OF RELATED CASES

Counsel for appellant Simon Shiao Tam ("Appellant" or "Applicant") is unaware of any related cases as defined by Federal Circuit Rule 47.5.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this *ex parte* appeal of the September 26, 2013 final decision of the Trademark Trial and Appeal Board ("the Board"), which affirmed the refusal by the United States Patent and Trademark Office ("PTO") to register Applicant's trademark pursuant to §2(a) of the Lanham Act, 15 U.S.C. § 1052(a). *See* 28 U.S.C. § 1295(a)(4)(B) and 15 U.S.C. § 1071(a)(1). Applicant timely filed his Notice of Appeal on November 22, 2013. (A.[1] 328-348.) *See* 15 U.S.C. § 1071(a)(2); 37 C.F.R. § 2.145(d).

## STATEMENT OF THE ISSUES ON APPEAL

This appeal involves an application to register the trademark THE SLANTS for "entertainment in the nature of live performances by a musical band" in International Class 41 (the "Mark"). The Mark was refused registration under § 15 U.S.C. § 1052(a). The issues presented for review are as follows:

1.    Did the Board err as a matter of law in finding on the record before it that the Mark was disparaging and therefore unregistrable under 15 U.S.C. § 1052(a)?

2.    Did the Board err in disregarding primary dictionary definitions and relying on secondary and tertiary dictionary definitions, without stating any justification, as a principal ground for its conclusion?

---

[1]    All references to "A. __" are to the Joint Appendix.

1

3.     Did the Board erroneously accept a selectively biased selection of purported reference work definitions as a basis for its conclusion?

4.     Did the Board erroneously disregard evidence of Appellant's use of the Mark included in his application for registration?

5.     Did the Board erroneously rely on anecdotal or inadmissible evidence as the basis for its conclusions as to the Appellant's use of the Mark?

6.     Did the Board erroneously rely on anecdotal or inadmissible evidence as the basis for its conclusions as to how the Mark is perceived by a "substantial composite" of the supposedly affected ethnic group?

7.     Did the Board improperly consider the Applicant's own ethnicity, or that of members of his musical band, in concluding that his use of the Mark was disparaging?

8.     Is §2(a) unconstitutional if it was applied here on the ground that its application was arbitrary and capricious?

9.     Is §2(a) unconstitutional on its face on the ground of vagueness?

10.    Is §2(a) unconstitutional as applied here on the ground that it restricts Applicant's First Amendment right to free speech?

## STATEMENT OF THE CASE

This appeal arises from the Board's September 26, 2013 affirmance of the final refusal to register the trademark THE SLANTS on the Principal Register. The

application, Serial No. 85/472044 (the "044 Application"), was filed by Applicant on November 14, 2011, for THE SLANTS in standard characters. "The Slants" are a musical group, and the services described are "entertainment in the nature of live performances by a musical band" in International Class 41. (A. 23-35.)

Contrary to the repeated mischaracterizations offered by the Board and the Examiner, this appeal is not premised on a member of an ethnic group claiming to "reappropriate" a supposedly offensive ethnic-based slur. This argument, rejected in *In re Heeb Media LLC,* 89 USPQ2d 1071, 2008 WL 5065114 (TTAB 2008), has **never** been made in connection with the 044 Application. This appeal concerns something more pernicious, albeit more subtle: The express use of a constitutionally suspect race-based criterion – i.e., the Applicant's ethnicity – to bar him from registering a mark deemed derogatory under §2(a), coupled with a misrepresentation of the evidentiary record by the Board that obfuscates the Examiner's admission that he did just that.

It is of critical importance for the Court to appreciate that the mark THE SLANTS has been the subject of two separate applications by Applicant, including multiple office actions (A. 2, 7, 247, 259) – but that only the 044 Application is before this Court now, and was the only application before the Examiner and the Board. Despite this, however, both the Examiner and the Board relied improperly, and without color of legal justification, on the prior application abandoned by the

3

same applicant, Serial No. 77/9582263. (A. 2, 7, 308.) The Board rationalized this irregularity by capriciously characterizing evidence of the Mark's use from the record of the previous application as the improper "past use" by the Appellant, relying on it without inquiry as to whether "past use" was of evidentiary relevance to – indeed, granting it an irrebuttable evidentiary presumption regarding – the 044 Application and, of course, affirming the refusal. (A. 7, 16-17.) The effect was to levy an unlawful *per se* bar to Applicant's right to register the Mark, regardless of the facts concerning his use, for all time.

These procedural defects rise to a constitutional level. In fact, the record reveals a host of other substantive and procedural defects which, due to a PTO "zero tolerance" policy toward trademarks bearing any taint of §2(a) "offensiveness," distorted its treatment of the 044 Application throughout the registration process and resulted in manifest unfairness. As shown below, that record raises serious questions about the constitutionality of placing so much policymaking power over issues concerning free expression and race in the hands of an agency charged by Congress merely with registering valid trademarks.

## A.    <u>Prosecution History</u>

The PTO initially refused registration of the 044 Application in a non-final January 6, 2012 Office Action (the "Initial Office Action"). (A. 37-207.) Appellant responded on May 29, 2012. (A. 208-241.) A final office action dated June 20,

4

2012 (the "Final Office Action") (A. 242-249) refused registration on the ground that the Mark "consists of or includes matter which may disparage or bring into contempt or disrepute persons, institutions, beliefs or national symbols . . . ." under §2(a) (A. 243), maintaining that THE SLANTS "likely means" Asians in the context of Applicant's services for "entertainment in the nature of live performances by a musical band," which, the PTO held, is an "offensive meaning." (A. 243-244.) A timely request for reconsideration was refused on December 20, 2012; Applicant timely appealed to the Board on February 19, 2013. (A. 250-297.)

On appeal, Applicant argued that the PTO had failed to carry its burden in establishing, on the record of the 044 Application – which makes no reference to Asians – that the Mark was disparaging to Asians. (A. 279-296.) More specifically, Applicant observed the irrefutable fact that the word "slants" is, standing alone, a common non-inherently offensive English word constituting the dominant portion of numerous trademark registrations. (A. 215, 228-233, 282, 284-286.) Absent a valid evidentiary record of offensive use by the Applicant, it was argued the otherwise neutral word "slants" was legally distinct from rejected applications containing "inherently offensive slurs such as HEEB, SQUAW or REDSKIN … ." and was entitled to registration. (A. 285-286.)

The Board nevertheless affirmed, adopting the analysis and conclusions of the PTO in whole.  This included the Examiner's reliance on obscure or obsolete

reference works, unauthenticated blog posts, and factual information concerning the Applicant's past use of the Mark taken from his earlier, abandoned application. (A. 1-17.) The Board's decision nodded to the two-part test of *In re Squaw Valley Development Co.*, 80 USPQ2d 1264, 2006 WL 1546500, at *2 (TTAB 2006):

> We must first determine, **based on evidence of record**, the "likely meaning?" of THE SLANTS; and then, if there is a meaning that invokes a group of persons, turn to consider whether that meaning may be disparaging to a substantial composite of the referenced group.

(A.10) (emphasis added). But after its rote citation of the standard, the Board abandoned a reasoned analysis, condoning or ignoring the PTO's procedural and analytical errors and refusing to focus on the appalling lack of record evidence to support the PTO's refusal to register a completely valid trademark. (A. 17.)

## STATEMENT OF FACTS

Appellant Simon Shiao Tam is the "front man" for the Portland, Oregon "dance rock band" The Slants. (A. 56.) Mr. Tam and a number of band members are, as the PTO puts it, "admittedly" of Asian descent. (A. 56, 95, 130.)

### A.    <u>The Facts Relied Upon by the PTO and the Board</u>

The Examiner's refusal of the 044 Application under §2(a) as "matter which may disparage or bring into contempt or disrepute persons, institutions, beliefs or

national symbols" (A. 42) was supported by 162 pages of "evidence" (A. 37-41), comprising the following documents:

- Selected portions of Internet articles quoting various people as saying the word "slant" is "insensitive" and concluding that the band's name, "The Slants," may displease some people of Asian descent (A. 46-47, 50);

- Another article stating that "The Slants" is a "controversial" name for Applicant's band (A. 51);

- Online comments from the band's website, generated by the Examiner in 2010 in connection with the abandoned application, regarding the band's "embracing" of the term "slanted eyes" (A. 52);

- A 2010 Wikipedia entry for "The Slants" asserting that the band's name was "derived from an ethnic slur for Asians" (A. 56-58);

- Online commentaries, not authenticated, objecting to use of the term "slant eyes" or "slants" in reference to Asians (A. 147-150, 151-159, 204-206) and objecting to the name of Applicant's band (A. 91, 100-128);

- A 2010 screen shot from the band's original MySpace.com website featuring Asian-themed images such as a stylized dragon and a rising sun (A. 59);

- Entries from online references for variants of "slant-eye(s)" and "slant" (A. 53-55, 75, 83, 135-136, 140-142), generated by the Examiner's Internet

searches for the word "slants" juxtaposed with the terms "niggers" and "derogatory" (A. 142-144, 168-173) dating from June 2010 and July 2011;

- Photocopies of entries for the words "slant" and "slant-eye(s)" from out-of-print books consisting entirely of derogatory meanings of words (A. 174-179, 181-183, 193-203); and

- An online brochure published by the Japanese American Citizens League cited by the Examiner for the proposition that "the term 'slant' is derogatory and should not be used" (but which contains no such statement at all). (A. 39, 43, 138-139.)

## B.     Facts Set Forth in the Record by the Applicant

The facts relied on by the Applicant in response to the Initial Office Action in support of registration of the Mark, and the factual basis on which he seeks by this Appeal a reversal of the Board's decision, are as follows:

- Four exemplary third-party U.S. trademark registrations and one intent-to-use application published for opposition on August 2, 2011 in which the words "slant" or "slants" are the dominant portion (A. 215, 228-233);

- A complete citation of the very online dictionary definition relied on by the PTO, *The American Heritage Dictionary of the English Language*, in which the word "slant" appears as a **fourth**, offensive slang definition for a "disparaging term for a person of East Asian birth or ancestry" (A. 140-141, 219);

8

- An additional online definition provided by the *Oxford English Dictionary*, showing the ethnic-slang definition of "slant" listed as the **tenth** out of a possible ten definitions (A. 220, 234-237); and

- The three specimens in the 044 Application, none of which includes "Asian-related" imagery or other reference to Asians (A. 23-35, 221-224).

### C.   <u>The Board's Affirmation of the Refusal to Register</u>

The Board affirmed the refusal to register in a precedential opinion (A. 1-17), which begins its discussion of the law with a citation to §2(a) of the Lanham Act and a restatement of the established test it utilizes to determine whether a mark is disparaging:

1) what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the Mark, the nature of the goods or services, and the manner in which the Mark is used in the Marketplace in connection with the goods or services; and

2) if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

(A. 8.)

As an initial matter, in affirming the refusal the Board's opinion quickly glossed over the cherry-picked dictionary references that were central to the Initial and Final Office Actions. (*Compare* A. 10 *with* 43 and 244.) Presumably this was a tacit acknowledgment that the Examiner's refusal to justify his selection of

9

relatively low-ranking definitions was improper under the PTO's own standards. The Board shifted focused to what it deemed evidence of the "nature of the identified services," accepting the Examiner's characterization of the record and concluding that "The interpretation of 'slant' as meaning 'person of Asian descent' (as opposed to other definitions of this word) arises because the mark is used in a manner to mean 'person of Asian descent.'" (A. 13.)

In so doing, Board accepted the Examiner's highly irregular incorporation of "past use" of the Mark by the Applicant based on specimens from Applicant's 2010 application and the results of Internet searches the Examiner performed in connection with that abandoned application. (A. 2, 4, 7, 15.)  The Board found the latter  material, consisting almost entirely of hearsay expressions of personal, subjective opinion, adequate proof of the Mark's meaning in the context used by the Applicant. (A. 15-17.) The Board stated that the Applicant had not rebutted this "proof" with evidence that would have shown that "due to applicant's change in its manner of use members of the referenced group [i.e., Asians], no longer perceive [the term] as having a disparaging meaning" (A. 15) – an astonishing exercise in burden-shifting, considering the attenuated nature and dubious provenance of this "proof" in the first place.

