2014-1203
(Serial No. 85/472,044)

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
_____

**IN RE SIMON SHIAO TAM**
_____

Appeal from the United States Patent and Trademark Office,
Trademark Trial and Appeal Board.
_____

**BRIEF FOR APPELLEE—DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE**

NATHAN K. KELLEY
Solicitor

MOLLY R. SILFEN
CHRISTINA J. HIEBER
THOMAS L. CASAGRANDE
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

*Attorneys for the Director of the
United States Patent and
Trademark Office.*

August 4, 2014

# TABLE OF CONTENTS

Table of Authorities ....................................................................... ii

Statement of Related Cases ............................................................. v

I.    Statement of the Issues ........................................................ 1

II.   Statement of the Case .......................................................... 2

      A.    The Examining Attorney's Refusal ................................ 2

      B.    The Board Affirmed the Refusal to Register .................. 8

III.  Summary of the Argument .................................................... 13

IV.   Argument ............................................................................ 14

      A.    Standard of Review .................................................... 14

      B.    The Mark THE SLANTS for Performances by a Musical
            Band Disparages People of Asian Descent ................... 15

            1.    The Board's Determination of the Mark's Likely
                  Meaning Is Supported by Substantial Evidence
                  Including the Band's Own Statements ................... 16

            2.    Substantial Evidence Supports the Board's Finding
                  That the Mark May Be Disparaging to Asian
                  Americans, as the Evidence Overwhelmingly
                  Describes the Slang Term as Disparaging .............. 24

      C.    This Court's Precedents Foreclose Mr. Tam's
            Constitutional Challenges to Section 2(a) .................... 29

            1.    It Is Well Established that Section 2(a) Does Not
                  Violate the First Amendment .............................. 30

            2.    Mr. Tam's Due Process Challenge Must Be Rejected ............ 35

            3.    Mr. Tam's Equal Protection Challenge Must Also Be
                  Rejected ......................................................... 38

V.    Conclusion .......................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Alappat, In re*, 33 F.3d 1526 (Fed. Cir. 1994) ..........................................37

*Animal Legal Defense Fund v. Quigg*, 932 F.2d 920 (Fed. Cir. 1991) ..................37

*Application of Bose Corp.*, 546 F.2d 893 (CCPA 1976) ........................................20

*Bayer Aktiengesellschaft, In re*, 488 F.3d 960 (Fed. Cir. 2007) ....................... 14, 22

*Boulevard Entertainment, Inc., In re*, 334 F.3d 1336 (Fed. Cir. 2003)........... passim

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) .................................................. 31, 32

*Crosby v. Holsinger*, 852 F.2d 801 (4th Cir. 1988) .................................................34

*Fox, In re*, 702 F.3d 633 (Fed. Cir. 2012)................................................... 13, 29, 31

*Friedman v. Rogers*, 440 U.S. 1 (1979)....................................................................34

*Geller, In re*, 751 F.3d 1355 (Fed. Cir. 2014).................................................. passim

*Gyulay, In re*, 820 F.2d 1216 (Fed. Cir. 1987) .................................................. 22, 28

*Heeb Media LLC, In re*, 89 USPQ2d 1071 (TTAB 2008).......................................36

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................36

*Jolley, In re*, 308 F.3d 1317 (Fed. Cir. 2002) .........................................................14

*Lebanese Arak Corp., In re*, 94 USPQ2d 1215 (TTAB 2010) ...............................36

*Lee v. Ventura County Superior Court*, 9 Cal. App. 4th 510 (1992)......................34

*Loew's Theatres, Inc., In re*, 769 F.2d 764 (Fed. Cir. 1985) ............................ 22, 28

*Mavety Media Group, Ltd., In re*, 33 F.3d 1367 (Fed. Cir. 1994).................. passim

*McGinley, In re*, 660 F.2d 481 (CCPA 1981)...................................... 12, 15, 32, 35

*National A-1 Advertising, Inc. v. Network Solutions, Inc.*,
    121 F. Supp. 2d 156 (D.N.H. 2000)....................................................................34

*National Endowment for Arts v. Finley*, 524 U.S. 569 (1998) ................................34

*NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) ...................................................37

*On-Line Careline, Inc. v. America Online, Inc.*,
229 F.3d 1080 (Fed. Cir. 2000) ........................................................................14

*Pacer Tech., In re*, 338 F.3d 1348 (Fed. Cir. 2003) ............................. 21, 22, 27, 28

*Reed Elsevier Props. Inc., In re*, 482 F.3d 1376 (Fed. Cir. 2007).........................20

*Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535 (4th Cir. 2004)...........22

*Ritchie v. Simpson*, 170 F.3d 1092 (Fed. Cir. 1999)..............................................32

*Rust v. Sullivan*, 500 U.S. 173 (1991)....................................................................35

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*,
483 U.S. 522 (1987)............................................................................................34

*Shinnecock Smoke Shop, In re*, 571 F.3d 1171 (Fed. Cir. 2009) ..................... 38, 39

*Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*,
748 F.2d 669 (Fed. Cir. 1984) .................................................................... 19, 24

*Squaw Valley Development Co., In re*,
80 USPQ2d 1264 (TTAB 2006) .........................................................26-28, 36

*Test Masters Educational Services, Inc. v. Singh*,
428 F.3d 559 (5th Cir. 2005) .............................................................................33

*United States v. Stevens*, 559 U.S. 460 (2010) .......................................................32

*Viterra Inc., In re*, 671 F.3d 1358 (Fed. Cir. 2012) ......................................... 14, 25

*Watts, In re*, 354 F.3d 1362 (Fed. Cir. 2004)........................................................26

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008)..................................................................................... 31, 32

## Statutes

15 U.S.C. § 1052(a) ....................................................................................... passim

15 U.S.C. § 1064(3) ................................................................................38

15 U.S.C. § 1070 ....................................................................................37

35 U.S.C. § 6 ..........................................................................................37

**Other Authorities**

Jeffrey Lefstin, *Does the First Amendment Bar Cancellation of the Redskins*, 52 Stan. L. Rev. 665 (2000) .............................................................33

Act of Feb. 20, 1905, Pub. L. No. 58-84 .................................................29

Act of July 5, 1946, Pub. L. No. 79-489 ..................................................29

Trademark Manual of Examining Procedure (TMEP) § 704.01 .............................24

**Regulations**

37 C.F.R. §§ 2.142-2.144 .................................................................. 21, 23

## STATEMENT OF RELATED CASES

The Director is not aware of any other appeal from the Trademark Trial and Appeal Board of the United States Patent and Trademark Office in connection with this trademark application that has previously been before this or any other court. The Director is also unaware of any related cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## I.    STATEMENT OF THE ISSUES

The Trademark Trial and Appeal Board ("Board") affirmed the refusal to register the mark THE SLANTS for services described as "entertainment in the nature of live performances by a musical band" because the mark, as used by the band, may disparage Asian Americans and is therefore ineligible for registration under section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).  The issues on appeal are:

(1)   Given the Appellant's use of THE SLANTS in context with Asian imagery and the band's repeated public discussions of its name as referring to the slang meaning of the term "slants," which indicates people of Asian descent, does substantial evidence support the Board's finding that the term's "likely meaning" in this case refers to people of Asian descent?

(2) Given the consensus—by dictionaries, Asian-American groups, and individual commentators discussing the band's name—that the word "slants," used in reference to people of Asian descent, is an offensive slur, does substantial evidence support the Board's finding that THE SLANTS is disparaging to a substantial composite of Asian Americans?

