# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals for the 𝔉ederal 𝔆ircuit

———————————————

**IN RE: SIMON SHIAO TAM,**
*Appellant*

———————————————

2014-1203

———————————————

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 85472044.

———————————————

Decided: April 20, 2015

———————————————

RONALD D. COLEMAN, Goetz Fitzpatrick PLLC, New York, NY, argued for appellant. Also represented by JOEL GEOFFREY MACMULL.

MOLLY R. SILFEN, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, argued for appellee Michelle K. Lee. Also represented by CHRISTINA HIEBER, THOMAS L. CASAGRANDE, NATHAN K. KELLEY.

———————————————

Before LOURIE, MOORE, and O'MALLEY, *Circuit Judges.*

MOORE, *Circuit Judge.*

Simon Shiao Tam appeals from the decision of the Trademark Trial and Appeal Board (the Board) affirming the examining attorney's refusal to register the mark THE SLANTS because it is disparaging. We *affirm.*

BACKGROUND

Mr. Tam is the "front man" for Asian-American dance rock band The Slants. In 2010, Mr. Tam filed Application No. 77/952,263 ('263 application) seeking to register the mark THE SLANTS for "Entertainment, namely, live performances by a musical band." Mr. Tam attached specimens featuring the band name set against Asian motifs to the '263 application. The examining attorney found the mark disparaging to people of Asian descent under 15 U.S.C. § 1052(a) ("§ 2(a)") and therefore refused to register it. Mr. Tam appealed that refusal to the Board, but the case was dismissed for failure to file a brief and the application was deemed abandoned. On November 14, 2011, six days after the abandonment of the '263 application, Mr. Tam filed a second application (Application No. 85/472,044, or the '044 application) seeking to register the mark THE SLANTS for essentially identical services as in the '263 application. In the '044 application, Mr. Tam claims use of the mark since 2006. Unlike the specimens attached to the '263 application, the specimens attached to the '044 application do not contain Asian motifs. The examining attorney again found the mark THE SLANTS disparaging and declined to register it. In making this determination, the examining attorney cited to materials that he had gathered in response to Mr. Tam's earlier application. Mr. Tam responded and a final office action issued.

The Board affirmed the examining attorney's refusal to register the mark. The Board found that "it is abundantly clear from the record not only that THE SLANTS . . . would have the 'likely meaning' of people of Asian descent but also that such meaning has been so perceived and has prompted significant responses by prospective attendees or hosts of the band's performances." *In re Tam*, No. 85472044, 2013 WL 5498164, at *5 (TTAB Sept. 26, 2013). To support this conclusion, the Board pointed to the band's website, which displayed the

mark next to "a depiction of an Asian woman, utilizing rising sun imagery and using a stylized dragon image," and to a statement by Mr. Tam that he selected the mark in order to "own" the stereotype it represents. *Tam*, 2013 WL 5498164, at \*5. The Board also found that the mark is disparaging to a substantial component of people of Asian descent because "[t]he dictionary definitions, reference works, and all other evidence unanimously categorize the word 'slant,' when meaning a person of Asian descent, as disparaging," and because there was record evidence of individuals and groups in the Asian community objecting to Mr. Tam's use of the word "slant." *Tam*, 2013 WL 5498164, at \*7. The Board therefore disqualified the mark for registration under § 2(a). Mr. Tam appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(4).

## DISCUSSION

Mr. Tam argues that the Board erred in finding the mark THE SLANTS disparaging under § 2(a) of the Lanham Act and therefore unregistrable. Mr. Tam also challenges the constitutionality of § 2(a).

## I. Disparagement Analysis

Section 2(a) of the Lanham Act provides that the Patent and Trademark Office (PTO) may refuse to register a trademark that "[c]onsists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a). A disparaging mark "'dishonors by comparison with what is inferior, slights, deprecates, degrades, or affects or injures by unjust comparison.'" *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014) (quoting *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 124 (D.D.C. 2003))

(alterations omitted). In *Geller*, we applied a two-part test to determine if a mark may be disparaging:

> (1) what is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services; and

> (2) if that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols, whether that meaning may be disparaging to a substantial composite of the referenced group.

*Id.* This determination is "a conclusion of law based upon underlying factual inquiries." *Id.* We review the Board's factual findings for substantial evidence, and its ultimate conclusion de novo. *Id.*

## A. Use of Prior Applications

As a threshold matter, Mr. Tam argues that the examining attorney and the Board should not have considered evidence gathered by the examining attorney while evaluating the earlier '263 application. We disagree. The examining attorney may look to evidence outside the application, such as dictionary definitions and newspaper articles, when determining the "manner of use" of the mark. *See In re Bayer Aktiengesellschaft*, 488 F.3d 960, 966–69 (Fed. Cir. 2007). Mr. Tam claims use of the mark THE SLANTS back to 2006, before he filed the '263 application. Evidence gathered in response to the '263 application is relevant to determining the mark's manner of use for the time period during which Mr. Tam asserts the mark was in use. While the evidence gathered during the evaluation of the '263 application derives from an abandoned application dated before the '044 application's filing date, its use was not improper.

## B. Likely Meaning

To determine if a mark is disparaging, we first consider "the likely meaning of the matter in question." *Geller*, 751 F.3d at 1358. The Board found that the mark THE SLANTS refers to people of Asian descent. Substantial evidence supports this finding. Mr. Tam argues that the mark does not refer to people of Asian descent. His argument seems to rely on 1) the fact that the term "slant" has a number of alternative, more common meanings; 2) that none of the specimens attached to the '044 application include Asian imagery or otherwise reference people of Asian descent; and 3) that the PTO has granted a number of unrelated trademark applications containing the term "slant." We are not persuaded by Mr. Tam's argument.

There is no dispute that the term "slants" has a number of meanings, one of which refers to people of Asian descent. The Board cited a number of traditional and slang dictionaries defining the word with reference to people of Asian descent, ranging from *Oxford Reference Online* to www.urbandictionary.com. *Tam*, 2013 WL 5498164, at *1–2 & n.3. Even the dictionary entries supplied by Mr. Tam include as possible definitions for the term "slant" "a disparaging term for a person of East Asian birth or ancestry," J.A. 219 (*The American Heritage Dictionary of the English Language*), and "[a] person with slanting eyes, spec. one of Oriental descent," J.A. 234–36 (*Oxford English Dictionary*).

