No. 14-1203
(Serial No. 85/472,044)

# United States Court of Appeals
## for the
## Federal Circuit

IN RE: SIMON SHIAO TAM

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
TRADEMARK TRIAL AND APPEAL BOARD, SERIAL NO. 85/472,044

## BRIEF ON BEHALF OF APPELLANT
## FOR *EN BANC* HEARING

RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,*
*Simon Shiao Tam*

ON THE BRIEF:
  JOHN C. CONNELL
  DARTH M. NEWMAN

June 11, 2015

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF RELATED CASES ................................................. 1

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ON APPEAL ................................... 1

STATEMENT OF THE CASE ................................................................ 1

STATEMENT OF FACTS ....................................................................... 3

    I.    The Facts Relied Upon by the PTO and the TTAB ............................. 3

    II.   The TTAB's Affirmation of the Refusal to Register ........................... 5

SUMMARY OF THE ARGUMENT ..................................................... 5

ARGUMENT ............................................................................................. 7

    I.    STANDARD OF REVIEW ................................................... 7

    II.   PURPOSES OF TRADEMARK REGISTRATION ........................... 8

        A.    Commercial objective and benefits: marketplace regulation .................................................................. 9

        B.    Non-commercial objective and burden: content regulation ................................................................. 11

    III.  TRADEMARKS ARE SPEECH CONSTITUTIONALLY PROTECTED BY THE FIRST AMENDMENT ............................... 14

    IV.  THE §2(a) BAR ON REGISTRATION OF DISPARAGING MARKS ABRIDGES PROTECTED SPEECH BY IMPOSING CONDITIONS ON THE EXERCISE OF FIRST AMENDMENT RIGHTS ................................................................. 16

        A.    The §2(a) bar finds no warrant in the Spending Clause ......... 18

        B.    The §2(a) bar acts as leverage to regulate speech outside of the contours of the commercial objectives of the program of trademark registration ........................................... 20

    V.   THE ABRIDGMENT OF PROTECTED SPEECH BY THE §2(a) BAR ON REGISTRATION OF DISPARAGING MARKS IMPLICATES FIRST AMENDMENT SCRUTINY ......... 23

A.    Because the §2(a) bar is not content-neutral, strict scrutiny applies .......................................................................23

B.    Even if the §2(a) bar were considered content-neutral, intermediate scrutiny applies ...................................................25

VI.    THE §2(a) BAR ON REGISTRATION OF DISPARAGING MARKS IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED...........................................................................................28

A.    On its face, the §2(a) bar is unconstitutional as content-based regulation ......................................................................28

B.    As applied, the §2(a) bar is unconstitutional as viewpoint discrimination..........................................................................29

CONCLUSION ....................................................................................30

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

CERTIFICATE OF INTEREST

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)..........................................................................14

*Abood v. Detroit Bd. of Educ.*,
  431 U.S. 209 (1977)..........................................................................18

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*,
  133 S.Ct. 2321 (2013).......................................................6, 19, 21, 22

*Alexander v. Cahill*,
  598 F.3d 79 (2d Cir.), *cert. den.*, 562 U.S. 1123 (2010) ...................27

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002)..........................................................................28

*B&B Hardware, Inc. v. Hargis Indus.*,
  135 S.Ct. 1293 (2015).........................................................................9

*Bates v. State Bar of Ariz.*,
  433 U.S. 350 (1977)..........................................................................15

*Bd. of Comm'rs v. Umbehr*,
  518 U.S. 668 (1996)..........................................................................21

*Bd. of Trs. v. Fox*,
  492 U.S. 469 (1989)..........................................................................15

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983)............................................................................27

*In re Boulevard Entm't, Inc.*,
  334 F.3d 1336 (Fed.Cir. 2003) ........................................................17

*Carey v. Pop. Servs. Int'l*,
  431 U.S. 678 (1977)..........................................................................27

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
  447 U.S. 557 (1980).............................................................14, 25, 26

*Cincinnati v. Discovery Network,*
    507 U.S. 410 (1993)...............................................................15, 24

*In re Compagnie Generale Maritime,*
    993 F.2d 841 (Fed.Cir. 1993) ...........................................19

*Edenfield v. Fane,*
    507 U.S. 761 (1993)...........................................................26

*Enter. Rent-A-Car Co. v. Advantage Rent-A-Car. Inc.,*
    330 F.3d 1333 (Fed.Cir. 2003) .......................................8, 9

*FCC v. League of Women Voters of California,*
    468 U.S. 364 (1984)...........................................................21

*Figueroa v. United States,*
    466 F.3d 1023 (Fed.Cir. 2006) .........................................19

*Florida Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995)...........................................................26

*In re Fox,*
    702 F.3d 633 (Fed.Cir. 2012) ...........................................17

*Friedman v. Rogers,*
    440 U.S. 1 (1979)...............................................................15

*In re Geller,*
    751 F.3d 1355 (Fed.Cir. 2014) .........................................12

*Harjo v. Pro-Football, Inc.,*
    50 U.S.P.Q.2d (BNA) 1705 (TTAB 1999),
    *rev'd*, 284 F.Supp.2d 96 (D.D.C. 2003) ...........................16

*Holiday Inn v. Holiday Inn, Inc.,*
    534 F.2d 312, 189 U.S.P.Q. 630 (CCPA 1976)...................17

*Int'l Ass'n of Machinists v. Street,*
    367 U.S. 740 (1961)...........................................................18

*In re Int'l Flavors & Fragrances Inc.,*
    183 F.3d 1361 (Fed.Cir. 1999) ...........................................7

*Koontz v. St. John's River Water Mgmt. Dist.*,
    133 S.Ct. 2586 (2013) ........................................................................20

*Lens.com, Inc. v. 1-800 Contacts, Inc.*,
    686 F.3d 1376 (Fed.Cir. 2014) .........................................................19

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) ..........................................................................15

*Marshak v. Treadwell*,
    240 F.3d 184 (3d Cir. 2001) .............................................................17

*In re Mavety Media Grp.*,
    33 F.3d 1367 (Fed.Cir. 1994) ...........................................................17

*In re McGinley*,
    660 F.2d 481 (C.C.P.A. 1981) .....................................................15, 17

*Merck & Co. v. Kessler*,
    80 F.3d 1543 (Fed.Cir. 1996) .............................................................7

