No. 2014-1203

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

————————————

## IN RE:  SIMON SHIAO TAM,

*Appellant*

————————————

Appeal from the United States Patent and Trademark Office,
Trademark Trial and Appeal Board, Serial No. 85/472,044

————————————

### BRIEF OF PRO-FOOTBALL, INC.
### AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT

————————————

ROBERT L. RASKOPF
  *(counsel of record)*
TODD ANTEN
JENNIFER D. BISHOP
**QUINN EMANUEL URQUHART &
  SULLIVAN, LLP**
51 Madison Ave., 22nd Floor,
New York, N.Y. 10010
(212) 849-7000

*Counsel for Amicus Curiae
Pro-Football, Inc.*

June 18, 2015

## <u>QUESTION PRESENTED</u>

Does the bar on registration of disparaging marks in 15 U.S.C.

§1052(a) violate the First Amendment?

# CERTIFICATE OF INTEREST

Counsel for *amicus curiae* Pro-Football, Inc. certifies the following:

1.  The full name of every party or *amicus* represented by one or more of the undersigned counsel is:  Pro-Football, Inc.

2.  The name of the real party in interest (if the party in the caption is not the real party in interest) represented by one or more of the undersigned counsel is:  Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus* represented by one or more of the undersigned counsel are:  None.

4.  The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by one or more of the undersigned counsel in the trial court or agency or are expected to appear in this court are:  Robert L. Raskopf, Todd Anten, and Jennifer D. Bishop of Quinn Emanuel Urquhart & Sullivan, LLP.

/s/ *Robert L. Raskopf*
Robert L. Raskopf
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
51 Madison Ave., 22nd Floor,
New York, N.Y. 10010
(212) 849-7000

*Counsel for Amicus Curiae Pro-Football, Inc.*

June 18, 2015

# TABLE OF CONTENTS

Page

QUESTION PRESENTED ................................................................... i

CERTIFICATE OF INTEREST .......................................................... ii

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF INTEREST ............................................................. 1

INTRODUCTION ................................................................................ 4

ARGUMENT ....................................................................................... 5

I.    SECTION 2(A) VIOLATES THE FIRST AMENDMENT ON ITS FACE ............................................................................... 5

    A.    Section 2(a) Abridges Free Speech ......................................... 5

        1.    Section 2(a) Deprives Mark Owners Of Substantial Benefits ........................................................ 6

            a.    All PTO Actions Pursuant To Section 2(a) Withhold Important Benefits From Trademark Holders ............................................... 7

            b.    Cancellation Under Section 2(a) Imposes Additional Costs, Amounting To A Penalty For Prior Speech ................................................ 10

        2.    Section 2(a) Denies Benefits Based On Mark Holders' Protected Use Of "Disparaging" Trademarks ................................................................. 12

        3.    Trademark Registration Is Not A Government Subsidy .......................................................................... 16

        4.    Even If Trademark Registration Is Treated As A Government Subsidy, Section 2(a) Is Not A Permissible Condition On That Subsidy ..................... 21

B.    Section 2(a) Cannot Withstand Constitutional Scrutiny ..... 23

    1.    The Government Does Not Have A Legitimate State Interest In Protecting The Public From Disparagement ............................................................ 25

    2.    Section 2(a) Does Not Directly Advance A Substantial State Interest In Avoiding Subsidization Of Disparaging Speech .......................... 26

    3.    Section 2(a) Does Not Directly Advance A Substantial State Interest In Avoiding The Perception Of Government Endorsement Of Disparaging Speech ...................................................... 27

    4.    Section 2(a) Does Not Directly Advance A Substantial State Interest In Preventing Harm To Dignity Or Racial Equality ..................................... 29

    5.    Section 2(a) Does Not Directly Advance A Substantial State Interest In The Functioning Of The Trademark System ................................................. 31

II.    *IN RE McGINLEY* SHOULD BE OVERRULED .......................... 33

CONCLUSION ....................................................................... 35

CERTIFICATE OF COMPLIANCE ........................................ 36

# TABLE OF AUTHORITIES

Page

## Cases

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996) ...................................................................... 5

*Application of Beatrice Foods Co.,*
   429 F.2d 466 (C.C.P.A. 1970) ................................................... 9

*Autor v. Pritzker,*
   740 F.3d 176 (D.C. Cir. 2014) ................................................. 17

*B & B Hardware, Inc. v. Hargis Indus., Inc.,*
   135 S. Ct. 1293 (2015) ............................................................... 6

*Bad Frog Brewery, Inc. v. N.Y. State Liquor Authority,*
   134 F.3d 87 (2d Cir. 1998) ...................................................... 30

*Blackhorse v. Pro-Football, Inc.,*
   Cancellation No. 92/046,185,
   2014 WL 2757516 (T.T.A.B. June 18, 2014) ......................... 2

*Blackhorse v. Pro-Football, Inc.,*
   Case No. 14-cv-1043 (E.D. Va.) ................................... *passim*

*Bolger v. Youngs Drug Prods. Corp.,*
   463 U.S. 60 (1983) ............................................................. 25, 26

*Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.,*
   811 F.2d 1479 (Fed. Cir. 1987) ......................................... 20, 23

*In re Boulevard Entm't, Inc.,*
   334 F.3d 1336 (Fed. Cir. 2003) ............................................... 34

*Brown v. Cal. Dep't of Transp.,*
   321 F.3d 1217 (9th Cir. 2003) ................................................. 23

*Bullfrog Films, Inc. v. Wick,*
   847 F.2d 502 (9th Cir. 1988) ....................................... 13, 14, 18, 19

v

*Carey v. Population Servs. Int'l,*
  431 U.S. 678 (1977) ............................................................... 25

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
  447 U.S. 557, 566 (1980) ....................................... 23, 31, 33

*Dep't of Tex., Veterans of Foreign Wars of the U.S. v.*
*Tex. Lottery Comm'n,*
  760 F.3d 427 (5th Cir. 2014) .................................. 17, 18, 21

*Donchez v. Coors Brewing Co.,*
  392 F.3d 1211 (10th Cir. 2004) ............................................ 8

*Edenfield v. Fane,*
  507 U.S. 761 (1993) ................................................ 24, 27, 29

*Educ. Media Co. at Va. Tech, Inc. v. Insley,*
  731 F.3d 291 (4th Cir. 2013) .............................................. 24

