Appeal No. 2014-1203

# In the United States Court of Appeals for the Federal Circuit

———————

IN RE: SIMON SHIAO TAM

———————

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 85472044

———————

## BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION, THE AMERICAN CIVIL LIBERTIES UNION OF OREGON, AND THE AMERICAN CIVIL LIBERTIES UNION OF THE NATION'S CAPITAL AS *AMICI CURIAE* IN SUPPORT OF APPELLANT

———————

Arthur B. Spitzer
American Civil Liberties Union of
   the Nation's Capital
4301 Connecticut Avenue
Washington, D.C. 20008
(202) 457-0800
artspitzer@aclu-nca.org

Lee Rowland*
Esha Bhandari*
American Civil Liberties Union
   Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lrowland@aclu.org
ebhandari@aclu.org

Mathew W. dos Santos*
American Civil Liberties Union
   Foundation of Oregon
P.O. Box 40585
Portland, OR 97240
(503) 227-6928
mdossantos@aclu-or.org

Brett Max Kaufman*
Technology Law & Policy Clinic
New York University School of Law
245 Sullivan Street
New York, New York 10012
(212) 998-6430
brettmaxkaufman@nyu.edu

Counsel for Amici Curiae

*Admissions Applications Pending

Appeal No. 2014-1203

===

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

————————

## IN RE: SIMON SHIAO TAM

————————

## CERTIFICATE OF INTEREST

————————

Counsel for *amici curiae* certifies the following:

1. The full name of every party or *amicus* represented by me is: **"American Civil Liberties Union," "American Civil Liberties Union of Oregon," and "American Civil Liberties Union of the Nation's Capital."**

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: **N/A.**

3. All parent companies and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are: **none.**

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

a.  **Arthur B. Spitzer – American Civil Liberties Union of the Nation's Capital**

b.  **Lee Rowland and Esha Bhandari – American Civil Liberties Union Foundation**

c.  **Mathew W. dos Santos – American Civil Liberties Union Foundation of Oregon**

d.  **Brett Max Kaufman – Technology Law & Policy Clinic, New York University School of Law**

Respectfully submitted,

  /s/ *Arthur B. Spitzer*

Arthur B. Spitzer
American Civil Liberties Union
of the Nation's Capital
4301 Connecticut Avenue
Washington, D.C. 20008
(202) 457-0800
artspitzer@aclu-nca.org

Date: June 19, 2015

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ......................................................................... ii

TABLE OF AUTHORITIES ............................................................................ v

INTEREST OF *AMICI CURIAE* ..................................................................... 1

INTRODUCTION ........................................................................................... 3

ARGUMENT .................................................................................................. 8

   a. Section 2(a) of the Lanham Act implicates the First Amendment. ............ 8

      i.      Section 2(a) implicates the First Amendment because it burdens protected expression. ................................................... 9

      ii.     Section 2(a) impermissibly mandates viewpoint discrimination. ....................................................................... 13

   b. Section 2(a) places an unconstitutional condition on the receipt of valuable government benefits. ................................................... 16

   c. Section 2(a) is unconstitutionally vague and overbroad. ......................... 20

   d. A finding that Section 2(a) is facially unconstitutional would not significantly alter the landscape of trademark law. ................................. 26

CONCLUSION ............................................................................................. 27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ............................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*ACLU of N.C. v. Tata*, 742 F.3d 563 (4th Cir. 2014) ...........................................2

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2332 (2013) ................................................................. 19

*Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382 (1950) ...................................... 12

*American Civil Liberties Union of N.C. v. Tata*, 742 F.3d 563 (4th Cir. 2014) ......................................................................................2

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) ........................... 11

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ........................................................... 21

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668 (1996) .............................................................................. 17

*Berger v. American Civil Liberties Union of N.C.*, No. 14-35 (July 11, 2014) ......................................................................................2

*Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479 (Fed. Cir. 1987) .................................................................................. 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). ........................................................................... 13

*Cf. Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ...................................... 10

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376 (4th Cir. 2006) ........................................................... 13

*Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788 (1985).............. 15

*Erickson v. City of Topeka, Kan.*, 209 F. Supp. 2d 1131 (D. Kan. 2002) ......... 15

*Ex parte Murphy*, 200 U.S.P.Q. (BNA) 801 (1977) ......................................... 27

*FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) .................... 20, 21

*FCC v. League of Women Voters of Cal.*, 468 U.S. 364 (1984)........................ 18

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) .................. 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................... 21

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) .............. 21

*In re Blvd. Entm't, Inc.*, 334 F.3d 1336 (Fed. Cir. 2003) ................................. 16

*In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071 (T.T.A.B. 2008) ...........................5

*In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981)........................................... passim

*In re Old Glory Condom Corp*, 26 U.S.P.Q.2d 1216 (T.T.A.B. 1993) ......... 9, 25

*In re Riverbank Canning Co.*, 95 F.2d 327 (C.C.P.A. 1938) ............................ 23

*In re Sociedade Agricola E. Comerical Dos Vinhos Messias, S.A.R.L.*,
159 U.S.P.Q. 275 (T.T.A.B. 1968) ..................................................................... 24

*In re Tam*, 785 F.3d 567 (Fed. Cir. 2015)................................................... passim

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)........................................... 21

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)................................ 14, 19

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252
(4th Cir. 2007)..................................................................................................... 10

