Appeal No. 2014-1203 **ORIGINAL**

# United States Court of Appeals
### *for the*
# Federal Circuit



IN RE: SIMON SHIAO TAM

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
TRADEMARK TRIAL AND APPEAL BOARD, SERIAL NO. 85/472,044

## BRIEF OF PROFESSOR HUGH C. HANSEN AS
## *AMICUS CURIAE* IN SUPPORT OF APPELLANT
## IN HEARING *EN BANC*

HUGH C. HANSEN
FORDHAM UNIVERSITY SCHOOL OF LAW
*Amicus Curiae Pro Se*
150 West 62nd Street
New York, New York 10023
(212) 636-7177

June 18, 2015
Corrected: June 23, 2015

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re: Simon Shiao Tam _____ v. _____

No. 2014-1203

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Amicus _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Professor Hugh C. Hansen

---

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

---

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

---

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Professor Hugh C. Hansen

---

June 18, 2015
Date

Signature of counsel

Hugh C. Hansen
Printed name of counsel

Please Note: All questions must be answered

cc: _____

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTEREST OF *AMICUS CURIAE*........................................................... 1

NOTE ABOUT THIS *AMICUS CURIAE* BRIEF ...................................... 2

ARGUMENT ........................................................................................ 3

I.    THE ROLE OF COURTS IN FREE SPEECH CASES IS TO
      DETERMINE HOW MUCH SPEECH SHOULD BE PROTECTED
      AND IN WHAT MANNER ........................................................... 3

II.   IN THE PAST, COURTS' TREATMENT OF SPEECH IN THE
      CONTEXT OF SECTION 2(A) OF THE LANHAM ACT HAS
      SHOWN A CONSISTENT BALANCING THAT SAW LITTLE
      NEED TO PROTECT SPEECH AND MANY PROBLEMS
      ASSOCIATED WITH PROTECTING IT ....................................... 4

III.  DENIAL OF REGISTRATION DUE TO SECTION 2(A)
      "DISPARAGEMENT" IS A VIOLATION OF THE FIRST
      AMENDMENT ........................................................................... 8

IV.   DISRUPTION OF THE CURRENT DISPARAGEMENT REGIME
      WOULD BE A PLUS NOT A DRAWBACK .................................... 9

V.    BY DETERMINING WHAT MARKS INDIVIDUALS AND
      GROUPS MAY USE TO DEFINE THEMSELVES, THE
      GOVERNMENT IS RESTRICTING SELF-EXPRESSION AND
      DEPRIVING THEM OF PERSONAL AUTONOMY ....................... 11

VI.   THERE IS SIGNIFICANT HARM TO MARK OWNERS WHO
      HAVE BEEN DENIED REGISTRATION .................................... 14

CONCLUSION ................................................................................... 16

# TABLE OF AUTHORITIES

Cases

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996) ........................................................................... 12

*Abrams v. United States*,
  250 U.S. 616 (1919) .............................................................................8

*Cohen v. California*,
  403 U.S. 15 (1971) ............................................................................. 12

*Huber Baking Co. v. Stroehmann Brothers Co.*,
  252 F.2d 945, 952 (2d Cir. 1958) ......................................................... 15

*In re McGinley*,
  660 F.2d 481 (C.C.P.A. 1981) ..................................................... 4, 5, 6, 7

*Procunier v. Martinez*,
  416 U.S. 396 (1974) ........................................................................... 11

*Ritchie v. Simpson*,
  170 F.3d 1092 (Fed. Cir. 1999) ....................................................... 5, 14

*Santana Products, Inc. v. Compression Polymers, Inc.*,
  8 F.3d 152 (3d Cir. 1993) ......................................................................5

*Test Masters Educ. Servs., Inc. v. Singh*,
  428 F.3d 559 (5th Cir. 2005) .................................................................5

*Virginia State Bd. of Pharmacy v.*
  *Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ........................................................................... 12

*Volkswagenwerk Aktiengesellschaft v. Wheeler*,
  814 F.2d 812 (1st Cir. 1987) .................................................................5