The Board also found that the Mark was perceived as disparaging to a "substantial composite" of Asian Americans regardless of the context. (A. 15.) It

10

based this finding on the "dictionary definitions, reference works and all other evidence unanimously categoriz[ing] the word 'slant,' when meaning a person of Asian descent, as disparaging." (A. 16.) The Board did not explain how it squared the words "regardless of context" with its premise that the Mark should be considered "when meaning a person of Asian descent," nor how it could use the term "unanimous" when the Applicant had demonstrated the Examiner's refusal to acknowledge more prominent dictionary definitions and even included his own. Asserting again that Applicant did "not dispute that the band's name is derived from an ethnic slur" – based on material from the abandoned 2010 application – the Board concluded, again, that "the evidence thereof stands unrebutted" and affirmed the refusal to register. (A. 16-17.)

## SUMMARY OF THE ARGUMENT

Section 2(a) of the Lanham Act states in relevant part:

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it —

Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute … .

15 U.S.C. § 1052(a). Applicant's application to register the Mark was refused under §2(a), but the factual basis of that refusal was conjectural, conclusory and patently insufficient on the record. The Examiner's sloppy recycling of the results

of pre-selected "reference" works, hearsay expressions of individual opinion and the results of transparently loaded Internet searches fell far short of his burden to establish that (i) the Mark has the meaning which he ascribed to it and (ii) a substantial composite of the referenced group would find the Mark to be so "offensive," "disreputable," or "shocking" to warrant refusal as "disparaging" under §2(a).

The Board in turn improperly acquiesced to the Examiner's reliance on "past use," itself of dubious probative value, imported from a different application to buttress the predetermined conclusion that the Applicant's use of the word "slants" is perceived as derogatory by Asians. The Board's decision, as set out below, was (i) inconsistent with currently applied standards of registration under §2(a); (ii) erroneous, in that it accepted the Examiner's decision, which failed in all material respects to establish, with competent and relevant evidence, a *prima facie* case to support the PTO's decision; (iii) erroneous, in that it relied on an amalgam of irrelevant observations and unjustified suppositions to reach a predetermined conclusion incompatible with well-established constitutional principles; and (iv) erroneous, in that it rejected contrary competent evidence that Applicant proffered by both mischaracterizing the evidence and the purpose for which it was proffered. In sum, the Board's adoption of the PTO's "evidence" to the effect that 'THE SLANTS' is a negative term regarding the shape of the eyes of certain persons of

Asian descent …" (A. 42; *see also* 244) despite the paucity of record evidence to that effect; its deeming the PTO's bootstrapping of material from one application to a subsequent application as sufficient to shift the burden of proof to the Applicant; and its approval of the PTO's explicit reliance on the Applicant's own ethnic identity as a legitimate basis to find "evidence of use," were erroneous as a matter of law and raise serious constitutional concerns under the Due Process clause.

Moreover, these errors must be viewed in light of a record of inconsistent, arbitrary and politically expedient application by the PTO of §2(a) in recent years. By its capricious disregard of its own legal and administrative standards, the Board has given a license to examining attorneys to jettison fundamental departures from standard PTO examining procedures in order to achieve that agency's own §2(a) policy goals, by any means necessary. This record brings into serious doubt the proposition that an administrative agency such as the PTO can, in a culture characterized by rapid shifts in meaning and sensibility and ever-changing standards of what is and is not offense, be charged with making determinations of what material "may disparage or falsely suggest a connection with persons . . . or bring them into contempt" without falling far afoul of constitutional guarantees of due process and free speech.

13

# ARGUMENT

## I.   <u>STANDARD OF REVIEW</u>

"Tribunals of the PTO are governed by the Administrative Procedure Act, and their rulings receive the same judicial deference as do tribunals of other administrative agencies." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002). "For judicial review to be meaningfully achieved within these strictures, the agency tribunal must present a full and reasoned explanation of its decision. The agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts." *Id.* Agency decisions "must be justified within the four corners of the record."  *In re Gartside,* 203 F.3d 1305, 1314 (Fed. Cir. 2000). Here the record is clear that Board failed to meet these standards.

In particular, the PTO bears the burden of proving that a proposed mark is prohibited from registration under 15 U.S.C. § 1052(a). *In re Fox*, 702 F.3d 633, 637 (Fed. Cir. 2012) (citation omitted). While this Court has not previously set forth the standard of review for a §2(a) refusal for "disparagement," it has found that refusals under Section 2(a)'s prohibition against registration of "scandalous" marks constitute "a conclusion of law based upon underlying factual inquiries." *Id.* "Factual findings of the Board are reviewed for the presence of substantial evidence, while its ultimate conclusion as to registrability is reviewed *de novo*." *Id.*

14

(citations omitted). Thus, the Board's factual findings will be reversed if found "arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence." *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1365 (Fed. Cir. 1999) (citations omitted).

Substantial evidence is "more than a mere scintilla" of evidence and "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (citation omitted). And as the Supreme Court has taught, the "substantial evidence" standard is not "simply rubber-stamping agency factfinding." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999). Accordingly, a reviewing court must evaluate the record and weigh evidence supporting the Board's determination as well as evidence supporting registration, accounting for both in deciding whether the Board erred.

Here the Board's manifest disregard of the "substantial evidence" standard alone justifies reversal.

**II.    THE BOARD ERRED AS A MATTER OF LAW IN FINDING ON THE INADEQUATE RECORD BEFORE IT THAT THE MARK WAS DISPARAGING AND THEREFORE UNREGISTRABLE UNDER §2(a) OF THE LANHAM ACT**

The Board's affirmance of the PTO's conclusion that the Mark is disparaging under §2(a) is erroneous because it was based on a palpably inadequate factual record. While §2(a) places a complex and sensitive mandate on the PTO, this only heightens the Board's responsibility to conscientiously and objectively evaluate whether the Examiner's proof meets the evidentiary standard required to justify departure from the presumption favoring registration. Any doubts are to be resolved in favor of the applicant, with due consideration for the recourse afforded to any party believing it would be damaged by registration to oppose it after publication. *See e.g., In re Lebanese Arak Corporation*, 94 USPQ2d 1215, 2010 WL 766488, at *8 (TTAB 2010); *In re Old Glory Condom Corp.*, 26 USPQ2d 1216, 1993 WL 114384, at *3 (TTAB 1993); *In re in Over Our Heads Inc.*, 16 USPQ2d 1653, 1990 WL 354546, at *1 (TTAB 1990).

Instead, however, the Board resorted to capricious rubber-stamping redolent of administrative policymaking. It ignored the frank inadequacy of the record on which the Examiner based his conclusions concerning both the Applicant's use of the Mark and the reaction of a "substantial composite" of Asians to merely weigh in with its own opinion of the merits, a regulatory approach flatly rejected in *In re Mavety Media Grp. Ltd.*, 33 F.3d 1367, 1371 (Fed. Cir. 1994). *Mavety* reminded

16

the Board that it is not the views of examiners, the Board or even members of this Court that governs "the legal conclusion that a trademark comprises scandalous matter," but, rather, the evidence-based "perspective of the substantial composite." *Id*. Yet the Board, certain of its rectitude in turning away an Applicant wishing to register what an Examiner had determined to be an ethnic slur, refused to even acknowledge the factual questions raised by the Applicant's two responses to the Office Actions. Its high-handed refusal to recognize, on this record, that the Examiner's conclusions were at least doubtful constitutes reversible error.

### A. The Board Erred as a Matter of Law in Relying on "Recycled" Research Consisting of Outcome Determinative Reference Works and Slang Dictionary Definitions to Determine the "Likely Meaning" of the Mark.

Determined to affirm the Examiner's policy-driven conclusion, the Board ignored the most glaring of defects of his refusal: The fact that it was recycled from an earlier, but different, application, and that his "examination" of the one before him was no "examination" at all.

The 044 Application was filed on November 14, 2011. (A. 23-27.) This was over a year and a half after the Applicant filed an earlier application, subsequently abandoned, for the same mark but utilizing Asian-themed materials as specimens, i.e., Serial No. 77/952263, filed on March 5, 2010. (A. 2; 308.) Yet, as indicated

from the upper left-hand corner of several pages of the record,[2] **all** of the Internet-based dictionary and reference works cited by the Examiner in his Initial Office Action (which was never supplemented in his Final Office Action) reveal Internet search dates of between June 2010 and July 2011, i.e., prior to the filing of the 044 Application. (A. 52-98, 100-173, 180, 184-192, 204-206.)  In other words, a vast majority of the record, and by all indications all the "evidence" relied on by the Examiner, was obtained, weighed, and deemed conclusive proof that the 044 Application was not entitled to registration **before** the 044 Application was ever filed! (A. 25, 27.)

Confident in his original conclusion and uninterested in the evidence that might bear on the new application before him, the Examiner's entire effort concerning the 044 Application was merely to cut and paste the results of his "due diligence" from the Applicant's previous, but materially different, application and sign at the bottom.[3] This arrogant "assembly line" method to examination, however, breached Trademark Rule § 2.61(a), 37 C.F.R. § 2.61(a), which mandates that applications for registration "be examined," a requirement elucidated by §

---

[2]    In a few instances the dates of the Examiner's Internet searches are reflected in approximately the middle of each page of the Appendix, rather than the upper left-hand corner of each page. (A. 180; 185-192.)

[3]    As discussed *infra*, the more notable differences between Application Serial No. 77/952263 and the 044 Application are the specimens of use submitted in connection with the services recited in these applications. *See* Trademark Rule § 2.56(b)(2), 37 C.F.R. § 2.56(b)(2).

704.01 of the Trademark Manual of Examining Procedure (8th ed., October 2011) ("TMEP")[4], pursuant to which an examining attorney is enjoined to perform "a complete examination." As the Rule explains:

> The initial examination of an application by the examining attorney must be a **complete** examination. A complete examination includes a search for conflicting marks and an examination of the written application, any preliminary amendment(s) or other documents filed by applicant before an initial Office action is issued, the drawing, **and any specimen(s)** . . . to determine whether the mark is eligible for the type of registration requested . . . .

(initial emphasis in original.) Notably, not one of the sources of information listed by § 704.01 is a previous application by the same Applicant. Each application is to be considered on its own terms, and there is no concept, in PTO procedure, of "repeat §2(a) offenders." These requirements would seem obvious if not for the fact that the Examiner did not deign to meet them here.

Instead, the Examiner abandoned the protocols established by Congress and the PTO for insuring fairness and regularity in the trademark examination process. Whether he did so out of an impatient eagerness to send a message about applications that might rock the §2(a) boat as to supposed ethnic slurs or due to mere laziness is impossible to know. But by turning a blind eye to the Examiner's disregard for these basic requirements, the Board failed in its role to ensure

---

[4]     § 704.01 of the TMEP then in effect at the time of the Examiner's examination of the 044 Application contains the same language as the current TMEP (October 2013, ed.)

regulatory and legal integrity at the PTO – even where §2(a) is implicated. This was reversible error.

    **1.**    **The dated and obscure dictionary and reference work definitions relied by the Examiner were accorded improper weight by the Board, which also erroneously disregarded contrary evidence submitted by the Applicant.**

In assessing the "likely meaning" of the Mark, the Examiner erroneously interpreted TMEP § 1203.03(c), a rule authorizing the PTO to go beyond dictionary definitions, as a permit to ignore entirely the most authoritative information dictionaries provide about meaning. Disregarding this Rule's explicit guidance, the Examiner neither cited full definitions when quoting actual dictionaries nor explained his justification for relying on subsidiary entries. (A. 42-44, 53-55, 83-84, 142-144, 145, 168-170, 178-183, 193-194, 197-199.) The Board, in affirming the refusal, did the same, adopting as definitive the fourth, slang entry for "slant" in *The American Heritage Dictionary* with no justification from the evidence in the record for bypassing the three more common and inoffensive definitions preceding it. (A. 3-4, 10, 16, 43, 136-137[5], 140-141.) Instead, the Board improperly used the Examiner's conclusory determination of the "nature of the identified services" as an excuse to wave away the significance of the very dictionary entries relied on by the Examiner himself, stating that the "mere fact

---

[5]    An example is the Examiner's reliance on the "offensive slang" definition of "slant" obtained from <u>www.wordnik.com</u>, which appears as the **ninth** definition out of a possible nine definitions. (A. 136.)

that that the term has several meanings, even when many may be innocuous, does not … foreclose the possibility that the proposed mark is disparaging to a groups of persons." (A. 10.)