(3)   Given that this Court has repeatedly rejected the Appellant's precise constitutional arguments and affirmed that section 2(a) does not violate free speech, due process, or equal protection, because "refusal to register a mark does

not proscribe any conduct or suppress any form of expression because it does not affect the applicant's right to use the mark in question," *In re Boulevard Entertainment, Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003), should this Court reaffirm that the statute is constitutional?

## II.    STATEMENT OF THE CASE

### A.    The Examining Attorney's Refusal

On November 14, 2011, Appellant Simon Shiao Tam sought registration of the proposed mark THE SLANTS for services identified as "entertainment in the nature of live performances by a musical band." A23-36 (Application Serial No. 85/472,044). The Trademark Examining Attorney refused registration under section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), which bars registration of any mark that "[c]onsists of or comprises . . . matter which may disparage . . . persons . . . or bring them into contempt[ ] or disrepute." A37-206; A242-49; *see also* A298-309.

The Examining Attorney applied the two-part test that has since been approved by this Court, first determining the likely meaning of the mark and, if it refers to identifiable persons, then determining whether that meaning may be disparaging to a substantial composite of the referenced group. A42. Specifically, the Examining Attorney considered:

> (1)    What is the likely meaning of the matter in question, taking into account not only dictionary

2

definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods and/or services, and the manner in which the mark is used in the marketplace in connection with the goods and/or services; and

(2)    If that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

*Id.*; *see In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014) (same test).

Regarding step (1), the Examining Attorney found that THE SLANTS has the likely meaning of "a negative term regarding the shape of the eyes of certain persons of Asian descent . . . [, which] is an inherently offensive term that has a long history of being used to deride and mock a physical feature of those individuals." A42. In support of that likely meaning, the Examining Attorney cited many dictionary definitions, several websites, and literature from a civil-rights organization defining the terms "slant," "slants," and "slant-eyes" in ways consistent with that likely meaning. A42-43 (citing, e.g., A53-55; A75; A83; A134-37; A140-42; A145; A168-83; A193-206; A48-49 (website of Japanese American Citizens League explaining that "slant" is a derogatory racial slur)); *see generally* A45-206. As just one example, the Online Etymology Dictionary defines "slant" to include a "[d]erogatory slang sense of 'Oriental, slant-eyed person.'" A83. Similarly, in evidence presented by Mr. Tam, the Oxford English Dictionary defines "slant," when pertaining to people "of Oriental descent," as

"depreciative and offensive," and the American Heritage Dictionary defines "slant," when pertaining to people of East Asian birth or ancestry, as "Offensive Slang" that is "[u]sed as a disparaging term." A236; A219. The Examining Attorney explained that the terms "slants" and "slant-eyes" are full equivalents, and he thus relied on definitions of both terms to support his conclusion that the likely meaning was the derogatory term relating to people of Asian descent. A42; *see, e.g.*, A75; A145; A168; A174; A177; A193-94 (all showing "slant(s)" to be equivalent to "slant-eyes").

The Examining Attorney explained that, of the different possible meanings of the word "slants," it was clear that the one referring to people of Asian descent was implicated because of the way the band uses the mark in the marketplace; "applicant (and his fellow band members) have repeatedly indicated that the name THE SLANTS is a direct reference to the derogatory meaning of the term and in fact, they are embracing the derogatory meaning of the term." A243-44 (citing A129-33). For example, the Examining Attorney cited an article that quoted Mr. Tam (who is also known as Simon Young (A5 n.5; A100)): "'I was trying to think of things that people associate with Asians. Obviously, one of the first things people say is that we have slanted eyes,' said Young. 'I thought, "What a great way to reclaim that stereotype and take ownership of it"—and, in doing so, take away the power from those who try to use it as a term of hate.'" A130; *see also,*

*e.g.*, A93 (Mr. Tam explaining that the band feels "strongly that Asians should be proud of their cultural heritage, and not be offended by stereotypical descriptions"); A59 (band's Myspace page showing use of the mark in connection with stylized depiction of Rising Sun Flag design and Chinese dragon); A52 (band's website discussing that band name is based on being proud of Asian cultural heritage); A301 (Examining Attorney describing band's Myspace page and website).

The Examining Attorney also noted that Mr. Tam had previously sought registration of the mark THE SLANTS for the same services—"live performances by a musical band." A247 n.1. That application (Serial No. 77/952,263) (the '263 application) was filed on March 5, 2010, examined by the same Examining Attorney as the present application, and similarly refused registration under section 2(a).[1]  A308 n.1.  In the '263 application, Mr. Tam had submitted specimens of use

---

[1] The Examining Attorney incorporated the prosecution history of the '263 application by reference. A247 n.1. The details of the '263 application are shown in the USPTO's Trademark Status & Document Retrieval database, available on the USPTO's website at: http://tsdr.uspto.gov/#caseNumber=77952263&caseType =SERIAL_NO&searchType=statusSearch.  The '263 application was abandoned on November 8, 2011, due to Mr. Tam's failure to file a brief in his appeal to the Board.  A308 n.1.

The Examining Attorney and the Board later noted that the services identified in the two applications are "nearly identical."  A308 n.1; A2 n.2.  In the '263 application, the identified services are "Entertainment, namely, live performances by a musical band," while in the present application, the identified services are "Entertainment in the nature of live performances by a musical band."  A23.

of THE SLANTS that contained Asian imagery and argued that the mark was being used by Asian Americans to describe Asian Americans.  A247 n.1.  In the present case, the Examining Attorney rejected Mr. Tam's attempt—by selecting different specimens of use that cleverly avoided associations with Asians or Asian culture—to avoid the same section 2(a) refusal.  The Examining Attorney explained that the evidence of the manner in which the mark is used in the marketplace still showed that the derogatory meaning of "slants" referencing people of Asian descent was implicated.  A244; A247 n.1.

Addressing part (2) of the test—that the mark is disparaging to a substantial composite of the referenced group—the Examining Attorney relied on evidence that the band's name itself has repeatedly been found offensive.  A43.  Specifically, the Examining Attorney explained that performances had been canceled based on concerns over the band's name, and articles noted the controversial nature of the name.  A43 (citing, e.g., A95-98; A60-63 (discussing the racist implication of the band's name); A91; A100-33).  The Examining Attorney also pointed out that the band had chosen its name in part due to the history of the term as a negative reference to persons of Asian descent.  A42-43 (citing, e.g., A60-63; A91; A100-33 (including at A103-06 Mr. Tam explaining that the term is referring to people of Asian descent)); A244 (citing, e.g., A94-96); *see also* A45 (quoting Mr. Tam as saying the band "celebrates all the different

Asian cultures out there" and, with reference to the band name, "You know what? We are slanted.  Who cares? We're proud of that."); A57 (quoting Mr. Tam as saying, "We want to take on these stereotypes that people have about us, like the slanted eyes, and own them."); A92-93; A95 ("For the band the name was a way to reclaim a racial slur and to assert Asian pride."); A302.  Moreover, as the Examining Attorney pointed out, the evidence showed that several people actually had taken offense at the band's name.  A43 (citing, e.g., A91 (calling the name "offensive"); A100-18 (long discussion of people finding the name offensive); A119-28 (same); A51 ("[P]eople responded [to band advertisements] by calling [Mr. Tam] racist"); A92 ("I find the name of this band offensive")).