The fact that the term "slants" has some innocuous meanings—and that some trademarks have issued with those innocuous meanings—does not foreclose the possibility that the term may also be used in an offensive manner, even when the non-disparaging meanings are more common. *See Tam*, 2013 WL 5498164, at *5. Rather, the existence of these other meanings makes it necessary to examine how the applicant uses the mark in

the marketplace to determine its likely meaning—as the Board did.

The evidence here supports the Board's finding that the mark THE SLANTS likely refers to people of Asian descent. For example, an article in the record includes a quote attributed to Mr. Tam where he describes the genesis of the band's name by explaining: "I was trying to think of things that people associate with Asians. Obviously, one of the first things people say is that we have slanted eyes. . . ." J.A. 130. The record also contains the band's entry in Wikipedia, which states that the band's name is "derived from an ethnic slur for Asians." J.A. 57. The Wikipedia entry quotes Mr. Tam: "We want to take on these stereotypes that people have about us, like the slanted eyes, and own them. We're very proud of being Asian—we're not going to hide that fact. The reaction from the Asian community has been positive." *Id.* Furthermore, the record includes an image from the band's website in which the mark THE SLANTS is set against "a depiction of an Asian woman, utilizing rising sun imagery and using a stylized dragon image," as described by the Board. *Tam*, 2013 WL 5498164, at *2, 5 (citing J.A. 59). Finally, the record includes evidence that both individuals and Asian groups have perceived the term as referring to people of Asian descent. *Tam*, 2013 WL 5498164, at *2–3 (citing, e.g., J.A. 95 ("[Mr. Tam] was initially slated to give the keynote address at the 2009 Asian American Youth Leadership Conference in Portland. But some conference supporters and attendees felt the name of the band was offensive and racist, and out of respect for these opinions the conference organizers decided to choose someone less controversial.")). On this record, we find that substantial evidence supports the Board's determination that the mark THE SLANTS likely refers to people of Asian descent.

Mr. Tam also argues that we should not consider this evidence because it is unauthenticated hearsay and does not satisfy the requirements of 37 C.F.R. § 2.122(a), which applies the Federal Rules of Evidence to inter partes proceedings. However, § 2.122(a) does not apply to ex parte proceedings. For ex parte proceedings, the Board has adopted a "somewhat more permissive stance with respect to the admissibility and probative value of evidence." TRADEMARK TRIAL & APPEAL BOARD MANUAL OF PROCEDURE § 1208. In ex parte proceedings, the Board permits the examining attorney to consider Internet material. *Id.* § 1208.03. We see no error in the Board's procedures.

## C. Whether the Meaning May Be Disparaging to a Substantial Composite of the Referenced Group

If the likely meaning of the mark "is found to refer to identifiable persons, institutions, beliefs or national symbols," we next consider "whether that meaning may be disparaging to a substantial composite of the referenced group." *Geller*, 751 F.3d at 1360. Substantial evidence supports the Board's finding that the mark THE SLANTS is likely offensive to a substantial composite of people of Asian descent.

First, the definitions in evidence universally characterize the word "slant" as disparaging, offensive, or an ethnic slur when used to refer to a person of Asian descent. *Tam*, 2013 WL 5498164, at *1–2, 7 & n.3. This includes the dictionaries provided by Mr. Tam in his response to office action. J.A. 219, 234–36. Additionally, the record includes a brochure published by the Japanese American Citizens League describing the term "slant," when used to refer to people of Asian descent, as a "derogatory term" that is "demeaning" and "cripple[s] the spirit." J.A. 48–49. The record also includes news articles and blog posts discussing the offensive nature of the

band's name, which led to the cancellation of the band's scheduled performance at a conference for Asian youth. *Tam*, 2013 WL 5498164, at *2–3 (citing J.A. 45, 51, 94–98, 100). We find there is substantial evidence—even without a marketing survey or some other quantitative measure of the term's offensiveness—supporting the Board's finding that the mark is disparaging to a substantial composite of people of Asian descent. The Board does not have the resources, nor is it required, to conduct a marketing survey each time it evaluates whether a term is disparaging. *See In re Loew's Theatres, Inc.*, 769 F.2d 764, 768 (Fed. Cir. 1985).

## II. Constitutionality of § 2(a)

Having affirmed the Board's holding that the mark is disparaging, we next turn to Mr. Tam's constitutional challenges.

### A. First Amendment

Mr. Tam argues that the Lanham Act's restrictions on disparaging trademarks are unconstitutional under the First Amendment both facially and as applied to his case because § 2(a) conditions a benefit—trademark registration—on the relinquishment of speech. This argument is foreclosed by our precedent. In *In re McGinley*, our predecessor court wrote:

> With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark does not affect his right to use it. No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark.

660 F.2d 481, 484 (C.C.P.A. 1981). In subsequent cases, we have accepted this reasoning. *In re Boulevard Entm't, Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003) ("[T]he refusal

to register a mark does not proscribe any conduct or
suppress any form of expression because it does not affect
the applicant's right to use the mark in question."); *In re
Mavety Media Grp.*, 33 F.3d 1367, 1374 (Fed. Cir. 1994);
*see also In re Fox*, 702 F.3d 633, 635 (Fed. Cir. 2012)
("Because a refusal to register a mark has no bearing on
the applicant's ability to use the mark, we have held that
§ 1052(a) does not implicate the First Amendment rights
of trademark applicants."). We here follow our precedent.

## B.  Vagueness

Mr. Tam also argues that the disparagement standard
of § 2(a) is unconstitutionally vague. He claims that key
terms of § 2(a), such as "scandalous" and "disparage," are
not "clearly defined" and are necessarily subjective. He
argues that § 2(a) therefore does not give "the person of
ordinary intelligence a reasonable opportunity to know
what is prohibited." *Grayned v. City of Rockford*, 408 U.S.
104, 108 (1972).

We have noted with respect to § 2(a)'s bar on scandal-
ous subject matter the "inherent difficulty in fashioning
a single objective measure like a substantial composite of
the general public from the myriad of subjective view-
points." *Mavety*, 33 F.3d at 1371. Nonetheless, we found
the standard "sufficiently precise to enable the PTO and
the courts to apply the law fairly and to notify a would-be
registrant that the mark he adopts will not be granted a
federal registration." *McGinley*, 660 F.2d at 485. The
same is true for the bar on disparaging marks. The Board
follows a well-established two-part test to determine if a
mark is disparaging. *See Geller*, 751 F.3d at 1358. This
standard is not unconstitutionally vague.