*In re Old Glory Condom Corp.*,
    26 U.S.P.Q.2d (BNA) 1216 (TTAB 1993) ........................................13

*On-Line Careline, Inc. v. Am. Online, Inc.*,
    229 F.3d 1080 (Fed.Cir. 2000) ...........................................................7

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ..........................................................................20

*Pro-Football, Inc. v. Harjo*,
    284 F.Supp.2d 96 (D.D.C. 2003) ......................................................12

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995) ..........................................................................22

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ......................................................23, 24, 28, 29

*Regan v. Taxation with Representation of Wash.*,
    461 U.S. 540 (1983) ....................................................................20, 21

*Rumsfeld v. Forum for Acad. & Inst. Rights*,
  547 U.S. 47 (2006)............................................................21

*Rust v. Sullivan*,
  500 U.S. 173 (1991)....................................................19, 21

*Rutan v. Repub. Party of Ill.*,
  497 U.S. 62 (1990)...........................................................20

*S.F. Arts & Ath. Inc. v. U.S. Olympic Comm.*,
  483 U.S. 522 (1987).........................................................15

*Simon & Schuster, Inc. v. Members of N.Y.S. Crime Victims Bd.*,
  502 U.S. 105 (1991).........................................................24

*Snyder v. Phelps*,
  562 U.S. 443 (2011).........................................................14

*Sorrell v. IMS Health Inc.*,
  131 S.Ct. 2653 (2011)................................................*passim*

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002)....................................................26, 27

*Trade-Mark Cases*,
  100 U.S. 82 (1879)......................................................8, 12

*Turner Broadcasting System, Inc. v. FCC*,
  512 U.S. 622 (1994).........................................................24

*United States v. Am. Library Ass'n, Inc.*,
  539 U.S. 194 (2003).........................................................21

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*,
  425 U.S. 748 (1976)....................................................14, 27

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)...........................................................6

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989).........................................................24

*Williams-Yulee v. Fla. Bar*,
  135 S.Ct. 1656 (2015) ........................................................................24

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of
  Ohio*,
  471 U.S. 626 (1985) .............................................................15, 26, 27

*Zippo Mfg. Co. v. Rogers Imps., Inc.*,
  216 F.Supp. 670 (S.D.N.Y. 1963) .......................................................8

**State Cases**

*Leidersdorf v. Flint*,
  50 Wis. 401, 7 N.W. 252 (1880) ........................................................12

*McCann v. Anthony*,
  21 Mo.App. 83 (1886) .......................................................................12

*Paddy's Market Produce Dealers & Merchants Ass'n, Inc. v. Lutus*,
  7 N.Y.S.2d 676 (Sup. Ct. 1938) ........................................................12

**Federal Statutes**

5 U.S.C. §706 ........................................................................................7

15 U.S.C. §1052(a) ........................................................................*passim*

15 U.S.C. §1057 ................................................................................10

15 U.S.C. §1071(a)(1) ..........................................................................1

15 U.S.C. §1071(a)(2) ..........................................................................3

15 U.S.C. §1127 ................................................................................10

26 U.S.C. §501(c)(3) ..........................................................................21

28 U.S.C. §46 ......................................................................................3

28 U.S.C. §1295(a)(4)(B) .....................................................................1

Act of Feb. 20, 1905, Chapter 592, §5, 33 Stat. 724 (1905) ....................13

## Rules

Fed.R.App.P. 35(a) ...................................................................3

Fed.Cir.R. 47.5 ........................................................................1

## Regulations

37 C.F.R. §2.145(d) ...............................................................3

## Constitutional Provisions

*U.S. Const.*, Art. I, §8, cl. 1 ...............................................18

*U.S. Const.*, Art. I, §8, cl. 3 ...............................................19

## Other

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §2:1 (4th ed.) .................................................8

1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* §3:9 (2015) .................................................................28, 29

David S. Welkowitz, *Trademark Dilution: Federal, State, and International Law* (2002) ...........................................8

H.R. Rep. No. 76-944 (1939) .................................................9

J. Lefstin, Note, *Does the First Amendment Bar Cancellation of REDSKINS?*, 52 Stan.L.Rev. 665 (2000) ...........................14

Llewellyn J. Gibbons, *Semiotics of the Scandalous and the Immoral and the Disparaging: Section 2(a) Trademark Law After Lawrence v. Texas*, 9 Marq. Intell. Prop. L. Rev. 187 (2005) ...........16

*Trade-Marks: Hearings on H.R. 4744 Before the Subcomm. On Trade-Mark s of the House Comm. On Patents*, 76th Cong., 1st Sess. (1939) ...............................................................16

## STATEMENT OF RELATED CASES

Counsel for Appellant, Simon Shiao Tam ("Appellant"), is unaware of any related cases as defined by Federal Circuit Rule 47.5.

## STATEMENT OF JURISDICTION

This court has jurisdiction over this *ex parte* appeal of the September 26, 2013 final decision of the Trademark Trial and Appeal Board ("the TTAB"), which affirmed the refusal by the United States Patent and Trademark Office ("PTO") to register Appellant's trademark THE SLANTS as disparaging under §2(a) of the Lanham Act ("the Act"), 15 U.S.C. §1052(a). *See* 28 U.S.C. §1295(a)(4)(B) & 15 U.S.C. §1071(a)(1).

## STATEMENT OF THE ISSUES ON APPEAL

This appeal involves an application to register the trademark THE SLANTS for "entertainment in the nature of live performances by a musical band" in International Class 41 (the "Mark"). The Mark was refused registration under 15 U.S.C. §1052(a). The issue presented for hearing *en banc* is as follows:

> Does the bar on registration of disparaging marks in 15 U.S.C. §1052(a) violate the First Amendment?

## STATEMENT OF THE CASE

The application, Serial No. 85/472,044 (the "'044 Application"), was filed by Appellant on November 14, 2011, for THE SLANTS in standard characters. "The Slants" are a musical group, and the services recited in the '044 Application

are "entertainment in the nature of live performances by a musical band" in International Class 41. (A.23-35).[1] This appeal arises from the TTAB's September 26, 2013 affirmance of the PTO'S final denial of the '044 Application to register the trademark THE SLANTS on the Principal Register because it was deemed "disparaging" under §2(a) of the Act, 15 U.S.C. §1052(a).