*FCC v. Pacifica Found.,*
  438 U.S. 726 (1978) ............................................................... 25

*Figueroa v. United States,*
  466 F.3d 1023 (Fed. Cir. 2006) ......................................... 19

*Friedman v. Rogers,*
  440 U.S. 1 (1979) ................................................................... 6

*Gamut Trading Co. v. U.S. Int'l Trade Comm'n,*
  200 F.3d 775 (Fed. Cir. 1999) ........................................... 11

*Goulart v. Meadows,*
  345 F.3d 239 (4th Cir. 2003) .............................................. 23

*In re Heeb Media, LLC,*
  89 U.S.P.Q. 2d 1071,
  2008 WL 5065114 (T.T.A.B. 2008) ................................... 30

*Hollowform, Inc. v. AEH,*
  515 F.2d 1174 (C.C.P.A. 1975) ........................................... 9

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46 (1988) ............................................................... 25

*Jartech, Inc. v.  Clancy,*
    666 F.2d 403 (9th Cir. 1982) ............................................... 28

*Lamparello v. Falwell,*
    420 F.3d 309, 313-14 (4th Cir. 2005) .................................. 32

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ............................................... 17, 20, 22

*In re Mavety Media Grp.,*
    33 F.3d 1367 (Fed. Cir. 1994) ........................................ 33, 34

*In re McGinley,*
    660 F.2d 481 (C.C.P.A. 1981) ................................. 3, 26, 27, 33, 34, 35

*MicroStrategy Inc. v. Motorola, Inc.,*
    245 F.3d 335 (4th Cir. 2001) ............................................... 13

*OBX-Stock, Inc. v. Bicast, Inc.,*
    558 F.3d 334 (4th Cir. 2009) ............................................... 32

*In re Old Glory Condom Corp.,*
    26 U.S.P.Q. 2d 1216 (T.T.A.B. 1993) ............................ 21, 28

*Park N Fly, Inc. v. Dollar Park and Fly, Inc.,*
    469 U.S. 189 (1985) ............................................................. 20

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ................................................... 5, 14, 16

*Regan v. Taxation With Representation of Wash.,*
    461 U.S. 540 (1983) ............................................................. 17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ...................................................... 14, 22

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ............................................................. 20

*Sambo's Rest., Inc. v. City of Ann Arbor,*
   663 F.2d 686 (6th Cir. 1981) ......................................................... 30, 31

*Simon & Schuster, Inc. v. Members of the*
   *N.Y. State Crime Victims Bd.,*
   502 U.S. 105 (1991) ............................................................................... 14

*Snyder v. Phelps,*
   580 F.3d 206 (4th Cir. 2009) ................................................................ 30

*Sorrell v. IMS Health, Inc.,*
   131 S. Ct. 2653 (2011) ........................................................ 5, 23, 24, 26

*Speiser v. Randall,*
   357 U.S. 513, 526 (1958) ...................................................................... 14

*In re Tam,*
   785 F.3d 567 (Fed. Cir. 2015) ................................................................ 8

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
   505 U.S. 763 (1992) ................................................................................ 8

*USAID v. Alliance for Open Soc'y Int'l, Inc.,*
   133 S. Ct. 2321 (2013) .......................................................................... 16

*Ysura v. Pocatello Educ. Assoc.,*
   555 U.S. 353 (2009) .............................................................................. 18

## Rules / Statutes

15 U.S.C. §1052 ............................................................................ *passim*

15 U.S.C. §1057(b) ........................................................................... 7, 8

15 U.S.C. §1064(3) ............................................................................. 10

15 U.S.C. §1065 .................................................................................. 11

15 U.S.C. §1071(b) ............................................................................... 2

15 U.S.C. §1072 ................................................................................. 7, 9

15 U.S.C. §1114.................................................................8

15 U.S.C. §1115...........................................................9, 11

15 U.S.C. §1116(d) ...........................................................8

15 U.S.C. §1117(b) ...........................................................8

15 U.S.C. §1124.................................................................7

15 U.S.C. §1125.................................................................8

Act of July 5, 1946, Pub. L. No. 79-489, 60 Stat. 427 ............................26

Fed. R. App. P. 29(c)(5)...................................................1

Model State Trademark Bill .............................................10, 31

Omnibus Budget Reconciliation Act of 1990,
    Pub. L. No. 101-508, S. 10101,
    1990 U.S.C.C.A.N. (104 Stat.) 1388 ...................................19

Revision of Patent and Trademark Fees,
    56 Fed. Reg. 65147 (1991).................................................19

## Miscellaneous

*Hearings Before the Comm. On Patents,*
    *Subcomm. on Trademarks,*
    *House of Representatives on H.R. 4744,*
    76th Cong., 1st Sess. (1939)...................................15, 25, 33

Jeffrey Lefstin*, Does the First Amendment Bar Cancellation of*
    *Redskins?*, 52 STAN. L. REV. 665 (2000)..............................28

J. MCCARTHY, TRADEMARKS AND
    UNFAIR COMPETITION (4th ed. 2014).......................6, 9, 10, 11

# STATEMENT OF INTEREST[1]

*Amicus* Pro-Football, Inc. ("PFI") owns and operates the Washington Redskins football club, one of the thirty-two National Football League member clubs whose teams play professional football games. The team name "Redskins," adopted more than eighty years ago in 1933, is among the oldest and most famous team names in any professional sports league. The Redskins have been the home football team of the Washington, D.C. region since 1937.

PFI is also the owner of six federal trademark registrations that contain the word "Redskin" or a derivation thereof, issued by the PTO in 1967, 1974, 1978, and 1990, that are the subjects of a cancellation action initiated before the Trademark Trial and Appeal Board (the "TTAB") in 2006. The petitioners in that action, who are Native Americans, allege that these registrations should be cancelled because they contain matter that may have disparaged Native Americans at the time each was registered, in violation of Section 2(a) of the Lanham Act,

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), counsel for *amicus* Pro-Football, Inc. represents that it authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than *amicus* or its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

15 U.S.C. §1052(a) ("Section 2(a)").[2]  On June 18, 2014, in a split decision, the TTAB ordered the cancellation of PFI's six registrations. *Blackhorse v. Pro-Football, Inc.*, Cancellation No. 92/046,185, 2014 WL 2757516 (T.T.A.B. June 18, 2014).  PFI appealed that decision to the United States District Court of the Eastern District of Virginia, Case No. 1:14-cv-1043 (E.D. Va.) (Lee, J.), pursuant to 15 U.S.C. §1071(b).  Included in PFI's appeal is a facial challenge to Section 2(a)'s bar on registration of disparaging marks as violating the First Amendment. *See id.*, PFI's Mem. of Law at 5-18, Feb. 23, 2015, ECF No. 56; PFI's Mem. of Law at 5-27, Apr. 3, 2015, ECF No. 119.  The U.S. Government has intervened in *Blackhorse* to defend Section 2(a) against PFI's First Amendment challenge, and the parties have fully briefed cross-motions for summary judgment on the question of whether Section 2(a)'s bar on registration of disparaging marks violates the First Amendment.