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ..................... 10

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ........................... 13

*Perry v. Sindermann*, 408 U.S. 593 (1972) ....................................................... 17

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972) ....................................7

*Pro-Football, Inc. v. Blackhorse, et al.*, 113 U.S. p.Q.2d 1749
(E.D. Va. Nov. 25, 2014) .....................................................................................1

*Revision of Patent and Trademark Fees*, 56 Fed. Reg. 65142 (1991). ............. 17

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995).................................................................................... 15, 19

*Rust v. Sullivan*, 500 U.S. 173 (1991)................................................................ 19

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990).............................. 14

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ................................1

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105, 115 (1991).................................................................................... 11

*Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011) ......................................... 13

*Speiser v. Randall*, 357 U.S. 513 (1958) ......................................................... 14

*Texas v. Johnson*, 491 U.S. 397 (1989) ........................................................... 14

*Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568 (1985).............. 22

*United States v. Alvarez*, 132 S. Ct. 2537 (2012) ............................................ 10

*United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010)....................................7

vi

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................7

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, No. 14-144, 2015 WL 2473375 (U.S. June 18, 2015) ....................................................................... 2, 9


**Statutes**

15 U.S.C. § 1125(c)(3)..................................................................................... 10

Lanham Act, 15 U.S.C. § 1052(a) ............................................................. passim


**Other Authorities**

*GENEQ queer*, Gender Equity Res. Ctr., Univ. of Cal. at Berkeley ................. 15

Jendi B. Reiter, *Redskins and Scarlet Letters: Why "Immoral" and "Scandalous" Trademarks Should Be Federally Registrable*, 8 Fed. Cir. B.J. 191 (1976) ............................................................................................................. 27

Llewellyn Joseph Gibbons, *Semiotics of the Scandalous and the Immoral and the Disparaging: Section 2(a) Trademark Law After Lawrence v. Texas*, 9 Marq. Intell. Prop. L. Rev. 187 (2005) .............................5

Office Action re: Trademark Appl. Serial No. 85/472,044 ..................................6

Theodore H. Davis, Jr., *Registration of Scandalous, Immoral, and Disparaging Matter Under Section 2(a) of the Lanham Act: Can One Man's Vulgarity Be Another's Registered Trademark?*, 83 Trademark Rep. 801 (1993)....................................................................... 18

Trademark Manual of Examining Procedure (TMEP) § 1203.01 ............... 22, 24

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with approximately 500,000 members dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. Since its founding in 1920, the ACLU has vigorously defended both free speech and racial justice. In specific instances, tensions may arise between these two principles. However, nearly a century of experience has convinced us that a strong First Amendment is not only compatible with equality but essential to its pursuit. In that regard, it is worth noting that many of the landmark civil rights decisions of the 1950s and 1960s arose out of free speech controversies, *see, e.g.*, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969), and that efforts to suppress particular viewpoints are often aimed at racial and ethnic minorities. To preserve the principle of viewpoint neutrality, the ACLU has appeared in numerous cases throughout the country. Recently, and of particular relevance to the issues raised here, these cases include: *Pro-Football, Inc. v. Blackhorse, et al.*, 113 U.S. p.Q.2d 1749 (E.D. Va. Nov. 25, 2014) (involving claim that proposed cancellation of Washington "Redskins" team trademark would

---

[1] The Court has permitted the submission of *amicus curiae* briefs in this case without consent or leave of the Court. *In re Tam*, 600 F. App'x 775, 776 (Fed. Cir. 2015). No party has authored this brief in whole or in part, and no one other than *amici*, its members, or counsel has paid for the preparation or submission of this brief.

1

be in violation of the First Amendment); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, No. 14-144, 2015 WL 2473375 (U.S. June 18, 2015), (holding Texas' specialty license plates are government speech, so Texas was entitled to refuse plates featuring the Confederate Flag); and *American Civil Liberties Union of N.C. v. Tata*, 742 F.3d 563 (4th Cir. 2014) (holding unconstitutional a state's decision to issue a "Choose Life" specialty license plate while refusing to issue a pro-choice specialty plate), *petition for cert. filed sub nom. Berger v. American Civil Liberties Union of N.C.*, No. 14-35 (July 11, 2014).

Accordingly, the proper resolution of this case is a matter of substantial interest to the ACLU and its members.

The American Civil Liberties Union of Oregon is a state affiliate of the National ACLU. The American Civil Liberties Union of the Nation's Capital is the Washington, D.C., affiliate of the National ACLU.

# INTRODUCTION

Few principles of constitutional law are as settled as the First Amendment's prohibition against government regulation of private speech based on viewpoint. This evergreen rule holds no less true in the context of trademark law. Yet the Lanham Act, 15 U.S.C. § 1052(a) (hereinafter "Section 2(a)"), not only condones but *mandates* viewpoint-based discrimination in the registration of trademarks, which provide substantial benefits to the trademark holder and which are often intended and understood to convey a message or idea. Further, the constitutional harms caused by Section 2(a) are magnified by vague and subjective terms that provide no meaningful notice to speakers as to which speech the government will find acceptable, thereby risking—and in this case, *ensuring*—inconsistent and discriminatory application of the law.