Statutes and Regulations

15 U.S.C. § 1052(a) ...................................................................... 16

15 U.S.C. § 1127........................................................................... 15

Additional Authorities

*Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the
   H. Comm. on Patents*, 76th Cong., 1st Sess. (1939) .......................... 10

Randall Kennedy, *Nigger: The Strange Career of a Troublesome Word*
   (2002)............................................................................................... 13

Stephen Baird, *Moral Intervention in the Trademark Arena: Banning the
   Registration of Scandalous and Immoral Trademarks*, 83 TRADEMARK
   REPORTER 661 (1993)...........................................................................7

### Interest of the *Amicus Curiae**

Professor Hugh C. Hansen is a law professor at the Fordham University School of Law where he is also the Founder and Director of the Fordham IP Institute and the Fordham Conference on Intellectual Property now in its 24th year. The conference has been called the "Davos of Intellectual Property" by the Director-General of the World Intellectual Property Organization based in Geneva.

He has taught intellectual property law for over 30 years and taught constitutional law for 25 years. Managing Intellectual Property Magazine for the third time has named him one of the 50 most influential people in the world.

As a result of two clerkships, litigation practice and over 30 years of teaching, Professor Hansen has developed a strong interest in approaching the law from a legal realist perspective.   He with colleagues is in the process of editing a casebook on intellectual property law for West Publishing that includes, perhaps for the first time, these perspectives.  Professor Hansen expects that this perspective will not be presented by others on this appeal. He thinks and hopes that the issues in this case will benefit from such an analysis.  This is not meant to denigrate any other form of analysis but hopefully to add something of value which otherwise would not be before the Court.

---

* This brief is being filed pursuant to the order of the Court dated April 27, 2015, stating that briefs of *amici curiae* will be entertained and may be filed without consent and leave of the court.  No counsel for any party authored this brief in whole or in part, and no person or entity, other than *amicus* or his counsel, made a monetary contribution to the preparation or submission of this brief.

1

**Note About this Amicus Curiae Brief**

This brief is a different type of submission from what one would normally see in litigation, and certainly different from ones I have previously written. The purpose is not to debate doctrinal First Amendment issues which I am sure will be covered successfully in the parties' and other amici briefs. In fact, I think Judge Moore's analysis in her additional comments is sufficient to resolve the issues.

I am submitting this to suggest another way of looking at this controversy, and the applicable law. I use cites very sparingly because either the points are generally accepted or the statements are for background and not central to the discussion. But also because citations in brief-writing style can get in the way of the text.

In addition, having clerked a couple of times I know how difficult it can be to get through a large pile of briefs. I am consciously trying to lighten the load because selfishly I want the brief to be read.

I am a legal realist, lower case, and my analysis will reflect this. This brief may or may not be of assistance. I submit it for what it is worth.

HCH

## **Argument**

**I. The role of Courts in free speech cases is to determine how much speech should be protected and in what manner.**

The role of the First Amendment in protecting "free speech" has changed dramatically since the Amendment was adopted in 1791. Today, the limited "no prior restraint" view of the framers would be unthinkable. On the other hand, the framers would not recognize the expansive approach of Justice Holmes, let alone the even broader view that prevails today.

This progressive doctrinal change is the product of courts' *de facto* common-law approach to the First Amendment, which has been adapted over time to changing circumstances. Such adaption has led courts to create rules not derived from the words of the Constitution but based on how they believed free speech should be protected in various settings.

Moreover, some courts have recently pursued an *ad hoc* approach in which they were not particularly concerned with establishing or applying rules, but rather with reaching the perceived correct outcome on the facts.

Such flexibility has made any synthesis of the applicable law more difficult, even as it has allowed courts to be more responsive in individual instances.

Thus, the basic issue before this Court is one underlying all free speech cases: how much speech needs to be protected on these facts and in what manner?

3

As this brief will show, there is a strong need for high protection for expressive marks from denial of registration by the "disparagement" clause.

**II. In the past, courts' treatment of speech in the context of Section 2(a) of the Lanham Act has shown a consistent balancing that saw little need to protect speech and many problems associated with protecting it.**

For those with responsibility for the public welfare, such as courts, there is no room for "pure" application of rights or the law.   Only those without responsibility have the luxury of such applications. Where protection for individuals and public welfare are on the line, policies and balancing become important.