The Applicant, however, never suggested that the possibility was "foreclosed" – only that the Examiner's reliance on dictionary definition as a basis for determining "likely meaning" was improper. *See Squaw Valley*, 2006 WL 1546500, at *10 (dictionary definitions go to "likely meaning" of mark, not offensiveness as perceived by affected group). This was error.

### 2. The Board erred in considering the conclusions of the slang dictionaries submitted by the Examiner.

The Board similarly abandoned its duty to review and correct lapses in examination technique by completely ignoring the Examiner's extensive reliance on obscure, dated and in some case anonymous works – collections of words deemed offensive by someone, somewhere, at some time – under the guise of "dictionary definitions." These works, however, are not "dictionaries" at all, as shown below. And while the Board refused to acknowledge that it was taking judicial notice of this motley selection of materials, it nonetheless referred to them in its opinion, to Applicant's severe prejudice.

The obscure or hoary verbal rogues' galleries[6] relied on by the Examiner do not provide the full range of word meanings as dictionaries do. Rather, they catalog every conceivable slang and offensive meaning of words and phrases.   They are specialized collections of expressions for which their respective editors have succeeded in finding offensive meanings, and are not probative at all – as **dictionary** definitions are meant to be – of any words "likely meaning." By relying on them as proof of the "likely meaning" of "slants," the Examiner committed a "converse error," or the logical fallacy of "affirming the consequent" – reversing or confusing the general category with the specific or sub-category.   For naturally if one peruses a list of "forbidden words" for a specific word, even one that has a "permissible" use also, the mere confirmation that the word is on that list may be no more than a "false positive."

It must be recalled that the use of dictionaries to establish "likely meaning" is a **separate** inquiry from the one concerning the applicant's use of the mark in context. *See Squaw Valley*, 2006 WL 1546500, at *7.  Yet the Board, never

---

[6]    One work cited by the Examiner was *The Color of Words: An Encyclopaedic Dictionary of Ethnic Bias in the United States*, which elucidates the history of the ethnic slur "slant." (A. 168-170, 217.)   This expedition is of questionable relevance under the legal standard, which mandates that a mark's meaning use be considered in terms of its contemporary, not historic, meaning. The other works are *The Big Book of Being Rude* (A. 174-176), *The Cassell Dictionary of Slang* (A. 177-179), *Dictionary of American Slang* (A. 181-183), *List of Ethnic Slurs* located at www.fact-index.com (A. 185-192), *Forbidden American English* (A. 193-196), *Slang and Euphemism* (A. 197-199), and *Unkind Words* (A. 200-203).

removing its gaze from its use-in-context assumption, completely ignored the Applicant's criticisms of the reliability of these works, including not only that they are not dictionaries but that they are woefully out of date, the most recent hard-cover work cited being 14 years old. [7] (A. 174-176.) Given the "ever-changing social attitudes and sensitivities" that must be accounted for when considering alleged scandalous or disparaging marks, *see Mavety*, 33 F.3d at 1371, it is surely not "beyond doubt" that the authors of these texts, whose specialized expertise the Examiner merely assumed, would define these entries the same way today as when they were published.

The Board's refusal even to acknowledge the conceptual and procedural flaws in the Examiner's "search for offense" is particularly troubling considering how he went about the Internet research he used not once but twice to reject registration of this Mark. So determined was the Examiner to unearth proof that "slant" was offensive that he went beyond sifting the contents of the World Wide Web via search engine "research" to find offensive uses of the word SLANT.

---

[7]     Even this relatively "current" source addresses only the popularization of "slant(-eye)," not "slant," during the 1950's. (A. 174.) Other reference works relied on by the Examiner indicate a popularization of the derogatory term "slant-eye" by 1929 and even the "early 1900s." (A. 181, 197.) Additionally, some of the Examiner's sources are analyses of slang words in British, not American English, which are not proper resources for PTO research as to a mark's meaning. (A. 174-179.) *See In re Future Ads LLC ,* 103 USPQ2d 1571, 1572 n.2 (TTAB 2012) (Board declined to take judicial notice of term from Cambridge Dictionaries Online because definition stated it was "British English").

Presumably coming up short, **he "spiked" the process by searching SLANT along with the word** "**NIGGERS**" (and elsewhere, with the word "DEROGATORY") to ensure the results he sought and which he included in the documentation appended to the refusal.  (A. 142-144, 168-173.)  (*See Figure 1*.)



*Figure 1*

Considering the search terms he used, it is no wonder the Examiner's research delivered "slanted" results and the predicted disparaging meaning. This exercise, far more offensive than the Mark, epitomizes selection bias, the result obtained when "there is a systematic difference between those [observations] included in the study and those [that] are not." *In re TMI Litig.*, 193 F.3d 613, 707 (3d Cir. 1999). That is why demonstrated selection bias renders expert testimony inadmissible. *See, e.g., Orthoflex, Inc. v. ThermoTek, Inc.*, Case No. 3:11-CV-

0870-D, --- F. Supp.2d ---, 2013 WL 6476371, at *22 (N.D. Tex. Nov. 20, 2013).

The Examiner's biased study should be have been rejected by the Board.  Instead,

the Board silently wrote its particulars out of the Office Actions – yet still relied on

them as evidence that the word is "unanimously" understood as disparaging. (A.

16.)  This was an abuse of discretion and reversible error.

### B.    The Board Erred in Finding that Evidence Showed the Mark Would be Interpreted as an "Offensive" Reference to Those of Asian Descent.

The record evidence does not support the Board's interpretation of the Mark

nor the Board's conclusion regarding a "substantial composite" of the Asian

American's community's perception of the Mark.  Based on suspect collections of

slang words, selected low-level dictionary definitions of the word "slant" and

"slants," and the unsupported assertion by the Examiner that "slant" is "the full

equivalent 'slant-eyes'" (A. 42), the Board – despite the complete absence in the

record of any empirical information about the attitude of Asians in general toward

the Mark or the Applicant's use of it – concluded that a "substantial composite of

the referenced group" deemed it "objectionable" "based on applicant's manner of

use." (A. 8, 13, 15.)   This was erroneous, because the record is bare of any such

evidence.

The Board compounded this non-sequitur by asserting – erroneously – that

the genesis of the band's name (a seemingly irrelevant consideration) as an ethnic

slur was not only a matter of record, but that "the evidence thereof stands unrebutted." (A. 16.) This improperly placed on the Applicant a burden to rebut not evidence but the Board's baseless factual assertions unconnected to any "evidence" in the record of the 044 Application and without even a semblance of justification, such as the taking of judicial notice, for referring to materials associated with the Applicant's earlier, abandoned application. Absent the same, however, nothing in the 044 Application justified the Board's assertion that the Mark is used in juxtaposition with Asian themes, concepts or persons other than the fact that the Applicant's name is Simon Shiao Tam. (A. 23, 25, 27.)

The impropriety of the Examiner declining to actually examine the 044 Application and instead just grafting his prior "findings" in connection with Application Serial No. 77/952263 onto the 044 Application, is addressed *supra*. As shown below, however, even disregarding the Examiner's "borrowing" of "evidence" from Applicant's earlier filed application, the record simply does not demonstrate that the Mark has the offensive quality ascribed to it by the Board.

### 1.  Applicant could have provided other more plausible interpretations of the Mark.

No one would be surprised to learn that the PTO will match the name of an applicant or a mark to a similar application previously considered and preliminarily refused, or that an Examiner finding such a match would take a hard look at a new application purporting to have cured the disqualifying flaw of the first. But

assuming the propriety of such an exercise, it is no less reasonable for an applicant to expect a refusal of the new application to be based on new research, analysis or evidence, to which an applicant would have the opportunity to respond.

Here, however, the Examiner simply relied on the "snapshot" of use he created in connection with the original application and on which he had already passed judgment.  He not only excused himself from the effort of performing new research, but did not even trouble himself to ask, as the TMEP authorizes, that the Applicant provide additional evidence with respect to use. (A. 41-44, 242-249, 291.)  Instead, the PTO treated the Applicant like a criminal defendant who got off on a technicality the last time around. Thus the Board agreed with the Examiner's insistence that in properly executing his obligation to go beyond the four corners of an application and "see what is really going on" with a trademark, he demonstrated that the Applicant was less than candid about his use of the Mark.

If this were actually the case, however, the refusal should have been based on evidentiary grounds under Trademark Rule § 2.122, 37 C.F.R. § 2.122.  But under that rubric, the Applicant could have rebutted any new information supposedly adduced by the Examiner concerning the 044 Application or provided additional proof or argumentation as appropriate.  Instead, the Examiner, and in turn the Board, determined that no real evidence was necessary to discern what

Simon Shiao Tam "really" meant when he said he wanted to register the word "slants" as a trademark.

This was improper. As was recognized in *In re Leo Quan Inc*., 200 USPQ 370, 1978 WL 21550 (TTAB 1978), the Board should have declined the invitation to assign sordid motives to an applicant whose trademark application is, on its face, devoid of offense. The word "slant" does have many meanings, and the Board and the courts, including this one, have consistently found marks that are capable of inoffensive meanings not to be scandalous or disparaging. *See, e.g., Mavety,* 33 F.3d 1367 (BLACK TAIL for adult entertainment magazine featuring photographs of African American women not scandalous); *Pro-Football Inc. v. Harjo,* 284 F. Supp. 2d 96, 127-128 (D.D.C. 2003) (REDSKINS for professional football team not shown to be disparaging by substantial evidence); *Order Sons of Italy in Am. v. The Memphis Mafia, Inc*., 52 USPQ2d 1364, 1999 WL 977231 (TTAB 1999) (MEMPHIS MAFIA for entertainment services not disparaging to Italian Americans)[8]; *Over Our Heads Inc*., 1990 WL 354546, at *1 (MOONIES and design incorporating a "buttocks caricature," for dolls whose pants can be dropped,

---

[8]    *Order Sons of Italy in Am.* is particularly relevant here because it stands in stark contrast to the Board's implied conclusion that "disparagement" under §2(a) of the Lanham Act is deserving of a broader application when the mark in question applies to people. (A. 17 "None of the marks in these third-party registrations refer to people.")

not disparaging where "would, when used on a doll, most likely be perceived as indicating that the doll 'moons,'" rather than members of The Unification Church). Here, however, the Applicant was deprived even of the opportunity to argue and prove that "slants," which has an empirically non-offensive meaning, is inoffensive – with the Board adding insult to procedural injury by deeming its conclusory contrary finding "unrebutted." (A. 16.)

To the extent the law properly weighs an applicant's motive, the one assigned to the Applicant by virtue of his selection of the Mark is not justified by the record.  The PTO's failure to "completely examine" the Mark, including by way of developing or requesting further evidence if it deemed the record incomplete, constitutes reversible error.

### 2.    Even if the Mark is interpreted as an ethnic slur the PTO failed to show that it is considered disparaging by Asians by competent evidence.

Besides improperly assuming that an Asian applicant must be making an Asian reference in his trademark application, as a matter of law the Board erred in holding that the Mark is disparaging under the second prong of the two-part test enunciated *Squaw Valley*, 2006 WL 1546500, at *2. As stated at the outset, any doubts regarding registrability under §2(a) are to be resolved in favor of the applicant.  For this reason, the Board may not deny the registration of a trademark it deems it to be in "bad taste" or "politically incorrect." To deprive an applicant of

registration on the ground that his mark constitutes an ethnic slur, it must demonstrate that determination by "such relevant evidence as a reasonable mind would accept as adequate to support [that] conclusion." *In re Pacer Tech.*, 338 F.3d at 1349. The Board's failure here to acknowledge the poverty of the evidentiary record is reversible error.

The very evidence the PTO and the Board cited as a basis for the refusal demonstrates **at least a doubt** as to whether reference to Asians as "slants" (not "slant-eyes"), much less by other Asians, is offensive and disparaging under current mores. Indeed, in a moment of candor, the Board acknowledged that "there is some mention in the record of support for the mark in the Asian community … ." (A. 15-16.) The Board's brief bow to the facts, however, did not keep it from its predetermined conclusion that the "record establishes that the slang term 'slant' or its plural 'slants,' when used to indicate ethnicity, is disparaging to a substantial composite of the referenced group." (A. 15.)