The Examining Attorney pointed out that, even if the mark was chosen to be self-deprecating and/or to attempt to reappropriate the disparaging term, Mr. Tam's intent is not dispositive of whether the mark is disparaging to Asian Americans. A43.  The Examining Attorney further pointed out that, "while applicant may not find the term offensive, applicant does not speak for the entire community of persons of Asian descent[,] and the evidence indicates that there is still a substantial composite of persons who find the term in the applied-for mark offensive."  *Id.*; *see also* A48-49 (website of Japanese American Citizens League explaining that "slant" is offensive when referring to Asian people).

In his attempt to rebut the Examining Attorney's evidence, Mr. Tam submitted only two types of evidence: (1) two dictionary definitions, both of which include a definition of "slant" as a "disparaging" or "offensive" term for people of Asian descent (A219; A236), and (2) four prior registrations that include the word "slant" in other contexts (A230-33). *See* Br. 8-9. He did not submit any information to show, for example, that since the Examining Attorney's research was conducted, a substantial composite of Asian Americans no longer find the word "slant" disparaging.

Upon consideration of Mr. Tam's evidence, the Examining Attorney maintained his refusal to register the mark THE SLANTS, finding that it may disparage a substantial composite of people of Asian descent, and made that refusal final. A43; A244.

### B.    The Board Affirmed the Refusal to Register

Mr. Tam then appealed to the Board. Notably, although Mr. Tam argued on appeal that the Examining Attorney had chosen the wrong likely meaning of the mark THE SLANTS, he never argued that the Examining Attorney had wrongly determined that a substantial composite of Asian Americans would find the meaning disparaging, the second part of the test. A277-96.

The Board affirmed the refusal to register the mark. A1-17. The Board first considered the Examining Attorney's evidence, including the many dictionary

definitions of the term "slant(s)," the evidence of the band's intent to refer to the ethnic slur, the band's use of Asian imagery, and the evidence that Asian-American groups and individuals consider the term "slant" and the band name in particular to be disparaging. A2-6. The Board also considered Mr. Tam's evidence: a dictionary definition and third-party registrations of marks including the word "slant." A6.

After reviewing Mr. Tam's arguments, the Board began its analysis by restating section 2(a) and the two-part test that the Board (and this Court) employs to determine whether a mark is disparaging, (1) determining the likely meaning of the mark and, if it refers to identifiable persons, then (2) determining whether that meaning may be disparaging to a substantial composite of the referenced group. A8. The Board explained that, with reference to part (2), whether a proposed mark is disparaging must be determined from the standpoint of a substantial composite, but not necessarily a majority, of the referenced group in the context of contemporary attitudes. A9. The Board further pointed out that a proposed mark may have a disparaging meaning as used in the marketplace in connection with the applied-for services, even if it has a non-disparaging meaning in other contexts. *Id.*

In assessing the likely meaning of THE SLANTS, the Board considered the "manner in which the mark is used in the marketplace in connection with the

services" and found the likely meaning of "slants" to be the slang meaning referring to people of Asian descent. A10-11. In particular, the Board noted that the band touts "the slang meaning of 'slants.'" A10. The Board further found that the "evidence of public perception of the meaning of THE SLANTS, as used in connection with [Mr. Tam's] services, shows that meaning to be a derogatory reference to people of Asian descent." A11. The Board further found that the band, "in its advertising and on its website, promotes the 'likely meaning' of the mark to be people of Asian descent by, for example, displaying the wording 'THE SLANTS' next to a depiction of an Asian woman, utilizing rising sun imagery and using a stylized dragon image." *Id.*; *see* A4. As the Board explained, the band's intent to "own" the stereotype is irrelevant to whether a substantial composite of the referenced group finds the term disparaging. A11.

Responding to Mr. Tam's argument that the refusal was based on Mr. Tam's being of Asian descent, the Board explained that, regardless of Mr. Tam's race, he may not register a mark that uses the term "slants" to refer to people of Asian descent. A12-14. The Board explained, "the focus of the inquiry into whether a mark is disparaging is not on applicant's race but rather on the referenced group's perception of the likely meaning of the mark." A13. And, as the Board pointed out, section 2(a) focuses on the nature of the mark, not the applicant. A13 n.12. The "finding that THE SLANTS is disparaging is not dependent on applicant's

ethnicity, but on the circumstances related to his use of the term. An application by a band comprised of non-Asian-Americans called THE SLANTS that displayed the mark next to the imagery used by applicant shown supra would also be subject to refusal under Section 2(a)." A13-14.

Responding to Mr. Tam's argument that the Examining Attorney had relied on Asian imagery in the band's prior application instead of the present application, the Board reiterated that the established test looks at the manner in which the mark is used in the marketplace, which includes looking beyond the four corners of the application to inform the Board's analysis. A14. And, although the evidence was dated before the 2011 filing date of Mr. Tam's application, the Board explained that Mr. Tam "bases his application on his use of the mark since 2006 and all evidence from then until the present is relevant. Notably, applicant has not submitted evidence rebutting the evidence of likely meaning, to support, for example, the proposition that due to applicant's change in its manner of use members of the referenced group no longer perceive it as having a disparaging meaning." A14-15 (footnote omitted).

Having determined the likely meaning of the mark in context, the Board addressed whether the mark is disparaging to a substantial composite of the referenced group. A15-17. Acknowledging some statements in the record of support for the mark in the Asian community, the Board explained that it is

"charged with taking into account the views of the entire referenced group who may encounter applicant's music entertainment services." A15-16. The Board found that to be all members of the Asian-American public. A16. "The dictionary definitions, reference works, and all other evidence unanimously characterize the word 'slant,' when meaning a person of Asian descent, as disparaging." *Id.* Given that consensus, along with Asian individuals and groups objecting to the use of the term in the context of this particular band, the Board found substantial evidence to find the mark disparaging to a substantial composite of Asian Americans. *Id.*

Finally, the Board considered Mr. Tam's additional arguments but found them unpersuasive. It reiterated that Mr. Tam's good intentions were irrelevant to registrability. A16-17. The Board explained that the other SLANT marks were used in different contexts and not referring to people, underscoring why the USPTO must look at the context of the use of the mark in the marketplace. A17. And the Board explained that Mr. Tam's "'First Amendment rights would not be abridged by the refusal to register [his] mark'" because no conduct is proscribed and no tangible form of expression suppressed. *Id.* (quoting *In re McGinley*, 660 F.2d 481, 484 (CCPA 1981)). "This case is solely about whether the applicant my 'call upon the resources of the federal government' to obtain federal registration of the mark on the Principal Register in order to assist applicant in enforcing the

mark." A17 (quoting *In re Fox*, 702 F.3d 633, 640 (Fed. Cir. 2012)). The Board

thus affirmed the refusal to register the mark, finding it disparaging. A17.

## III.    SUMMARY OF THE ARGUMENT

Substantial evidence supports the Board's factual findings underpinning its

conclusion that the mark THE SLANTS for "live performances by a musical

band," given the context of this band and its marketing, is ineligible for registration

under section 2(a) because it may disparage Asian Americans. Specifically, the

Board's finding that the likely meaning of the mark in context refers to people of

Asian descent is well supported by several dictionary definitions, the band's own

use of the mark, and the reaction of consumers of the band's services. The Board's

finding that the mark is disparaging is supported by the repeated reference to the

word, when referring to people, as disparaging. It is equally well supported by

documentation of an Asian-American civil-rights group describing the term as

derogatory, as well as published articles and blog posts documenting Asian

Americans' reactions to the band's name finding it offensive. Finally, section 2(a)

is not unconstitutional, as this Court has repeatedly held, because "refusal to

register a mark does not proscribe any conduct or suppress any form of expression

because it does not affect the applicant's right to use the mark in question." *In re

Boulevard Entertainment, Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003).