## C.  Due Process

Mr. Tam argues that the PTO applies the disparage-
ment provisions arbitrarily and without clear guidelines.
He points to registered trademarks containing slurs

against homosexuals such as DYKES ON BIKES, U.S. Registration No. 3323803, as evidence of the arbitrary nature of trademark adjudication.

We have rejected similar due process challenges to § 2(a). In both *Boulevard Entertainment*, 334 F.3d at 1343, and *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 1174 (Fed. Cir. 2009), the applicant argued that by refusing to register his mark while granting similar marks, the PTO had violated the Due Process clause. In these cases, we found no due process violation because the applicant "was provided a full opportunity to prosecute his applications and to appeal the examining attorney's final rejections to the Board." 571 F.3d at 1174. The same is true here. We also noted that "allegations regarding similar marks are irrelevant because each application must be considered on its own merits." *Id.* (citing *Boulevard Entm't*, 334 F.3d at 1343). Furthermore, "[e]ven if all of the third-party registrations should have been refused registration under [§ 2(a)], such errors do not bind the USPTO to improperly register [the a]pplicant's marks." *Id.* (citing *Boulevard Entm't*, 334 F.3d at 1343). This reasoning compels us to reject Mr. Tam's due process argument.

## D. Equal *Protection*

Lastly, Mr. Tam argues that because the examining attorney's disparagement analysis hinged on his and his bandmates' ethnic identities, the rejection of the mark violated the equal protection clause. To support this argument, Mr. Tam points to the Final Office Action, which states:

> Here, the evidence is uncontested that applicant is a founding member of a band (The Slants) that is self described as being composed of members of Asian descent. . . . Thus, the association of the term SLANTS with those of Asian descent is evi-

> denced by how the applicant uses the Mark – as
> the name of an all Asian-American band.

J.A. 244. Mr. Tam argues the examining attorney's race-based determination is neither justified by a compelling government interest nor narrowly tailored towards achieving that goal.

We reject Mr. Tam's equal protection argument. The record shows that the Board denied Mr. Tam the registration because he used the mark THE SLANTS in a disparaging manner, not on account of his race. The Board wrote that "[a]n application by a band comprised of non-Asian-Americans called THE SLANTS that displayed the mark next to the imagery used by applicant . . . would also be subject to a refusal under Section 2(a)." *Tam*, 2013 WL 5498164, at *6. Furthermore, we have held that a trademark refusal does not violate equal protection so long as there are nondiscriminatory reasons for denying registration. *Shinnecock Smoke Shop*, 571 F.3d at 1175. Here there are nondiscriminatory reasons for denying Mr. Tam's application.

## CONCLUSION

We *affirm* the Board's decision affirming the examining attorney's refusal to register the mark THE SLANTS because it is disparaging.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

## IN RE: SIMON SHIAO TAM,
*Appellant*

---

2014-1203

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 85472044.

---

MOORE, *Circuit Judge*, additional views.

It is time for this Court to revisit *McGinley*'s holding on the constitutionality of § 2(a) of the Lanham Act. Under § 2(a), the PTO may refuse to register immoral, scandalous, or disparaging marks.  15 U.S.C. § 1052(a). In *In re McGinley*, our predecessor court held without citation to any legal authority in just a few sentences that § 2(a) does not implicate the First Amendment:

> With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark does not affect his right to use it. No conduct is proscribed, and no tangible form of expression is suppressed.  Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark.

660 F.2d 481, 484 (C.C.P.A. 1981).  More than thirty years
have passed since *McGinley*, and in that time both the
*McGinley* decision and our reliance on it have been widely
criticized.[1]  Furthermore, First Amendment jurisprudence

---

[1]    *See, e.g.*, *Ritchie v. Simpson*, 170 F.3d 1092, 1103
& n.1 (Fed. Cir. 1999) (Newman, J., dissenting); *Pro-
Football Inc. v. Harjo*, No. 99-1385 (CKK), 2000 WL
1923326, at *4 (D.D.C. Dec. 11, 2000); Stephen Baird,
*Moral Intervention in the Trademark Arena: Banning the
Registration of Scandalous and Immoral Trademarks*, 83
TRADEMARK REPORTER 661, 685–86 (1993); Justin G.
Blankenship, *The Cancellation of Redskins as a Disparag-
ing Trademark: Is Federal Trademark Law an Appropri-
ate Solution for Words That Offend?*, 72 U. COLO. L. REV.
415, 443–44 (2001); Terence Dougherty, *Group Rights to
Cultural Survival: Intellectual Property Rights in Native
American Cultural Symbols*, 29 COLUM. HUM. RTS. L. REV.
355, 383 (1998); Bruce C. Kelber, *"Scalping the Redskins:"
Can Trademark Law Start Athletic Teams Bearing Native
American Nicknames and Images on the Road to Racial
Reform?*, 17 HAMLINE L. REV. 533, 556 (1994); Paul Ku-
ruk, *Goading a Reluctant Dinosaur: Mutual Recognition
Agreements as a Policy Response to the Misappropriation
of Foreign Traditional Knowledge in the United States*, 34
PEPP. L. REV. 629, 662 n.209 (2007); Michelle B. Lee,
*Section 2(a) of the Lanham Act as a Restriction on Sports
Team Names: Has Political Correctness Gone Too Far?*, 4
SPORTS LAW J. 65, 66–67 (1997); Jeffrey Lefstin, *Does the
First Amendment Bar Cancellation of Redskins?*, 52 STAN.
L. REV. 665, 676–77 (2000); Nell Jessup Newton, *Memory
and Misrepresentation: Representing Crazy Horse*, 27
CONN. L. REV. 1003, 1030 n.109 (1995); Ron Phillips, *A
Case for Scandal and Immorality: Proposing Thin Protec-
tion of Controversial Trademarks*, 17 U. BALT. INTELL.
PROP. L.J. 55, 67–68 (2008); Jendi Reiter, *Redskins and*

on the "unconstitutional conditions" doctrine and the protection accorded to commercial speech has evolved significantly since the *McGinley* decision. In 1991, the source of the PTO's funding shifted from the taxpayers to application fees. The constitutionality of § 2(a) is an important and timely issue that raises a number of constitutional questions. The time has come to give this issue the consideration it is due.