The PTO initially refused registration of the '044 Application in a non-final January 6, 2012 Office Action (the "Initial Office Action"). (A.37-207). Appellant responded on May 29, 2012. (A.208-241). A final office action dated June 20, 2012 (the "Final Office Action") (A.242-249) refused registration on the ground that the Mark "consists of or includes matter which may disparage or bring into contempt or disrepute persons, institutions, beliefs or national symbols" under §2(a). (A.243). The PTO maintained that THE SLANTS "likely means" Asians in the context of Appellant's services for "entertainment in the nature of live performances by a musical band," which, the PTO held, is an "offensive meaning." (A.243-244). A timely request for reconsideration was refused on December 20, 2012.

Appellant timely appealed to the TTAB on February 19, 2013. (A.250-297). On appeal, Appellant argued that the PTO failed to carry its burden in establishing, on the record of the '044 Application, that as a matter of fact and law the Mark was

---

[1] All references to "A." are to the Joint Appendix.

disparaging to Asians. (A.279-296). The TTAB nevertheless affirmed, adopting the analysis and conclusions of the PTO in whole.

Appellant timely filed his Notice of Appeal on November 22, 2013. (A.328-348). *See* 15 U.S.C. §1071(a)(2); 37 C.F.R. §2.145(d). The appeal was argued before a three-judge panel on January 9, 2015, which issued an opinion dated April 20, 2015. Thereafter, a *sua sponte* request for a poll on whether to consider this appeal *en banc* in the first instance was made. Consequently, by Order dated April 27, 2015, this court vacated the April 20, 2015 panel opinion, directed that this appeal be heard *en banc sua sponte* under 28 U.S.C. §46 and Fed. R. App. P. 35(a), and set a briefing schedule.

## STATEMENT OF FACTS

Appellant, Simon Shiao Tam, is the "front man" for the Portland, Oregon "dance rock band", "The Slants". (A.56). Mr. Tam and a number of band members are, as the PTO puts it, "admittedly" of Asian descent. (A.56, 95, 130.)

## I.    The Facts Relied Upon by the PTO and the TTAB

The Examining Attorney's refusal of the '044 Application under §2(a), as "matter which may disparage or bring into contempt or disrepute persons, institutions, beliefs or national symbols" (A.42), was supported by various "evidence" (A.37-41), essentially comprising the following documents, virtually

all of which had been collected by the Examining Attorney in connection with a prior, abandoned application, Serial No. 77/952,263. (A.2, 7, 308):

1.  Selected portions of Internet articles quoting various people as saying the word "slant" is "insensitive" and concluding that the band's name, "The Slants," may displease some people of Asian descent (A.46-47, 50);

2.  Another article stating that "The Slants" is a "controversial" name for Appellant's band (A.51);

3.  An online comment found on the band's website by the Examining Attorney in 2010 regarding the band's "embracing" of the term "slanted eyes" (A.52);

4.  A 2010 Wikipedia entry for "The Slants" asserting that the band's name was "derived from an ethnic slur for Asians" (A.56-58);

5.  Anonymous, unauthenticated online commentaries objecting to use of the term "slant eyes" or "slants" in reference to Asians (A.147-150, 151-159, 204-206) and objecting to the name of Appellant's band (A.91, 100-128);

6.  A 2010 screen-shot from the band's original MySpace.com website featuring Asian-themed images such as a stylized dragon and a rising sun (A.59);

7.  Entries from online references for variants of "slant-eye(s)" and "slant" (A.53-55, 75, 83, 135-136, 140-142), generated by the Examining Attorney's Internet searches for the word "slants" juxtaposed with the terms "niggers" and "derogatory" (A.142-144, 168-173) dating from June 2010 and July 2011;

8.  Photocopies of entries for the words "slant" and "slant-eye(s)" from out-of-print books consisting entirely of derogatory meanings of words (A.174- 176, 181-183, 193-203); and

9.  An online brochure published by the Japanese American Citizens League cited by the Examining Attorney for the proposition that "the term 'slant' is derogatory and should not be used" (but which contains no such statement at all) (A.138-139).

## II.    The TTAB's Affirmation of the Refusal to Register

The TTAB affirmed the refusal to register in a precedential opinion. (A.1-17, 311-327). In affirming the PTO's refusal to register, the TTAB accepted the Examining Attorney's characterization of the record, concluding that "[t]he interpretation of 'slant' as meaning 'person of Asian descent' (as opposed to other definitions of this word) arises because applicant's mark is used in a manner to mean 'person of Asian descent.'" (A.13, 323). The TTAB also found that the Mark was perceived as disparaging to a "substantial composite" of Asian Americans "when used to indicate ethnicity". (A.15, 325). It based this finding on the "dictionary definitions, reference works and all other evidence unanimously categoriz[ing] the word 'slant,' when meaning a person of Asian descent, as disparaging." (A.16, 326). Noting that Appellant did "not dispute that the band's name is derived from an ethnic slur" – based on material from the abandoned 2010 application – the TTAB concluded that "the evidence thereof stands unrebutted," disposed of Appellant's myriad procedural arguments, and affirmed the refusal to register. (A.16-17, 326-327).

## SUMMARY OF THE ARGUMENT

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (cited in *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 133 S.Ct. 2321, 2332 (2013) (Roberts, C.J.) ("*Alliance*")).

The bar on registration of disparaging marks in §2(a) of the Act violates the First Amendment. The purposes of the Act are to protect a trademark holder's right to benefit from its own goodwill; to protect established marks from appropriation; and to protect the consuming public from confusing, misleading, or false and deceptive marks which create a misimpression between a product and its source. These objectives entail consideration solely of the commercial function, as opposed to the purportedly offensive or objectionable content or quality, of a mark, with one exception: §2(a), which additionally conditions registration on, *inter alia*, the mark not being "disparaging," *viz.*, not having a meaning that may be perceived as derogatory. Satisfying §2(a) necessarily implicates the PTO in a subjective evaluation of the expressive content of a mark.

Trademarks are a form of commercial speech, protected under the First Amendment. Government regulation of commercial speech is subject to a showing of at least a substantial governmental interest that is directly advanced by the regulation drawn no more broadly than necessary to meet that interest. However, no legitimate governmental interest justifies §2(a)'s restriction on speech. To the contrary, §2(a)'s bar on the registration of disparaging marks (1) constitutes

content-based regulation of speech, and (2) attaches conditions on speech that are

neither justified by the Spending Clause nor define the limits of a government

spending program. Rather, §2(a)'s conditions act as leverage to regulate speech

based on an agency's subjective determination of derogatory meaning, far beyond

the contours of the commercial objectives of trademark registration established by

the Act. Whether adjudged under strict or intermediate scrutiny, such conditions

are unconstitutional both as content-based on their face and as viewpoint-

discriminatory as applied.