Because PFI has challenged the TTAB's decision on the ground that Section 2(a) facially violates the First Amendment—the issue now

---

[2]  As used in this brief, "Section 2(a)" refers to the bar against registration of disparaging marks; it is not used to refer to other provisions within 15 U.S.C. 1052(a), *e.g.*, to the bar against registration of marks that are immoral or scandalous.

before this *en banc* Court—PFI has a significant interest in the outcome of this appeal.  Notably, in *Blackhorse*, both the petitioners and the Government heavily rely on *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981) in defending Section 2(a) from First Amendment scrutiny.[3]

In addition, PFI has a strong interest in ensuring that this Court consider Section 2(a)'s effects when it is used to ***cancel*** previously-issued registrations.  While Mr. Tam's interest in Section 2(a) is that of an ***applicant*** for a trademark registration, PFI's interest is that of a ***registrant*** who faces cancellation of marks that have been registered for nearly fifty years, and in which PFI has invested significant economic resources dedicated to promoting goodwill in its marks.  Such injury arguably is far more severe than that faced by Mr. Tam.  PFI thus may provide this Court with unique perspectives about Section 2(a)'s effects (economic and otherwise) on First Amendment curtailments that differ from those faced by Mr. Tam.

---

[3]  *See Blackhorse*, Defs. Mem. of Law at 1, 7, ECF No. 106; Defs. Rebuttal Mem. at 3, ECF No. 126; U.S. Mem. of Law at 6, 7, 8, ECF No. 110; U.S. Reply Mem. at 2, 3, 6, ECF No. 127.

## INTRODUCTION

While Section 2(a) can be found within the Lanham Act, it is decidedly not trademark law. Rather, it is classic anti-First Amendment law. The rest of the Lanham Act provides for registration of all marks that can *function* as trademarks. No matter the particulars, no matter the precise name, shape, color, or form, if the designation sought to be registered functions as a mark, it is registered (so long as another doesn't already own it).

But Section 2(a) is different. It blocks and cancels the registration of certain marks, not because they don't function as marks (indeed Section 2(a) can bar the strongest functioning marks), but because of the *message* the Government or others believe they convey. This freewheeling ability to deprive trademark owners of significant benefits *because of what they say* through their marks strikes at the very heart of the First Amendment values this country holds dear.

Under modern First Amendment jurisprudence, withholding a benefit on the basis of speech burdens that speech, and a burden on speech is as bad as a ban, so Section 2(a) undoubtedly abridges free speech. And because it does so without directly advancing *any*

legitimate and substantial state interest, it must be found unconstitutional.

## ARGUMENT

## I.    SECTION 2(A) VIOLATES THE FIRST AMENDMENT ON ITS FACE

Section 2(a) abridges free speech by denying important government benefits to actual and prospective trademark holders based on the message conveyed by their protected use of "disparaging" trademarks.  It does so without directly advancing any legitimate and substantial state interest, in violation of the First Amendment.

### A.    Section 2(a) Abridges Free Speech

Under the Supreme Court's modern First Amendment jurisprudence, the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech," *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), nor may it "silence unwanted speech by burdening its utterance," *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2664 (2011); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996) (plurality op.) (although Government need not provide benefits, "it does not follow that conferral of the benefit may be conditioned on the

surrender of a constitutional right"). It is beyond dispute, and the Government has conceded here, that the **use** of a trademark is protected speech under the Supreme Court's commercial speech jurisprudence. *See* Brief for Appellee at 34 n.5, Aug. 4, 2014, ECF No. 36 ("Trademarks are a form of commercial speech."); *Friedman v. Rogers*, 440 U.S. 1, 11 (1979) ("use of trade names … is a form of commercial speech"). Section 2(a) abridges this protected speech by conditioning important benefits on the use of non-"disparaging" trademarks, thereby burdening and chilling the use of "disparaging" marks.

### 1.    Section 2(a) Deprives Mark Owners Of Substantial Benefits

Section 2(a) denies the benefits of federal registration to trademark owners whose marks the PTO deems disparaging. 15 U.S.C. §1052(a). These withheld benefits are "substantial," and include "important legal rights and benefits" that are both substantive and procedural, the deprival of which causes serious economic consequences. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1300, 1310 (2015) (citing 3 J. MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION §§19:3 at 19-21; 19:9 at 19-34 (4th ed. 2014) (hereinafter "MCCARTHY")).

### a.    All PTO Actions Pursuant To Section 2(a) Withhold Important Benefits From Trademark Holders

For all trademark owners—including applicants for registration (like Tam) and owners of longstanding trademark registrations (like PFI)—the denial or cancellation of registration under Section 2(a) has serious economic and substantive consequences.  The owner of a mark that is deemed "disparaging" under Section 2(a) at a minimum must work harder—and spend more—to enforce its rights against infringers.  For example, the owner of an unregistered mark lacks constructive notice of ownership, 15 U.S.C. §1072, as well as *prima facie* evidence of the mark's validity and the applicant's ownership and exclusive use of the mark sought to be registered, 15 U.S.C. §1057(b).  It also may not obtain the assistance of the U.S. Customs Office to stop the importation of infringing goods.  15 U.S.C. §1124.

While spending more to enforce their rights, the owners of "disparaging" marks stand to recover less damages in court when they are wronged—for example, they may not pursue counterfeiting claims and remedies, which include treble damages and prejudgment interest,

against infringers.   15 U.S.C. §§1116(d), 1117(b).[4]  At the same time,

they remain subject to dilution claims by other mark holders, unlike

owners of registered marks.  15 U.S.C. §1125(c)(6).