Section 2(a) prohibits the registration of any trademark interpreted by the U.S. Patent and Trademark Office ("PTO") to "comprise[] immoral, deceptive, or scandalous matter; or matter which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt or disrepute." 15 U.S.C. § 1052(a). Application of the disparagement provision turns on the subjective determination of PTO officials. It is therefore no surprise that the unclear standards of Section 2(a) have led to inexplicable and irreconcilable results, with the same mark being accepted for some applicants but rejected for

3

others in similar contexts. For example, the PTO did not find a Section 2(a)

violation when reviewing an application for the use of Uppity Negro[2] on apparel

and mugs in one case, but later rejected the exact same mark, Uppity Negro,[3] also

for apparel, on Section 2(a) grounds as a "matter that may disparage or bring into

contempt or disrepute African-Americans."

Such results are a telltale sign that Section 2(a) cannot pass constitutional

muster. Not only are its strictures vague, leading to incongruous results, but they

are not time-bound in any way. The provision allows the PTO to find a mark

disparaging at any point in time, even if it did not make such a finding at the time

of registration. A trademark can be lawfully registered for years but cancelled

abruptly due to changing societal perceptions of acceptability. This means that

Section 2(a) fails to put speakers on notice not only of what expressions the

government may bar today, but also of what it may decide to suppress years from

now. Even worse, as illustrated by this case, Section 2(a) acts as a one-way ratchet:

While the government may deem an extant trademark offensive at any point in

time and therefore cancel its registration, minority groups can conversely be

prevented from speaking through the registration of marks that redefine slurs

against them. Section 2(a) thus burdens the evolution of language through

---

[2] U.S. Trademark Application Serial No. 86,053,392 (filed August 31, 2013)
(rejected on grounds other than Section 2(a)).

[3] U.S. Trademark Application Serial No. 78,312,525 (filed October 12, 2003).

reappropriation, a powerful tool used by numerous social justice movements to neutralize the power of offensive words and take ownership of their own stories and language.[4] The First Amendment prohibits the government from engaging in this kind of recurrent and subjective policing of public discourse.

This case highlights a central paradox of Section 2(a): Instead of benefiting the communities the law seeks to protect, its vague, viewpoint-based restrictions can lead to the opposite result—denying those same communities the benefits they seek. When the PTO denied Mr. Tam's second application to register a trademark on behalf of his rock band, The Slants, due to the PTO's determination that the mark violates Section 2(a), the examining attorney recognized that the band selected the mark in order "to be self-deprecating and to attempt tp [*sic*] reappropriate the disparaging term." J.A. 43 (Office Action re: Trademark Appl.

---

[4] *See* Llewellyn Joseph Gibbons, *Semiotics of the Scandalous and the Immoral and the Disparaging: Section 2(a) Trademark Law After Lawrence v. Texas*, 9 Marq. Intell. Prop. L. Rev. 187, 191 n. 18 (2005) ("Although 'queer' has historically denigrated homosexuals, it has evolved . . . to reflect the recent renunciation of its negative uses and the reclamation of the term by sexual minorities."). Reappropriation is a process that the PTO has itself recognized in certain instances, albeit inconsistently. *See, e.g.,* DYKES ON BIKES, Registration No. 3323803 (initially rejected on the ground that the term "dyke" was considered vulgar, offensive, or disparaging but later accepted for registration after the trademark holder submitted evidence that the term "dyke" can be used as a source of pride and identity for the LGBT community). *But see In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071 (T.T.A.B. 2008) (rejecting the proposed trademark "Heeb" as used for a magazine that focuses on Jewish culture and is marketed to young Jewish people).

Serial No. 85/472,044). However, he noted that "[t]he lack of disparaging intent is not dispositive on the issue of Section 2(a) disparagement in the Federal registration analysis." *Id.* at 3. Mr. Tam appealed the PTO's decision to the Trademark Trial and Appeal Board, which affirmed the PTO's refusal on September 26, 2013. In reference to the government's analysis, Mr. Tam has stated, "It was like banging our head against the wall, trying to convince someone that we were not offensive to ourselves."[5] On April 27, 2015, this Court affirmed the Board's decision before voting *sua sponte* in favor of *en banc* reconsideration. *Tam*, 600 F. App'x at 776.

Rather than crediting The Slants' intent to neutralize a racial slur, the PTO's original determination treated it as further evidence that the word "slants," when used against people of Asian descent, has traditionally carried racially derogatory overtones that evoke a negative emotional response from many people. And certainly not every Asian or Asian-American person agrees that "slants" is a term that should be reappropriated, or that The Slants have successfully done so. For these reasons, *amici* agree with the examining attorney's factual determination that the mark refers to Asian groups and that it may be considered disparaging by some individuals of Asian heritage.

---

[5] *See The Slants*, http://www.theslants.com/about/
biography/ (last visited June 17, 2015).

But the question of whether certain speech is disparaging is entirely distinct from the question of whether the government can constitutionally disadvantage it for that reason. Under the First Amendment, a viewpoint-based burden on private speech is never acceptable, regardless of how controversial the viewpoint. *See, e.g.*, *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion"); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) ("government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."). It is simply not within the government's authority to make a moral determination about which speech is too "offensive" to merit trademark protection. The Lanham Act's determination of trademark propriety "is inconsistent with the maintenance of a robust and uninhibited marketplace of ideas," *United States v. Alvarez*, 617 F.3d 1198, 1204 (9th Cir. 2010), *aff'd*, 132 S. Ct. 2537 (2012)—especially so in the trademark context, where a *literal* marketplace allows members of the public to register protest through boycotts of a mark holder's products or services, or through other traditional First Amendment means.