In applying the First Amendment to speech, courts have taken into consideration the nature of the speech at issue and its environment.  But also normally present are practical concerns such as will the speech disrupt the economic, political or bureaucratic status quo?  Or the policy concern whether the speech so repulsive and harmful to the public welfare that it should receive no protection at all, or some lesser protection?   Both of these are present in the matter before the Court.

*A. In re McGinley,* 660 F.2d 481 (C.C.P.A. 1981)

There are doctrinal flaws in the First Amendment analysis in *McGinley.* Why then did the five-judge panel, comprised of some of our best federal judges,

4

not see them?  Why have three panels (again with excellent judges) subsequently

adhered to that precedent?  Why have at least three circuit courts of appeals agreed

with that analysis?[1]  Why did Judge Newman's insightful dissent in *Ritchie v.*

*Simpson*, 170 F.3d 1092, 1099 (Fed. Cir. 1999) (Newman, J., dissenting), not gain

traction on the Court?   Why did Judge Rich not follow up and amplify his lightly-

hinted dissatisfaction with the *McGinley's* majority's First Amendment analysis in

his subsequent 18 years on the Court? *In re McGinley* at 487 ("More "public

funds" are being expended in the prosecution of this appeal than would ever result

from the registration of the mark.") (Rich, J., dissenting).

The answer is that maybe they did see flaws but there were important

balancing concerns as well.  In fact *McGinley* is a main-stream approach to the

First Amendment, not an outlier.  It was decided the way most courts would have

decided it in 1981, and for years afterward.  This is especially true for a Court

which is the overseer/guardian of the USPTO trademark registration system.

---

[1] *See* Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 578 n.9 (5th Cir.
2005) ("We join our sister circuit in rejecting Singh's argument that prohibiting
him from registering a mark with the PTO violates his first amendment rights.");
Santana Products, Inc. v. Compression Polymers, Inc., 8 F.3d 152, 155 (3d Cir.
1993) ("[T]he Patent and Trademark Office's refusal to register a person's
trademark 'does not affect his right to use it.'") (quoting *McGinley* at 484
(C.C.P.A. 1981)); Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812,
819 (1st Cir. 1987) ("A refusal by the PTO to register a mark does not preclude the
owner of the mark from his right to use it.") (citing *McGinley* at 484 (C.C.P.A.
1981))

In the post-*McGinley* years, supporters of the opinion adopted what might be termed an "emperor's new clothes" approach to the doctrinal issues. If no one mentioned that the Court did not appropriately clothe its First Amendment analysis, then all would be well. For a long while, all was indeed well because it was in no one's real-world interest to mention it.

Most likely, the reasons for not mentioning it included:

(1) The marks at issue were smutty, vulgar or worse and not intended to send any larger expressive message;

(2) Registration was not really economically necessary to mark owners as no one else would want to infringe their marks or license them. Moreover, if an owner did sue for infringement, it could face a "pox on both of your houses" reaction from courts and, in particular, juries;

(3) Whatever problems the provisions provided to "serious" free speech might be ameliorated by careful or limiting application of the statutory tests;

(4) Section 2(a) "immoral" and "scandalous" provisions provided a desirable civilizing effect on what could be registered as marks; and

(5) Courts had already made Section 2(a) more First Amendment friendly through a construction that effectively eliminated "immoral." *See In re McGinley*, at 484 n.6 ("We note the dearth of reported trademark decisions in which the term 'immoral' has been directly applied.")

6

On the other hand, the result of declaring a First Amendment violation would include:

    (1) Serious disruption of the status quo -- a removal of provisions in the law since 1905:

    (2) Outrage in Congress and the public; and

    (3) A potential smut-bath of new applications.

For most who would balance these policies and effects, the choice was not difficult.