The record, however, establishes no such thing – certainly not by competent evidence. Indeed, just as it did in *Harjo*, here the Board failed completely to identify the objective evidentiary basis on which it premised its denial of the Applicant's presumptive entitlement to registration under §2(a). *Harjo* was a District Court appeal of the Board's cancellation of six REDSKINS trademark registrations owned by the NFL and used by its Washington, D.C. franchise in

response to a cancellation petition filed by a group of Native Americans claiming the marks violated §2(a). The U.S. District Court of the District of Columbia reversed the cancellation and granted summary dismissal of the petition, in part because the Board had not based its finding that the REDSKIN marks "may disparage" Native Americans on competent evidence.[9] The *Harjo* court's criticism of the Board's procedure and reasoning was nothing short of scathing, describing its approach as "logically flawed" and lambasting the Board for failing "to apply the correct legal standard to its own findings of fact." *Harjo*, 284 F. Supp. 2d at 125-126.

The same applies here. As in *Harjo*, here the PTO has gone beyond its statutory responsibility to sensitively weigh valid ethnic grievances in its understanding of the strictures of §2(a) to a stance of zealous "rejectionist" advocacy concerning any application to register a trademark that "may" offend an ethnic group. There can be no better demonstration of this than comparing the PTO's slapdash "evidence" here to this Court's advice in *Mavety* that "the PTO may discharge its burden of proving [a mark is unregisterable] under § 1052(a) through evidence such as consumer surveys regarding the substantial composite of

---

[9]    The dismissal was also based on laches. The petitioners appealed to the Court of Appeals for the District of Columbia, which in 2005 remanded solely on the laches issue. *See Pro-Football, Inc. v. Harjo*, 415 F.3d 44 (D.C. Cir. 2005).

the general public." [10] 33 F.3d at 1374. Far from demanding rigorous proof appropriate to the task of rebutting the presumption of registrability, the Board based its finding that THE SLANTS "may be disparaging to a substantial composite of the referenced group" on thin, subjective and – under traditional evidentiary standards – patently inadmissible collection of "proof" as can be imagined.

The proof relied on by the Board in its determination that the Mark may be disparaging "to a substantial composite of the referenced group" consisted of seven documents, none authenticated. These were purportedly written by Asians, or express the views of self-described Asian-oriented advocacy groups of unknown membership or authority, and all are cited as condemning use of the term "slant." (A. 46, 48-49, 91, 97-98, 100-128, 160-167, 184, 204-206). In fact, closer review reveals that many of these second-hand reports or position statements decry use of the term "slant-eye(s)," not "slants" – the former conveying an exclusive and unmistakable meaning as a racial slur. (A. 46, 101, 160, 184, 204-206). The Examiner's conflation of the term "slant-eyes" as a "full equivalent" of the Mark

---

[10] Again, *Mavety* concerned the alleged "scandalousness" of the trademark BLACK TAIL in connection with adult magazines featuring African American women. *Mavety* precedes the Board's decision in *Lebanese Arak Corporation*, 2010 WL 766488, wherein a Board panel of five split 3-2 with the dissent arguing that the determination of "disparaging" should hinge on a word's meaning to the general population and not, per the majority, on how it is perceived by members of the referenced group. *See id.* at *8, 10-11.

(A. 42) is so obviously wrong as a matter of basic trademark law, that it is kinder to ascribe bias than legal error to an Examining Attorney making such an assertion.[11] While the Board's disregard of this evidentiary mish-mosh is harder still to understand, it is certainly reversible error.

### 3. The record does not establish that a "substantial" number of Asian Americans find the Mark disparaging, nor does it reflect perceptions from a "composite" of that group.

Even if the handful of opinions cited by the PTO were, despite the "slant eyes" / "slants" distinction, **relevant** to the disparagement question, and even if they were not hearsay, they would still not approach the level of **competent proof** legally required to support the Board's affirmance. It mocks the very concept of evidence to suggest that, as against the approximately 14,000,000 ethnic Asians living in this country,[12] seven editorial opinions or press releases could be deemed "substantial evidence" that "individuals and groups in the Asian community

---

[11]    For example, under a likelihood of confusion analysis "[s]uch differences of connotation and meaning are key factors in determining the likelihood of confusion. Differing connotations themselves can be determinative, even where identical words with identical meanings are used." *Revlon, Inc. v. Jerell, Inc.*, 713 F. Supp. 93, 98 (S.D.N.Y. 1989) (citation omitted).

[12]    *See* Central Intelligence Agency, *The World Factbook,* found at https://www.cia.gov/ library/publications/the-world-factbook/geos/us.html, last visited April 20, 2014. The ethnic composition of the United States, including the estimate that 4.43% of the U.S.'s estimated population of 318,892,103 is ethnically Asian, is based in part on 2007 calculations.

object[ ] to use of the term in the context of applicant's band." (A. 16.)  But the Board did just that.  This is not some rhetorical point:  That there must be some reckoning of the size of the group whose opinion is being weighed is axiomatic to the "substantial composite" prong set forth in *Squaw Valley*. This is why this Court suggested the PTO use a competent, representative survey in *Mavety*, which would enable a fact-finder to render a conclusion about a "substantial composite" of a large group and make some degree of quantitative reckoning of "substantiality" even if the percentage ultimately employed is something less than a majority in the assessing of contemporary attitudes. *See Heeb Media*, 2008 WL 5065114, at *5 (citing cases).

    In contrast, nothing remotely like such a rigorous quantitative reckoning exists in this record.  The failure is not confined to numbers, either, for just as the Board glossed over the "substantial" part of "substantial composite," it slid right past *Squaw Valley*'s use of the word "composite," which has a meaning as well – relying on one Japanese and one Chinese "source" in an ironic display of cultural insensitivity toward a host of other affected ethnic groups, considering its present posture. (A. 48-49, 138-139, 160-161.) Taking no account of the perceptions of ethnic East Indians, Iranians, or Russians, or those possessing epicanthic folds over their eyes (A. 75, 205) such as Koreans, Filipinos, Vietnamese, Pacific Islanders or Thais, it is as hard to understand the basis on which the Board concluded that it had

34

considered a fair "composite" of the "Asian American community" in making its disparagement determination under §2(a) (A. 16) as it is distasteful to contemplate the level of ethnic line-drawing apparently required to comply with a statute governing the mere registration of trademarks.

Furthermore, even permitting the conceit that sampling one each of a Chinese and a Japanese group is sufficient to create a "composite" of "all Asians," the Board's conclusion – that the record contains "substantial evidence" that the Mark, a plain English word, is perceived as disparaging by that composite when encountered in the context of the Applicant's use is preposterous. It is not enough to "connect the dots," i.e., to claim that by establishing generalized offense on the part of the "substantial composite" all the PTO must do is align that perception with a free-floating description of an applicant's use. As the court explained in *Harjo*, the Board's failure there to identify substantial evidence that REDSKINS was perceived as disparaging by Native Americans **in the context in which it was used** was grounds for reversing its §2(a) determination. *See* 284 F. Supp.2d at 133-136.

And here? Here the Board's proof – its posited evidentiary connection between the Applicant's use and the vaunted feeling of disparagement by a "substantial composite" of Asians – amounts to two unauthenticated blog posts from parties calling themselves "bigWOWO" and "Ben Efsaneyim," who describe

themselves as Asians, along with accompanying reader comments – also unauthenticated. (A. 43, 91, 100-118, 119-128.) The pronouncements of bigWOWO and Ben Efsaneyim, the Board concluded, amounted to "substantial evidence" of what Asians think of THE SLANTS – despite constituting hearsay and hearsay within hearsay; despite the absence of any evidence that the writers actually are Asian; despite any indication that these comments reflect anything beyond their writers' own individual views.

Whatever the PTO's logic, however, these blog printouts do not meet the requirements of Fed. R. Evid. 801(c) – and, lest there be any question, the Rules of Evidence do apply to PTO proceedings. *See* Trademark Rule § 2.122(a), 37 C.F.R. § 2.122(a). Even granting the extent to which the Board has, in recent years, taken a more "permissive stance with respect to the admissibility and probative value of evidence in an *ex parte* proceeding than it does in an *inter partes* proceeding," its reliance on these materials went beyond permissive to a gross abuse of discretion. Trademark Trial and Appeal Board Manual of Procedure ("TBMP") § 1208 (3d ed. June 2013).

Indeed, considering the great weight placed by the Board on materials whose evidentiary *bona fides* would not satisfy a municipal court judge, the Board's wholesale abandonment of its own rules concerning Internet evidence, as set out in the TBMP, is significant and determinative here. The TBMP, in fact, specifically

36

provides guidance on the admissibility of "Internet material" – guidance the Board disregarded completely.[13] The relevant Rule states in part, as follows:

> Material obtained through the Internet or from websites is acceptable as evidence in ex parte proceedings. … Material obtained from an applicant's website, or that of a third party, may provide information about, for example, products or services, customers, and channels of trade, although their probative value will vary depending on the facts of the particular case.

TBMP § 1208.03. In this case the Examiner and the Board treated the blog posts discussed above as proof of how the Applicant's use of the THE SLANTS is perceived among Asian Americans, even though that is not one of the (admittedly exemplary) uses enumerated in § 1208.03. (A. 13, 15-16, 43.) For this evidence to carry any weight, however, much less the vast weight assigned to it by Board, the Board must have also accepted as true the unauthenticated assertions that the authors of these posts are in fact Asian – for which there is simply no proof whatsoever. The Board's reliance on this material was plain error on too many

---

[13]    TBMP § 1208.01 provides:

> The applicant or the examining attorney may submit articles or excerpts from articles taken from periodicals or NEXIS and other similar databases as evidence. [Note 1.] Such material is evidence of how a term or mark may be perceived, rather than of the truth of the underlying information in the article. [Note 2.]

The blog posts at issue (A. 43, 91, 100-118, 119-128), however, are not periodicals derived from NEXIS or other similar databases, so TBMP § 1208.01 cannot be said to apply to this evidence.

evidentiary grounds to enumerate, and the Board's characterization of even a portion of it as "substantial evidence" in and of itself provides a basis for reversal.

### 4.    The Board's reference to and reliance on the Applicant's "past use" of the Mark was error.

Relying on *In re DNI Holdings Ltd.*, 77 U.S.P.Q.2d 1435, 2005 WL 3492365, at *4 (TTAB 2005), the Board held that because "applicant bases his application on his use of the mark since 2006 … all evidence from then until the present is relevant." (A. 14-15.) Therefore, says the Board, past "admissions" as to the origins of the Mark, or with respect to the dreaded claim of "reappropriation," are not only probative, but are essentially dispositive grounds supporting the PTO's refusal to register the Mark. (A. 14-16, 43, 51, 57, 244.) The problems with the Board's logic on this point are manifold.

To begin with, the Board itself stated in *Squaw Valley*, that the "relevant time period" for determining whether a mark's use offends the relevant group under §2(a) is not the past at all, but the present. *See Squaw Valley*, 2006 WL 1546500, at *7. Citing *Harjo* to the effect that "with respect to the historical evidence before the Board . . . the ultimate legal inquiry is whether the six trademarks at issue may disparage Native Americans when used in connection with Pro-Football's services and during the relevant time frame," the Board clarified that the "relevant time frame" is "the present." *Id.* at n. 5. Absent proof that "past use"

has continued into the present, the Board's improvised "past use" criterion is entirely improper.

*DNI Holdings*, relied on by the Board, is readily distinguishable from this case. It involved the question of whether the mark SPORTSBETTING.COM was generic for claimed services that excluded monetary wagering where it was undisputed that the applicant in fact did provide those services. Mindful of this Court's prior teaching in *Magic Wand Inc. v. RDB Inc*., 940 F.2d 638, 640 (Fed. Cir. 1991), the Board asked rhetorically: "Must this Board turn a blind eye to the reality of what is being offered on the named website, restricting our purview to the recitation of services in the application itself, as suggested by the *Magic Wand* case?" *DNI Holdings*, 2005 WL 3492365, at *3. In answering "no," the Board read the limiting language of *Magic Wand* as "based on the premise that the recitation accurately reflects actual conditions of use of the involved term." *Id.* Focusing on the applicant's descriptions of its own specimens of record as "publication and communication via the World Wide Web" the Board deemed it appropriate to take "undifferentiated services into consideration when defining the genus of services." *Id.*, at *4. This, coupled with its determination that members of the relevant public, i.e., persons with Internet access who bet on sports, perceive the term "sports betting" as generic, resulted in the Board's finding of genericness and refusal to register. *See id.* at *7.