13

## IV.  ARGUMENT

### A.    Standard of Review

"The determination that a mark may be disparaging is a conclusion of law based upon underlying factual inquiries.  The Board's factual findings are reviewed for substantial evidence, while its ultimate conclusion as to registrability is reviewed de novo."  *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014) (citations and quotation marks omitted).

"Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion."  *In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012) (quotation marks and brackets omitted).  The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's finding from being supported by substantial evidence.  *On-Line Careline, Inc. v. America Online, Inc.*, 229 F.3d 1080, 1086 (Fed. Cir. 2000).  Where contradictory conclusions may reasonably be drawn from the evidence, the Board's decision to favor one conclusion over the other is the type of finding that must be sustained as supported by substantial evidence.  *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 970 (Fed. Cir. 2007); *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

### B.     The Mark THE SLANTS for Performances by a Musical Band Disparages People of Asian Descent

Under section 2(a) of the Lanham Act, disparaging marks cannot be registered by the USPTO.  In *In re Mavety Media Group, Ltd.*, 33 F.3d 1367, 1374 (Fed. Cir. 1994), among others, this Court addressed section 2(a)'s prohibition on registering scandalous matter, and its reasoning applies equally to section 2(a)'s prohibition on registering disparaging matter.  As the Court explained, the statutory provision "is not 'an attempt to legislate morality, but, rather, a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government.'" *Mavety*, 33 F.3d at 1374 (quoting *In re McGinley*, 660 F.2d 481, 486 (CCPA 1981)).  The statute also reflects Congress's "will that such marks not be afforded the statutory benefits of registration." *McGinley*, 660 F.2d at 486.

The Board's conclusion that the mark THE SLANTS for "entertainment in the nature of live performances by a musical band" disparages people of Asian descent is supported by substantial evidence and legally correct.  The Board applied a two-part test, approved by this Court in *Geller*, 751 F.3d at 1358.  The test asks:

> (1)   what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

> (2)    if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

A8-9; *Geller*, 751 F.3d at 1358.  Mr. Tam does not challenge the use of this two-part test to determine whether a mark may disparage a group of persons.

### 1.    The Board's Determination of the Mark's Likely Meaning Is Supported by Substantial Evidence Including the Band's Own Statements

The Board correctly found that the word "slants" has several possible meanings, including one possible meaning that is a slang, derogatory term for people of Asian descent.  A2-6; A10; *see Geller*, 751 F.3d at 1358-60 (discussing existence of different possible meanings before picking one based on context).  Mr. Tam does not dispute that the slang term is one possible definition of the term "slants."  Br. 1, 20-21 (describing it as a secondary or tertiary definition).  Indeed, the dictionaries Mr. Tam cited all include such a definition.  *See* A219; A236.

The Board then correctly determined that the slang definition referring to people of Asian descent was the likely meaning in the context of this band.  A10-15; *see Geller*, 751 F.3d at 1358-60.  Specifically, when there is more than one possible meaning of a mark, as this Court has explained, the likely meaning is determined "taking into account not only dictionary definitions, but also . . . the manner in which the mark is used in the marketplace."  *Geller*, 751 F.3d at 1358.  The likely meaning is the one most applicable in the context of the applicant's use

16

in the marketplace. *See Geller*, 751 F.3d at 1358-60 (finding mark disparaging because, although there were two possible meanings, in the context of applicant's services, the likely meaning was the disparaging one); *cf. Mavety*, 33 F.3d at 1373 (vacating Board's finding that mark was scandalous only because non-scandalous meaning was "equally applicable" in the context of the applicant's marketplace). Mr. Tam agrees that context in the marketplace is a relevant factor in determining the likely meaning. Br. 22-23; A290 (Mr. Tam, in brief to the Board, stating that USPTO *must* consider context).

Here, the Board relied on evidence that the band uses Asian imagery in connection with advertising. A11; A4; *see* A59. The Board also relied on the band's public discussions indicating that the name is a direct reference to the slang meaning of the term. A10-11; *see, e.g.*, A130 (band discussing taking ownership of the "slanted eyes" stereotype); A93; A52 (band's website discussing that band name is based on being proud of Asian cultural heritage). And the Board relied on websites that showed that the public perceives the band name as referring to people of Asian descent. A11; *see, e.g.*, A95; A97; A60-61; A91; A100-28. All of that evidence shows that the band is projecting a single likely meaning in the marketplace—the slang meaning referring to people of Asian descent.

In asserting that the Board picked the wrong likely meaning, Mr. Tam relies on no evidence that a different meaning was more likely. Indeed, it is not clear

how the "more common and inoffensive definitions" (Br. 20) such as "a slope" (A219) could possibly apply to this band in the context of how it uses the term in the marketplace. Mr. Tam simply attacks the evidence the Board relied on. Br. 17-29. But Mr. Tam's attacks are unfounded. Although he asserts that the Board relied on dictionary definitions that were chosen because they were derogatory, attacking the Examining Attorney's search criteria and accusing him of selective bias (Br. 2, 12, 21-25), he does not deny that even the dictionaries he cites include the slang definition of the word "slant" (Br. 1, 20-21; A219-20 (Mr. Tam's response to initial refusal)).

Similarly, Mr. Tam attacks the dictionaries relied on by the Board for being obsolete because they are from 2010 or earlier (Br. 5-6, 21-25; *see, e.g.*, A83 (accessed in June 2010)), but the dictionaries Mr. Tam cites, regardless of when they were published, include the same definition referring to people of Asian descent (A219-20; A236). For similar reasons, Mr. Tam's attacks on certain dictionaries for encompassing British English fail. Br. 23 n.7. Mr. Tam therefore cannot credibly argue that the age of the dictionary evidence or its source renders it obsolete or irrelevant.

The Board relied on the dictionaries to show that the term for people of Asian descent is a *possible* meaning, not to prove that it had chosen the correct *likely* meaning. The Board relied on the band's own materials and discussions of

the band's name, referencing the derogatory meaning of "slant," to choose the meaning that consumers of Mr. Tam's services likely would understand. A10-11.

Mr. Tam also attacks the Board's evidence that the band intends to and does project the likely meaning of "slant" as referring to people of Asian descent. Specifically, he makes two arguments—(a) that the Board should not have considered Mr. Tam's race in making its decision, and (b) that the Board should not have considered the evidence submitted with or found in connection with Mr. Tam's prior application for the mark THE SLANTS. Br. 2-4, 6, 25-29. Contrary to Mr. Tam's first point, the Board did not apply the refusal based on Mr. Tam's race. Rather, the Board followed the statutory requirement set forth in the preamble of section 2, 15 U.S.C. § 1052, that refusals of registration focus on the nature of the mark, not the applicant. A13 n.2. As the Board explained, "[a]n application by a band comprised of non-Asian-Americans called THE SLANTS that displayed the mark next to the imagery used by applicant shown supra would also be subject to refusal under Section 2(a)." A14; *see also infra* § IV.C.3. Thus, the refusal was based on the mark as used by Mr. Tam, not on Mr. Tam's race.