There are three requirements for finding a violation of the First Amendment. The speech at issue must be protected speech. *See, e.g.*, *Roth v. United States*, 354 U.S. 476 (1957) (obscenity is not protected by the First Amendment); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (defamation under certain circumstances is not protected by the First Amendment); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ("fighting words" are not protected by the First Amendment); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992) ("'[T]he freedom of speech' referred to by the First Amendment does not include a freedom to disregard these traditional limitations."); *United States v. Alvarez*, 132 S. Ct. 2537, 2543–44 (2012) (plurality opinion). There must be government action that abridges that speech in a manner that implicates the First Amendment, as, for example, when the government bans flag-burning, *Texas v. Johnson*, 491 U.S. 397, 405 (1989), or imposes taxes on certain publications, *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229–30 (1987). And the abridgement must be unconstitutional when analyzed under the appropriate framework—for

---

*Scarlet Letters: Why "Immoral" and "Scandalous" Trademarks Should Be Federally Registrable*, 6 FED. CIR. BAR. J. 191, 197 (1996); Lilit Voskanyan, *The Trademark Principal Register as a Nonpublic Forum*, 75 U. CHI. L. REV. 1295, 1302 (2008).

example, the *Central Hudson* four-part test for determining the constitutionality of restrictions on commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

I.    Are Trade Names Protected Speech?

For many years, commercial speech lay outside the ambit of the First Amendment. In 1975, the Supreme Court ruled that the First Amendment protects commercial speech, *Bigelow v. Virginia*, 421 U.S. 809, 818 (1975), and five years later the Supreme Court laid out the four-part test for determining the constitutionality of restrictions on commercial speech, *Central Hudson*, 447 U.S. at 566.

Today, however, it is unquestionably true that trademarks are protected speech under Supreme Court commercial speech jurisprudence. Commercial speech is the "dissemination of information as to who is producing and selling what product, for what reason, and at what price." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976). Protecting the flow of this type of information is "indispensable." *Id.* Four years after *Bigelow*, the Supreme Court held that the trade name of an optometrist is commercial speech. *Friedman v. Rogers*, 440 U.S. 1, 11 (1979) ("The use of trade names in connection with optometrical practice, then, is a form of commercial speech and nothing more."). Trade names identify the source of a product or service for users, and thus provide some of the information labeled indispensable by the Supreme Court in *Virginia State Board*. Indeed, the government has conceded that "[t]rademarks are a form of commercial speech." Appellee's Br. 34 n.5. Because a trademark identifies the source of a product or service for users, it is protected commercial speech.

While it may be true that many marks are used solely as a source identifier, that is not the case here. Mr. Tam's mark THE SLANTS does more than merely identify the band in the commercial arena. In *Friedman*, the Court reasoned that the optician seeking the trade name "does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters." 440 U.S. at 11. Here, by contrast, Mr. Tam seeks to trademark the name of a musical group, selecting the name "The Slants" to "reclaim" and "take ownership" of Asian stereotypes. J.A. 129–30. The band draws inspiration for its lyrics from childhood slurs and mocking nursery rhymes, J.A. 130, and its albums include "The Yellow Album" and "Slanted Eyes, Slanted Hearts." The band "feel[s] strongly that Asians should be proud of their cultural heritage, and not be offended by stereotypical descriptions." J.A. 52. With their lyrics, performances, and band name, Mr. Tam and The Slants weigh in on cultural and political discussions about race and society that are within the heartland of speech protected by the First Amendment.

## II.    Is § 2(a) an Abridgement of Speech?

### A. Benefits of Trademark Registration

The *McGinley* court held that the refusal to register a mark under § 2(a) does not bar the applicant from using the mark, and therefore does not implicate the First Amendment. It is true that § 2(a) does not bar the applicant from using the mark. Here, for example, Mr. Tam's band can continue to perform and advertise using the name "The Slants." However, as the *McGinley* court wrote, § 2(a) denies the applicant access to "benefits provided by the Lanham Act which enhance the value of a mark." 660 F.2d at 486 n.12. "Registration is significant. The Lanham Act confers important legal rights and

benefits on trademark owners who register their marks."
*B&B Hardware, Inc. v. Hargis Ind., Inc.*, 135 S. Ct. 1293,
1300 (2015).

These benefits—unavailable in the absence of federal
registration—are numerous, and include both substantive
and procedural rights. First, the holder of a federal
trademark has a right to exclusive nationwide use of that
mark where there was no prior use by a party other than
the markholder. *See* 15 U.S.C. §§ 1072, 1115. Because
under the common law, a markholder only has the right
to exclusive use where he has used his mark before, *see* 5
J. Thomas McCarthy, *McCarthy on Trademarks and
Unfair Competition* § 26:32 (4th ed.), holders of a federal
trademark have an important substantive right they
could not otherwise obtain. Also, a registered mark is
presumed to be valid, 15 U.S.C. § 1057(b), and the mark
becomes incontestable (with certain exceptions) after five
years of consecutive post-registration use, *id.* § 1065; *see
also B&B Hardware*, 135 S. Ct. at 1310 ("Incontestability
is a powerful protection"). A markholder may sue in
federal courts to enforce his trademark, 15 U.S.C. § 1121,
and he may recover treble damages if he can show in-
fringement was willful, *id.* § 1117. He may also obtain
the assistance of U.S. Customs and Border Protection in
restricting importation of infringing or counterfeit goods,
*id.* § 1124; 19 U.S.C. § 1526, or prevent "cybersquatters"
from misappropriating his domain name, 15 U.S.C.
§ 1125(d). In effect, § 2(a) of the Lanham Act conditions
trademark registration and all of its attendant benefits on
the applicant's selection of a suitable mark. Section 2(a)'s
registerability conditions are not tethered to the trade-
mark's functioning as a source identifier or to any concern
over the mark creating confusion or being misleading.
Instead, § 2(a) allows the PTO to determine whether the
trademark is suitable for registration, in this case wheth-

er it is disparaging, which is a moral judgment based solely and indisputably on the mark's expressive content.