## ARGUMENT

## I.    STANDARD OF REVIEW

The standard of review for a decision from the PTO is specified in the

Administrative Procedure Act ("APA"). Under the APA, a "reviewing court shall

decide all relevant questions of law." 5 U.S.C. §706. Review of issues of law is *de

novo*. *See On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1084

(Fed.Cir. 2000); *In re Int'l Flavors & Fragrances Inc.*, 183 F.3d 1361, 1365

(Fed.Cir. 1999). Under a *de novo* standard of review, the Federal Circuit gives no

deference to legal conclusions of the trial court. *See Merck & Co. v. Kessler*, 80

F.3d 1543, 1550 (Fed.Cir. 1996).

## II.     PURPOSES OF TRADEMARK REGISTRATION

Section 2(a) of the Act serves no commercial purpose advanced by trademark registration. U.S. trademark law encompasses three main policy objectives: (1) protecting the consuming public from confusion in the marketplace; (2) protecting a mark-holder from having the fruit of his labor misappropriated; and (3) encouraging competition from which the public benefits. *See* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §2:1 (4th ed.) (citing *Zippo Mfg. Co. v. Rogers Imps., Inc.*, 216 F.Supp. 670, 694-695 (S.D.N.Y. 1963)) (quotations omitted). The PTO's interest in abridging commercial speech is impossible to justify where §2(a)'s disparagement bar fails to promote any of these trademark policies.

Efforts to use trademarks as protection "against unfair competition and … deception[]" originated in the English common law. *Enter. Rent-A-Car Co. v. Advantage Rent-A-Car. Inc.*, 330 F.3d 1333, 1338 (Fed.Cir. 2003) (quoting David S. Welkowitz, *Trademark Dilution: Federal, State, and International Law* 4 (2002)); *accord Trade-Mark Cases*, 100 U.S. 82, 92 (1879). In 1946, Congress codified the common law and existing federal trademark statutes by passing the Act, which reflected the "traditional view" of the nature of trademark protection and its focus on purely commercial objectives:

> Trade-marks are merely a convenient way of distinguishing the goods
> of one trader from those of another. By furnishing a means of

identification, they perpetuate good will, and enable purchasers, by recognizing the marks, to buy again the goods which have pleased them before.... The public is thus assured of identity, and is given an opportunity to choose between competing articles. To protect trademarks, i.e., marks which permit the goods of different makers to be distinguished from each other, is to promote competition and is sound public policy.

The protection which is accorded is security against misrepresentation as to the origin of goods, by suppressing imitations which are calculated to mislead buyers into the belief that the goods of one maker are those of another.

*Enter. Rent-A-Car Co.*, 330 F.3d at 1338-39 (alteration in original) (quoting H.R. Rep. No. 76-944, at 3 (1939)).

### A.    Commercial objective and benefits: marketplace regulation

The benefits of registration under the Act are "substantial" and "significant." *B&B Hardware, Inc. v. Hargis Indus.*, 135 S.Ct. 1293, 1300, 1310 (2015). Individuals and entities interested in protecting their use of a trademark can seek the shelter of three harbors: (1) various State statutes; (2) the common law; and (3) registration under §2 of the Act.

There can be little doubt that the protections offered to registered marks under the Act are the broadest and most comprehensive. The protections offered by State statutes and the common law are limited by the boundaries of the individual States or the geographic scope of the actual use of a trademark. In contrast, federal registration operates as nationwide constructive notice of ownership, *prima facie* evidence of "the owner's exclusive right to use the registered mark in commerce or

in connection with the goods or services specified in the certificate," and, after five years, incontestability. 15 U.S.C. §1057. Incontestability constitutes conclusive evidence of ownership and validity, substantially limiting the defenses available to an alleged infringer in an action for trademark infringement.[2] Combined with the Act's grant to registrants of the right to sue in federal court, these benefits enable federal registrants to stop infringement anywhere in the country. Registration also gives a mark's owner the right to request that U.S. Customs and Border Protection bar the importation of allegedly infringing goods. In addition, registration operates as a complete defense to State or common law claims of trademark dilution. None of these benefits is available to protect unregistered trademarks.

To obtain such a registration, the Act requires a mark owner to file an application with the PTO. Federal registration is available to all protectable marks – marks that "identify" a merchant or manufacturer's goods and "distinguish them from those manufactured or sold by others" – and denied to marks that fail as source identifiers. 15 U.S.C. §1127. Although there is a presumption in favor of registrability, §§1502(b)-(f) identify several categories of marks which may not be registered:

---

[2] Registration also affords the opportunity for a registrant to recover treble damages upon a showing of willful trademark infringement, use of the ® symbol, specific rights attendant to preventing "cybersquatters" from misappropriating a mark-holder's rights via registration of a domain name, and a foothold in gaining registrations in other countries provided they are signatories under the Paris Convention.

1. §2(b) prohibits the registration of national flags or other insignia,

2. §2(c) prohibits the registration of a mark composed of the "name, portrait, or signature" of a living person without her consent,

3. §2(d) prohibits the registration, with some exceptions, of a mark that is likely to "cause confusion, or to cause mistake, or to deceive[]", and

4. §§2(e) and (f) set forth the requirement that purely descriptive marks must achieve secondary meaning or "become distinctive of the applicant's goods in commerce" before they can be registered.

Notably, the restrictions in §§2(b)-(f) fit the broader scheme of the Act and advance the longstanding goal of trademark law to preserve trademarks as a useful and clear form of commercial speech free from deception and confusion.

### B.     Non-commercial objective and burden: content regulation

However, §2(a) is different. It restricts registration based on criteria that are independent from the commercial objectives that underlie the Act. Under this provision, the PTO may deny registration of a trademark that is neither deceptive nor confusing if it finds that the mark

> [c]onsists of or comprises immoral, deceptive, or scandalous matter; or matter which <u>may disparage</u> or falsely suggest a connection with <u>persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute</u>.