Denial of registration under Section 2(a) can also deprive a mark

holder of substantive rights in its mark.  Registration provides a right

---

[4]   To be clear, while some causes of action are unavailable to owners of
unregistered marks, the owner of an unregistered mark *can* bring an
unfair competition claim under §43(a) of the Lanham Act, even if the
mark is adjudicated "disparaging" under Section 2(a).  Respectfully, the
cases cited by Judge Moore in her statement of additional views in the
panel opinion stand for the proposition that a mark must be
***protectable*** as a trademark before receiving §43(a) protection.  *See In
re Tam*, 785 F.3d 567, 576 (Fed. Cir. 2015) (citing cases).  That is, a non-
misleading mark capable of performing a source-identifying function
can be enforced under § 43(a), regardless of whether the mark meets
the requirements for registration.  *See, e.g., Two Pesos, Inc. v. Taco
Cabana, Inc.*, 505 U.S. 763, 768-69 (1992) ("[T]he general principles
qualifying a mark for registration under §2 of the Lanham Act are ***for
the most part*** applicable in determining whether an unregistered
mark is entitled to protection under §43(a)."); *Donchez v. Coors Brewing
Co.*, 392 F.3d 1211, 1215-16 (10th Cir. 2004) (§43(a) plaintiff must show
"her mark is protectable," and "[t]o be protectable, a mark must be
capable of distinguishing the products [or services] it marks from those
of others") (internal quotation marks omitted).  And as set forth herein,
Section 2(a)—unlike much of the rest of Section 2—is wholly unrelated
to whether a mark can perform the job of source identification.  That
said, a §43(a) action certainly is more difficult to prove and more  costly
than enforcement of a registered mark under 15 U.S.C. §1114 because,
*e.g.*, the mark owner lacks the presumptive evidence of validity,
ownership, and exclusive use that accompany a federal registration.
*See* 15 U.S.C. §1057(b).

to exclusive **nationwide** use of the registered mark where there is no prior use by another party. 15 U.S.C. §§1115, 1072; *see also Application of Beatrice Foods Co.*, 429 F.2d 466, 472-73 (C.C.P.A. 1970) (registration provides "that no one else may, henceforth legitimately adopt his trademark … in another area of the country"). But without a registration, under common law, the mark owner's exclusive rights exist only in parts of the country where it uses the mark. *See* 5 McCarthy §26:32; *see also, e.g.*, *Hollowform, Inc. v. AEH*, 515 F.2d 1174, 1177 (C.C.P.A. 1975) ("Where neither party holds a registration, a good faith junior user is entitled to injunctive relief against the senior user if the senior user attempts to enter a distant area where the junior user has established common law trademark rights."). Thus, for an applicant that does not yet use its mark nationally, denial of registration under Section 2(a) could actually **prevent** the applicant from using their mark in some areas. Here, for example, if another music group began using the designation "THE SLANTS," Tam could be enjoined from using his own "The Slants" mark in any part of the country where it was not already used.

9

Finally, denial of a federal registration under Section 2(a) may affect the applicant's state law rights, as most states have adopted a version of the Model State Trademark Bill, which denies registration (and attendant benefits) to "disparaging" marks.  *See* 3 MCCARTHY §22:8; *see also id.* §22:5 & n.1.

### b.    Cancellation Under Section 2(a) Imposes Additional Costs, Amounting To A Penalty For Prior Speech

In addition to depriving new applicants of important benefits through denial of registration, Section 2(a) allows the TTAB to ***cancel*** a previously-granted registration on grounds of disparagement—no matter the length of time that has passed between the PTO's initial registration and the registration's cancellation.  15 U.S.C. §1064(3). The impact of such a cancellation is even more severe than denial of registration in the first instance, particularly when the registration has been held for a long time.

In addition to the sudden loss of the benefits described above, if a registration is cancelled after more than five years, the mark owner will also lose the benefits of owning an "incontestable" mark, including ***conclusive evidence*** of the key elements of an infringement claim:  (1)

the mark's validity; (2) the registrant's ownership of the mark; and (3) the registrant's exclusive right to use the mark. 15 U.S.C. §§1115(b), 1065. Moreover, when Section 2(a) is used to cancel a previously-granted and long-held registration, the owner is financially **_penalized_** for its prior choice of and use of its mark. After cancellation, the owner of the mark must choose between the valuable benefits of registration and the continued use of a mark that it has already used and promoted in reliance on its registration. This is no real choice—after years of use (and sometimes **_decades_**), it can be too late for the mark owner to adopt a new trademark. The value of a trademark—its goodwill—is developed through longtime use of a mark. *See* 1 MCCARTHY §2:17 ("'Good will' has been defined as 'the advantage obtained by use of a trademark.'"); *Gamut Trading Co. v. U.S. Int'l Trade Comm'n*, 200 F.3d 775, 783 (Fed. Cir. 1999) ("The goodwill of a trademark is developed by use of the mark."). To retain that goodwill (and indeed any public familiarity with the goods or services bearing the mark) the mark holder must continue to use the mark without a federal registration and bear the related costs—a penalty imposed only **_after_** the mark has

developed goodwill and therefore become a significant asset of the owner.

Indeed, putting aside obvious monetary loss, in the case of PFI it would be simplistic to suggest that any new mark would be a comparable substitute for "Redskins," a brand that uniquely calls to mind a storied franchise's 82-year history. The intangible loss of value to PFI occasioned by transition to a different mark that the Government would not penalize is incalculable.

### 2. Section 2(a) Denies Benefits Based On Mark Holders' Protected Use Of "Disparaging" Trademarks

Under Section 2(a), whether a trademark owner is denied the benefits of registration turns solely on whether the PTO deems the trademark owner to be using a "disparaging" mark. In other words, the benefits of registration are conditioned on a person *not* using such a mark, and the burdens of using an unregistered mark are imposed on those who do. And unlike most of the other statutory limits on trademark registration, this particular condition—which did not exist prior to the 1946 Lanham Act—is based solely on the *message conveyed* by a trademark's content, wholly unrelated to the mark's

ability to perform the "trademark function" of source identification. *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001) (prerequisite to trademark protection is mark's ability to "perform[] the trademark function of identifying the source of the merchandise to the customers") (internal quotation marks omitted); *see generally* 15 U.S.C. §1052 (barring registration of, *inter alia*, marks confusingly similar to other marks, that are misdescriptive, that are descriptive but lack secondary meaning, that are deceptive, and that falsely suggest a connection with others). Plainly, Section 2(a) discriminates between uses of different trademarks "on the basis of content." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 510-11 (9th Cir. 1988).