By denying The Slants the benefit of registering their mark because of the PTO's conclusion that the band's name expresses a disparaging viewpoint, the government violated the First Amendment. This Court should end this formal system of viewpoint discrimination by issuing a narrow ruling that strikes down those portions of Section 2(a) of the Lanham Act that prohibit registration of "immoral," "scandalous," or "disparag[ing]" marks.

## ARGUMENT

### a.  Section 2(a) of the Lanham Act implicates the First Amendment.

The Lanham Act regulates private speech that is protected by the First Amendment. Regardless of whether all proposed trademarks constitute expressive speech, many of them plainly communicate a particularized message entitled to First Amendment protection. And there is no question that proposed trademarks denied by the PTO as scandalous, immoral, or disparaging under Section 2(a) express a message. Indeed, Section 2(a) expressly conditions the provision of federal trademark registration on the government's recognition that a proposed mark is expressive and its own understanding of the viewpoint expressed in the proposed mark. It is axiomatic that the government may not regulate private

8

expression based on its viewpoint; in mandating such viewpoint-based

discrimination, Section 2(a) is an unconstitutional regulation of speech.[6]

### i. Section 2(a) implicates the First Amendment because it burdens protected expression.

The disparagement clause of the Lanham Act authorizes the government to

regulate trademarks, which comprise protected speech. The provision creates a

financial disincentive to adopt marks the PTO may deem disparaging, thereby

creating a chilling effect over the expressions those marks represent. As a result,

Section 2(a) merits close First Amendment scrutiny.

While some trademarks merely identify or brand a commercial product, in

many cases, the expressive and commercial elements of trademarks are

---

[6] As an initial matter, trademarks registered in the Principal Register constitute private speech, and not government speech. As an initial matter, trademarks registered in the Principal Register constitute private speech, and not government speech. Today's Supreme Court decision in *Walker v. Tex. Div., Sons of Confederate Veterans, Inc*., No. 14-144, 2015 WL 2473375 (U.S. June 18, 2015), does not change that. Unlike license plates, which governments have used "to urge action, to promote tourism, and to tout local industries," and which are "closely identified in the public mind with the [State]," trademarks have never played such a role. *Id.* at *9–*10 (citations omitted). Trademark registration provides no government imprimatur to the marked product or service. *See In re Old Glory Condom Corp*, 26 U.S.P.Q.2d 1216 at *5 n.3 (T.T.A.B. 1993) (rejecting the notion that registration constitutes the government's endorsement of the mark or the product to which it is affixed). The Public Register does not serve any expressive purpose for the government, and it is the trademark owner, not the government, that has editorial control over the mark and bears ultimate responsibility for its content.

inextricably intertwined.[7] Trademark applicants often propose marks explicitly intended to define a group identity,[8] engage in parody,[9] convey artistic ideas,[10] or express a political opinion—as here. In regulating such expression, the government is constrained by the First Amendment.

Appellants in this case, an Asian-American band, "select[ed] the name 'The Slants' to 'reclaim' and 'take ownership' of Asian stereotypes." *In re Tam*, 785 F.3d 567, 575 (Fed. Cir. 2015) (Moore, J., additional views) (quoting J.A. 129–30), *reh'g en banc granted, opinion vacated*, *In re Tam*, 600 F. App'x 775 (Fed. Cir. 2015). Through that name choice and otherwise, The Slants have routinely

---

[7] Indeed, trademark law has long recognized the intersection of trademarks and expressive speech. *See, e.g.*, 15 U.S.C. § 1125(c)(3) (providing a complete fair-use defense to dilution liability for marks that serve as parody, criticism, or commentary); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) (protecting the use of a trademarked term in a literary title from liability under the Lanham Act); *see also, e.g.*, *United States v. Alvarez*, 132 S. Ct. 2537, 2554–55 (2012) (Breyer, J., concurring) (comparing trademark-infringement requirements to other government restrictions on expressive activity, such as perjury or impersonation).

[8] For example, "American Civil Liberties Union" and "ACLU" are federally registered trademarks that, among other things, convey a message about the values and identity of the organization filing this brief.

[9] *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 261 (4th Cir. 2007) (concluding that the trademark for "Chewy Vuitton" dog toys was "a comment on the rich and famous, on the LOUIS VUITTON name and related marks, and on conspicuous consumption in general").

[10] *Cf. Rogers v. Grimaldi*, 875 F.2d 994, 998 (2nd Cir. 1989) (noting that film titles are "of a hybrid nature, combining artistic expression and commercial promotion").

weighed in on cultural and political discussions on race and society, which are "within the heartland of speech protected by the First Amendment." *Id.* The band's choice of name thus bears all the hallmarks of purely expressive speech, relying on wordplay, irony, and ambiguity to convey a political and deeply personal message.

While it is true that the PTO's decision does not prohibit The Slants from continuing to use their name, the denial of trademark protection has real and tangible consequences. As Judge Moore noted in her supplemental opinion, the benefits of a trademark "are numerous, and include both substantive and procedural rights." *Id.* It is well established that government action implicates the First Amendment not only when it directly prohibits speech, but also when it creates a financial disincentive to engage in speech. *See, e.g.*, *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."). For example, a state may not require a convicted criminal who writes a book about his crimes to turn over profits to the victim, *id.*, nor may it impose a sales tax on some magazines but exempt "religious, professional, trade, and sports journals," *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229–30 (1987); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134–35, (1992) (striking down ordinance that permitted county to charge controversial speakers for extra police

protection because "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob"); *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950) ("[U]nder some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes."). *See infra* pp. 16–20 (discussing unconstitutional conditions doctrine).