It is true that some commentators did acknowledge that the emperor had no clothes. Academics made cogent complaints with regard to *McGinley. See e.g.*, Stephen Baird, *Moral Intervention in the Trademark Arena: Banning the Registration of Scandalous and Immoral Trademarks*, 83 TRADEMARK REPORTER 661, 685–86 (1993). Rightly or wrongly, however, academic views appear to have less impact than they might have in the past. In any event, these had no recognizable effect.

Whether or not the Court in *McGinley* made the right choices in its result, those choices have nothing to do with this case and the choices that need to be made here with regard to the disparagement provision in Section 2(a).

**III. Denial of registration due to Section 2(a) "disparagement" is a violation of the First Amendment.**

Oliver Wendell Holmes extolled the idea that freedom of speech in the First Amendment is based upon a marketplace of ideas. *See Abrams v. United States*, 250 U.S. 616, 624 (1919) (Holmes, J., dissenting). No ideas are sacrosanct and all have to withstand scrutiny and debate. Truth will win out in this process and democracy will benefit.

While that is a very worthy ideal, it is difficult to find any such marketplace today. Newspapers are in decline. Television news shows are divided ideologically with viewers driven by confirmation bias. The Internet is primarily a gathering place for digital mobs ready to tar and feather those who hold opposing views.

The rest of us have gathered not in the public square but in private groups where admission is dependent upon adherence to politically-correct orthodoxy. It is safe inside these groups where shared views are sacrosanct, and they never have to withstand scrutiny. Opposing views are there too, but only to be mocked from a distance.

In this environment, free speech is permitted for somebody with the same views but is disdained when it comes to opposing ones. Political correctness is the new tribalism.

It is upon this highly-fraught platform that the government argues that it should be able to enforce politically correct views through Section 2(a). It tells those that are distressed, and are in the right private group, that it will challenge offensive marks on their behalf or allow the distressed to do it themselves. It will not debate these marks in the public square but rather will exclude them from it.

Appellant's mark, which encapsulates their controversial ideas, is barred because of those ideas.   Yet it is such use of expressive marks that are the best hope for a marketplace of ideas.  No private group can exclude their ideas because they cannot insulate themselves from exposure to THE SLANTS. Moreover, people receive the name without warning in neutral territory – in a setting where they might actually consider the ideas on their merits – before they can jump-start their ideological protective screening.

In sum, the use of marks for expressive content is an important nascent marketplace for the reception and debate of ideas.  Current construction of Section 2(a) effectively stifles this marketplace and, as will be discussed, does serious harm to mark owners and to all of us as well.

**IV. Disruption of the current disparagement regime would be a plus not a drawback.**

There can be legitimate concerns with disrupting the status quo. That, however, should not be an issue here.

9

First, this type of disparagement enforcement is relatively new, and was not envisioned by the legislators in 1946. In fact, the provision did not originate as the result of a clearly felt need but rather appears to have been meant to fill potential gaps in the other provisions. *See Hearings of H.R. 4744 Before the Subcomm. On TradeMarks of the Committee on Patents*, 76th Cong., 1st Sess. 20-21 (1939). In any case, legislators did not envision this regime.

Yet, even those who believe in a governmental politically correct enforcement regime should be concerned with the current one.

For instance, should the Boy Scouts lose their mark? A disparagement attack could be used to force a "proper" resolution of whether the organization should allow gay scouts and scoutmasters. There are people on both sides who are genuinely upset over this issue and might feel that the mark under the wrong regime would sully or disparage scouts as a group or "the scouting way."

The NAACP is a cancellation proceeding just waiting to happen. While the organization was founded in 1910 it was only registered in 1982, not long enough ago to argue that "colored persons" was acceptable at the time of registration. In any case, that defense is probably illusory as a high level of current indignation helps people to time travel back in time and equate their current feelings with what people thought back then.

Of course, it would be seriously politically incorrect to attack the NAACP under almost any political correctness rules. Yet, political correctness cannot be controlled. There might be people out there for whom it would be politically correct to attack it, and use cancellation as a weapon against it.

This current system is also perfect for disparagement trolls. They can bring or threaten to bring opposition and cancellation proceedings against unsuspecting mark owners based on members of the public "heartfelt" beliefs, who should not be hard to find.