Here, by contrast, the PTO's inquiry did not concern an observed or even posited dichotomy between the 044 Application's claimed services and "the reality" of the Applicant's services. These, it is undisputed, have remained the same at all times. Rather, the Examiner's inquiry was grounded in a determination about something entirely different – whether the Mark's use is or was disparaging – based on information that was **only** historical. In other words, rather than insisting on a current, wide-eyed assessment of "reality," the Examiner stubbornly insisted that the "reality" he claimed to have captured in 2010 was now that same "reality" – a disapproved, "offensive" reality – from which this Applicant could never escape, regardless of the empirical facts concerning his use of the Mark at any other time. Thus, in affirming refusal the Board legitimatized a policy by which the PTO will refuse registration under the rubric of §2(a) if an applicant has **ever** used the applied-for mark in a manner deemed disparaging. There is no legal basis, however, for such a reading of the Lanham Act – certainly none in *DNI Holdings*. Indeed, as acknowledged in *Harjo* and *Squaw Valley*, *supra*, the law in fact is quite to the contrary.

The proposition, in fact, that an applicant should never be allowed to reform or remake "past use" deemed violative of §2(a) – that the taint of youthful disparaging use lingers indefinitely, or for as long as the PTO deems it extant – is inconsistent with the general "without prejudice" policy of PTO practice. This

40

policy allows applicants to revisit, based on new facts and evidence, determinations already made, such as whether a mark has acquired distinctiveness.[14] Here, however, the Applicant deprived of that opportunity, and penalized for his failure to both anticipate and prove a negative, i.e., that his present use was "non-disparaging." It should have been sufficient for him to submit an application devoid of "inappropriate" use of the mark, as he did. To the extent the Examiner had evidentiary questions concerning the matter, he kept them to himself; the result, according to the PTO, was a state of presumption "unrebutted" and unrebuttable. (A. 16.) There is no legal or procedural basis for such an imposition of prejudice on someone seeking to register a trademark.

Indeed, taken to its logical conclusion, the Board's "past use" approach would render the first date of use in commerce set forth in a trademark application a sort of reverse statute of limitations for §2(a) purposes. Continued trademark use

---

[14]    There is irony, if not plain oversight in the Board's arrival at its conclusion. In *DNI Holdings*, the Examiner argued that applicant admitted that "SPORTSBETTING" and "COM" were not registrable by virtue of having disclaimed these terms in an earlier registration. *See DNI Holdings*, 2005 WL 3492365, at *8. In response to that argument, the Board wrote:

> It is clear that a disclaimer does not preclude registrant, as a matter of law, from later demonstrating in another application, for example, rights in the disclaimed matter if it can show that the disclaimed words have, with time and use, become distinctive of such goods or services.

*Id.* Of course, the Board's decision here fails to explain why an applicant's prior disclaimer may be revisited, but not the circumstances surrounding its past use of the mark.

over time, if it ever treads on the third rail of §2(a), would create a suffocating, inescapable envelope of offensiveness trumping not only an applicant's own description of his present use but even his admissible proof that he has "gone legit." The only way out of this trap would be to abandon the tainted mark as defined by 15 U.S.C. § 1127 to justify a "new" date of first use beginning at some period when abandonment would be deemed effective.  The cost, of course, would be the loss to the trademark holder of priority obtained by virtue of the earlier date of use, not to mention the very real risk of a permanent loss of any rights – even common law rights – in his mark in order to obtain a registration.

Such a vindictive trap has no basis in the law and promises a policy certain to be unwieldy in its application and counterproductive in its effect. A perfectly effective, if vicious, system for punishing any use of a mark deemed unacceptable under §2(a), such an approach certainly cannot be said to have a basis in the Lanham Act or to further its policies, discussed further below. Yet it is the path the PTO is on, justified only by its diehard determination to prevent the registration of any mark that could be taken as an ethnic insult.  The violence such an ideological position is working on the trademark system has no support in our jurisprudence, however, and for these reasons the Board's decision refusing registration should be reversed.

42

## III.  THE DISPARAGEMENT PROVISION OF §2(a) OF THE LANHAM ACT IS UNCONSTITUTIONAL ON ITS FACE

Because the legislative history of the Lanham Act contains little information about the intent behind §2(a)'s bar to registration, courts must "speculate as to Congress's intent based on the text" of the statute. *See* Llewellyn J. Gibbons, *Semiotics of the Scandalous and the Immoral and the Disparaging: §2(a) Trademark Law After Lawrence v. Texas*, 9 Marq. Intell. Prop. L. Rev. 187, 233 (2005); *Harjo v. Pro-Football, Inc.*, 50 USPQ2d 1705, 1737, 1999 WL 375907 (TTAB 1999), *rev'd*, 284 F. Supp. 2d 96. Nevertheless, courts have not been reluctant to hypothesize justifications for the provision. In discussing the prohibition on scandalous trademarks under §2(a), the United States Court of Customs and Patent Appeals wrote, in words whose irony is obvious in light of recent §2(a) litigation:

> In providing that marks comprising scandalous matter not be registered, Congress expressed its will that such marks not be afforded the statutory benefits of registration. We do not see this as an attempt to legislate morality, but, rather, a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government.

*In re McGinley*, 660 F.2d 481, 486 (C.C.P.A. 1981). Other courts have suggested that the interests protected under such provisions of the Lanham Act seek to preserve the "integrity of the register." *See, e.g., Marshak v. Treadwell*, 240 F.3d 184, 194 (3d Cir. 2001).

As justifiable as these articulations for a basis for §2(a) may be in the abstract, they nevertheless stand on infirm ground constitutionally. This Court has previously turned away constitutional challenges to §2(a) with the argument that the mere withholding of a trademark registration does not prohibit a mark's use. But this rationale fails to adequately account for the chilling effect on the free speech of trademark owners whose ability to do business under an appropriate trademark is curtailed, or for the impingement on their ability to benefit fully from the substantive rights attendant to registration.[15]  These rights are circumscribed by the PTO's insertion of itself as a public censor and policymaker concerning the propriety of that special species of speech encompassed by trademark in ways far beyond its legislated mandate or any conceivable rationale about the "integrity of the register."

In *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980) the Supreme Court held that commercial speech that neither

---

[15]    The rights derived from registration on the Principal Register are manifest and include, but are not limited to: nationwide priority, incontestability, the automatic right to sue in federal court, the opportunity for a registrant to recover treble damages upon a showing of willful trademark infringement, use of the ® symbol, enlisting the assistance of the U.S. Customs and Border Protection in restricting the importation of infringing or counterfeit goods, presumptive validly of the mark, an aid in preventing "cybersquatters" from misappropriating a registrants' domain name, and a foothold in gaining registrations in other countries provided they are signatories under the Paris Convention. All of these are unavailable in the absence of a federal trademark registration.

concerns unlawful activity nor is misleading may be regulated only if: (i) the government first establishes a "substantial interest" in the subject; (ii) regulation directly advances that interest; and (iii) the government acts in a manner which assures that the applied restriction is not unnecessarily broad and directly advances the interest asserted. Each of these three inquiries must be answered in the affirmative for the regulation to be found constitutional.

U.S. trademark law encompasses three main policy objectives: (i) protecting the consuming public from confusion in the marketplace; (ii) protecting a mark holder from having the fruit of his labor misappropriated; and (iii) encouraging competition from which the public benefits. *See McCarthy on Trademarks and Unfair Competition* § 2:1 (4th ed.), citing *Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670 (S.D.N.Y. 1963). The PTO's interest in restricting commercial speech is impossible to justify where neither that restriction nor §2(a)'s disparagement bar promotes any of these traditional trademark policies.

Certainly there is no aspect of the Board's position with respect to its refusal to register THE SLANTS that is explicitly based in any such policy, or which is even arguably consistent with it. Indeed, as set forth in the previous section, the PTO's present role as a referee of political correctness concerning ethnic discourse is potentially destructive of trademark doctrine.  In affirming the refusal to register the 044 Application, the Board even invoked its imagined plenary power to shield

the U.S. government from registering trademarks deemed "ethnic slurs." (A. 16.) In doing so, it in fact proved far too much about its vision of the proper scope of its interference in government and commerce. As one commentator has aptly noted:

> The precise harm originating from "government imprimatur" is rather hazy. Presumably, members of the public may be encouraged to use scandalous and disparaging terms if they perceive them to have received a government stamp of approval. Thus, the real government interest in withholding government imprimatur appears to be discouraging scandalous and disparaging terms in non-commercial use. However, as argued above, suppression of offensive terms is a content-based government interest that is presumptively invalid; the Supreme Court has explicitly disavowed the suppression of offensive advertising as a legitimate justification for the regulation of commercial speech.

> But even assuming that such suppression is a legitimate end, the "imprimatur" theory requires that citizens understand trademark registration to connote government approval or sponsorship. Evidence for such understanding is not apparent. The overwhelming majority of the public encounters trademarks in their roles as product identifiers, not as the beneficiaries of a federal registration scheme. The public is unlikely to believe that a registered trademark designation accompanying a word or logo on a product reflects government endorsement. On the contrary, the only way trademark registration is likely to be seen as government endorsement is if certain trademarks are denied registration on the basis of their content. If government unconditionally registers trademarks without reference to their offensive content, the public will not perceive registration as government endorsement. However, if government selectively grants registration only to those trademarks meeting government mores, registration is more likely to be perceived as carrying the imprimatur of the state. Perhaps for this reason, both the Court of Customs and Patent Appeals and the Trademark Trial and Appeal Board have unequivocally rejected the notion that trademark registration connotes government imprimatur.

Jeffrey Lefstin, *Does the First Amendment Bar Cancellation of Redskins*, 52 Stan.

L. Rev. 665, 684 (2000) (internal citations omitted). Indeed, the rule of *McGinley*,

660 F.2d at 487 n. 13, and the Board's own decision in *Old Glory Condom Corp.*,

1993 WL 114384, at *5 n. 3, are inconsistent with the notion that some

"government imprimatur" interest is a legitimate counterweight to the obvious

constitutional costs of such a policy, much less placing such power in the hands of

any administrative agency.

For these reasons the disparagement prohibition of §2(a) is infirm and

should be struck as unconstitutional.

### A.    The Disparagement Standard of §2(a) is Unconstitutionally Vague.

The disparagement provision of §2(a) is also void for vagueness and

therefore should be denied under both the First and Fifth Amendments.

Although no applicant's right to trademark registration is absolute, "that

right cannot be denied [by the PTO] without compliance with Fifth Amendment

due process requirements." *McGinley*, 660 F.2d at 484. The Due Process Clause

requires that laws be crafted with sufficient clarity to "give the person of ordinary

intelligence a reasonable opportunity to know what is prohibited" and to "provide

explicit standards for those who apply them." *Grayned v. City of Rockford*, 408

U.S. 104, 108 (1972). Section 2(a)'s "disparagement" provision does meet this

standard.

47

The statute contains several infirmities. It does not reasonably provide notice as to what may be deemed disparaging. Its key terms – "scandalous," "disparage," etc., – are unconstitutionally vague. And it is unconstitutionally overbroad. The Supreme Court recognizes the validity of facial attacks on overbroad statutes affecting constitutional rights, one of those being free speech. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003), citing *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). Such an attack is appropriate here. Courts addressing §2(a) have frequently noted the ethereal contours surrounding the definitions of "scandalous" and "disparage" under the statute. *See, e.g., Mavety*, 33 F.3d at 1371; *McGinley*, 660 F.2d at 485; *Harjo*, 284 F. Supp. 2d 124. In its more candid moments the Board itself has struggled with these concepts as applied. *See, e.g., Old Glory Condom Corp.*, 1993 WL 114384, at *2 ("There is relatively little published precedent to guide us in deciding whether a mark is "scandalous" within the meaning of §2(a) of the Lanham Act); *Over Our Heads Inc.*, 1990 WL 354546, at *2 ("the guidelines for determining whether a mark is scandalous or disparaging are "somewhat vague" and the "determination [of whether] a mark is scandalous [or disparaging] is necessarily a highly subjective one," citing *In re Hershey*, 6 USPQ2d 1470, 1471, 1988 WL 252485, at *2 (TTAB 1988). How much longer will courts continue to acknowledge that the only way to interpret a law is to yield

to inconsistency, subjectivity and unpredictability before acknowledging that a law

so applied is no law, in the American sense of the word, at all?