Regarding Mr. Tam's point (b), it was entirely proper for the Board to rely on evidence that Mr. Tam submitted earlier in connection with his application for the same mark (for the same services) and evidence that the Examining Attorney adduced in that application. *See, e.g.*, *Specialty Brands, Inc. v. Coffee Bean*

*Distributors, Inc.*, 748 F.2d 669, 673 (Fed. Cir. 1984) (noting that a party's statement in "a similar proceeding involving similar marks and goods is a fact" that "may be considered relevant and competent") (citation omitted).  Here, Mr. Tam concedes that the prior application was not just "similar," but actually involved the *same* mark for the *same* services.  (Br. 17; *see* A247 n.1; A2 n.2.)  In addition, this Court has previously frowned upon attempts by applicants to artificially truncate the USPTO's inquiry into the registrability of a mark, as used, by manipulating aspects of the application and materials submitted to the agency.  *See In re Reed Elsevier Props. Inc.*, 482 F.3d 1376, 1378, 1379 (Fed. Cir. 2007) (approving the USPTO's reference, in such circumstances, to the applicant's website "for context, to inform its understanding of the term" at issue); *see also* A14 n.13.  Indeed, it would be problematic to ignore the prior application, since it shows how the band has used its mark and thus how the public has perceived the mark.  *See Application of Bose Corp.*, 546 F.2d 893, 897 (CCPA 1976) (explaining that specimens submitted with trademark application must show its use); *see also* A14.

Given that Mr. Tam filed this application a mere six days after the abandonment of his earlier application, he cannot credibly argue that the circumstances surrounding the band's use of the mark have changed in that short time to render the meaning of the mark non-disparaging.  But even assuming the band had since tried to change its image and used the mark to mean something

different—a proposition for which Mr. Tam has cited no evidence—there is nevertheless no evidence that the public has jettisoned the old image in favor of a new image. Furthermore, to the extent that Mr. Tam implies that the band has changed how it is using its mark, Mr. Tam also asserts that it is "undisputed" that his claimed services and his actual services "have remained the same at all times." Br. 40. It is therefore inconsistent for Mr. Tam to claim that the name no longer refers to people of Asian descent.

Mr. Tam's complaint that he did not have a chance to rebut the Board's evidence or show how the mark is currently used (Br. 29; *see* Br. 10) is based on a faulty understanding of the trademark application process. Contrary to Mr. Tam's assertions that the Board should have asked for more evidence (Br. 27, 29), the law is clear that, once the Examining Attorney has presented a *prima facie* case with evidence, it is the applicant's burden to provide any rebuttal evidence.[2] Under this Court's precedents, the Examining Attorney has the initial burden to make a *prima facie* case of ineligibility under the applicable subsection of section 2 of the Lanham Act. *See, e.g.*, *In re Pacer Tech.*, 338 F.3d 1348, 1350 (Fed. Cir. 2003) (concerning lack of inherent distinctiveness under § 2(e)(1)); *Boulevard*, 334 F.3d at 1341 (referring to the applicant's failure to overcome the examining attorney's

---

[2] The law is equally clear that the record should be complete when the appeal is filed. 37 C.F.R. § 2.142(d).

*prima facie* case in a § 2(a) scandalousness case).  Due to the limitations imposed by the non-adversarial nature of *ex parte* examination and the USPTO's limited resources, the burden of establishing a *prima facie* case in an *ex parte* setting requires only that the USPTO establish a "reasonable predicate" for the specific type of refusal at issue.  *See, e.g.*, *Pacer Tech.*, 338 F.3d at 1351-52; *In re Loew's Theatres, Inc.*, 769 F.2d 764, 768 (Fed. Cir. 1985).  "Once the PTO sets forth a sufficient *prima facie* case, the burden shifts to the applicant to come forward with evidence to rebut the *prima facie* case." *Pacer Tech.*, 338 F.3d at 1350; *see In re Gyulay*, 820 F.2d 1216, 1217 (Fed. Cir. 1987) ("It is insufficient, in view of the PTO's prima facie case, to criticize the absence of additional evidence weighing against the applicant.  Rebuttal evidence and argument are the applicant's province.").  Mr. Tam never offered, in response to any action by the Examining Attorney, any rebuttal evidence to show, for example, that the use of the mark in the marketplace has changed.  A14-15.

Similarly, Mr. Tam's repeated complaints that the Board relied on evidence that is "inadmissible" and "hearsay" (Br. 2, 7, 10, 12, 36-38) are unjustified.  As this Court has explained, "Internet evidence is generally admissible and may be considered for purposes of evaluating a trademark." *Bayer*, 488 F.3d at 966 (citing, *inter alia*, *Retail Serv., Inc. v. Freebies Publ'g*, 364 F.3d 535, 544-45 (4th Cir. 2004) (considering online dictionaries and websites as evidence of consumer

perception of mark)).  Mr. Tam has presented no contrary evidence, and the Board was correct to rely on the evidence presented by the Examining Attorney.  Mr. Tam's citation of 37 CFR § 2.122(c) for the proposition that the Federal Rules of Evidence apply is incorrect.  That provision appears in a section of the chapter entitled "Procedure in *Inter Partes* Proceedings," and thus does not apply when the Board sits in its appellate capacity reviewing an *ex parte* refusal of registration.  *See* 37 C.F.R. §§ 2.142-2.144 (rules regarding "Appeals").

Furthermore, in asserting that the Examining Attorney's evidence was not current because it came from earlier research (Br. 18-19), again, Mr. Tam presented no evidence of changed circumstances to rebut the Examining Attorney's findings.  *See Boulevard*, 334 F.3d at 1341 (to challenge "a dictionary on the ground that it is outdated and therefore does not reflect current community standards," applicant must show the new meaning with either a more recent contrary dictionary or other persuasive evidence of changed meaning). Mr. Tam argues that the use of prior research prevents him from ever being able to register his mark.  Br. 4, 40-42.  Not so.  All Mr. Tam has to do is present persuasive rebuttal evidence that the public perception of the mark has changed since the Examining Attorney did his research.  And, to the extent that Mr. Tam argues that the prior application is somehow off limits because the Trademark Manual of Examining Procedure ("TMEP") lists other possible sources of evidence and not an

applicant's prior applications (Br. 19), the manual is clearly not an exhaustive list of sources of evidence, since its intent is to ensure that the examination be as complete as possible (TMEP § 704.01 (entitled "Initial Examination Must Be Complete")).   Any competent evidence can be considered, including prior statements made by the applicant.  *See, e.g.*, *Specialty Brands*, 748 F.2d at 673. The Examining Attorney's evidence was all relevant and competent to support the refusal of registration under applicable law and examination procedures.

In sum, because the Board correctly reviewed the evidence of possible meanings of the word "slants" and correctly picked the one that was implied by the band's use of the mark and the public's perception of that use, and because Mr. Tam presented no contrary evidence, the Board's determination of the mark's likely meaning is supported by substantial evidence.