Not only is a disparaging trademark denied federal registration, but it cannot be protected by its owner by virtue of a § 43(a) unfair competition claim. *Id.* § 1125(a). Section 43(a) allows for a federal suit, much like state common law, to protect an unregistered trademark. As many courts have noted, it is the use of a trademark in commerce, not its registration, which gives rise to a protectable right. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006) ("Registration does not create a mark or confer ownership; only use in the marketplace can establish a mark."); *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1366 (Fed. Cir. 1999) ("The federal registration of a trademark does not create an exclusive property right in the mark. The owner of the mark already has the property right established by prior use. . . . However, those trademark owners who register their marks with the PTO are afforded additional protection not provided by the common law."). Equally clear, however, is that § 43(a) protection is only available for unregistered trademarks *that could have qualified for federal registration. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (section 43(a) "protects qualifying unregistered trademarks and . . . the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)"); *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004) (plaintiff must establish that its mark is protectable to prevail in a claim under § 43(a)); *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 992 (2d Cir. 1987) (requiring a plaintiff to "demonstrate that his [unregistered] mark merits protection under the Lanham Act"). Thus, no federal cause of action is availa-

ble to protect a trademark deemed disparaging, regardless of its use in commerce.

Section 2(a)'s bar on disparaging marks was a creation of the federal government, first developed when Congress enacted the Lanham Act. *See infra* at 21–22. Three years later, the United States Trademark Association prepared the Model State Trademark Bill—a bill patterned on the Lanham Act in many respects. McCarthy at § 22:5. The Model Bill contained language barring a mark from registration if it "consists of or comprises matter which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 1964 Model State Trademark Act, § 2. Following the lead of the federal government, virtually all states have adopted the Model Bill and its disparagement provision. McCarthy at § 22:5. Thus, not only are the benefits of federal registration unavailable to Mr. Tam, so too are the benefits of trademark registration in nearly all states. And as commentators have noted, state statutory and common law schemes mirror Lanham Act protections, making it likely that an unregisterable trademark will have no state protection. McCarthy at § 22:1.50; *see also* 1964 Model State Trademark Act, § 1.C ("The term 'mark' as used herein includes any trademark or service mark *entitled to registration* under this Act whether registered or not.") (emphasis added).

While denial of registerability and the attendant rights of protection both federal and state do not prevent a trademark owner from using its mark, such denial severely burdens use of such marks. Section 2(a)'s content-based restrictions on registerability were adopted to reduce use of trademarks the government deemed unsuitable (such as those that disparage)—no doubt a chilling effect on speech.

## B. The "Unconstitutional Conditions" Doctrine

The Supreme Court has repeatedly held that the government cannot deny access to a benefit because of the recipient's exercise of constitutionally protected speech. Under the "unconstitutional conditions" doctrine,

> [E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Under this doctrine, the Supreme Court held that a state college could not refuse to retain a professor because of his public criticism of that college's policy, even though the professor had no right to reemployment and even though the government had not directly prohibited the professor from speaking. *Id.* at 597–98. This is because "[t]o deny [a benefit] to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Speiser v. Randall*, 357 U.S. 513, 518 (1958).

Since *Perry*, the Supreme Court has wrestled with the inherent tension between applying the "unconstitutional conditions" doctrine and protecting Congress' ability to direct government spending. As the Supreme Court has noted, the Spending Clause of the U.S. Constitution, which grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. Art. I, § 8, cl. 1, "provides

Congress broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327–28 (2013). This includes "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends," even when these limits are conditioned on the recipients' constitutional rights. *Id.* at 2328 (citing *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991)). The Court reasoned that "if a party objects to a condition on the receipt of federal funding," it can always decline the funds. *Id.*

Thus, "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 211 (2003) (quoting *Rust*, 500 U.S. at 194). Under this reasoning, the Supreme Court upheld regulations prohibiting the use of federal family planning funds for abortion counseling and referral services. *Rust*, 500 U.S. at 192. Similarly, the Court held that conditioning public libraries' receipt of federal subsidies on their use of Internet filtering software was a valid exercise of Congress' spending power, because Congress was entitled to insist that "public funds be spent for the purposes for which they were authorized." *Am. Library Ass'n*, 539 U.S. at 211–12 (quotation marks omitted). This spending limitation applies to indirect forms of public funding such as tax exemptions as well as direct subsidies. *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 544 (1983) ("Both tax exemptions and tax-deductibility are a form of subsidy that is administered through the tax system.").

The government's discretion under the Spending Clause, while broad, is not unbounded. If a program arises from the Spending Clause, Congress is free to attach "conditions that define the limits of the govern-

ment spending program—those that specify the activities Congress wants to subsidize." *Agency for Int'l Dev.*, 133 S. Ct. at 2328. However, Congress does not have the authority to attach "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* For example, the Court held that Congress could not restrict appropriations aimed at combating the spread of AIDS to only organizations having policies explicitly opposing prostitution and sex trafficking. *Id.* at 2230–31.

Thus, the analysis of whether Congress has imposed an unconstitutional condition on a federal benefit is affected by the nature of the Congressional benefit— namely, was the benefit authorized pursuant to Congress' Spending power. Courts have examined whether the conditioned benefit was pursuant to the Spending Clause. For example, the Ninth Circuit considered whether the "unconstitutional conditions" doctrine prevented the government from implementing a treaty under which certain "educational, scientific, and cultural" audio-visual materials were subject to benefits, including exemption from import duties. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 503 (9th Cir. 1988). Film makers, producers, and distributors argued that the treaty violated the First Amendment. *Id.* at 504. The government responded by arguing, as it does here, that the regulations stemming from the treaty did not "punish or directly obstruct plaintiffs' ability to produce or disseminate their films," and that any benefits flowing from the regulations were "a case of the government simply declining to pay a subsidy." *Id.* at 509. The Ninth Circuit disagreed with the government's "benign characterization" of the effect of the regulations and reasoned that the trade benefits were not a subsidy because "no Treasury Department funds [were] involved," and therefore the spending exception did not apply. *Id.* at 509. The Ninth Circuit held that "by condi-

tioning a valuable governmental benefit on the basis of
speech content, the [government] forces film makers to
choose between exercising their right to free speech and
foregoing benefits under the [treaty], or curtailing their
speech and obtaining the benefits." *Id.* at 511. It rea-
soned that "this sort of dilemma patently transgresses the
well-established principle that government may not
condition the conferral of a benefit on the relinquishment
of a constitutional right." *Id.*