15 U.S.C. §1052(a) (emphasis added).

By definition[3] a mark may be found disparaging if it "dishonors by comparison with what is inferior, slights, deprecates, degrades, or affects or injures by unjust comparison." *In re Geller*, 751 F.3d 1355, 1358 (Fed.Cir. 2014) (quoting *Pro-Football, Inc. v. Harjo*, 284 F.Supp.2d 96, 124 (D.D.C. 2003)) (alterations and internal quotations omitted). The two-part test to assess a disparaging mark examines "the likely <u>meaning</u> of the matter in question" and "whether that <u>meaning</u> may be disparaging." *Ibid*. (emphasis added).

The bar on registering disparaging marks did not exist prior to the 1946 codification of U.S. trademark law. *See Trade-Mark Cases*, 100 U.S. at 94 (noting that exclusive right to use mark was "simply founded on priority of appropriation. We look in vain in the statute for any other qualification or condition"). Under the earlier federal trademark statutes and common law, the PTO registered, and courts enforced, arguably disparaging marks. For example, NIGGER-HAIR SMOKING TOBACCO, PADDY'S MARKET, and OLD COON SMOKING TOBACCO have all been enforced against infringers. *See Leidersdorf v. Flint*, 50 Wis. 401, 7 N.W. 252 (1880) (enforcing "Nigger-Hair Smoking Tobacco" mark); *Paddy's Market Produce Dealers & Merchants Ass'n, Inc. v. Lutus*, 7 N.Y.S.2d 676, 676 (Sup. Ct. 1938) (enforcing "Paddy's Market" mark); *McCann v. Anthony*, 21

---

[3] The bar on registration of marks that disparage groups or categories of people is a creature of case law, not readily apparent or defined in the language of the statute.

Mo.App. 83, 91-92 (1886) (enforcing "Old Coon Smoking Tobacco" mark); *see also* Act of Feb. 20, 1905, ch. 592, §5, 33 Stat. 724 (1905) (alterations in original).

These historical examples buttress the modern observation of the TTAB that

[t]he duty of this Office ... in reviewing applications for registration is nothing more and nothing less than to register those marks that are functioning to identify and distinguish goods and services in the marketplace.... Just as the issuance of a trademark registration by this Office does not amount to a government endorsement of the quality of the goods to which the mark is applied, the act of registration is not a government *imprimatur* or pronouncement that the mark is a "good" one in an aesthetic, or any analogous, sense.

*In re Old Glory Condom Corp.*, 26 U.S.P.Q.2d (BNA) 1216, 1219 n.3 (TTAB 1993). Yet, the two-part test for denial of a disparaging mark – examining "the likely meaning of the matter in question" and "whether that meaning may be disparaging" – necessarily entails the government's subjective assessment, and approval or not, of the expressive content of the mark, based on criteria unrelated to trademark policy.

Indeed, the PTO's role as a referee of political correctness concerning ethnic and racial discourse has nothing to do with advancing the commercial purposes of trademark registration established under the Act. The TTAB admitted as much, explicitly invoking, in its affirmance of the refusal to register the '044 Application, its power to shield the government from registering trademarks deemed "ethnic slur[s]." (A.16). In doing so, the TTAB demonstrated precisely why the arrogation of such "power" to any government agency is inevitably beyond the

13

constitutionally limited scope of government regulation of commercial speech. Speech, after all, "remains protected even when it may 'stir people to action,' 'move them to tears,' or 'inflict great pain.'" *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2670 (2011) (quoting *Snyder v. Phelps*, 562 U.S. 443, 460-461 (2011)). The government "does not have the broad discretion to suppress truthful, non-misleading information for paternalistic purposes". *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 510 (1996).[4]

The §2(a) prohibition of disparaging marks is an aberration which does not serve the commercial purposes of trademark law, the free and accurate flow of commercial speech, or any other legitimate government interest. Instead, §2(a) mandates that the PTO make content-based moral judgments to exclude truthful, non-confusing marks and is at odds with the purposes of the Act.

## III.  TRADEMARKS ARE SPEECH CONSTITUTIONALLY PROTECTED BY THE FIRST AMENDMENT

"[C]ommercial speech, like other varieties, is protected". *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561, 566

---

[4] *See* J. Lefstin, Note, *Does the First Amendment Bar Cancellation of REDSKINS?*, 52 Stan.L.Rev. 665, 684 (2000) ("If government unconditionally registers trademarks without reference to their offensive content, the public will not perceive registration as government endorsement. However, if government selectively grants registration only to those trademarks meeting government mores, registration is more likely to be perceived as carrying the imprimatur of the state") (internal citations and footnote omitted).

(1980) ("The First Amendment … protects commercial speech from unwarranted governmental regulation"). Notably, in the 34 years since the United States Court of Customs and Patent Appeals decided *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981), the Supreme Court has clarified the nature of the Constitution's significant protection of commercial speech.

"There is no longer any room to doubt that what has come to be known as 'commercial speech' is entitled to the protection of the First Amendment". *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 637 (1985). Indeed, "even speech that does no more than propose a commercial transaction is protected by the First Amendment." *Cincinnati v. Discovery Network*, 507 U.S. 410, 421 (1993). Commercial speech is afforded such protections because it "performs an indispensable role in the allocation of resources in a free enterprise system." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977). A "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." *Ibid. See also Sorrell*, 131 S.Ct. at 2664-65; *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001); *Bd. of Trs. v. Fox*, 492 U.S. 469, 475 (1989).

Accordingly, trade names are subsumed under the mantle of this protection. *Friedman v. Rogers*, 440 U.S. 1, 11 (1979) ("use of trade names in [commerce] … is a form of commercial speech"); *accord S.F. Arts & Ath. Inc. v. U.S. Olympic*

*Comm.*, 483 U.S. 522, 540 (1987) (same). This is also true of trademarks, as the government acknowledges. Aug. 4, 2014 Gov't Br. at 34 n.5 (No. 36) ("Trademarks are a form of commercial speech").

## IV.   THE §2(a) BAR ON REGISTRATION OF DISPARAGING MARKS ABRIDGES PROTECTED SPEECH BY IMPOSING CONDITIONS ON THE EXERCISE OF FIRST AMENDMENT RIGHTS

Given that trademarks are commercial speech, the PTO's assessment of the expressive meaning of a mark as disparaging or not under §2(a) is an impermissible regulation of speech by the government.