Because trademark use is protected speech under the First Amendment, Section 2(a)'s content-based condition abridges the First Amendment rights of mark holders. *See supra* at 5-6. By conditioning "a valuable governmental benefit on the basis of speech content," Section 2(a) forces mark holders to "choose between exercising their right to free speech and foregoing benefits[,]" and thereby "transgresses the well-established principle that government may not condition the

conferral of a benefit on the relinquishment of a constitutional right." *Bullfrog Film*, 847 F.2d at 511.

Recognizing Section 2(a) as an abridgment of speech is consistent with the First Amendment principles underlying courts' scrutiny of speech-based conditions on government benefits and other speech-based burdens. The Supreme Court has been clear: "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be ***penalized*** and ***inhibited***[,] … allow[ing] the government to 'produce a result which [it] could not command directly.'" *Perry*, 408 U.S. at 597 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)) (emphasis added). In other words, although such conditions and burdens do not prohibit speech, they may nonetheless "effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). Preventing such "chilling of individual thought and expression" by the hands of the Government is, of course, a "[v]ital First Amendment speech principle[]." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835 (1995).

Section 2(a) certainly works to chill speech in this manner. Through it, the Government uses threatened denial of registration to encourage potential registrants not to use "disparaging" names. Faced with the possibility of being denied a registration—or worse, cancellation after years of investment-backed brand development—new brand owners are more likely to avoid brand names that may be arguably controversial for fear of later being deemed "disparaging." And those who are denied registration under Section 2(a) often abandon the denied application and file a new one, indicating that they have changed their name rather than bear the costs of using a "disparaging" mark or challenge the PTO's determination. Indeed, the little relevant legislative history demonstrates that it was the Government's intent to discourage the *use* of "disparaging" names through Section 2(a). *Hearings Before the Comm. On Patents, Subcomm. on Trademarks, House of Representatives, on H.R. 4744*, 76th Cong., 1st Sess. 18-21 (1939) (hereinafter "*Hearings on H.R. 4744*") (statement of Rep. Thomas E. Robertson) (testifying that a mark like "Abraham Lincoln gin ought not to be *used*," and that Section 2(a) "would take care of [such] abuses") (emphasis added).

### 3.  Trademark Registration Is Not A Government Subsidy

The Government has argued elsewhere that Section 2(a) is a permissible condition on a Government "subsidy" provided to trademark owners.  *See Blackhorse*, U.S. Mem. at 14-16, ECF No. 110; *id.*, U.S. Reply at 11-13, ECF No. 127. Respectfully, this line of argument makes little sense.  Section 2(a) facially is not a "subsidy," nor is it supported by the constitutional rationales that allow the Government to condition certain subsidies on the content of recipients' speech.

To be sure, there is an exception to the general rule against "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected interests," *Perry*, 408 U.S. at 597, where the Government selectively subsidizes or funds private speech or activities that it wishes to encourage as a policy matter.  Courts have thus justified speech-based funding decisions on two constitutional grounds. First, they are uses of Congress' broad discretion to tax and spend under the Spending Clause, which includes "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends."  *USAID v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327-28 (2013).  Second, speech-based funding can be

understood as the Government's own speech, and "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-42 (2001) (citation omitted).

But Section 2(a) has nothing to do with either of these justifications for selective funding. The benefits of registration do not amount to a "subsidy" or "funding" of any sort. The Government creates a "subsidy" or "funds" when it provides for the "receipt of funds ***from the public fisc***." *Dep't of Tex., Veterans of Foreign Wars of the U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 436 (5th Cir. 2014) (emphasis added); *see also Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014) ("The Supreme Court has never extended the subsidy doctrine to situations not involving financial benefits."). Thus, the Government "subsidizes" speech or activity when it provides grants or tax exemptions for private activities. *See Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 544 (1983) (tax exemption is a

"form of subsidy that is administered through the tax system," like "a cash grant").[5]

The benefits of federal registration, by contrast, are not in the form of public funds, either directly or indirectly—they are substantive and procedural rights conferred to trademark holders as part of Congress' national regulation of the trademark system. Like other non-financial benefits conferred by regulatory legislation, federal trademark registration is not a subsidy that can be conditioned on a limitation of protected speech. *See, e.g.*, *Bullfrog Films*, 847 F.2d at 509 (exemption from import duties not a subsidy because "no Treasury Department funds [were] involved"); *Dep't of Tex.*, 760 F.3d at 436 (lottery licenses "wholly distinguishable" from subsidy cases "because no public monies or 'spending' by the state are involved").

Accordingly, Section 2(a) cannot be justified under Congress' broad Spending Clause power. In fact, applicants for registration are required to pay a fee ***to*** the Government (not the other way around),

---

[5] The Government also provides a "subsidy" when it allows for payments of government funds directly to private organizations in other ways, such as through government employee payroll deductions. *See, e.g.*, *Ysura v. Pocatello Educ. Assoc.*, 555 U.S. 353, 357 (2009).

and since 1991, PTO operations have been funded entirely by these registration fees, not Treasury funds. *Figueroa v. United States*, 466 F.3d 1023, 1028 (Fed. Cir. 2006); *see also* Revision of Patent and Trademark Fees, 56 Fed. Reg. 65147 (1991); Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, S. 10101, 1990 U.S.C.C.A.N. (104 Stat.) 1388.

To the extent any federal money is spent at all on the registration system, that money is provided to the PTO itself to fund administration—not registration applicants.  It cannot be that Congress' funding of the Government's **administration** of non-financial benefits amounts to a "subsidy" that can be conditioned on curtailment of speech—every government benefit is administered in some way, so this interpretation would annihilate the notion of "unconstitutional conditions" altogether.  Indeed, in *Bullfrog Films*, the Ninth Circuit found that the substantive and procedural benefits accompanying certification of foreign audiovisual materials could not be conditioned on speech content, although the United States Information Agency was required to expend resources to "decide for itself whether the material presented qualifies for benefits."  847 F.2d at 504, 509.