As applied to groups like The Slants that seek trademarks to self-identify, the potential denial of registration may inhibit them from obtaining and enforcing their chosen symbol of association. If a group fears that its chosen name will be denied federal trademark protection by the government's invocation of Section 2(a), it will be less likely to adopt the name, at least in part because the associative value of the trademark itself is lessened when it is unlikely that a group will be the exclusive holder of that mark.

The PTO erroneously contends that trademarks are commercial speech, and that the government may more freely regulate their registration. *See* Appellee Br. at 34 n.5, *Tam*, (filed Aug. 4, 2014). But this is simply not the case. The commercial speech doctrine in First Amendment jurisprudence applies to "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447

U.S. 557, 561 (1980). Many trademarks do far more than propose a financial transaction, as explained above. This is certainly true for The Slants, who are clearly expressing their social and political views through the trademark they seek. Furthermore, even purely commercial speech is subject to the First Amendment's restriction against viewpoint discrimination. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011).

As the benefits of federal registration are both uncontested and significant, and Section 2(a) targets expressive speech, the denial of a trademark on disparagement grounds merits First Amendment scrutiny.

### ii. Section 2(a) impermissibly mandates viewpoint discrimination.

Section 2(a) is unconstitutional because it burdens expressive speech on the basis of the viewpoint that the speech represents.[11] Viewpoint-based discrimination of private speech always receives strict scrutiny, and is always disfavored. *See, e.g.*, *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 384 (4th Cir. 2006). This constitutional presumption applies fully even when the government does not *ban* private speech but instead disadvantages it, encumbers it, or refuses to fund it, based on distaste for the speech. *See Rutan v.*

---

[11] Where a speech regulation results in a "substantial number of impermissible applications," as here, a facial challenge is proper. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 619 (1998). *See also infra* pp. 20–26 (discussing vagueness and overbreadth).

*Republican Party of Illinois*, 497 U.S. 62, 77–78 (1990) ("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly."); *see also Speiser v. Randall*, 357 U.S. 513, 519 (1958) ("denial of a tax exemption for engaging in certain speech necessarily will have the effect of coercing the claimants to refrain from the proscribed speech. The denial is frankly aimed at the suppression of dangerous ideas.") (citations omitted).

The plain language of Section 2(a) *requires* viewpoint discrimination. The PTO's determination that a proposed mark is "immoral," "scandalous," or "disparag[ing]" explicitly turns on whether some members of the public consider it offensive—even if others do not. The Supreme Court has repeatedly held that avoiding offensiveness is an impermissible government motivation that elevates certain viewpoints over others. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001) ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest."). These decisions, and others like them, demonstrate that a "desire to stem listeners' reactions to speech is simply not a viewpoint-neutral basis for regulation." *Erickson v. City of Topeka, Kan.*, 209 F. Supp. 2d 1131, 1145 (D. Kan.

2002) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 812

(1985)).[12]

That a single word can express multiple viewpoints is exemplified by this

case. While some view the word "slants" as degrading, others—namely Mr. Tam

and his band—see the term as a means of empowerment. The First Amendment

does not permit the PTO to express preference for one view over the other.

Indeed, by its very terms, Section 2(a) significantly hinders the practice of

reappropriation, whereby marginalized groups reclaim use of a word that has been

used to disparage them, often as part of a larger movement for social justice. *See*

*supra* n.4 (discussing, as an example, the reclamation of the term "dyke" as a

source of pride and solidarity for the LGBT community); *see also GENEQ queer*,

Gender Equity Res. Ctr., Univ. of Cal. at Berkeley, *available at*

---

[12] In addition to Section 2(a)'s facial viewpoint discrimination, the PTO's decision in this case indicates that it gives rise to *speaker-based* discrimination, which is also constitutionally impermissible. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). In refusing to register "The Slants," the PTO predicated its rejection on the mark's relation to Mr. Tam's race. See J.A. 244 (Final Office Action) ("the association of the term SLANTS with those of Asian descent is evidenced by how the applicant uses the mark—as the name of an Asian-American band"). Meanwhile, many other registrations for "Slant" or variations on it have been registered. *See, e.g.*, "SLANT," Registration Nos. 3437230 (serving-ware for food); 2163769 (art and graphic design services); 2081228 (education services); 1511492 (insecticides). Ironically, assuming the mark "slants" is related to the Asian community because an Asian-American band has requested its registration is the exact sort of racial stereotyping that Section 2(a) purportedly prevents.

https://www.ocf.berkeley.edu/~geneq/docs/infoSheets/Queer.pdf ("In recent years, *queer* has been reclaimed, most commonly, by younger members of the LGBT community."). Reappropriation by its very nature involves strategic use of a word that is disparaging in the hopes that, over time, it will no longer be disparaging (at least in certain contexts). But Section 2(a) arrests that process, because it prevents use of a mark that is disparaging at the time the applicant wishes to register it—*i.e.*, *before* the process of reappropriation has likely run its course. It is simply not the government's role to disadvantage individuals who seek—whether successfully or not—to change the meaning of slurs or disparaging terms. This is viewpoint discrimination prohibited by the First Amendment.