In short, an application of the First Amendment here would not disrupt a valuable regime. Rather, it would disable a regime that is already badly flawed and could go seriously wrong.

**V. By determining what marks individuals and groups may use to define themselves, the government is restricting self-expression and depriving them of personal autonomy**.

As Justice Marshall observed:

> The First Amendment serves not only the needs of the polity but also those of the human spirit—a spirit that demands self-expression. Such expression is an integral part of the development of ideas and a sense of identity. To suppress expression is to reject the basic human desire for recognition and affront the individual's worth and dignity.

*Procunier v. Martinez*, 416 U.S. 396, 427 (1974) (Marshall, J., concurring).

11

Contrary to these purposes, Section 2(a) interferes with the ability of individuals and groups to define themselves. Instead, it tasks USPTO trademark examiners with determining *for others* what is and is not disparaging *for them and others*.[2] Such paternalistic regulation and suppression of speech, even in the commercial context, has been consistently discouraged. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 510 (1996) ("legislature does not have broad discretion to suppress truthful nonmisleading information for paternalistic purposes"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976) (rejecting state's "highly paternalistic" approach to pharmacist advertising). Further, the First Amendment is "designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us." *Cohen v. California*, 403 U.S. 15, 24 (1971).

---

[2] There are numerous examples of minority groups attempting to register marks deemed to disparage the very group of which they are a part. However, many of these attempts are rejected or ultimately abandoned under the power of 2(a)'s disparagement clause. *See e.g.*, THE BIG HEEB BREWING COMPANY Serial No. 78/432,597, filed June 9, 2004; N.I.G.G.A. NATURALLY INTELLIGENT GOD GIFTED AFRICANS Serial No. 75/002,364, filed Oct. 6, 1995. The application was ultimately abandoned; BABY JAP by a Jewish woman for clothing. Serial No. 78/665,332, filed July 7, 2005. Rather than protecting the marginalized and subjugated, the U.S. government's bar on registration for such reappropriated marks condones their oppression.

Moreover, once the USPTO denies a mark on the basis that it is disparaging, it is as a practical matter declaring it permanently to be so despite what cultural changes may transpire over time.   In recent years, minority groups have often reappropriated terms considered disparaging, transforming slurs into as an empowering form of speech and self-identification. *See, e.g.*, RANDALL KENNEDY, NIGGER: THE STRANGE CAREER OF A TROUBLESOME WORD 38 (2008) ("[African Americans] have added a positive meaning to nigger, just as women, gays, lesbians, poor whites, and children born out of wedlock have defiantly appropriated and revalued such words as bitch, cunt, queer, dyke, redneck, cracker, and bastard.")

As it stands, it would seem highly unlikely that even if a once "disparaging" mark was reapplied for after being reappropriated, that any subsequent USPTO examiner would approve a mark previously deemed "disparaging."   It would be a can of worms they would not want to open.

Finally, it is inappropriate for the government to be choosing among contemporary choices of how a group wants to call itself.   Justice Marshall never stopped using the term "Negro" in his opinions and elsewhere even after it was considered inappropriate among the politically correct.   It would be up to an Examining Attorney and the PTO, in the first instance anyway, to determine whether he could use it in a mark.

13

But would Justice Marshall have tried to use it in a mark? Probably not, indicating that the disparaging provision is a de facto prior restraint on use of speech in marks.

Another example is that the NAACP continues to use the spelled out words "Colored Persons" in its name on it website and elsewhere. Undoubtedly, it is proud of its heritage. Under this Court's liberal standing rules, however, a person of any race could object to what they considered disparaging words and seek cancellation. *See Ritchie v. Simpson*, 170 F.3d 1092, 1097 (Fed. Cir. 1999) ("the potential injury sustained if the mark is registered is the disparagement of [plaintiff's] alleged belief in a loving and nurturing relationship between husband and wife.) These standing rules would allow members of the public to harass mark owners not in spite of but because of their protected speech.

**VI. There is significant harm to mark owners who have been denied registration.**

Judge Plager has noted that "the mark holder who is denied federal registration [because of Section 2(a)] will not receive the benefits conferred on a federal trademark registrant," *Ritchie v. Simpson*, 170 F.3d 1092, 1099 (Fed. Cir. 1999). Judge Moore, in her additional views, catalogues the many ways lack of registration harms the mark owner.