Clearly, as § 1203.3 of the TMEP acknowledges in this Court's decision in

*Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, 703 F.2d 1372,

1375-76 (Fed. Cir. 1983), the present §2(a) jurisprudence has gone far beyond any

reasonable guess at what its original purpose was:

> A reading of the legislative history with respect to what became §2(a)
> shows that the drafters were concerned with protecting the name of an
> individual or institution which was not a technical "trademark" or
> "trade name" upon which an objection could be made under §2(d)....
>
> Although not articulated as such, it appears that the drafters sought by
> §2(a) to embrace concepts of the right to privacy, an area of the law
> then in an embryonic state.

Whatever the statute's origins or its framer's intentions, all that can be really said

for sure about the statute's application today is that it is amorphous, subjective and

bears little resemblance to either trademark or privacy protection. Reviewing

courts, the Board and the PTO have all wrestled for answers within the meaning of

2(a), and have ultimately ended up applying their own subjective assessments. *See,*

*e.g., Old Glory Condom Corp.*, 1993 WL 114382, at *4-5 (expressing doubt as to

whether a pattern can be discerned from prior cases applying a "scandalous"

analysis under §2(a)). With no established precedent on which to grant or deny the

registrations of marks, the disparagement bar of §2(a) has allowed the PTO to

become the government's last remaining assessor of morality – or, even more

tyrannically, of "moral" style – based not on a single coherent mandate but on the disparate sensibilities of each individual Examiner as he applies his personal system of values and the extent of his career ambition to a black box through which all would-be registered trademarks can only hope to pass.

## IV.   EVEN IF THE "DISPARAGEMENT" PROHIBITION UNDER §2(a) IS NOT UNCONSTITUTIONAL, ITS APPLICATION BY THE BOARD HERE IS AN UNCONSTITUTIONAL DEPRIVATION OF THE APPLICANT'S RIGHT TO EQUAL PROTECTION UNDER THE LAW

Even if §2(a) were deemed facially constitutional, the Board's reliance here on the Applicant's ethnic identity and that of his fellow band members in applying its "disparagement" bar violates the Constitution's guarantees of equal protection under the Fifth and Fourteenth Amendments.

### A.   The Board's Order is Subject to the Equal Protection Clause.

Although the Fifth Amendment contains no explicit right to equal protection, it forbids government discrimination that is so unjustifiable as to violate due process, and the scope of Fifth Amendment equal protection claims "has always been precisely the same as [that of] equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2 (1975). Thus, if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment had it been implemented by a State, the same classification, violates the due process requirements of the Fifth Amendment when imposed by a

component of the federal government. *See Johnson v. Robison*, 415 U.S. 361, 366 (1974); *see also, Richardson v. Belcher*, 404 U.S. 78, 81 (1971). In particular, judicial orders "have long been held to be state action governed by the Fourteenth Amendment." *Palmore v. Sidoti*, 466 U.S. 429, 432 n.1 (1984); *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948). *Cf. United States v. Paradise*, 480 U.S. 149, 166 n.16 (1987) (subjecting race conscious federal court remedial order to strict scrutiny). The actions of the Board fit well within the category of state action.

## B.    Racial or Ethnic Classifications are Inherently Suspect and are Subject to Strict Scrutiny.

The central purpose of the equal protection principle is to prevent the government from purposely discriminating between individuals on the basis of race. *See Shaw v. Reno*, 509 U.S. 630, 642 (1993); *see also Palmore*, 466 U.S. at 432. Racial classifications "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). Race-based classifications "embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts – their very worth as citizens – according to a criterion barred to the Government by history and the Constitution." *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 604 (1990) (O'Connor, J., dissenting). Race neutrality is the "driving force of the Equal Protection Clause" and racially based classifications are permitted only as a last resort. *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009). Race

and ethnic distinctions of **any** sort are "inherently suspect" and call for "the most exacting judicial examination." *Wygant v. Jackson Board of Education*, 476 U.S. 267, 273 (1986) (plurality opinion). Thus, "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." *Id.* at 273-74 (citation omitted).

Under the equal protection component of the Fifth Amendment's Due Process Clause, "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constr., Inc. v. Pena*, 515 U.S. 200, 224 (1995). This standard of review "is not dependent on the race of those burdened or benefited by a particular classification"; all are subject to strict scrutiny. *Gratz v. Bollinger*, 539 U.S. 244, 269 (2003).  Obviously this includes the Board.

Strict scrutiny is a two-pronged test. First, any racial classification "must be justified by a compelling government interest"; second, "the means chosen by the State to effectuate its purpose must be narrowly tailored to the achievement of that goal." *Wygant*, 476 U.S. at 274. The Board's actions here cannot survive strict scrutiny.  The PTO's Final Office Action states:

> Here, the evidence is uncontested that applicant is a founding member
> of a band (The Slants) that is self described as being composed of

> members of Asian descent. . . . Thus, the association of the term
> SLANTS with those of Asian descent is evidenced by how the
> applicant uses the Mark – **as the name of an all Asian-American
> band.**

(A. 244) (emphasis added). This excerpt from the Final Office Action explicitly

and unconstitutionally set out the PTO's basis for the refusal: **this particular**

**applicant** is not entitled to a registration, because by using the Mark as a member

of an "all Asian-American band" **he supplies the disparaging component of use**

**by being Asian**. The Board's endorsement of this explicit, unprecedented and

disturbing race-based determination satisfies neither prong of the strict scrutiny test

and violates the Constitutional promise of equal protection.

### C.    The Board's application of the statute using vague and arbitrary guidelines is unconstitutional.

As reflected in the Board's decision and discussed above, the refusal to

register the Mark on the ground that it is "disparaging" (A. 17) is predicated on the

application of vague, amorphous and inconsistent standards. This legal window-

dressing for a fundamentally arbitrary process allowed the Board to deny the

Applicant the important benefits of federal trademark registration for what

ultimately amounts to reasons all its own. Such a capricious exercise of

government power is repugnant to ordered liberty and constitutionally

impermissible.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). In keeping with that principle, the First Amendment bars government officials from censoring works said to be "offensive," *Texas v. Johnson*, 491 U.S. 397, 414 (1989), "sacrilegious," *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 531 (1952), "morally improper," *Hannegan v. Esquire*, 327 U.S. 146, 149 (1946), or even "dangerous," *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 548 (1983). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. at 414.

In *Hannegan,* for example, the Supreme Court held that the Postmaster General could not deny second-class postal privileges to a magazine, admittedly not containing material that was obscene and therefore illegal, because it was found by him not to be conducive to the "public good." 327 U.S. at 149. Similarly, in *Spence v. Washington*, 418 U.S. 405 (1974), the Supreme Court struck, on First Amendment grounds, a flag misuse statute as applied to a college student who hung an American flag with a peace symbol on it upside down out of his window. Among the grounds considered and rejected for upholding the judgment against the

54

student, the Court noted: "that the State may have desired to protect the sensibilities of passersby" is not a basis for suppressing ideas, and that "[a]nyone who might have been offended could easily have avoided the display." *Spence*, 418 U.S. at 412. Thus, "[u]nder our system of government there is an accommodation for the widest varieties of tastes and ideas. What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another." *Hannegan*, 327 U.S. at 157 (footnotes omitted).

There is no principled basis to distinguish the disparagement prohibition of §2(a) from the conduct condemned in these cases. The limited government envisioned by our Constitution does not entrust the PTO to serve as a moral authority, a public censor or even a petty custodian of franchises and privileges, empowered to withhold the benefits of trademark registration based on its whims and the moment's definition of what is and is not "offensive" and "disparaging." No better illustration of this is found in the Principal Register itself, which while "guarded" by the PTO against any perceived "disparagement" of ethnic groups is crammed with registrations based on terms widely recognized as slurs describing homosexuals. These have, inexplicably, been deemed acceptable by the PTO by virtue of their proponents' militant "reclaiming" or "embracing" of them – a strategy for registration repeatedly rejected by the PTO when applied to ethnic

terms of disparagement.[16] There is no principled distinction between "reclaimed slurs" the PTO deems acceptable and those it does not, however: It is arbitrary and capricious.

Governmental efforts to suppress expression can take many forms, and our courts have not hesitated to invalidate those efforts, no matter how indirect their form. In *Speiser v. Randall*, 357 U.S. 513 (1958), for example, the Supreme Court noted that "[t]o deny an exemption to claimants [of property tax exemptions] who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech." *Id.* at 518. In *Hannegan*, the Court recognized that "[t]he second-class [mail] privilege is a form of subsidy," 327 U.S. at 151, and found that the denial of the privilege based on the immorality of a publication amounted to illegal censorship. *See id.* at 157. So too is the government's effort here tantamount to censorship, predicated upon a vague, arbitrary and constitutionally flawed interpretation of the Lanham Act that should not be permitted to continue to thwart the rights of applicants and

---

[16]    *See, e.g.,* DYKE NIGHT, U.S. Registration No. 4146588 dated May 22, 2012; PIXIEDYKES.COM, U.S. Registration No. 3993448 dated July 12, 2011; DYKES ON BIKES, U.S. Registration No. 3323803 dated October 30, 2007; F·A·G FABULOUS AND GAY, U.S. Registration No. 2997761 dated September 20, 2005 (subsequently cancelled on October 12, 2012). These are merely a few of scores of similar registrations.

exercise an influence over commerce, communications and conscience far beyond anything contemplated by Congress in its scheme to regulate and encourage the law of trademarks and to protect consumers from confusion.

## CONCLUSION

For all the foregoing reasons, Applicant respectfully submits that both applicable law and the record evidence require that the Board's September 26, 2013 decision on appeal be reversed.

## REQUEST FOR ORAL ARGUMENT

Applicant respectfully requests oral argument so that any issues of concern to the Court may be addressed.

Respectfully submitted,

_____

RONALD D. COLEMAN
JOEL G. MACMULL
**GOETZ FITZPATRICK LLP**
ONE PENN PLAZA, SUITE 3100
NEW YORK, NEW YORK 10119
212.695.8100 phone
212.629.4013 fax

*Attorneys for Appellant-Applicant*

Dated: April 21, 2014

ADDENDUM

<div style="border:1px solid black">

**THIS OPINION IS A
PRECEDENT OF THE T.T.A.B**

</div>

Mailed:
September 26, 2013

## UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*In re Simon Shiao Tam*

———

Serial No. 85472044

———

Ronald D. Coleman of Goetz Fitzpatrick, LLP for Simon Shiao Tam.

Mark Shiner, Trademark Examining Attorney, Law Office 102 (Mitchell Front, Managing Attorney).

———

Before Rogers, Chief Administrative Trademark Judge, and Kuhlke and Taylor, Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Applicant, Simon Shiao Tam, seeks registration on the Principal Register of the mark THE SLANTS in standard characters for services identified as "entertainment in the nature of live performances by a musical band," in International Class 41.[1]

---

[1] Application Serial No. 85472044 was filed on November 14, 2011, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on an allegation of first use and use in commerce on November 15, 2006.

Serial No. 85472044

Registration has been refused under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that applicant's mark "consists of or includes matter which may disparage or bring into contempt or disrepute persons, institutions, beliefs or national symbols under Trademark Act Section 2(a)."[2] E.A. Br. p. 3.

When the refusal was made final, applicant appealed and requested reconsideration. On December 20, 2012, the examining attorney denied the request for reconsideration. Subsequently, the appeal was resumed and has been fully briefed. We affirm the refusal.

<u>Arguments and Evidence</u>

The examining attorney contends that THE SLANTS is a highly disparaging reference to people of Asian descent, that it retains this meaning when used in connection with applicant's services, and that a substantial composite of the referenced group finds it to be disparaging. In support of this contention the examining attorney has submitted several definitions from various dictionaries and reference works that label "slant" as a derogatory word, including the following definitions:

> Slant/Slant-eye n. a derog. Term for an Oriental person <u>The Cassell Dictionary of Slang</u> (1999);
>
> Slant 1. A derogatory term used to refer to those of Asian descent. More accurately, it tends to refer to anybody with slanted eyes. <u>Urban Dictionary</u> (www.urbandictionary.com);
> Slant noun US, derog. and offensive = slant-eye noun. <u>Oxford Reference Online</u> www.oxfordreference.com;

---

[2] This is applicant's second application for the mark THE SLANTS for nearly identical services. Application Serial No. 77952263 was also refused under Section 2(a) as disparaging. Applicant appealed that refusal to the Board, but the case was dismissed for failure to file a brief. E. A. Br. n.1; Office Action n.1 (June 20, 2012).