### 2. Substantial Evidence Supports the Board's Finding That the Mark May Be Disparaging to Asian Americans, as the Evidence Overwhelmingly Describes the Slang Term as Disparaging

The Board also correctly determined that the term "slants," when referring to people of Asian descent, may disparage a substantial composite of Asian Americans.   A15-17.   As the Board explained, the definitions in evidence *unanimously* characterize the word "slant," when referring to people of Asian descent, as disparaging.  A16; *see, e.g.*, A219 ("Offensive Slang" and "disparaging term"); A236 ("depreciative and offensive"); A53 ("derogatory"); A83; A168;

A177; A197 (same); A75 ("pejorative"); A134-35 (included in list of "Ethnic Slurs"); A136 ("Offensive Slang" and "disparaging term"); A141 (same); A142 ("Offensive"); A145 ("derog and offensive"); A174 (included in "The Big Book of Being Rude"); A181-82 (using symbol that refers to "terms of contempt and derision . . . of strongest impact"); A194 ("Intended and perceived as derogatory. User is considered to be racially bigoted").  Moreover, the Japanese American Citizens League, an Asian-American civil-rights group, described the term as "derogatory," "demeaning," and a "racial slur[ ]" that "cripple[s] the spirit."  A48-49.  The Board acknowledged some statements of support for the mark in the Asian community, but the Board relied on the greater weight of statements finding the term disparaging, including the statement by an Asian-American civil-rights group.  A15-16; *see, e.g.*, *Viterra*, 671 F.3d at 1361 ("Where two different conclusions may be warranted based on the evidence of record, the Board's decision to favor one conclusion over the other is the type of decision that must be sustained . . . as supported by substantial evidence.") (citation omitted).  Indeed, as this Court has determined, a "substantial composite" need not be all, or even a majority, of the referenced group.  *See Mavety*, 33 F.3d at 1371 ("not necessarily a majority, but a substantial composite").

Mr. Tam argues that the record contains no evidence about the attitude of Asian Americans in general toward the term.  Br. 25, 29-38.  As an initial matter,

Mr. Tam never argued to the Board that the Examining Attorney had erred in his determination of the attitude of Asian Americans in general toward the term; rather, he argued that the Examining Attorney had chosen the wrong likely meaning. A277-96. His argument has therefore been waived and should not be considered on appeal. *See In re Watts*, 354 F.3d 1362, 1367-68 (Fed. Cir. 2004).

Regardless, the Board's analysis was correct. The numerous dictionary definitions, all of which describe the term as disparaging, show contemporary attitudes of the general public about the term and, without evidence to the contrary, can be interpolated to show the attitudes of Asian Americans. Indeed, Mr. Tam concedes that "slant-eye(s)" is an "unmistakable . . . racial slur." Br. 32. Thus, if substantial evidence supports the finding that "slant(s)" and "slant-eye(s)" mean the same thing (A42), then "slants" must also be a disparaging racial slur. And numerous dictionaries show "slant(s)" and "slant-eye(s)" to mean the same thing. *See, e.g.*, A75 (defining both together with same definition); A168; A174; A177; A193-94 (same); A145 (showing that they are equivalent, or "="). Thus, even Mr. Tam points out that the term is a racial slur and therefore disparaging.

Mr. Tam summarizes *In re Squaw Valley Development Co.*, 80 USPQ2d 1264 (TTAB 2006) as supporting the proposition that "dictionary definitions go to 'likely meaning' of [a] mark, not offensiveness as perceived by [the] affected group." Br. 21. But Mr. Tam mischaracterizes that case. There, the Board actually

relied on a dictionary definition to show that a mark was disparaging to a substantial composite of Native Americans. *Squaw Valley*, 80 USPQ2d at 1276. Dictionary definitions are competent evidence to show that a group finds a mark disparaging, especially when combined with other evidence such as, in this case, a record of Asian Americans and Asian-American groups specifically finding the term disparaging. *Cf. Boulevard*, 334 F.3d at 1340-41 (where a "mark has only one pertinent meaning, dictionary evidence alone can be sufficient to satisfy the PTO's burden" of showing that a substantial composite of the general public finds it offensive).

Mr. Tam's other arguments selectively ignore the evidence. For example, Mr. Tam argues that the Board relied only on seven documents that were purportedly written by Asian Americans (Br. 32-38), when in fact the Board relied on much more evidence, including the dictionary definitions cited above. A16 ("The dictionary definitions, reference works, and all other evidence unanimously characterize the word 'slant,' when meaning a person of Asian descent, as disparaging."). Mr. Tam adds that the blog posts finding the band's name offensive are not necessarily by Asian people, rendering them irrelevant to the substantial composite analysis (Br. 35-38), but the Board has rejected such arguments. Specifically, in light of the USPTO's limited resources, *Pacer Tech.*, 338 F.3d at 1351-52, the Board explained in *Squaw Valley*:

27

> [E]ven if, as applicant maintains, the statements in the
> record attributed to Native Americans are those of Native
> American activists and of legislators who share the views
> of such activists, we do not discount such statements.
> Applicant would have us assume that the views of Native
> American activists and sympathetic legislators do not
> represent the views of a substantial composite of Native
> Americans. Applicant provides no basis for concluding
> that their views would not be shared by a substantial
> composite of Native Americans. Further, in light of the
> ex parte nature of this case and the Federal Circuit's
> recognition of the limited resources of examining
> attorneys, we do not discount the probative value of such
> evidence.

80 USPQ2d at 1276.  If Mr. Tam wanted to contest the weight that the Examining

Attorney and the Board placed on the comments about the band's name, he could

have offered his own evidence, such as surveys, in rebuttal.  He did not do so.

And to the extent that Mr. Tam asserts that the USPTO should have

conducted its own survey (Br. 34), this Court has explained that "[t]he PTO does

not have means to conduct a marketing survey as [appellant] would require. The

practicalities of the limited resources available to the PTO are routinely taken into

account in reviewing its administrative action."  *Loew's Theaters*, 769 F.2d at 768;

*see Pacer Tech.*, 338 F.3d at 1351-52; *Gyulay*, 820 F.2d at 1217.

Mr. Tam also argues that the Board's evidence relates primarily to the term

"slant-eye," not "slant" (Br. 32), but that is simply not true.  The dictionary

definitions and the civil-rights group, cited above, all refer to the term "slant,"

which in many cases is equated with the term "slant-eye."  Similarly, the posts and

discussions about the band's name itself refer to the word "slants." A95-98; A60-63; A91; A100-28; A51; A92. And the discussions of the word "slant" unrelated to the band's name similarly refer to the word "slant(s)" as well as "slant-eye(s)." *See, e.g.*, A46; A47; A151-59.

Finally, Mr. Tam reprises his argument that the evidence that was found in connection with his prior application is obsolete. Br. 38-40. But, as explained above, Mr. Tam has not presented any evidence that, since 2010 or 2011 when that evidence was found, the feelings of a substantial composite of Asian Americans have changed. Thus, the Examining Attorney's evidence stands unrebutted.

In sum, the evidence fully supports the Board's finding that the mark is disparaging to a substantial composite of Asian Americans and was appropriately refused under section 2(a).

### C. This Court's Precedents Foreclose Mr. Tam's Constitutional Challenges to Section 2(a)

Section 2(a)'s specific prohibition on registration of disparaging trademarks has existed since 1946, *see* Act of July 5, 1946, Pub. L. No. 79-489, §2(a), 60 Stat. 427, 428, with the more general prohibition on registration of "immoral or scandalous matter" being first codified in 1905, *see* Act of Feb. 20, 1905, Pub. L. No. 58-84, § 5(a), 33 Stat. 724, 725. *See Fox*, 702 F.3d at 634-35.

Disregarding controlling precedent to the contrary, Mr. Tam argues that section 2(a) violates the First Amendment by deterring his speech and further

argues that it violates his constitutional rights to due process and equal protection under the Fifth and Fourteenth Amendments based on the USPTO's registration of supposedly similar marks. Br. 43-57. This Court and its predecessor have repeatedly and soundly rejected all of those constitutional challenges, based on the very same arguments Mr. Tam presents here. As the Court explained in *Mavety*, in no uncertain terms, "our precedent forecloses [applicant's] challenges to § 1052(a) as unconstitutional on its face or as applied." 33 F.3d at 1374 (explaining that First Amendment and due process/vagueness arguments were foreclosed); *see Boulevard*, 334 F.3d at 1343 (same, also rejecting equal protection argument based on registration of supposedly similar marks). Each of Mr. Tam's arguments lacks merit.