The Fifth Circuit recently considered, en banc, the
constitutionality of a Texas law allowing charitable organ-
izations to hold bingo games so long as the resulting funds
were not used for lobbying. *Dep't of Tex., Veterans of
Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 430
(5th Cir. 2014) (en banc). The Texas Lottery Commission
argued that the law's restrictions were not unconstitu-
tional because they fell within the state government's
spending power, which is analogous to the federal gov-
ernment's spending power. *Id.* at 434. The Fifth Circuit
agreed that "the government may attach certain speech
restrictions to funds linked to the public treasury—when
either granting cash subsidies directly from the public
coffers . . . or approving the withholding of funds that
otherwise would go to the public treasury." *Id.* at 435.
However, the Fifth Circuit found the Texas bingo program
"wholly distinguishable . . . because no public monies or
'spending' by the state are involved." *Id.* at 436. The
Fifth Circuit reasoned that the bingo program's primary
function is regulatory, further "underscor[ing] the incon-
gruity of [applying] the 'subsidy' paradigm to the bingo
program." *Id.* at 437. The Fifth Circuit therefore applied
the "unconstitutional conditions" doctrine to the bingo
program, and found its lobbying provision unconstitution-
al. *Id.* at 437–41.

The D.C. Circuit similarly held that a presidential di-
rective barring lobbyists from serving on international

trade advisory committees implicated the First Amend-
ment. *Autor v. Pritzker*, 740 F.3d 176, 177 (D.C. Cir.
2014). The government argued that "when [it] appropri-
ates public funds to establish a program, its decision not
to use program funds to subsidize the exercise of a fun-
damental right does not infringe." *Id.* at 182 (quotations
and alterations omitted). The D.C. Circuit rejected the
government's argument because membership in the
advisory committees was a non-financial—albeit valua-
ble—benefit. *Id.* at 182–83. It noted that advisory com-
mittee members are not paid for their service, "absorbing
even their out of pocket expenses." *Id.* at 183. Because
"[t]he Supreme Court has never extended the [spending
exception] to situations not involving financial benefits,"
the D.C. Circuit found the directive could be an unconsti-
tutional condition, and remanded so the district court
could consider the lobbyists' claims further. *Id.* at 183–
84.

    In another case, satellite carriers objected to the
"must carry" provision in a federal law that granted
satellite carriers a copyright license to retransmit local
television stations in a given market so long as they also
retransmitted all local television stations in that market
upon request. *Satellite Broad. & Commc'ns Ass'n v. FCC*,
146 F. Supp. 2d 803, 808–09 (E.D. Va. 2001), *aff'd*, 275
F.3d 337 (4th Cir. 2001). The district court reasoned that
Congress' grant of a copyright license to satellite carriers
did not arise from the Spending Clause (and therefore
qualify as a "subsidy") because "it [did] not entail the
grant of government funds, or other benefits obtained
through the use of government funds (i.e., property,
government-created jobs, etc.), to confer a benefit." *Id.* at
829. The court then considered the constitutionality of
the "must carry" condition attached to the copyright
license, and held the law constitutional both because it
satisfied intermediate scrutiny and because, if a carrier

opted not to accept the copyright license granted by the statute, it could still negotiate for the right to transmit the local stations. *Id.* at 830–31.

### C. Applying the "Unconstitutional Conditions" Doctrine to Trademark Registration

*McGinley* is the only case of ours to consider, if only briefly, the First Amendment implications of § 2(a). Since *McGinley*, a number of cases raised a First Amendment challenge to § 2(a), but in each case, the panel held itself bound by *McGinley*. *See In re Boulevard Entm't, Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003); *In re Mavety Media Grp.*, 33 F.3d 1367, 1374 (Fed. Cir. 1994); *In re Fox*, 702 F.3d 633, 635 (Fed. Cir. 2012). Neither the court in *McGinley* nor any other court has analyzed § 2(a) under the "unconstitutional conditions" doctrine. This is error. Federal trademark registration confers valuable benefits, and under § 2(a), the government conditions those benefits on the applicants' choice of a mark. Because the government denies benefits to applicants on the basis of their constitutionally protected speech, the "unconstitutional conditions" doctrine applies.

However, we are faced with a fundamental predicate question: does the "unconstitutional conditions" doctrine apply with full force in the context of trademark registration, or is it tempered by virtue of Congress' spending power? The benefits of trademark registration, while valuable, are not monetary. Unlike tangible property, a subsidy, or a tax exemption, bestowal of a trademark registration does not result in a direct loss of any property or money from the public fisc. Rather, a trademark redefines the nature of the markholder's rights as against the rights of other citizens, depriving others of their rights to use the mark. Like the programs in *Bullfrog* and *Texas Lottery Commission*, the system of trademark registration is a regulatory regime, not a government subsidy program.

Furthermore, the act of registering a trademark does not involve the federal treasury. In 1981, as noted by the *McGinley* court, trademark registration was "underwritten by public funds." 660 F.2d at 486. That is no longer true today. Since 1991, PTO operations have been funded entirely by registration fees, not the taxpayer. Figueroa v. United States, 466 F.3d 1023, 1028 (Fed. Cir. 2006); see also 56 Fed. Reg. 65147 (1991); Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, S. 10101, 1990 U.S.C.C.A.N. (104 Stat.) 1388.

While PTO operations are fully funded by registration fees, some federal funds are nonetheless spent to facilitate the registration and enforcement of trademarks. For example, PTO employee benefits, which include pensions, health insurance, and life insurance, are administered by the Office of Personnel Management and funded from the general treasury. *Figueroa*, 466 F.3d at 1028. And registering a trademark may lead to additional government spending, such as when the trademark owner seeks to enforce the trademark through the federal courts and U.S. Customs and Border Patrol. This spending, however, is attenuated from the benefits bestowed by trademark registration. Trademark registration does not implicate the Spending Clause merely because of this attenuated spending, else every benefit or program provided by the government would implicate the Spending Clause. The programs in *Bullfrog* and *Texas Lottery Commission* were likely funded in some part by the government—perhaps also by government benefits paid to employees administering the programs—but the Ninth Circuit and the Fifth Circuit considered only whether the conditioned benefits were paid for by government spending, and not whether the government subsidized the program in more indirect manners. And while the government argued in *Autor* that the government had appropriated public funds to establish the international trade advisory committees, 740 F.3d at 182, the D.C. Circuit nonetheless found that member-

ship on these advisory committees was not a financial benefit, *id.* at 183.