Because the legislative history of the Act reveals little about the intent behind §2(a)'s bar to registration, courts must "speculate as to Congress's intent based on the text" of the statute.[5] *See* Llewellyn J. Gibbons, *Semiotics of the Scandalous and the Immoral and the Disparaging: Section 2(a) Trademark Law After* Lawrence v. Texas, 9 Marq. Intell. Prop. L. Rev. 187, 233 (2005); *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d (BNA) 1705, 1737 (TTAB 1999), *rev'd*, 284 F.Supp.2d 96 (D.D.C. 2003). Nevertheless, courts have not been reluctant to hypothesize justifications for the provision. In discussing the prohibition on

---

[5] Even the Congressional drafters engaged in subjective, moralistic justifications for barring disparaging marks, for example, observing that "Abraham Lincoln gin ought not to be used, but I would not say that the use of G. Washington on coffee should not be permissible." *Trade-Marks: Hearings on H.R. 4744 Before the Subcomm. On Trade-Mark s of the House Comm. On Patents*, 76th Cong., 1st Sess., 19 (1939) (by Edward S. Rogers, atty., in statement of Thomas E. Robertson, former Commissioner of Patents).

scandalous trademarks under §2(a), the Court of Customs and Patent Appeals

wrote:

> In providing that marks comprising scandalous matter not be registered, Congress expressed its will that such marks not be afforded the statutory benefits of registration. We do not see this as an attempt to legislate morality, but, rather, a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government.

*McGinley*, 660 F.2d at 486.[6] Other courts have suggested that the interests

protected under such provisions of the Act seek to preserve the "integrity of the

register." *See*, *e.g., Marshak v. Treadwell*, 240 F.3d 184, 194 (3d Cir. 2001).

Accordingly, this court has previously turned away constitutional challenges in

drawing the cursory distinction that §2(a) merely denies trademark registration but

does not prohibit a mark's use:

> With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark does not affect his right to use it. *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 319 n.6, 189 USPQ 630, 635 n.6 (CCPA 1976). No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark.

*McGinley*, 660 F.2d at 484; *accord In re Fox*, 702 F.3d 633, 635 (Fed.Cir. 2012);

*In re Boulevard Entm't, Inc.*, 334 F.3d 1336, 1343 (Fed.Cir. 2003); *In re Mavety*

*Media Grp.*, 33 F.3d 1367, 1374 (Fed.Cir. 1994).

---

[6] Of course, that court's pronouncement is ironic in light of recent §2(a) litigation; surely, litigating the constitutionality of § 2(a) is more costly than simply adding THE SLANTS to the Register.

Assuming these explanations for §2(a) are at all plausible in the abstract, they nevertheless stand on constitutionally infirm ground. The rationale of *McGinley* fails to account adequately for the chilling effect on the free expression of commercial speech caused by the burden §2(a) imposes on an owner's ability to benefit from the substantive and procedural rights attendant to registration. There can be little question that if §2(a) were enacted or applied so as to <u>directly</u> abridge speech expressed in a trademark, it would violate the First Amendment. But it is well established under First Amendment jurisprudence that the government cannot burden indirectly what it cannot do through direct abridgement. *E.g., Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 227 n.23 (1977) ("the First Amendment … forbids any abridgment by government whether directly or indirectly" (quoting *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 777 (1961) (Douglas, J., concurring)). Yet, §2(a) effectively conditions the many benefits of registration on the suitability of the expressive meaning of the mark, curtailing protected speech. By so doing, it runs afoul of the "doctrine of unconstitutional conditions," which we address below.

## A.    The §2(a) bar finds no warrant in the Spending Clause

The keystone of *McGinley*'s defense of §2(a) is that the government may generally attach conditions on the use of government funds. This authority, stemming from the Spending Clause, *U.S. Const.*, Art. I, §8, cl. 1, is well known:

> [t]he Spending Clause of the Federal Constitution grants Congress the power [and] … broad discretion to tax and spend for the "general Welfare"…. That power includes the authority to impose limits on the on the use of such funds to ensure they are used in the manner Congress intends.

*Alliance*, 133 S.Ct. at 2327-28. *See also Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991) (holding that Congress has the power both to allocate funds for public purposes as well as "an ancillary power to ensure that those funds are properly applied to the prescribed use").

However, the Spending Clause cannot justify denial of registration under §2(a). Legal authority for the Act, rather, arises from the Commerce Clause, *U.S. Const.*, Art. I, §8, cl. 3. *E.g., Lens.com, Inc. v. 1-800 Contacts, Inc.*, 686 F.3d 1376, 1380 (Fed.Cir. 2012); *In re Compagnie Generale Maritime*, 993 F.2d 841, 854 (Fed.Cir. 1993). The purpose of trademark registration is simply to regulate commerce by protecting both the consumer and the mark-holder. The applicant enjoys no accompanying benefit in the form of monetary subsidy or grant from the government. Nor is there any government expenditure involved. Unlike when *McGinley* was decided 34 years ago, public funds no longer underwrite the PTO's costs for application processing and registration. Since the 1989 amendments to the Act, those expenses have been funded by registration fees. *See Figueroa v. United States*, 466 F.3d 1023, 1028 (Fed.Cir. 2006).

Thus, the conditions imposed by §2(a) cannot be derived from Congress's

authority to impose limits on the use of public funds under the Spending Clause.

**B.     The §2(a) bar acts as leverage to regulate speech outside of the
contours of the commercial objectives of the program of
trademark registration**

Even if a Spending Clause analysis applied, §2(a) would fail. The United

States Supreme Court has "said in a variety of contexts that 'the government may

not deny a benefit to a person because he exercises a constitutional right.'" *Koontz*

*v. St. John's River Water Mgmt. Dist.*, 133 S.Ct. 2586, 2594 (2013) (quoting *Regan*

*v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983); *Rutan v.*

*Repub. Party of Ill.*, 497 U.S. 62, 78 (1990)). This proscription has particular

application in the context of the exercise of constitutionally protected speech under

the First Amendment:

> [E]ven though a person has no 'right' to a valuable governmental
> benefit and even though the government may deny him the benefit for
> any number of reasons, there are some reasons upon which the
> government may not rely. They may not deny a benefit to a person on
> a basis that infringes his constitutionally protected interests –
> especially, his interest in freedom of speech. For if the government
> could deny a benefit to a person because of his constitutionally
> protected speech or associations, his exercise of those freedoms would
> in effect be penalized and inhibited.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (emphasis added). "The

government may not deny a benefit to a person on a basis that infringes his

constitutionally protected ... freedom of speech even if he has no entitlement to that

benefit." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003)

(alteration in original) (emphasis added) (quoting *Bd. of Comm'rs v. Umbehr*, 518

U.S. 668, 674 (1996)). *See also Rumsfeld v. Forum for Acad. & Inst. Rights*, 547

U.S. 47, 59 (2006).