Nor is Section 2(a) justified as necessary to prevent "distort[ion]" of a "governmental message." *Legal Servs. Corp.*, 531 U.S. at 541. This rationale has no application where, as here, the Government has not acted to "promote a governmental message" or policy, but rather to generally "facilitate private speech." *Id.* at 542; *see also Rust v. Sullivan*, 500 U.S. 173, 194-95 (1991) (distinguishing subsidy from "a ***general law*** singling out a disfavored group on the basis of speech content") (emphasis added). The broad purpose of the Lanham Act is to "secure to the owner of [a trademark] the goodwill of his business." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985). Registration is specifically intended to facilitate the private use of trademarks and the messages ***they*** convey by putting the world on notice of the exclusive rights in a mark. *See Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479, 1485 (Fed. Cir. 1987) (registration seeks to "encourage the presence on the register of trademarks of ***as many as possible of the marks in actual use***") (emphasis added). And indeed, the benefits of federal registration are available to nearly all owners of marks that are capable of functioning as source-identifiers—not just those that promote a message favored by

the Government. Thus, it is "erroneous" to treat "the issuance of a trademark registration" as an "award[] of the U.S. Government's 'imprimatur' to the mark," *In re Old Glory Condom Corp.*, 26 U.S.P.Q.2d 1216, 1219 n.3 (T.T.A.B. 1993), and therefore no government message would be diluted by the issuance of registrations to "disparaging" marks.

At base, Section 2(a) is not supported by the justifications that sometimes allow the Government to dole out funds based on speech content, while it does work to chill protected speech. "[B]ecause the subsidy rationale is inapplicable, the unconstitutional conditions doctrine controls. *Dep't of Texas*, 760 F.3d at 438. Section 2(a) is an abridgment of protected speech, and it must be scrutinized to determine whether its encroachment on free speech is compatible with the Constitution.

### 4.     Even If Trademark Registration Is Treated As A Government Subsidy, Section 2(a) Is Not A Permissible Condition On That Subsidy

Even if the Court finds that trademark registration is a "subsidy" (which it isn't), Section 2(a) would still abridge free speech because it

discriminates based on viewpoint and is not reasonably related to the purpose of registration.

Where the Government creates a subsidy, government forum cases "provide some instruction." *Legal Servs. Corp.*, 531 U.S. at 544. Under this jurisprudence, the Government cannot restrict entry to a government forum on the basis of a speaker's viewpoint. *Rosenberger*, 515 U.S. at 829-31. But Section 2(a) does just that: it denies access to federal registration to marks based on the ***viewpoint*** of the messages they convey, *i.e.*, it denies registration to marks that "disparage" a particular person or group, but not to marks that are neutral or laudatory towards the same person or group.

Further, the Government cannot restrict entry to a government forum on the basis of content if the restriction "is not reasonable in light of the purpose served by the forum." *Rosenberger*, 515 U.S. at 829 (internal quotation marks omitted). Section 2(a) has nothing to do with the purposes of federal registration discussed above. *See supra* at 20. To the contrary, Section 2(a) ***interferes*** with the purposes of registration by making it more difficult for some mark owners to secure the goodwill of their business, and by keeping the public in the dark

22

about certain protectable marks (thereby encouraging unwitting infringement). *See, e.g., Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1222-23 (9th Cir. 2003) (content-based exemptions from permit requirements not reasonably related to the purpose of the permit program).[6]

## B.   Section 2(a) Cannot Withstand Constitutional Scrutiny

Section 2(a) fails to pass constitutional muster under the "intermediate" level of scrutiny traditionally applied to regulations on commercial speech. *See, e.g., Sorrell*, 131 S. Ct. at 2667-68 (describing commercial speech scrutiny and citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)).[7] Under that

---

[6] Further, under a forum analysis, federal registration should be properly considered a "designated public forum" because the Government has made it "generally available" to owners of protectable marks, registration is "granted as a matter of course," and entry is contingent only on the "ministerial judgment" of compliance with Section 2. *Goulart v. Meadows*, 345 F.3d 239, 249-51 (4th Cir. 2003); *see also Bongrain Int'l (Am.) Corp.*, 811 F.2d at 1485 (Fed. Cir. 1987) (registration system designed to encourage registration of as many trademarks as possible). In such a forum, ***all*** content-based restrictions (like Section 2(a)) are impermissible.

[7] The Supreme Court recently suggested that regulations that discriminate based on the content of speech (like Section 2(a)) must satisfy a more "heightened scrutiny," ***even when they affect only***
(*footnote continued*)

standard, the regulation of lawful, non-misleading commercial speech is unconstitutional unless the Government demonstrates that "the statute directly advances a substantial government interest and that the measure is drawn to achieve that interest." *Id.* at 2667-68. It is the Government's burden to show that "the harms it recites are ***real*** and that its restriction [on speech] will in fact alleviate them ***to a material degree***," which it must do through more than "mere speculation and conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

Here, Section 2(a) indisputably does not regulate unlawful or misleading speech. Because the Government cannot show that it advances ***any*** legitimate and substantial government interest, it runs afoul of the First Amendment.

---

***commercial speech***. *Sorrell*, 131 S. Ct. at 2664; *see also Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 297-98 (4th Cir. 2013) (discussing argument that *Sorrell* mandates application of strict scrutiny to all content-based restrictions on commercial speech). The Court need not reach this issue because Section 2(a) fails even "intermediate" scrutiny.

1.    **The Government Does Not Have A Legitimate State Interest In Protecting The Public From Disparagement**

The little available legislative history indicates that Section 2(a) was intended for a single illegitimate purpose:  to "take care of" the possibility of brand owners "abus[ing]" persons with their marks by not "permit[ing]" this type of mark.  *Hearings on H.R. 4744* at 18-21 (statement of Rep. Thomas E. Robertson).  In other words, Section 2(a) was intended to prevent or discourage the use of disparaging marks.  And, as the Government has conceded in its brief in this case, this "policy objective[]" is clear from the face of the statute.  Brief for Appellee at 33-34 n.4, Aug. 4, 2014, ECF No. 36.