### b. Section 2(a) places an unconstitutional condition on the receipt of valuable government benefits.

As Judge Moore noted, panels of this Court have ruled themselves bound by the cursory First Amendment analysis in *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981) in all subsequent First Amendment challenges to Section 2(a). In *McGinley*, this Court concluded that "the PTO's refusal to register appellant's mark does not affect his right to use it. . . . Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark." *Id.* at 484; *see Tam*, No. 14-1203 at *5 (Moore, J., additional views); *see also, e.g., In re Blvd. Entm't, Inc.*, 334 F.3d 1336, 1343 (Fed. Cir. 2003) ("[T]he refusal to register a mark does not proscribe any conduct or suppress any form of expression because it does not

affect the applicant's right to use the mark in question."). But this *en banc* Court is not bound by *McGinley,* and *amici* agree with Judge Moore that Section 2(a) should be analyzed under the "unconstitutional conditions" doctrine. *See Tam*, No. 14-1203 at *14 (Moore, J., additional views). That doctrine "holds that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

*McGinley* is no longer correct either as a matter of fact or as a matter of law.

First, *McGinley* was based on factual circumstances relating to trademark registrations that have changed dramatically in the more than thirty years since it was decided. In that case, this Court held that the expenditure of the federal government's "time" and "services" to confer the benefits of trademark registration placed the Lanham Act beyond the First Amendment's reach. That holding was incorrect even then—for example, the government could hardly have denied a parade permit on the ground that its expenditure of time and services to grant the permit and direct traffic around the parade placed parades beyond the First Amendment's protection. But even had the holding been correct at that time, since 1991, user application fees, rather than public funds, have supported the PTO. *See Revision of Patent and Trademark Fees*, 56 Fed. Reg. 65142 (1991). This is true

17

whether the trademark applicant is ultimately successful or not—the application fees are paid up front. As a result, today, "it is the PTO's opposition to a mark, rather than its approval, that is more likely to cause the expenditure of federal funds." Theodore H. Davis, Jr., *Registration of Scandalous, Immoral, and Disparaging Matter Under Section 2(a) of the Lanham Act: Can One Man's Vulgarity Be Another's Registered Trademark?*, 83 Trademark Rep. 801, 833 (1993). The government expenditures to which the Court referred in *McGinley* are now used to *adjudicate* applications for trademark registration. If the PTO grants a mark, the government's work is done—and enforcement occurs at the hands of private parties. When the PTO denies or cancels a mark, as this litigation makes clear, the government is likely to expend considerably more resources defending that decision. *See also McGinley*, 660 F.2d at 487 (Rich, J., dissenting) ("[m]ore 'public funds' are being expended in the prosecution of this appeal than would ever result from the registration of the mark.").

Second, *McGinley*'s conclusion can no longer be justified under established First Amendment law. It is unquestionable that the Lanham Act's viewpoint-based regulations place a burden on speech that in any other context would be unlawful. *See, e.g.*, *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383–84 (1984) ("A regulation of speech that is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest

18

is the purest example of a 'law . . . abridging the freedom of speech, or of the press.'") (citations omitted). And while the government has more leeway to control the message of *government* speech and programs, the Supreme Court has been clear that the government lacks the power to disadvantage *private* speech that falls outside a pre-approved spectrum:

> Neither the latitude for government speech nor its rationale applies to subsidies for private speech in every instance, however. As we have pointed out, "[i]t does not follow . . . that viewpoint-based restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Rosenberger*, [515 U.S. at 834].

*Velazquez*, 531 U.S. at 541–42.[13]

Section 2(a) of the Lanham Act cannot withstand this analysis because it is a government program that impermissibly promotes certain private viewpoints over others. The plain text of the provision demonstrates Congress's intent to provide general access to owners of valid trademarks. *See* 15 U.S.C. § 1052(a) ("No

---

[13] Of course the government can restrict its financial support for the purpose of furthering its own programs even when those programs are themselves viewpoint-based. *See, e.g., Rust v. Sullivan*, 500 U.S. 173 (1991). But the registration of private speech as trademarks does not turn that private speech into a government program. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2332 (2013) ("The Policy Requirement compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program."). The purpose of offering a trademark registration system is to regulate private speech and behavior, not to advance a government program or priority.

19

trademark shall be refused registration on the Principal Register on account of its nature unless" it falls into certain enumerated categories.); *see also Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479, 1485 (Fed. Cir. 1987) ("One of the policies sought to be implemented by the [Lanham] Act was to encourage the presence on the register of trademarks of as many as possible of the marks in actual use."). By providing a generally-available forum for trademarks, Section 2(a) effectively allows a diversity of viewpoints to be expressed, *except* in the proscribed categories.

By mandating viewpoint discrimination, Section 2(a) has placed an unconstitutional condition on the receipt of a government benefit, *i.e.*, trademark registration. Because *McGinley* holds otherwise, it should now be overruled.