14

In addition to these explicit harms it should be noted that a mark cancelled or denied registration because of disparagement is the equivalent to a criminal record for an individual. There is a stigma that has to be overcome. A person can be rehabilitated but there is nothing a mark can do to achieve that. This stigma will affect, if not preclude, sales, licensing and investment in the mark. It will also similarly affect the product which will become an IP orphan, and there are no IP orphanages.

Moreover, because of the lack of support it will be hard to build goodwill in the mark. What goodwill has been obtained will be "fair game" for free riders who know that enforcement will be very difficult for the owner. Ironically, this might cause more dissemination of the disparagement than if the mark were registered.

In addition barring registration would preclude any protection for a collective mark in its capacity as a collective mark with use "by the members of a cooperative, an association, or other collective group or organization" 15 U.S.C.A. § 1127. This is because there is no protection at common law for them. *See Huber Baking Co. v. Stroehmann Brothers Co.*, 252 F.2d 945, 952 (2d Cir. 1958) ("collective mark was unknown to the common law, it is actually a creature of federal statute.") and collective marks would be particularly useful to groups who

15

are debating and fighting for the proper designation and names for people within the group.

## Conclusion

For all the foregoing reasons, Amicus Curiae respectfully supports the Appellants' position that the bar on registration of disparaging marks in §2(a) of the Lanham Act, 15 U.S.C. §1052(a), violates the First Amendment and, as a consequence, the TTAB's September 26, 2013 decision on appeal should be reversed and ordered that the THE SLANTS mark be registered.

Respectfully submitted,

HUGH C. HANSEN
FORDHAM UNIVERSITY SCHOOL
OF LAW
150 W. 62ND STREET
NEW YORK NY 10023
(212) 636-7177

*AMICUS CURIAE*

STATE OF NEW YORK )           **AFFIDAVIT OF SERVICE**
                        )    ss.:     **BY OVERNIGHT EXPRESS**
COUNTY OF NEW YORK )           **MAIL**

I, Simone Cintron, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

**On June 23, 2015**

deponent served the within: **Corrected Brief of Professor Hugh C. Hansen as *Amicus Curiae* in Support of Appellant in Hearing *En Banc***

**Upon:**

**See Attached Service List**

the address(es) designated by said attorney(s) for that purpose by depositing **2** true copy(ies) of same, enclosed in a properly addressed wrapper in an Overnight Next Day Air Federal Express Official Depository, under the exclusive custody and care of Federal Express, within the State of New York.

**Sworn to before me on June 23, 2015**

**/s/ Maria Maisonet**                      **/s/ Simone Cintron**
    **MARIA MAISONET**
Notary Public State of New York
No. 01MA6204360
Qualified in Queens County
Commission Expires Apr. 20, 2017       **Job # 260202**

Service List:

Ronald D. Coleman
Archer & Greiner, P.C.
Court Plaza South (West Wing)
21 Main Street
Hackensack, New Jersey 07601
201-498-8544

     -and-

John C. Connell
Archer & Greiner, P.C.
One Centennial Square
33 East Euclid Avenue
PO Box 3000
Haddonfield New Jersey 08033-0968
856-354-3074

     -and-

Joel Geoffrey MacMull
Goetz Fitzpatrick PLLC
One Penn Plaza
New York, New York 10119
212-695-8100

*Attorneys for Appellant*

Nathan K. Kelley
United States Patent and Trademark Office
PO Box 1450 Mail Stop
8 Alexandria VA 22313
571-272-9035

     -and-

Mark R. Freeman
Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530
202-514-5714

*Attorneys for Appellee Michelle K. Lee, Director, U.S. Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   this brief contains 3,465 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman with a font size of 14.

Respectfully submitted,

HUGH C. HANSEN
FORDHAM UNIVERSITY
SCHOOL OF LAW
150 W. 62ND STREET
NEWYORK NY 10023
(212) 636-7177

*Amicus Curiae*

Dated: June 18, 2015