A2

Serial No.  85472044

Slant noun a. South Asian person US 1942 Offensive <u>The New Partridge Dictionary of Slang and Unconventional English Vol. II</u> (2006) (http://books.google.com); and

[S]lant a derogatory nickname for any Oriental. From the shape of the Oriental eyes. <u>Slang and Euphemism</u> (2d abridged ed. 1991).[3]

In one of the submissions other contextual meanings are included in the

definition:

Slant n. 1. a. A line, plane, course, or direction that is other than perpendicular or horizontal, a slope, b. A sloping thing or piece of ground; 2. *Printing* A virgule; 3. a. A personal point of view or opinion, b. A bias; **4. Offensive Slang Used as a disparaging term for a person of East Asian birth or descent.** <u>The American Heritage</u>

---

[3] Other definitions from reference works and websites include:

"Slant-eye, Slant pejorative term for a person of Far Eastern origin (Chinese, Japanese, Korean, Vietnamese etc.) Derived from the term for those who have epicanthic folds." List of ethnic slurs  (www.wikipedia.org);

"Slant ... The noun is from 1655. Derogatory slang sense of 'Oriental, slant-eyed person' is recorded from 1943, from earlier slant-eyes (1929)." <u>Online Etymology Dictionary</u> (www.etymonline.com);

"Slant - Asians - Facial Description – referring to the eyes." Ethnic Slurs www.asianjoke.com;

"Slant, slanteye, slant-eye. A derogatory reference to Asians, based on the epicanthic fold, or flap, over the eyes of some Asian peoples, giving the eyes a slanted look." <u>The color of words: an encyclopaedic dictionary of ethnic bias in the United States</u> (1997);

"Forbidden Terminology Derogatory Racial Terms Slant refers to the perceived shape of Asian eyelids" <u>21st Century American English Compendium</u> (3rd rev. ed. 2006);

"slope and slant, slanteye(s) an East Asian [including Japanese] or Southeast Asian person having the 'oriental' epicanthic folds. (Intended and perceived as derogatory. User is considered to be racially bigoted. ... )" <u>Forbidden American English</u> (1995); and

"'Jap' is a derogatory term! ... And, so are terms like 'chink' ... and 'slant.'" Japanese American Citizens League Anti-Hate Program www.lacl.org.  "The Japanese American Citizens League is a national organization whose ongoing mission is to secure and maintain the civil rights of Japanese Americans and all others who are victimized by injustice and bigotry." www.jacl.org.

3

---

Serial No. 85472044

<u>Dictionary of the English Language</u> retrieved from <u>Credo Reference</u> www.credoreference.com and <u>Wordnik</u> www.wordnik.com (emphasis added).

The examining attorney also included printouts from applicant's web page located at www.myspace.com/theslants, including the one depicted below:



Further, the band's entry in Wikipedia is of record and references that "The band name, The Slants, is derived from an ethnic slur for Asians." www.wikipedia.org.[4]  This entry also includes the following quote attributed to applicant:  "We want to take on these stereotypes that people have about us, like the slanted eyes, and own them.  We're very proud of being Asian – we're not going to hide that fact.  The reaction from the Asian community has been positive."

---

[4] This Wikipedia entry was attached to the First Office Action (January 6, 2012); therefore, applicant had an opportunity to rebut it.  *In re Cook Medical Technologies LLC*, 105 USPQ2d 1377, 1382 n.2 (TTAB 2012); *In re Carrier Consulting Group*, 84 USPQ2d 1028, 1032-33 (TTAB 2007).  Applicant did not do so.  As will be discussed *infra*, applicant does not dispute the historical pejorative use of the term but, rather, can be characterized as intending to embrace and redefine the term.

4

Serial No.  85472044

Finally, the examining attorney submitted printouts of online articles which report that individuals representing Asian groups or in their individual capacity consider the term "slant," its plural "slants" and even specifically applicant's mark THE SLANTS to be disparaging terms.  A few examples are set forth below:

> A few years back, the **Oregon Commission on Asian Affairs** AND the **Asian American Youth Leadership Conference**, both LOCAL Oregon organizations, pulled support from the Slants, citing their offensive name.   I've got nothing against the Slants other than their name, which is racially offensive... "bigWOWO" at www.bigwowo.com (2010) (emphasis in original);

> Earlier this year, the band experienced first-hand the complex and diverse political perspectives of Asian Americans.  Young[5] was initially slated to give the keynote address at the 2009 Asian American Youth Leadership Conference in Portland.  But some conference supporters and attendees felt the name of the band was offensive and racist, and out of respect for these opinions the conference organizers decided to choose someone less controversial.  "The Asian Reporter" (August 4, 2009);

> "Young [applicant] called the new band The Slants – a name that has been controversial from the start. ... It wasn't until he posted advertisements for Asian bandmates and people responded by calling him racist that Young realized the name pushed some hot buttons." The Oregonian (December 4, 2010); and

> Oregon Governor Cancels Asian Band the Slants' Performance at Asian Youth Conference ... However, the OCAA withdrew support of the event because they found The Slants' name to be offensive towards the Asian community.  Fearing that the action would trigger similar responses with other supporters, the AAYLC had no choice but to select an alternate speaker and cancel the band's appearance. "The Daily Swarm" http://64.34.174.165/headlines (2010);

---

[5] Applicant, Simon Shiao Tam, is also known as Simon Young.  See Office Action (January 6, 2012) p. 57 (www.bigwowo.com/2011/04/the-slants-and-bigwowos-support-of-the-u-s-patent-and-trademark-office).

5

Serial No. 85472044

In response to the refusal, applicant submitted the following dictionary definition:[6]

> Slant n. 1. a. A line, plane, course, or direction that is other than perpendicular or horizontal; a slope. b. A sloping thing or piece of ground. 2. *Printing* A virgule. 3. a. A personal point of view or opinion b. a bias 4. Offensive Slang Used as a disparaging term for a person of East Asian birth or ancestry.[7]

In addition, applicant submitted four third-party registrations and an application for marks that contain the word "slant." See Reg. No. 4123704 for the mark SLANT for, *inter alia*, skateboards, water skis, surf skis, skis, snow boards; Reg. No. 3894536 for the mark SLANT for, *inter alia*, motion picture film productions, production of radio or television programs; and two marks for serving ware for serving food, the standard character mark SLANT (Reg. No. 3437230) and the design mark  (Reg. No. 3437238).[8]

Applicant's primary contention is that his trademark has been "refused registration on the basis of Applicant's race ... [and given the] failure of proof and misapplication of law, the evidentiary record does not support the PTO's conclusions

---

[6] We only include the noun definitions inasmuch as the verb definitions have less relevance to the mark THE SLANTS wherein "slants" is used as a noun, as determined by use of the definite article "the" immediately preceding the word "slants."

[7] American Heritage Dictionary of the English Language (http://ahdictionary.com May 2, 2012). Applicant also submitted the full excerpt of definitions for "slant" from the Oxford English Dictionary which includes ten different meanings with the offensive slang meaning as the last entry.

[8] The fifth example is an application (Serial No. 85269787) and, as such, is of limited probative value. *Glamorene Products Corp. v. Earl Grissmer Co., Inc.*, 203 USPQ 1090, 1092 n.5 (TTAB 1979) (an application is evidence only of its filing).

Serial No. 85472044

that the Application for registration of THE SLANTS should be denied." App. Br. pp. 3-4. Applicant asserts that the examining attorney failed to provide evidence that the mark is "inherently offensive" and takes issue with the examining attorney's reliance on one possible meaning of the word "slant," which resulted in the examining attorney's search parameters using the words "slant" and "derogatory" to "confirm" his refusal. App. Br. pp. 12-14.

As to the Office's evidence pertaining to applicant's services and manner of use, applicant argues that "the grounds for refusal constituted error [for] at least two reasons ... (1) They improperly condition registration on the ethnic background of an applicant, and (2) they amount to an unprecedented prohibition against registration by a particular individual or group of people because of their past use of a mark." App. Br. p. 17. Specifically, applicant contends that, based on the examining attorney's logic, non-Asians would be entitled to registration of the word "slants" but Asians are not. Id. Applicant goes on to suggest that the only rebuttal to the examining attorney's refusal "would have been a submission proving that the band was not entirely Asian and hence entitled to registration, a patently offensive proposition." App. Br. p. 18. With regard to applicant's second point concerning its past use, applicant asserts that the refusal is "dependent on the identity of the person, rather than the content of the application."[9] Id.

Applicant concludes that:

The refusal, rather, is based on who the Applicant is. It follows that if anyone else on earth – Asian or otherwise – submitted an application

[9] The "past use" is in reference to the examining attorney's evidence of applicant's use and public perception of that use that is prior to applicant's November 14, 2011 filing date.

7

Serial No.  85472044

to register THE SLANTS that was identical to the Application here, registration would have been allowed.  Concomitantly, Applicant could never register THE SLANTS no matter the content of the application.

This result would be a surprising and troubling reading of 15 U.S.C. § 1052(a), and one that is not supported by law, policy or common sense.  Neither the ethnic identity of Applicant, the extent to which he associates in his use of the mark with other Asians, the degree to which he makes use of his own cultural heritage, or his identity in any sense at all should be of relevance concerning registration of THE SLANTS as a trademark for "entertainment in the nature of live performances by a musical band."

App. Br. p. 19.

<u>Law</u>

Registration of a mark which consists of matter which may disparage, *inter alia*, "persons," is prohibited under Section 2(a) of the Trademark Act.  To determine whether a proposed mark is disparaging the Board applies the following two-part test:

1)  what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

2)  if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

*In re Lebanese Arak Corp*, 94 USPQ2d 1215, 1217 (TTAB 2010);[10] *In re Heeb Media LLC*, 89 USPQ2d 1071, 1074 (TTAB 2008); *In re Squaw Valley Development Co.*, 80

---

[10] See the *Lebanese Arak* decision for a discussion of the various provisions of Section 2(a) and the differentiation between terms asserted to be disparaging and those asserted to be scandalous.

8

Serial No. 85472044

USPQ2d 1264, 1267 (TTAB 2006).   The burden of proving that a mark is disparaging rests with the USPTO. *Squaw Valley*, 80 USPQ2d at 1271.

Whether a proposed mark is disparaging must be determined from the standpoint of a substantial composite of the referenced group (although not necessarily a majority) in the context of contemporary attitudes. *Squaw Valley*, 80 USPQ2d at 1269; *Harjo v. Pro-Football, Inc.,* 50 USPQ2d 1705, 1758 (TTAB 1999), *rev'd on other grounds* 284 F. Supp. 2d 96, 68 USPQ2d 1225 (D.D.C. 2003).

Depending on the facts of the case, a proposed mark may be: (1) an innocuous term that in the context of the goods or services is disparaging, *Lebanese Arak,* 94 USPQ2d at 1223 (likely meaning of KHORAN is the Islamic holy text and use for wine disparages religion and beliefs of Muslim-Americans); *see also Doughboy Industries, Inc. v. Reese Chemical Co.,* 88 USPQ 227 (PTO Exmr. In Chief 1951) (Doughboy refers to World War I American soldier as reinforced by picture of soldier on packaging and use on "a prophylactic preparation for the prevention of venereal diseases" disparages the soldiers); (2) a disparaging term that may have a non-disparaging meaning in a specific context, *Squaw Valley,* 80 USPQ2d 1264 (SQUAW when used with ski-related goods and services means Squaw Valley ski resort under the first part of the test, but disparaging meaning remains as to other non ski-related goods and services); or (3) a disparaging term that has no non-disparaging meanings in any context, and remains disparaging despite the applicant's goods or services, actual use or intent, *In re Heeb Media LLC,* 89 USPQ2d 1071 (TTAB 2008) (applicant's good intentions and inoffensive goods and

9

Serial No. 85472044

services do not obviate finding that HEEB is disparaging in context of the goods and services; and mixed opinion among members of the referenced group does not erase the perception of a substantial composite who find it disparaging).

<u>Findings/Analysis</u>

We must first determine, based on the evidence of record, the "likely meaning" of THE SLANTS; and then, if there is a meaning that invokes a group of persons, turn to consider whether that meaning may be disparaging to a substantial composite of the referenced group.