### 1.    It Is Well Established that Section 2(a) Does Not Violate the First Amendment

In arguing that section 2(a) unconstitutionally restricts his First Amendment right to free speech (Br. 43-57), Mr. Tam disregards this Court's controlling precedent. This Court has already spoken on the issue; the Court explained that its precedent definitively "forecloses" such a challenge. *Mavety*, 33 F.3d at 1374; *see Boulevard*, 334 F.3d at 1343; *see also* A17. Indeed, Mr. Tam's argument—that trademark registration by the government confers concrete benefits on the registrant, so the denial of registration curtails speech—is precisely the same as the argument presented and rejected in *Boulevard*. Brief of Appellant, *In re Boulevard*

*Entertainment, Inc.*, 2002 WL 32817214, \*33-35 (Fed. Cir. Oct. 30, 2002) (appellant, Boulevard, arguing that "[f]ederal trademark registration confers benefits that are not available to a trademark owner who is denied registration"); *see Boulevard*, 334 F.3d at 1343 ("We . . . reject Boulevard's First Amendment challenge").   And, indeed, the Court confirmed as recently as 2012 that a prohibition on registration of marks based on their nature does not implicate the First Amendment rights of trademark applicants.  *Fox*, 702 F.3d at 634-35.  In light of the controlling precedent, the Court need not address Mr. Tam's argument any further.

In any event, Mr. Tam's First Amendment rights are not abridged by a refusal of federal registration.   As an initial matter, even if Mr. Tam's constitutional theory were plausible, he could not make the extraordinary showing required to warrant invalidating an Act of Congress on its face.  *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008) (listing reasons why facial challenges are disfavored, such as drawbacks of limited record of a single case, preference for judicial restraint, and avoiding short-circuiting will of the people); *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (facial invalidation under the First Amendment is "strong medicine" that should be employed "sparingly and only as a last resort").  To prevail in a facial challenge to an Act of Congress, a plaintiff normally must show that "no set of circumstances

exists under which [the challenged law] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citations and quotation marks omitted); *see also Washington State Grange*, 552 U.S. at 449 (plaintiff in facial challenge must show that the challenged law "is unconstitutional in all of its applications").[3]   Mr. Tam cannot make such a showing.

Here, as this Court and its predecessor have repeatedly held, there is no plausible First Amendment theory to render the statute invalid.   The refusal to register Mr. Tam's "mark does not proscribe any conduct or suppress any form of expression because it does not affect [Mr. Tam's] right to use" it.  *Boulevard*, 334 F.3d at 1343.   Thus, Mr. Tam's First Amendment rights are not implicated.  *Id.*; *Ritchie v. Simpson*, 170 F.3d 1092, 1099 (Fed. Cir. 1999) (explaining, in response to concern about First Amendment rights, "that the denial of federal registration of a mark does not prohibit the use of that mark"); *Mavety*, 33 F.3d at 1374; *In re McGinley*, 660 F.2d 481, 484 (CCPA 1981) ("With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark

---

[3] Even in the special context of First Amendment overbreadth doctrine, a successful facial challenge requires the plaintiff to demonstrate that a "substantial number" of the statute's applications are unconstitutional when "judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quoting *Washington State Grange*, 552 U.S. at 449 n.6); *see also Broadrick*, 413 U.S. at 613.

does not affect his right to use it.  No conduct is proscribed, and no tangible form of expression is suppressed.  Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark." (citation omitted)).  For the same reasons, the Fifth Circuit has similarly rejected the contention that section 2(a) violates the First Amendment.  *See Test Masters Educational Servs., Inc. v. Singh*, 428 F.3d 559, 578 n.9 (5th Cir. 2005).  The same reasoning applies equally to the prohibition against registration of disparaging marks, also under section 2(a).

Indeed, according to Mr. Tam, "[t]he overwhelming majority of the public encounters trademarks in their roles as product identifiers, not as the beneficiaries of a federal registration scheme."  Br. 46 (quoting Jeffrey Lefstin, *Does the First Amendment Bar Cancellation of the Redskins*, 52 Stan. L. Rev. 665, 684 (2000)).  Thus, although Mr. Tam cites the benefits of registration (Br. 44 & n.15), Mr. Tam cannot point to a "form of expression" that has been proscribed or suppressed by section 2(a).  *Boulevard*, 334 F.3d at 1343.

Moreover, other courts consistently agree with the principle that, under the First Amendment, the government does not have to lend its support to terms that are offensive or degrading where no form of expression is proscribed.[4]  For

---

[4]  Mr. Tam cites a treatise setting forth some of the overarching policies of trademark law generally to argue that the trademark law is not designed to promote the policy of prohibiting registration of disparaging marks.  Br. 45, 4.  But the policy of the disparagement provision of section 2(a) is clear on its face:  Congress prohibited registration of any proposed mark that "[c]onsists of or comprises . . .

example, the government does not have to lend support by allowing registration of disparaging legal names or Internet domain names, where the same content can be expressed elsewhere.[5]  *See Lee v. Ventura County Superior Court*, 9 Cal. App. 4th 510 (1992) (holding that appellant had no constitutionally protected right to legally change his name to "Misteri Nigger" and, because he retained the common law right to use that name, the state's refusal to officially sanction his name change did not adversely affect his First Amendment right to freedom of speech); *Nat'l A-1 Advertising, Inc. v. Network Solutions, Inc.*, 121 F. Supp. 2d 156, 177-78 (D.N.H. 2000) (finding that no tangible form of expression was suppressed by prohibition on certain words as second-level domain names because plaintiffs could use those words elsewhere in their URLs); *see also Crosby v. Holsinger*, 852 F.2d 801, 802 (4th Cir. 1988) (disallowing school mascot and symbol "Johnny Reb" because "[a] school mascot or symbol bears the stamp of approval of the school itself").

Relatedly, in *National Endowment for Arts v. Finley*, the Supreme Court held that a statute allowing art to be funded based on criteria including "decency"

---

matter which may disparage . . . persons . . . or bring them into contempt[ ] or disrepute."  15 U.S.C. § 1052(a).  Thus, any argument that section 2(a) has different policy objectives simply ignores the statute itself.

[5] Indeed, the government may regulate commercial speech more freely than non-commercial speech.  *See Friedman v. Rogers*, 440 U.S. 1, 10 & n.9 (1979). Trademarks are a form of commercial speech.  *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 540 (1987); *see also* Br. 44-45.

did not run afoul of the First Amendment, in part because the unfunded parties were not prevented from presenting their points of view.  524 U.S. 569, 585-88 (1998); *see also Rust v. Sullivan*, 500 U.S. 173, 192-95 (1991) (also reaffirming that government has authority to make value judgments through selective funding). Similarly, here, although the government keeps a register and offers certain benefits from registration, Congress's determination that racist or disparaging marks should "not occupy [the USPTO's] time, services, and use of funds," *McGinley*, 660 F.2d at 486, does not amount to a First Amendment violation because "[n]o conduct is proscribed, and no tangible form of expression is suppressed," *id.* at 484.