The purpose and nature of trademark registration support the conclusion that trademark registration is not a government-funded benefit. The Lanham Act derives from the Commerce Clause, not the Spending Clause, and its purpose is to regulate marks used in interstate commerce—not to subsidize the markholders. 15 U.S.C. § 1127. Furthermore, it is the markholder, and not the government, that must spend money (on advertising using its mark) to obtain the benefits of trademark registration. Registration of a trademark is not a federally funded financial benefit to the applicant.

McGinley was written only one year after Central Hudson and was decided against a background of law where the First Amendment had only recently begun to apply to commercial speech. Given the drastic changes since *McGinley* in constitutional jurisprudence and the PTO's shift from a taxpayer-funded organization to a user-funded program, the *McGinley* court's analysis of the constitutionality of § 2(a) of the Lanham Act no longer suffices. This analysis did not discuss the "unconstitutional conditions" doctrine, despite the doctrine's clear relevance. And because trademark registration is no longer funded by the federal treasury, there is no longer any argument that trademark registration implicates Congress' power to spend. To the contrary, the trademark registration scheme is a prototypical example of a regulatory regime. As a result, the "unconstitutional conditions" doctrine applies. The government cannot hinge the benefits of federal trademark registration on constitutionally protected speech—here, the applicant's selection of a suitable mark—unless the government's actions pass constitutional scrutiny.

III.        Is § 2(a) Unconstitutional?

A. Viewpoint Discriminatory Regulations

"Content-based regulations are presumptively invalid." *R.A.V.*, 505 U.S. at 382; *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).   Viewpoint-based regulations are even more suspect, as they "raise[] the specter that the government may effectively drive certain ideas or viewpoints from the marketplace."  *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991); *see Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).   As a result, these regulations receive the strictest of scrutiny.  "In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell*, 131 S. Ct. at 2667.

Section 2(a) of the Lanham Act bars the registration of disparaging speech.   Under this law, it is possible to register trademarks that refer to a certain group in a positive, or non-disparaging manner, but not trademarks that refer negatively to the same group.   *See R.A.V.*, 505 U.S. at 391 (finding that an ordinance forbidding the use of "fighting words" that insulted "on the basis of race, color, creed, religion or gender" was viewpoint discriminatory because certain fighting words could be used only by those arguing in favor of tolerance, not their opponents). Section 2(a) discriminates against disparaging or offensive viewpoints.[2]  Under this analysis, § 2(a) is presump-

_____

    [2]    It is incorrect to imply that the Lanham Act treats "laudatory" and disparaging trademarks the same.   The Lanham Act always prohibits registration of disparaging marks.   In contrast, the Lanham Acts prohibits the registration of "merely descriptive" marks unless or until they

tively invalid, and must satisfy strict scrutiny to be found constitutional.

Although the Supreme Court has yet to decide whether strict scrutiny attaches to restrictions on commercial speech that are viewpoint discriminatory, there is reason to believe it is an issue worth considering. *Sorrell*, 131 S. Ct. at 2664. This uncertainty is likely of no consequence, however, because it seems likely that section 2(a) cannot survive even the intermediate scrutiny that any restriction on commercial speech receives under *Central Hudson*.

B. *Central Hudson* Test for Commercial Speech

In *Central Hudson*, the Supreme Court laid out the framework for determining the constitutionality of restrictions on commercial speech. 447 U.S. at 566. First, commercial speech "must concern lawful activity and not be misleading." *Id.* If this is the case, we ask whether (1) "the asserted governmental interest is substantial," (2) "the regulation directly advances the governmental interest asserted," and (3) the regulation "is not more extensive than is necessary to serve that interest." *Id.*

First, we ask whether the regulated activity is lawful and not misleading. *Id.* at 563–64. There is nothing illegal about a disparaging trademark such as THE SLANTS, and Mr. Tam does not challenge the Lanham Act's proscription on the registration of misleading marks. Disparaging trademarks satisfy the first prong of the *Central Hudson* framework.

---

acquire distinctiveness or secondary meaning. 15 U.S.C. § 1052(f). Once a laudatory or descriptive mark attains secondary meaning as a source identifier, such marks are eligible for registration; disparaging trademarks are never eligible for registration.

Next, for speech that is lawful and not misleading, a substantial government interest independent of disapproving the speech's message must justify the regulation. *Id.* at 566; *Sorrell*, 131 S. Ct. at 2668 (2011) (law must not "seek to suppress a disfavored message"); *Sorrell*, 131 S. Ct. at 2670 (rejecting message-based interest as "contrary to basic First Amendment principles"). The government has not put forth any substantial interests that would justify § 2(a)'s bar against disparaging marks. One purpose of the disparagement provision of § 2(a) is evident on its face, and it is message-based: to discourage the use of trademarks that are disparaging to persons, institutions, beliefs, or national symbols. The legislative history reinforces the conclusion that Congress enacted § 2(a) because it disapproved of the message conveyed by disparaging marks. *See* Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the House Comm. on Patents, 76th Cong., 1st Sess. 18–21 (1939) (statement of Rep. Thomas E. Robertson) (Rep. Maroney) ("[W]e would not want to have Abraham Lincoln gin."). This is plainly true of the reason for denying registration here, as in other disparagement cases. *See, e.g.*, *In re Geller*, 751 F.3d 1355 (Fed. Cir. 2014) (affirming rejection of STOP THE ISLAMISATION OF AMERICA); *Blackhorse v. Pro-Football, Inc.*, 111 U.S.P.Q.2d 1080 (TTAB June 18, 2014) (cancelling registration of REDSKINS); *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215 (TTAB Mar. 4, 2010) (refusing to register KHORAN for wine); *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071 (TTAB Nov. 26, 2008) (refusing to register HEEB); *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264 (TTAB May 23, 2006) (refusing to register SQUAW VALLEY for one class of goods, but registering it for another). And there is no doubt that

these marks are protected speech, not categorically excluded from First Amendment protection.[3]

While the government may argue that it has an interest in discouraging the use of disparaging marks that may be offensive to persons, institutions, beliefs, or national symbols, this is not a legitimate government interest. *See Sorrell*, 131 S. Ct. at 2670. The Supreme Court has "consistently held that the fact that protected speech may be offensive to some does not justify its suppression." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 (1983). It is a "bedrock principle underlying the First Amendment . . . that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *United States v. Eichman*, 496 U.S. 310, 319 (1990).