As the Court has noted in cases addressing this issue, the distinction between

constitutional and unconstitutional conditions turns on a circumstantial evaluation

of "conditions that define the federal program and those that reach outside it".

*Alliance*, 133 S.Ct. at 2330. For example,

> on the one hand, government regulatory conditions have been found
> to be constitutional where their effect is simply to do nothing more
> than define the limits of the government benefit program without
> curtailing a constitutional right. *E.g., Regan v. Taxation with
> Representation of Wash.*, 461 U.S. at 544-545 (government regulation
> held constitutional where requirement, that non-profit organization
> seeking tax-exempt status under 26 U.S.C. §501(c)(3) not engage in
> substantial efforts to influence legislation, did not prohibit such
> organization from lobbying altogether under dual structure, which
> preserved tax-exemption benefit); *Rust v. Sullivan*, 500 U.S. 173, 196
> (1991) (government regulation held constitutional where spending
> limitation distinguished between Title X projects specifically as
> opposed to Title X grantees generally, leaving the Title X grantee
> unfettered in its other protected activities of abortion advocacy,
> without denial of the funding benefit);
>
> on the other hand, government regulatory conditions have been
> deemed unconstitutional when the restrictions imposed extended
> beyond the limits of the governmental program and burdened
> constitutionally protected activity. *E.g., FCC v. League of Women
> Voters of California*, 468 U.S. 364, 399-401 (1984) (government
> regulation held unconstitutional where funding regulation, prohibiting
> all editorializing including with private funds as a condition of the
> benefit of federal financial assistance to non-commercial broadcast

21

stations, leveraged the benefit in order to improperly regulate protected speech outside the scope of the program); *Alliance*, 133 S.Ct. at 2330-32 (government regulation held unconstitutional where requirement of policy declaration, compelling a grant recipient to adopt a particular belief as a condition of the benefit of funding, leveraged the benefit in order to improperly regulate protected speech outside the scope of the program).

In short, the constitutionality of a regulation turns on whether the receipt of governmental benefits pursuant to that regulation is conditioned on requirements imposed within or without the limits of the government program itself.

This distinction readily underscores the unconstitutionality of §2(a). As demonstrated above, the §2(a) bar of disparaging marks is a condition on registration that regulates speech <u>outside</u> the contours of the commercial objectives of the program of trademark registration. Assessing the expressive content of a mark, that – like THE SLANTS – is not misleading or deceptive or confusing, neither helps consumers identify the source of goods nor protects producers from wrongful appropriation of the good will in their products and services. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-164 (1995) (Lanham Act "reduces the customer's costs of shopping and making purchasing decisions," and "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product") (alteration in original).

The only end served by the §2(a) bar is to regulate speech by denying the mark-holder of the benefits of registration for an otherwise valid trademark simply because it "may" be considered offensive. Given the significant benefits of registration[7], the burden on commercial speech rendered by denial of registration is substantial. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment". *Sorrell*, 131 S.Ct. at 2667. Consequently, "restraints on the way in which … information might be used" implicates First Amendment rights. *Id.* at 2665 (internal quotations omitted). As a result, the §2(a) bar penalizes the mark-holder for no reason other than official disapproval of what, in an agency's judgment, that mark "may" mean. By any measure, that is censorship.

## V. THE ABRIDGMENT OF PROTECTED SPEECH BY THE §2(a) BAR ON REGISTRATION OF DISPARAGING MARKS IMPLICATES FIRST AMENDMENT SCRUTINY

In determining whether the abridgment of protected speech wrought by a regulation is constitutional, the level of scrutiny to which that regulation is subject will be determined by whether the regulation is content-neutral.

### A. Because the §2(a) bar is not content-neutral, strict scrutiny applies

"Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). While "the First Amendment does not

---

[7] *See* §II.A, *supra*.

prevent restrictions directed at commerce", where a regulation imposes "a specific, content-based burden on protected expression … heightened judicial scrutiny is warranted." *Sorrell*, 131 S.Ct. at 2664 (commercial speech). *See also Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 658 (1994) (strict scrutiny of regulations reflecting aversion to speech of "disfavored speakers"); *Cincinnati v. Discovery Network*, 507 U.S. at 418 (heightened scrutiny of "categorical prohibition on the use of newsracks to disseminate commercial messages").[8] The underlying concern expressed by the Supreme Court in these decisions is that "content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" *R.A.V.*, 505 U.S. at 387 (quoting *Simon & Schuster, Inc. v. Members of N.Y.S. Crime Victims Bd.*, 502 U.S. 105, 115 (1991). "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 131 S.Ct. at 2664.

In barring the registration of disparaging marks, the government is "seeking to handicap the expression of particular ideas." *R.A.V.*, 505 U.S. at 394. By its very terms, §2(a) focuses on, and cannot be justified without reference to, the expressive content of the potentially disparaging mark. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Under §2(a), it is not enough for registration that a mark

---

[8] Under strict scrutiny, "a speech restriction [must be] narrowly tailored to serve a compelling [government] interest". *Williams-Yulee v. Fla. Bar*, 135 S.Ct. 1656, 1665-66 (2015). Section 2(a) fails this test.

function as a truthful and non-misleading source identifier in the marketplace: its meaning <u>must also be incapable of offense</u>. To determine whether a proposed mark "may" be disparaging necessarily requires the government to undertake a subjective examination of the substance of a particular category of marks, *i.e.*, those considered to be derogatory in meaning, with the result of disfavoring some and encumbering their use in the marketplace by depriving them of a government benefit permitted to marks whose content is deemed culturally acceptable. This burden on protected speech is subject to heightened scrutiny and presumptively invalid.

### B.   Even if the §2(a) bar were considered content-neutral, intermediate scrutiny applies

Alternatively, government regulation of commercial speech is subject to intermediate scrutiny, *Cent. Hudson*, 447 U.S. at 562-564, which the §2(a) bar cannot satisfy. Constitutionally permissible government regulation of commercial speech, that concerns lawful activity and is not misleading, must satisfy three conditions:

1. the asserted governmental interest must be substantial;

2. the regulation must directly advance the governmental interest asserted; and

3. the regulation must not be more extensive than necessary to serve that interest.