Deterrence or suppression of purportedly offensive speech will **never** qualify as a legitimate government interest.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 (1983) (explaining that offensiveness is "classically not [a] justificatio[n] validating the suppression of expression") (quoting *Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977)); *see also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it.") (quoting *FCC v. Pacifica*

*Found.*, 438 U.S. 726, 745-46 (1978)). As the Supreme Court has reasoned, "[s]peech remains protected even when it may 'stir people to action,' 'move them to tears,' or 'inflict great pain.'" *Sorrell*, 131 S. Ct. at 2670. The Government thus cannot rely on its interest in discouraging use of disparaging marks as a justification for Section 2(a)'s abridgement of speech—the ***only*** purported state interest that is evident from the history and face of the statute.[8]

### 2. Section 2(a) Does Not Directly Advance A Substantial State Interest In Avoiding Subsidization Of Disparaging Speech

Because Congress's only clear interest in enacting Section 2(a) is constitutionally infirm, this Court in *In re McGinley* justified Section 2(a) instead as "a judgment by the Congress that such marks not occupy the time, services, and use of funds of the federal government." *In re McGinley*, 660 F.2d at 486. As an initial matter, this justification must be impermissible under the "unconstitutional conditions" cases (*see*

---

[8] It is not surprising that Congress cited no legitimate justification for Section 2(a)'s restriction on speech at the time it was enacted. The Lanham Act was passed nearly thirty years before the Supreme Court first recognized that the First Amendment protects commercial speech at all. *See Bolger*, 463 U.S. at 64; Act of July 5, 1946, Pub. L. No. 79-489, § 2(a), 60 Stat. 427, 428.

*supra* at 13-14)—if the Government could justify a speech-based limitation on benefits solely because it has a state interest in its own "judgment" that certain speech is unworthy of federal resources, then the "unconstitutional conditions" doctrine would be meaningless.

Moreover, this interest is not directly advanced to a "material degree" by Section 2(a). As explained *supra* at 18-19, applicants pay fees to the Government and do not use Treasury funds. And Section 2(a)'s disparagement clause likely results in the expenditure of more public funds defending Section 2(a) denials in lawsuits—like the instant case—"than would ever result from the registration of the mark." *In re McGinley*, 660 F.2d at 487 (Rich, J., dissenting).

### 3. Section 2(a) Does Not Directly Advance A Substantial State Interest In Avoiding The Perception Of Government Endorsement Of Disparaging Speech

More recently, the Government has tried to defend Section 2(a) as necessary to avoid the perception that the Government has endorsed disparaging marks. *See Blackhorse*, U.S. Mem. at 21, ECF No. 110; U.S. Reply at 15-17, ECF No. 127. But the Government cannot meet its burden of showing that perception of Government endorsement is a "real" harm caused by registration of disparaging marks. *Edenfield*,

507 U.S. at 771. As the Government has conceded, "'issuance of a trademark registration' does not 'amount[] to the awarding of the U.S. Government's imprimatur.'" *Blackhorse*, U.S. Mem. at 21, ECF No. 110 (quoting *In re Old Glory Condom Corp.*, 26 U.S.P.Q.2d at 1219 n.3. The idea that registration nonetheless results in a **perception** of endorsement is nonsensical: people encounter marks as brand signifiers in the marketplace and are unlikely to be aware of whether a trademark is registered. *See* Jeffrey Lefstin, *Does the First Amendment Bar Cancellation of Redskins?*, 52 STAN. L. REV. 665, 684 (2000) ("The overwhelming majority of the public encounters trademarks in their roles as product identifiers, not as the beneficiaries of a federal registration scheme."). And just as consumers would not believe the Government endorses pornography because obscene works may be registered with the U.S. Copyright Office, no one would infer the Government endorses immoral, scandalous, or disparaging viewpoints through the registration of such trademarks.[9] *See, e.g., Jartech, Inc. v.*

---

[9] Indeed, were the public to interpret federal registration of such marks in any manner, the public most likely would find such registration reflective of the First Amendment's prohibition on laws abridging the freedom of speech.

*Clancy*, 666 F.2d 403, 405-06 (9th Cir. 1982) (obscene works of authorship protected by federal copyright law).

### 4. Section 2(a) Does Not Directly Advance A Substantial State Interest In Preventing Harm To Dignity Or Racial Equality

The Government has also recently asserted that Section 2(a) furthers a substantial state interest in preventing secondary effects of slurs and other disparaging speech, such as harm to dignity and racial harmony and equality. *See Blackhorse*, U.S. Reply at 15-17, ECF No. 127. Putting aside whether these interests are actually *secondary* (as opposed to primary) effects of disparaging speech that can form a legitimate basis for government regulation, Section 2(a) does not advance these interests to a "material degree." *Edenfield*, 507 U.S. at 771.

Section 2(a) has at best a *de minimis* effect on the use of slurs and disparaging speech that the Government argues harms dignity and racial equality. While Section 2(a) deters the use of disparaging *marks*, it does not materially affect the overall use of offensive and disparaging *speech*—it does nothing to stop or deter people from using such speech in any way they choose (other than as a trademark). And forms of

speech patently more offensive and disparaging than *any* trademark abound in the marketplace of ideas.  *See, e.g.*, *Snyder v. Phelps*, 580 F.3d 206, 222-23 (4th Cir. 2009) (display of signs such as "Thank God for Dead Soldiers" protected by First Amendment).[10]  As the Second Circuit has explained, the removal "of a few grains of offensive sand from a beach of vulgarity" fails to materially advance any Government interest.  *Bad Frog Brewery, Inc. v. N.Y. State Liquor Authority*, 134 F.3d 87, 100 (2d Cir. 1998).

Given that Section 2(a) does not even materially affect the use of disparaging speech, it is hard to see how it could materially limit secondary effects of that speech.  And it is not at all clear that the harms the Government points to—harm to dignity and equality—are actually secondary effects of disparaging speech.  Any "impact on these laudable goals by" the registration of disparaging marks "is speculative at best."  *Sambo's Rest., Inc. v. City of Ann Arbor*, 663 F.2d 686, 695

---

[10]  The PTO has inconsistently applied Section 2(a) to marks claimed to "disparage" racial groups, further demonstrating that Section 2(a) does little to remove racial slurs from the marketplace of ideas.  For instance, the PTO granted a registration to HEEB for a particular use (Reg. No. 2,858,011) (June 29, 2004), but denied a registration to HEEB for a different use, *In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071, 2008 WL 5065114, at *8 (T.T.A.B. 2008).