### c.  Section 2(a) is unconstitutionally vague and overbroad.

The Constitution prohibits vague regulations of speech because ambiguous terms create a risk of arbitrary enforcement and self-censorship. *See FCC v. Fox Television Stations, Inc*., 132 S. Ct. 2307, 2317 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (holding that courts must consider whether the "law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary

and discriminatory applications."). The requirement of clarity is at its height when the government is regulating speech. *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) ("'Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.'") (quoting *Button*, 371 U.S. at 432–33 (1963). The Supreme Court has repeatedly emphasized that the vagueness doctrine is most powerful when dealing with potential infringements on the First Amendment because speakers "sensitive to the perils posed by . . . indefinite language[] avoid the risk . . . only by restricting their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see Reno v. American Civil Liberties Union*, 521 U.S. 844, 871 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect."). Laws or regulations that are impermissibly vague must be invalidated. *Fox*, 132 S. Ct. at 2317.[14]

---

[14] The Court has also examined statutes that vest unbridled discretion to regulate speech under the Due Process Clause. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. As noted above, the requirement of clarity is especially stringent when a law interferes with First Amendment rights. *See Keyishian*, 385 U.S. at 604. The Constitution requires the State to define restrictions on speech with clarity *both* to ensure procedural fairness and to avoid chilling speech.

Section 2(a) provides little guidance to the PTO as to the meaning of its terms, leading to a long line of arbitrary and contradictory decisions. The PTO has no means of understanding how many people comprise a "substantial composite" of a certain group, or what constitutes "disparaging," "scandalous," or "immoral" marks. The legislative history of the Lanham Act provides no further explanation. The Trademark Manual of Examining Procedure concedes that "[t]here is little legislative history concerning the intent of Congress with regard to the provision," Trademark Manual of Examining Procedure (TMEP) § 1203.01. While it is sometimes the case that "[a] term that appears vague on its face may derive much meaningful content from the purpose of the Act, its factual background, and the statutory context," *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 593 (1985) (citation omitted), such purpose, background, or context is entirely absent in the Lanham Act. The lack of clear standards is exemplified by the PTO's long history of bizarre and contradictory decisions: The *very same* terms are frequently granted registration in one case and denied in another with no seeming continuity of logic.

For example, the PTO registered "WANKER" for use on beer,[15] but rejected it for use on clothing,[16] with no clear difference in meaning. Likewise, "TITMOUSE"

---

[15] Registration No. 2,036,108.

[16] U.S. Trademark Application Serial No. 78,610,369 (filed April 16, 2005).

was rejected for use on computer cursor control devices,[17] but "TITMOUSEINC." is a registered mark used for animation production services.[18] There are countless examples of such irregularities. *Compare* MADONNA, *In re Riverbank Canning Co.*, 95 F.2d 327 (C.C.P.A. 1938) (affirming rejection of mark for use on wines as scandalous), *with* MADONNA, Registration No. 3,545,635 (accepted for use on wine); PUSSY POWER, U.S. Trademark Application Serial No. 77,387,209 (filed February 2, 2008) (rejected for use for entertainment services), *with* PUSSYPOWERREVOLUTION, Registration No. 4,507,246 (accepted for use on clothing); COCAINE, U.S. Trademark Application Serial No. 78,829,207 (filed March 3, 2006) (rejected for use on soft drinks and energy drinks), *with* COCAINE, Registration No. 1,340,874 (accepted for use on clothing); CUM, U.S. Trademark Application Serial No. 78,059,173 (filed April 19, 2001) (rejected for use on perfume), *with* CUM, Registration No. 1,044,903 (accepted for "no description entered"); THE COMPLETE A**HOLE'S GUIDE TO . . ., U.S. Trademark Application Serial No. 76,351,811 (filed December 21, 2001) (rejected for use on series of books providing information relating to advice, counseling, self-help, and humor), *with* MANAGING YOUR INNER A**HOLE, U.S. Trademark Application Serial No. 85,711,056 (filed August 23, 2012) (accepted for use on books on the

---

[17] U.S. Trademark Application Serial No. 78,954,967 (filed August 18, 2006).

[18] Registration No. 4,624,689.

development of emotional intelligence—not registered on other grounds); BIGCOCK, U.S. Trademark Application Serial No. 85,418,794 (filed September 9, 2011) (rejected for use on energy drinks), *with* ONEFOOTCOCK, Registration No. 4,544,038 (accepted for use on alcoholic beverages); MESSIAS, *In re Sociedade Agricola E. Comerical Dos Vinhos Messias, S.A.R.L.*, 159 U.S.P.Q. 275 (T.T.A.B. 1968) (rejected for use on wine and brandy), *with* IL MESSIA, Registration No. 4,093,035 (accepted for use on wine).

The patchwork nature of such decisions means that no trademark applicant can ever be on notice as to what words or ideas will trigger PTO rejection—even, as in this case, when that speech is intended as a statement of racial solidarity or reappropriation.

The PTO's sole limiting principle requires an examining attorney who believes a pending trademark is scandalous or disparaging to "consult with his or her supervisor" if she believes, "for whatever reason, that a mark may be considered to comprise such matter," in order to "ensure consistency in examination with respect to immoral or scandalous matter." TMEP § 1203.01. But this procedural step does nothing to ensure that the PTO applies Section 2(a)'s standards consistently, as the examples cited above demonstrate. There is little doubt that the only consistent result of the application of the disparagement clause is inconsistency.