*What is the likely meaning?*

The mere fact that the term has several meanings, even when many may be innocuous, does not, as applicant seems to argue, foreclose the possibility that the proposed mark is disparaging to a group of persons.[11]  When we take into account the "nature of the identified services," in this case, live performances by a musical band, we are faced with a term that necessarily identifies people, i.e., the live performers.   Thus, those who attend the live performances will necessarily understand THE SLANTS to refer to the persons who comprise the musical band. Further, we must consider the "manner in which the mark is used in the marketplace in connection with the services," *Lebanese Arak,* 94 USPQ2d at 1217, which the record in this case shows to involve touting the slang meaning of "slants."

---

[11] It appears to be applicant's position that a term is "inherently disparaging" when there is only one meaning for the word and that meaning is disparaging.  However, when there are multiple definitions of a word and the manner of use of the word in the marketplace only points to the disparaging meaning, the term cannot be saved by the other irrelevant meanings.

10

Serial No. 85472044

Thus, it is abundantly clear from the record not only that THE SLANTS, used for the identified services, would have the "likely meaning" of people of Asian descent but also that such meaning has been so perceived and has prompted significant responses by prospective attendees or hosts of the band's performances. The evidence of public perception of the meaning of THE SLANTS, as used in connection with applicant's services, shows that meaning to be a derogatory reference to people of Asian descent.

Applicant argues that 1) the proposed mark is not inherently disparaging and there are no additional elements to make it so, and 2) there is nothing about the services that make it disparaging. The problem with applicant's analysis is that it ignores "the manner in which the mark is used in the marketplace." *Id.* The musical group, in its advertising and on its website, promotes the "likely meaning" of the mark to be people of Asian descent by, for example, displaying the wording "THE SLANTS" next to a depiction of an Asian woman, utilizing rising sun imagery and using a stylized dragon image. In addition, applicant actively seeks to associate his services with this meaning as a way to embrace this slang meaning and to "own" the stereotype represented by THE SLANTS. That applicant, or even the entire band, may be willing to take on the disparaging term as a band name, in what may be considered an attempt not to disparage, but rather to wrest "ownership" of the term from those who might use it with the intent to disparage, and that some members of the referenced group may support applicant's use, does not mean that all members of the referenced group of persons share applicant's view. In *Heeb*

11

Serial No. 85472044

*Media*, 89 USPQ2d at 1077, we faced and rejected a similar argument, holding that "[t]he fact that applicant has good intentions with its use of the term does not obviate the fact that a substantial composite of the referenced group find the term objectionable."

Applicant contends that the examining attorney based his conclusion as to "likely meaning" on the fact that "applicant is a founding member of a band (the Slants) that is self-described as being composed of members of Asian descent." App. Br. p. 4, quoting examining attorney's brief. Applicant argues further that:

> The Examining Attorney's rationale turned the entire policy justification for Section 2(a) on its head. It was a refusal to register based on the ethnic background of Applicant and his associates that was offensive. Unless reversed by the Board this formulation inevitably will involve the Patent and Trademark Office in inappropriate and constitutionally suspect inquiries concerning the ethnicity of applicants, their associates and their activities.

App. Br. p. 4.

Applicant is effectively arguing that because he actively seeks to convey a message that he has taken ownership of the term and its meaning, and intends no disparagement of members of the referenced group, the Office is prohibited from finding that THE SLANTS is disparaging to others, precisely because of applicant's race. In other words, applicant intentionally adopted the mark because it is disparaging to some, but we should ignore that because he is Asian and should not be perceived as intending to disparage other Asians but, rather, as redefining the term in a positive way. In essence, applicant does not address the injury that use of THE SLANTS may cause to other members of the referenced group and instead

12

Serial No. 85472044

focuses on the asserted injury to himself, which he attributes to the examining attorney's improper consideration of his ethnicity. In the same way the particular ethnicity of the people behind the corporate applicant in *Heeb Media* did not serve to obviate or remove the disparaging nature of the term for others, here, too, applicant's ethnicity does not make his use unlikely to be perceived as conveying the disparaging meaning of the term SLANTS for Asian Americans.

The focus of the inquiry into whether a mark is disparaging is not on applicant's race but rather on the referenced group's perception of the likely meaning of the mark.[12] The evidence clearly shows both that members of the referenced group ascribe the derogatory meaning based on applicant's manner of use and that members of the referenced group find it objectionable. There are no "other elements" in the mark to affect its meaning, and there is nothing about the way the mark is used in the marketplace from which one would understand the term as meaning anything other than an Asian person. Thus, the refusal is properly based on the perceptions of the referenced group and not on applicant's or his band-mates' ethnic background.

The interpretation of "slant" as meaning "person of Asian descent" (as opposed to other definitions of this word) arises because applicant's mark is used in a manner to mean "person of Asian descent." Applicant cannot claim ownership and redefine the term without a use that acknowledges the meaning that must be overcome. However, it is very important to note that a finding that THE SLANTS

---

[12] Section 2(a), 15 U.S.C. § 1052(a) focuses on the nature of the mark, not the applicant: "No *trademark* . . . shall be refused registration . . . on account of *its* nature unless *it* . . . [c]onsists of or comprises . . . matter which may disparage . . . ." (emphasis added).

13

Serial No. 85472044

is disparaging is not dependent on applicant's ethnicity, but on the circumstances related to his use of the term. An application by a band comprised of non-Asian-Americans called THE SLANTS that displayed the mark next to the imagery used by applicant shown supra would also be subject to a refusal under Section 2(a).

Finally, applicant's objection that the evidentiary record includes applicant's "past use," (i.e., use prior to the filing date of this application) and that such evidence is not within the four corners of the application, ignores the first prong of the test where we look to the "manner of use" which necessarily goes beyond the "four corners" of the application. Moreover, a determination about the view of the referenced group requires the USPTO to go outside the four corners of the application even if only to reference a dictionary definition that labels a term as derogatory. As to the date of the evidence, applicant bases his application on his use of the mark since 2006 and all evidence from then until the present is relevant.[13] Notably, applicant has not submitted evidence rebutting the evidence of

---

[13] Regarding the four corners of an application, in its brief, applicant acknowledges in general that specimens may demonstrate disparaging use. App. Br. p. 10. As noted earlier, applicant abandoned his prior application by failing to file a brief on *ex parte* appeal. Applicant then filed this application, presumably with different specimens of use. As noted by the examining attorney:

> [T]hat applicant cleverly chose specimens that avoided associations with Asians or Asian culture is not evidence that the mark is not used in a way to conjure up the derogatory meaning and to be disparaging to Asians. ... It is worth mentioning that applicant appears to have reversed course on its arguments for registrability, arguing in the prior application that because the applied-for mark was being used by Asian-Americans as a self-descriptor, it could not be disparaging, while in this case arguing that there is no indication in the application that the mark is in any way associated with Asians or Asian-Americans. ... Applicant's argument that the Office is limited to the four-corners of the application in determining the disparaging nature of the mark is too clever by half. Were applicant's theory correct, any

14

Serial No. 85472044

likely meaning, to support, for example, the proposition that due to applicant's change in its manner of use members of the referenced group no longer perceive it as having a disparaging meaning.

*Is it disparaging to a substantial composite?*

Having determined the likely meaning (in the context of the goods and services and how applicant uses the mark), we look to the second prong: is the mark disparaging to a substantial composite of the referenced group? The record establishes that the slang term "slant" or its plural "slants," when used to indicate ethnicity, is disparaging to a substantial composite of the referenced group.

While there is some mention in the record of support for applicant's mark in the Asian community (to be clear, quoted statements from applicant noting such support), "[o]ur consideration of whether the term is disparaging is not restricted to

---

smart applicant (or smart attorney) could easily draft an identification of goods and services that skates around any mention of a group or persons associated with a particular term, while at the same time, using the mark in such a way as to associate the mark with the disparaged group. Office Action (June 20, 2012).

In response to the examining attorney, applicant, in its Request for Reconsideration, states that the refusal:

... is premised entirely on outside evidence of Applicant's aggressively Asian-themed artistic and commercial identity as used in the past with the mark. [and the refusal is based on] his use of the mark in circumstances not reflected in the Application but relied on as grounds for refusal in a previous application [that has] been deemed offensive by third parties. Req. Recon. pp. 6-7.

Applicant's own actions highlight the wisdom of our well-settled test for determining whether a mark is disparaging, which requires not only an assessment of information on the "four corners" of the application, such as the mark and the goods or services, but also looks at the manner in which the applicant uses the mark. Indeed, we also look at an applicant's manner of use to inform analysis of other types of refusals, such as those based on genericness. *See, e.g., In re DNI Holdings Ltd.*, 77 USPQ2d 1435, 1439-40 (TTAB 2005).

15

Serial No. 85472044

the perception of applicant's" fans who have no objection to the name of applicant's band. *Heeb Media*, 89 USPQ2d 1077. Rather, we are charged with taking into account the views of the entire referenced group who may encounter applicant's music entertainment services in any ordinary course of trade for the identified services. Thus, all members of the Asian-American public may encounter the mark THE SLANTS in advertising in newspapers, billboards or on a website.

The dictionary definitions, reference works and all other evidence unanimously categorize the word "slant," when meaning a person of Asian descent, as disparaging. Moreover, the record includes evidence of individuals and groups in the Asian community objecting to use of the term in the context of applicant's band. Taken as a whole we find the record contains substantial evidence to support the refusal. *Squaw Valley*, 80 USPQ2d at 1272. Finally, applicant does not dispute that the band's name is derived from an ethnic slur and the evidence thereof stands unrebutted.

The fact that applicant has good intentions underlying his use of the term does not obviate the fact that a substantial composite of the referenced group find the term objectionable. *Heeb Media*, 89 USPQ2d at 1077. As the examining attorney states "while applicant may not find the term [disparaging], applicant does not speak for the entire community of persons of Asian descent and the evidence indicates that there is still a substantial composite of persons who find the term in the applied-for mark offensive." Office Action (January 6, 2012). Thus, despite applicant's assertion that "this is not yet another case of a member of an ethnic

16

Serial No. 85472044

group seeking registration of a supposedly offensive slur on the ground that group members, or he in particular, have 'embraced' the term" (App. Br. p. 3), in fact it is just such a case.

Applicant's argument that other SLANT marks have been registered merely underscores why, in cases such as these, where a term may have different meanings depending on the context, the USPTO looks to the manner of use to ascertain whether potential consumers would perceive the term as disparaging. None of the marks in these third-party registrations refer to people.

We emphasize that this decision only pertains to applicant's right to register the term and "it is clear that the PTO's refusal to register [applicant's] mark does not affect [his] right to use it. No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, [applicant's] First Amendment rights would not be abridged by the refusal to register [his] mark." *In re McGinley*, 211 USPQ at 672, *citing Holiday Inn v. Holiday Inn, Inc.*, 534 F.2d 312, 189 USPQ 630, 635 n.6 (CCPA 1976). *See also Mavety*, 31 USPQ2d at 1928. This case is solely about whether the applicant may "call upon the resources of the federal government" to obtain federal registration of the mark on the Principal Register in order to assist applicant in enforcing the mark. *See In re Fox*, 702 F.3d 633, 105 USPQ2d 1247, 1252. Because we find it disparaging, however, the mark is disqualified under Section 2(a) for registration.

**Decision**: The refusal to register under Section 2(a) is affirmed.

17

A17

# United States Court of Appeals
## for the Federal Circuit

**CERTIFICATE OF SERVICE**

In Re: Simon Shiao Tam

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by GOETZ FITZPATRICK LLP, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **April 21, 2014**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief on Behalf of Appellant** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Nathan K. Kelly, Solicitor
Thomas L. Casagrade, Associate Solicitor
Christina Hieber
United States Patent and Trademark Office
Office of the Solicitor
P.O. Box 1450 Mail Stop 9
Alexandria, VA  22213

A courtesy copy will be sent once the court approves the brief.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  x    The brief contains _____13,650_____ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

    x    The brief has been prepared in a proportionally spaced typeface using  MS Word 2002  in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using MS Word 2002  in a ___ characters per inch_____ font.

Respectfully submitted,

_____
RONALD D.  COLEMAN
JOEL G. MACMULL
**GOETZ FITZPATRICK LLP**