### 2.    Mr. Tam's Due Process Challenge Must Be Rejected

Mr. Tam's due process claim (Br. 13, 43, 47-50, 53-57) is also foreclosed by this Court's precedent.  In a closely analogous situation, responding to a vagueness challenge much like Mr. Tam's (*see* Br. 43, 47-50), this Court and the CCPA determined that section 2(a)'s prohibition of "scandalous" marks is not unconstitutionally vague because it "is sufficiently precise to enable the PTO and the courts to apply the law fairly and to notify a would-be registrant that the mark he adopts will not be granted a federal registration."  *McGinley*, 660 F.2d at 484; *see Mavety*, 33 F.3d at 1374.  Similarly, the prohibition of "disparag[ing]" marks under the same subsection is "sufficiently precise."  *McGinley*, 660 F.2d at 484.  If

anything, disparaging could be considered a subset of scandalous and is thus *more* precise. *See In re Lebanese Arak Corp.*, 94 USPQ2d 1215, 1216-17 (TTAB 2010) (explaining that both provisions relate to causing offense; the tests differ only in whether the mark offends a particular group or the general public). Indeed, Mr. Tam does not point to anything, nor could he, to support the notion that "disparag[ing]" is any more vague than "scandalous."

Furthermore, as explained above, the Board follows a well-established two-part test to determine whether a mark is disparaging. A8; *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014). The Board first determines the likely meaning of the mark, and it then determines if that meaning is disparaging to a substantial composite of the referenced group. A8; *Geller*, 751 F.3d at 1358. Several published, precedential decisions of the Board illuminate how the agency applies this provision. *See, e.g.*, *Lebanese Arak*, 94 USPQ2d 1215; *In re Heeb Media LLC*, 89 USPQ2d 1071 (TTAB 2008); *Squaw Valley*, 80 USPQ2d 1264. Mr. Tam is therefore incorrect that there is "no established precedent on which to grant or deny the registration of marks." Br. 49. Indeed, Mr. Tam concedes elsewhere that Congress and the USPTO have established "protocols . . . for [e]nsuring fairness and regularity in the trademark examination process." Br. 19. And because Mr. Tam could have foreseen the refusal under this Court's test, his claim is foreclosed under Supreme Court precedent. *Holder v. Humanitarian Law Project*, 561 U.S. 1,

20 (2010) ("[A] plaintiff whose speech is clearly proscribed [by a given statute] cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice.").

Mr. Tam also generally calls into question the USPTO's authority to apply the statutory mandate that disparaging marks not be registered. *See* Br. 4, 44-50. But as this Court has noted, the Supreme Court has upheld agencies' authority to do just that through adjudication of individual cases. *See, e.g.*, *Animal Legal Defense Fund v. Quigg*, 932 F.2d 920, 929 (Fed. Cir. 1991) (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292-95 (1974)); *see also In re Alappat*, 33 F.3d 1526, 1580 (Fed. Cir. 1994) (en banc) (Plager, J., concurring). This principle is especially applicable to the USPTO, which by statute has two specialized adjudicative bodies within it. *See* 15 U.S.C. § 1070; 35 U.S.C. § 6. There is nothing legally infirm about using the Board to do precisely the job Congress created it to do.

Mr. Tam further asserts that the Board applied section 2(a) in an arbitrary and capricious way. Br. 53-57. As explained above, the Board's application of section 2(a) directly followed the precedent of this Court. Any inconsistency with other registered marks does not render the statute unconstitutional. *See* Br. 55-56 & n.16 (complaining that other registered marks, such as DYKE NIGHT, are equally disparaging). "The fact that, whether because of administrative error or

otherwise, some marks have been registered even though they may be in violation of the governing statutory standard does not mean that the agency must forgo applying that standard in all other cases." *Boulevard*, 334 F.3d at 1343; *see In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174 (Fed. Cir. 2009) (rejecting due process argument because, "[e]ven if all of the third-party registrations should have been refused registration under section 1052(a), such errors do not bind the USPTO to improperly register Applicant's marks").[6] This Court's precedent thus forecloses Mr. Tam's allegation that the Board's application of the law in other cases could somehow create a due process violation in Mr. Tam's case.

### 3.   Mr. Tam's Equal Protection Challenge Must Also Be Rejected

Finally, Mr. Tam's equal protection challenge must also be rejected because it is foreclosed by controlling precedent and is based on an inaccurate factual premise.   Mr. Tam argues that section 2(a) deprives him of equal protection, alleging that his mark was refused registration based on his race.  Br. 50-53.  It is simply untrue that the mark was refused based on Mr. Tam's race.  The Board's decision is clear that the mark was refused registration based on the nature of the mark as used for the identified services, not the nature of the applicant.  As the

---

[6] Indeed, those who believe a mark should not have been registered can petition to cancel the registration.  *See* 15 U.S.C. § 1064(3) (providing that a registered mark can be canceled "[a]t any time" if it was obtained contrary to section 2(a)).

Board explained, the mark was refused registration because Mr. Tam deliberately uses the mark to refer generally to people of Asian descent; any applicant using the term "Slants" to refer to people of Asian descent would have been similarly refused. *See* A14 ("An application by a band comprised of non-Asian-Americans called THE SLANTS that displayed the mark next to the imagery used by applicant shown supra would also be subject to a refusal under Section 2(a)."). The fact that he is a member of the referenced group does not matter.

Moreover, even if the Board had treated Mr. Tam differently from an applicant who was not of Asian descent, this Court has held that section 2(a) does not violate equal protection rights under the Fifth and Fourteenth Amendments if there are also nondiscriminatory reasons for denying registration. Specifically, "allegations of disparate treatment, even if accurate, do not diminish the Board's and Examining Attorney's legitimate, nondiscriminatory reasons for denying registration." *Shinnecock Smoke Shop*, 571 F.3d at 1174-75. Thus, even if the Board had used Mr. Tam's race as one of its reasons for refusing to register the mark, its other reasons, including the band's own statements about its intent to "reclaim" the ethnic slur, preclude any equal protection violation. Mr. Tam's arguments about equal protection lack merit for at least those two separate reasons.

In view of the substantial precedent of this Court, Mr. Tam's constitutional challenges to section 2(a) or the manner in which it was applied in this case must fail.

## V. CONCLUSION

The Board's finding that the mark THE SLANTS is disparaging to people of Asian descent was legally correct and supported by substantial evidence. This Court should affirm.

Dated: August 4, 2014                    Respectfully submitted,


  /s/ Molly R. Silfen
NATHAN K. KELLEY
Solicitor

MOLLY R. SILFEN
CHRISTINA J. HIEBER
THOMAS L. CASAGRANDE
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

*Attorneys for the Director of the United*
*  States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing BRIEF FOR APPELLEE—DIRECTOR OF THE

UNITED STATES PATENT AND TRADEMARK OFFICE contains 9,644 words

as measured by the word-processing software used to prepare this brief.

Dated: August 4, 2014                Respectfully submitted,


/s/ Molly R. Silfen
NATHAN K. KELLEY
Solicitor

MOLLY R. SILFEN
CHRISTINA J. HIEBER
THOMAS L. CASAGRANDE
Associate Solicitors

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

*Attorneys for the Director of the United States Patent and Trademark Office*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2014, I electronically filed the foregoing

BRIEF FOR APPELLEE—DIRECTOR OF THE UNITED STATES PATENT

AND TRADEMARK OFFICE with the Court's CM/ECF filing system, which

constitutes service, pursuant to Fed. R. App. P. 25(c)(2), Fed. Cir. R. 25(a), and the

Court's Administrative Order Regarding Electronic Case Filing 6(A) (May 17,

2012).

/s/ Molly R. Silfen
Molly R. Silfen
Associate Solicitor
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035