---

[3]   Disapproval of the message is also the apparent basis for denying under § 2(a) the registration of many "scandalous" marks that are not obscene. *See, e.g.*, *In re Fox*, 702 F.3d 633 (Fed. Cir. 2012) (affirming rejection of COCK SUCKER for chocolate rooster lollipops); *In re Boulevard Entm't, Inc.*, 334 F.3d 1336 (Fed. Cir. 2003) (affirming rejection of 1-800-JACK-OFF and JACK-OFF for adult entertainment services over telephone); *In re Betty Bangs, LLC*, 2013 WL 5407261 (TTAB July 9, 2013) (refusing to register I BANGED BETTY); *In re Kirby*, 2008 WL 4674566 (TTAB Sept. 22, 2008) (refusing to register COCAINE for energy drinks); *In re Love Bottling Co.*, 2005 WL 1787238 (TTAB June 22, 2005) (refusing to register W.B. WIFE BEATER); *In re Zaharoni*, 2005 WL 363392 (TTAB Jan. 4, 2005) (refusing to register THE COMPLETE A**HOLE'S GUIDE TO . . .); *In re Runsdorf*, 171 U.S.P.Q. 443 (TTAB 1971) (refusing to register BUBBY TRAP for brassieres).

Courts have attributed an additional government interest to § 2(a), reasoning that it acts as "a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government." *See, e.g.*, *McGinley*, 660 F.2d at 486. This cannot warrant the government's regulation of these marks. Trademark registration is entirely user-funded, not taxpayer-funded, so registering these marks costs the government little money. Furthermore, the government must expend significant funds defending its refusal decisions under the statute as it currently stands, so it is not clear that the statute succeeds in saving the government money. *See McGinley*, 660 F.2d at 487 (Rich, J., dissenting) ("More 'public funds' are being expended in the prosecution of this appeal than would ever result from the registration of the mark.").

Finally, labeling this sort of interest as substantial would create an end-run around the "unconstitutional conditions" doctrine, as virtually all government benefits involve the time, services, or funds of the federal government. Nearly every benefit could be justified under this ground, no matter how minimal.

Another interest that has been proposed to justify § 2(a)'s ban on disparaging marks is the government's interest in maintaining a well-functioning trademark system that harmonizes state and federal trademark law. In enacting the Lanham Act, Congress codified a number of long-standing common law trademark principles; the argument posits that striking down § 2(a)'s bar on disparaging marks would disrupt these principles. However, this argument relies on the notion that § 2(a)'s bar on disparaging marks is merely a codification of a common law bar on disparaging marks. That is not the case. While states have long refused to enforce vulgar or misleading trademarks, there is no similar history of a bar on disparaging marks. In drafting § 2(a)'s bar on disparaging marks, Congress was creating new law, not codifying

clear and established principles. *See Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co.*, 703 F.2d 1372, 1376 (Fed. Cir. 1983) ("Although not articulated as such, it appears that the drafters sought by § 2(a) to embrace concepts of the right to privacy, an area of the law then in an embryonic state."); *see also* Act of Feb. 20, 1905, ch. 592, § 5, 33 Stat. 724 (1905) (barring registration of scandalous and immoral marks, but not disparaging marks).    Section 2(a)'s bar on disparaging marks was employed only rarely until recently, and its application was inconsistent. *See, e.g., Doughboy Indus., Inc.*, 88 U.S.P.Q. (BNA) ¶ 227 (P.T.O. Jan. 25, 1951) (refusing to register mark "Dough-boy" in connection with "a prophylactic preparation for the prevention of venereal diseases); *In re Anti-Communist World Freedom Cong., Inc.*, 161 U.S.P.Q. (BNA) ¶ 304 (TTAB Feb. 24, 1969) (refusing to register mark consisting of hammer and sickle with an "X" over it); *In re Condas S.A.*, 188 U.S.P.Q. (BNA) ¶ 544 (P.T.O. July 31, 1975) (finding mark JAP not disparaging to Americans of Japanese ancestry); *Greyhound Corp. v. Both Worlds, Inc.,* 6 U.S.P.Q.2d 1635 (TTAB Mar. 30, 1988) (finding that mark depicting a defecating dog disparaged Greyhound's trademarked running dog logo). And in the early disparagement cases, courts did not base the contours of what it means to be disparaging on the common law. *See generally id.*  Striking down § 2(a)'s on disparaging marks would not disrupt long-standing, well-balanced common law traditions.

Trademarks—which are applied to private goods to identify the source of the goods for consumers—are private speech, not "government speech." *Cf. Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").   Although the government publishes registered trademarks in the Trademark Principal Register, it does so not to communicate a particular message or select a particular

viewpoint; rather, it publishes trademarks to provide notice that a mark has been registered. Despite this, supporters of § 2(a) have claimed that the government has an interest in not being seen to give a stamp of approval, imprimatur, to scandalous and disparaging terms. For this interest to be substantial, the public must believe that trademarks carry the stamp of government approval. The U.S. government recently explained that "'issuance of a trademark registration' does not 'amount[] to the awarding of the U.S. Government's 'imprimatur.'" Brief of United States at 21, *Pro-Football, Inc. v. Blackhorse*, No. 14-cv-1043 (GBL/IDD) (E.D. Va. Mar. 23, 2015), ECF No. 109 (quoting *In re Old Glory Condom Corp.*, 26 U.S.P.Q.2d 1216, 1219–20 n.3 (TTAB Mar. 3, 1993) (alterations in original)). As the Trademark Trial and Appeal Board wrote:

> The duty of this Office . . . in reviewing applications for registration is nothing more and nothing less than to register those marks that are functioning to identify and distinguish goods and services in the marketplace . . . . Just as the issuance of a trademark registration by this Office does not amount to a government endorsement of the quality of the goods to which the mark is applied, *the act of registration is not a government imprimatur or pronouncement that the mark is a "good" one in an aesthetic, or any analogous, sense.*

*Old Glory Condom Corp.*, 26 U.S.P.Q.2d at 1219–20 n.3 (emphasis added). The public is not likely to believe that a registered trademark conveys the imprimatur of the government. The trademark is printed on private property, in fact commercial goods, not on any government property. The purpose served by trademarks, to identify the source of the goods, is antithetical to the notion that the trademark is tied to the government.

We have yet to be presented with any substantial government interests that would justify the PTO's refusal to register disparaging marks. Without this, § 2(a) cannot satisfy the *Central Hudson* test. It is time to revisit the holding in *McGinley* in light of subsequent developments in the law and the trademark registration funding regime.