447 U.S. at 566; *accord Zauderer*, 471 U.S. at 638. "It is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (internal quotations and alterations omitted); *accord Sorrell*, 131 S.Ct. at 2667. That burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech <u>must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree</u>." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995) (emphasis added) (internal quotations omitted). *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) (noting that the *Central Hudson* test "is significantly stricter than the rational basis test"). In addition, as the Court stated in *Edenfield*,

> [u]nlike rational basis review, the *Central Hudson* standard does not permit [the Court] to supplant the precise interest put forward by the State with other suppositions…. Neither will [the Court] turn away if it appears that the stated interests are not the actual interests served by the restriction.

507 U.S. at 768 (citations omitted).

The government cannot meet its burden to establish the three conditions for constitutionally acceptable regulation of commercial speech here. The only conceivable interest the government may have in the suppression of disparaging trademarks through §2(a) is protecting the public, or a subset of the public, from offensive expression. However, the potential of a listener's offense is "classically

not justification[] validating the suppression of expression protected by the First Amendment." *Carey v. Pop. Servs. Int'l*, 431 U.S. 678, 679, 700 (1977) ("the fact that protected speech may be offensive to some does not justify its suppression"). "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983) (holding that suppression of offensive speech is insufficient governmental interest) (internal quotations omitted); *see also Zauderer*, 471 U.S. at 642 (rejecting abridgment of speech despite the fact that "some sensitive souls may have found appellant's advertisement in poor taste"). "Some … ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented." *Thompson*, 535 U.S. at 367. For this reason, the Supreme Court has consistently protected "tasteless" and "excessive" commercial speech from government regulation. *See Va. State Bd. of Pharmacy*, 425 U.S. at 765; *see also Bolger*, 463 U.S. at 81 (noting that "the commercial element does not necessarily provide a valid basis for noncommercial censorship") (Stevens, J., concurring); *Alexander v. Cahill*, 598 F.3d 79, 93 (2d Cir.) ("Questions of taste or effectiveness in advertising are generally matters of subjective judgment"), *cert. den.*, 562 U.S. 1123 (2010).

Despite these well-established principles of First Amendment law, §2(a) charges the PTO to assume the exclusive role of judging what speech is in good taste. That offends the First Amendment. The government simply has no constitutionally legitimate interest in regulating the tastefulness or desirability of speech by denying registration to a mark that otherwise qualifies for registration as a truthful, non-deceptive, and clear source identifier.

## VI.    THE §2(a) BAR ON REGISTRATION OF DISPARAGING MARKS IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED

Ultimately, the level of scrutiny is not critical here. "As in previous cases, … the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Sorrell*, 131 S.Ct. at 2667. So too here.

### A.    On its face, the §2(a) bar is unconstitutional as content-based regulation

"A content-based regulation either explicitly or implicitly presumes to regulate speech on the basis of the substance of the message." 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* §3:9 at 3-36.15 (2015). "[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564 , 573 (2002) (internal quotations omitted). *See also R.A.V.*, 505 U.S. at 382. As explained above, by requiring approval of the expressive meaning of a proposed mark as a condition of granting or denying registration, the §2(a) bar impermissibly regulates content.

### B.    As applied, the §2(a) bar is unconstitutional as viewpoint discrimination

A "viewpoint-based law goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the particular position the speaker wishes to express." 1 *Smolla*, *supra*, §3:9 at 3-36.15. Even if the regulation were content-neutral, the government "may not regulate use based on hostility – or favoritism – towards the underlying message expressed." *R.A.V.*, 505 U.S. at 386. As the Court there noted,

> [t]he First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects.

*Id.* at 391. That is especially so where a regulation's "practical operation ... goes even beyond mere content discrimination, to actual viewpoint discrimination." *Ibid.* By denying registration to those marks found to have the potential to be disparaging, the §2(a) bar impermissibly discriminates on the basis of the speaker's, *i.e.*, the mark-holder's, viewpoint.

As the record below indicates, that is precisely the case here. For example, among the evidence of disparagement, relied on by the TTAB in affirming the PTO's denial to register the Mark, were comments published by "The Slants" on the band's website to the effect that the band was "embracing" the term "slanted eyes." (A.52, 16-17). The use of these comments as "proof" by the PTO was nothing more than official distaste for the viewpoint expressed by the Mark and by

the Appellant. Such regulatory disapproval constitutes viewpoint discrimination.

The result is an unconstitutional abridgement of the rights of those trademark

owners whose views concerning the message of their trademark depart from

official orthodoxy. Such regulation violates the First Amendment.

## CONCLUSION

For all the foregoing reasons, Appellant respectfully submits that the bar on

registration of disparaging marks in §2(a) of the Lanham Act, 15 U.S.C. §1052(a),

violates the First Amendment and, as a consequence, the TTAB's September 26,

2013 decision on appeal should be reversed.

Respectfully submitted,

*/s/ Ronald D. Coleman*
RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,*
*Simon Shiao Tam*

Dated: June 11, 2015
12686548v1

30

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because:

    this brief contains 7,068 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii) and Fed.Cir.R. 32(b).

2.  This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman with a font size of 14.


*/s/ Ronald D. Coleman*
RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,*
 *Simon Shiao Tam*

Dated: June 11, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2015, I caused to be electronically filed the foregoing Brief for Appellant-Applicant, Simon Shiao Tam, with the Court's CM/ECF filing system, which constitutes service, pursuant to Fed.R.App.P. 25(c)(2), Fed.Cir.R. 25(a) and the Court's Administrative Order regarding Electronic case filing 6(A) (May 17, 2012).

*/s/ Ronald D. Coleman*
RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,*
*Simon Shiao Tam*

**Form 9**

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re: Simon Shiao Tam _____ v. _____

No. 2014-1203

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Simon Shao Tam

_____

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

n/a

_____

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

n/a/

_____

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Archer & Greiner P.C. - Ronald D. Coleman, John C. Connell, Darth M. Newman, Joel G. MacMull

_____

June 11, 2015 _____          /s/ Joel G. MacMull _____
Date                                      Signature of counsel

                                       Joel G. MacMull _____
                                       Printed name of counsel

Please Note: All questions must be answered
cc: _____

124