(6th Cir. 1981). The Government has no evidence that registration of purportedly disparaging marks would "retard[] or impede[] achievement or furtherance of its goal of racial equality" or cause dignitary harm. *Id*. Because Section 2(a) "provides only ineffective or remote support for the [G]overnment's purpose[s]," it is not a constitutional restriction on speech. *Central Hudson*, 447 U.S. at 564.

**5.    Section 2(a) Does Not Directly Advance A Substantial State Interest In The Functioning Of The Trademark System**

Lastly, the Government has also argued that Section 2(a) directly advances its interest in ensuring that the trademark system functions properly by avoiding conflicts between federal, common, and state trademark law and preserving the balance between the rights of trademark owners and the free speech of others. *See Blackhorse*, U.S. Mem. at 21-24, ECF No. 110.

Regardless of whether the Government has a substantial interest in avoiding conflicts between federal, common, and state trademark law, it is clear that this interest is not advanced by Section 2(a). Owners of disparaging marks ***retain*** their common law protections. And state law only bars registration of "disparaging" marks because the Model State

Trademark Bill was based on the Lanham Act—not the other way around. Eliminating Section 2(a) will not create any upheaval in the harmony between common, state, and federal law in the trademark system.

Similarly, Section 2(a) does not advance any government interest in preserving a balance between trademark rights and free speech. To be sure, trademark law balances free speech concerns, but it does so by: (1) requiring marks to serve a source-identifying function, and refusing to protect (not just register) generic marks or descriptive marks that lack secondary meaning, reserving such words for public use;[11] and (2) ensuring that trademark rights can only be enforced against confusingly similar or misleading uses.[12] Section 2(a) is independent of these limitations on trademark rights—marks that would be registered *but for* Section 2(a): (1) *do* serve source-identifying functions; and (2) can only be enforced against confusingly similar or misleading uses.

---

[11] *See, e.g.*, *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 339-40 (4th Cir. 2009) (trademark law "protects the 'linguistic commons' by denying … an exclusive interest in words that do not identify … products or product sources but rather are used for their common meaning").

[12] *See, e.g.*, *Lamparello v. Falwell*, 420 F.3d 309, 313-14 (4th Cir. 2005) (limits on trademark enforcement protect "useful social and commercial discourse") (internal quotation marks omitted).

And the Government cannot identify any separate way that Section 2(a)

works to preserve free speech.[13]

## II. *IN RE MCGINLEY* SHOULD BE OVERRULED

To the extent that *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981),

decided by this Court's predecessor forecloses the foregoing First

Amendment analysis, this Court should overturn that case.

In *McGinley*, the C.C.P.A. affirmed the rejection of a trademark as

"scandalous."    660 F.2d at 482.    In addressing the applicant's First

Amendment challenge to the prohibition on scandalous marks,

*McGinley* conducted only a cursory analysis.    In three sentences, the

Court concluded that the "PTO's refusal to register appellant's mark

does not affect his right to use it."    660 F.2d at 484.    "No conduct is

---

[13]  Even if Section 2(a) sought to advance a legitimate state interest, its language is impermissibly vague to advance that interest.  The statute provides no guidance as to which trademarks will be deemed disparaging, scandalous, or immoral.  As the Assistant Commissioner of Patents during the Congressional hearings on the Lanham Act testified, "it is always going to be *just a matter of the personal opinion* of the individual parties as to whether they think it is disparaging." *Hearings on H.R. 4744* at 21 (statement of Leslie Frazer) (emphasis added).  As a result, no coherent standard has emerged over time.  *In re Mavety Media Grp.*, 33 F.3d 1367, 1371-72 (Fed. Cir. 1994) (collecting cases). Absent a consistent and definitive application of Section 2(a), Section 2(a)'s advancement of any Government interest is "tenuous" and "highly speculative." *Central Hudson*, 447 U.S. at 569.

proscribed, and no tangible form of expression is suppressed. Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark." *Id.* For more than three decades, the Federal Circuit has followed this approach. *See*, *e.g.*, *In re Boulevard Entm't, Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003) (citing *In re McGinley*); *In re Mavety Media Grp. Ltd.*, 33 F.3d at 1374 ("our precedent forecloses … challenges to [Section 2(a)] as unconstitutional on its face or as applied") (citing *McGinley*).

But the analysis in *McGinley* rested on a faulty premise: that the First Amendment did not apply because Section 2(a) does not actually prevent the use of the mark. As explained *supra* in Part I.A, benefits denied because of the would-be recipient's speech create a burden on speech, and burdens on speech are subject to First Amendment scrutiny just like bans. Section 2(a) burdens certain disfavored marks and denies federal benefits to those marks, which indisputably "affect[s]" their use. Moreover, as also explained *supra* in Part I.A.1, Section 2(a) in some instances ***does*** prevent use of a mark when the mark is not yet in nationwide use.

*McGinley* no longer has any place in modern First Amendment law, and this Court should overrule it.

## CONCLUSION

This en banc Court should hold that Section 2(a)'s bar on the registration of disparaging marks facially violates the First Amendment.

Dated:  June 18, 2015

Respectfully submitted,

s/ *Robert L. Raskopf*

ROBERT L. RASKOPF
 *(counsel of record)*
TODD ANTEN
JENNIFER D. BISHOP
**QUINN EMANUEL URQUHART &
   SULLIVAN, LLP**
51 Madison Ave., 22nd Floor,
New York, N.Y. 10010
(212) 849-7000
fax:  (212) 849-7100

*Counsel for Amicus Curiae
Pro-Football, Inc.*

## **CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 29(d) and 32(a)(7)(B), this brief contains 6,945 words. This certificate was prepared in reliance on the word count of the word-processing system (Microsoft Office Word 2007) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Century Schoolbook font.

Dated: June 18, 2015                    s/ *Robert L. Raskopf*
                                        ROBERT L. RASKOPF

# CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June 2015:

1.     I presented the **BRIEF OF PRO-FOOTBALL, INC.  AS** ***AMICUS CURIAE* IN SUPPORT OF APPELLANT** to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to all counsel of record, which constitutes service pursuant to Fed. R. App. P. 25(c)(2), Fed. Cir. R. 25(a), and the Court's Administrative Order regarding Electronic Case Filing 6(A) (May 17, 2012).

s/ *Robert L. Raskopf*
ROBERT L. RASKOPF