24

The absence of guidance has forced both the PTO and the courts to turn instead to a random sampling of dictionaries in attempts to meet the statutory requirement. In this case, the examining attorney resorted to Urban Dictionary—an internet site originally designed as a parody, offering definitions of slang and vulgarity submitted by its users.[19] Examiners have no choice but to consult such niche dictionaries to search out disqualifying insults due to the constantly evolving nature of language. As the Trademark Trial and Appeal Board has noted, "what was considered scandalous as a trademark or service mark twenty, thirty or fifty years ago may no longer be considered so, given the changes in societal attitudes." *In re Old Glory Condom Corp.*, 26 U.S.P.Q.2d at *4. Or, as in this case, *vice versa*. Instead of wading into what society does or does not deem acceptable at a given moment in history, the government should allow movements led by artists and activists like The Slants to run their course.

Furthermore, the PTO's inconsistent application of Section 2(a) creates a chilling effect on the registration of trademarks, which are protected speech. It is reasonable to assume that a musical group will think twice before choosing a potentially reappropriating name after hearing about The Slants' rejection, and that others will likely steer far away from anything remotely controversial. The

---

[19] *See Urban Dictionary*, Wikipedia,
http://en.wikipedia.org/wiki/Urban_Dictionary (last visited June 17, 2015).

25

potential for chill is amplified because trademark applicants not only have to guess what the PTO may find scandalous, immoral, or disparaging *today,* but also what it may find objectionable years from now—long after substantial resources have been invested in establishing a recognizable mark. Those who wish to register an expressive mark must therefore make their best guess about how to survive the timeless gauntlet of Section 2(a)'s moral judgment—by self-censoring.[20]

The terms of Section 2(a) have resulted in a heavy-handed and counterproductive PTO decision-making process. The disparagement clause is both set in stone—concretizing archaic notions of propriety and stopping progressive social movements in their tracks—and ephemeral—what may be deemed acceptable today may become disparaging tomorrow, depending on the PTO's perception of social mores. As such, Section 2(a) is impermissibly vague and grants government power to regulate without sufficient guidance, resulting in inconsistent and unconstitutional administrative action. This Court should not allow such a law to continue suppressing lawful speech.

### d. A finding that Section 2(a) is facially unconstitutional would not significantly alter the landscape of trademark law.

---

[20] As the inconsistencies in registration and denials demonstrate—even as applied to the very same words—it would be nearly impossible for anyone to predict with any degree of certainty whether any potentially sexual or racial trademark would be permitted at *any* given point in time. *See supra at* 16–17.

A finding of unconstitutionality in this case requires only a narrow remedy that will not create upheaval in existing trademark law. Indeed, a finding for The Slants would cause immeasurably less mischief in the PTO and the courts than would ratifying a formal heckler's veto against any reappropriation of a racial slur.

As noted above, terms sometimes considered "disparaging" by the PTO are in fact granted trademarks, albeit in an inconsistent fashion. *See supra* pp. 22–24. Thus, as a practical matter, striking down Section 2(a)'s exclusions will not result in controversial trademarks being registered for the first time.

In addition, eliminating Section 2(a) from the Lanham Act will bring trademark law more closely in compliance with copyright and patent law, which manages to secure intellectual property rights without making *ad hoc* moral judgment. *See* Jendi B. Reiter, *Redskins and Scarlet Letters: Why "Immoral" and "Scandalous" Trademarks Should Be Federally Registrable*, 8 Fed. Cir. B.J. 191, 200 (1976) (noting that mere offensiveness is no bar to copyright protection, and that courts have been increasingly wary of denying patents on the basis of vague moral standards); *see also, e.g.*, *Ex parte Murphy*, 200 U.S.P.Q. (BNA) 801, 802–03 (1977) (reversing the immorality-based rejection of a patent for a slot machine).

## CONCLUSION

For the above reasons, this Court should hold in favor of the Appellant and declare Section 2(a) of the Lanham Act facially unconstitutional.

Respectfully submitted,

___/s/ Arthur B. Spitzer_____

Arthur B. Spitzer
American Civil Liberties Union of
    the Nation's Capital
4301 Connecticut Avenue
Washington, D.C. 20008
(202) 457-0800
artspitzer@aclu-nca.org

Lee Rowland*
Esha Bhandari*
American Civil Liberties Union
    Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
lrowland@aclu.org
ebhandari@aclu.org

Mathew W. dos Santos*
American Civil Liberties Union
    Foundation of Oregon
P.O. Box 40585
Portland, OR 97240
(503) 227-6928
mdossantos@aclu-or.org
brettmaxkaufman@nyu.edu

Brett Max Kaufman*
Technology Law & Policy Clinic
New York University School of
Law
245 Sullivan Street
New York, NY 10012
(212) 998-6430

*Counsel for Amici Curiae*[21]*

*Admissions Applications Pending

Date: June 19, 2015

---

[21] Counsel for the *amici* wish to thank Joseph Ireland and Patrick Holvey, former students in the Technology Law & Policy Clinic at N.Y.U. School of Law, for their invaluable contributions to this brief.

28

Appeal No. 2014-1203

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

_____

IN RE: SIMON SHIAO TAM

_____

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

_____

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 6,746 words, excluding

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

__/s/ *Arthur B. Spitzer*_____
Arthur B. Spitzer
American Civil Liberties Union of
the Nation's Capital
4301 Connecticut Avenue
Washington D.C. 20008
(202) 457-0800
artspitzer@aclu-nca.org

Date: June 19, 2015