Appeal No. 2014-1203

## *UNITED STATES COURT OF APPEALS*

### *for the*

### *FEDERAL CIRCUIT*

In Re:  SIMON SHIAO TAM,

*Appellant.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
TRADEMARK TRIAL AND APPEAL BOARD IN SERIAL NO. 85/472,044

## BRIEF OF RICHARD L. STANLEY
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE

-----------------------

Richard L. Stanley
P.O. Box 7967
Houston, Texas 77270
(832) 656-4277

*Attorney for*
*Amicus Curiae*

July 23, 2015

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

In re SIMON SHIAO TAM, 2014-1203

**CERTIFICATE OF INTEREST**

Counsel for Amicus Curiae Richard L. Stanley certifies the following:

1.    The full name of every party represented by me is:

      Richard L. Stanley

2.    The name(s) of the real parties in interest represented by me is:

      Not Applicable.

3.    All parent corporations and any publicly held companies that own 10 percent

or more of the stock of the party represented by me are:

      None.

4.    The names of all law firms and the partners or associates that appeared for

Amicus Curiae in the agency or are expected to appear in this court are:

      Richard L. Stanley
      Law Office of Richard L. Stanley
      P.O. Box 7967
      Houston, TX  77270
      Telephone: (832) 656-4277
      Facsimile:  None

Dated:  July 23, 2015                    Respectfully submitted,

      By:  /s/ Richard L. Stanley
           Counsel for Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

ABBREVIATIONS ......................................................................... viii

INTEREST OF *AMICUS CURIAE* .........................................................1

ARGUMENT ...................................................................................3

A.    A Viewpoint-Neutral Analysis Shows Section 2(a) Is
      Constitutional.........................................................................4

B.    The Lanham Act's Trademark Regime Already Correctly
      Balances Important First Amendment Concerns...........................8

C.    The Lanham Act And Section 2(a) Are Legitimate Exercises Of
      Congress's Constitutional Power ..............................................15

D.    Section 2(a) Satisfies The *Central Hudson* Test For Permissible
      Governmental Regulation Of Commercial Speech .......................20

      1.    Because Many Disparaging Marks Cannot Satisfy The
            First Requirement Of *Central Hudson*, Section 2(a) Is
            Not Facially Invalid.......................................................20

      2.    The Government Has A Substantial Interest In
            Discouraging Use Of Disparaging Marks ...........................24

      3.    Section 2(a) Is Narrowly Tailored To Serve The
            Government's Interests ...................................................26

III.  CONCLUSION ....................................................................29

# TABLE OF AUTHORITIES

## CASES

*Agency for Int'l Development v. Alliance for Open Society Int'l. Inc.*,
 133 S. Ct 2321 (2013) ...................................................................19

*B & B Hardware, Inc. v. Hargis Indus.*, Inc.,
 135 S. Ct. 1293 (2015) ........................................................ 17, 18

*Beauharnais v. Illinois*,
 343 U.S. 250 (1952) .....................................................................9

*Board of Trustees of State University of New York v. Fox*,
 492 U.S. 469 (1989) ............................................................ 25, 28

*Bolger v. Youngs Drug Prods. Corp.*,
 463 U.S. 60 (1983) .............................................................. 24, 25

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*,
 447 U.S. 557 (1980) ...................................................20-24, 26-28

*Chaplinsky v. New Hampshire*,
 315 U.S. 568 (1942) ....................................................................9

*Cohen v. California*,
 403 U.S. 15 (1971) .....................................................................13

*DuPont Cellophane Co. v. Waxed Products Co.*,
 85 F.2d 75 (2d Cir. 1936) ..........................................................12

*Edenfield v. Fane*,
 507 U.S. 761 (1993) ........................................................ 24, 25, 28

*Friedman v. Rogers*,
 440 U.S. 1 (1970) ......................................................................13

*Grove City College v. Bell*,
 465 U.S. 555 (1984) ...................................................................17

iii

*Heart of Atlanta Motel, Inc. v. United States*,
    379 U.S. 241 (1964) ...................................................................15

*Holiday Inn v. Holiday Inns, Inc.*,
    534 F.2d 312 (CCPA 1976) ........................................................18

*In re Geller*,
    751 F.3d 1355 (Fed. Cir. 2014) ........................................... 14, 15

*In re Int'l Flavors & Fragrances, Inc.*,
    183 F.3d 1361 (Fed. Cir. 1999) ........................................... 17, 18

*In re McGinley*,
    660 F.2d 481 (CCPA 1981) .................................................. 18, 26

*In re Merrill, Lynch, Pierce, Fenner, and Smith, Inc.*,
    828 F.2d 1567 (Fed. Cir. 1987) ..................................................10

*In re Northland Aluminum Products, Inc.*,
    777 F.2d 1556 (Fed. Cir. 1985) ..................................................12

*In re Pennington Seed Co.*,
    466 F.3d 1053 (Fed. Cir. 2006) ..................................................12

*Katzenbach v. McClung*,
    379 U.S. 294 (1964) ...................................................................15

*Moseley v. V Secret Catalogue, Inc.*,
    537 U.S. 418 (2003) ...................................................................11

*Murphy Door Bed Co. v. Interior Sleep Systems, Inc.*,
    874 F.2d 95 (2d Cir. 1989) .........................................................12

*National Fed. of Indep. Business v. Sebelius*,
    132 S. Ct. 2566 (2012) ...............................................................16

*Nautilus Group, Inc. v. Icon Health & Fitness, Inc.*,
    372 F.3d 1330 (Fed. Cir. 2004) ........................................... 10, 22

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................7

*Ohralik v. Ohio State Bar Assn.*,
    436 U.S. 447 (1978) .................................................................28

*Pittsburgh Press Co. v. Human Rel. Comm'n*,
    413 U.S. 376 (1973) .................................................................21

*Planned Parenthood of S.C. Inc. v. Rose*,
    361 F.3d 786 (4th Cir. 2004) ..................................................19

*Posadas de Puerto Rico Associates v. Tourism Co. of P. R.*,
    478 U.S. 328 (1986) .................................................................26

*Pro-Football, Inc. v. Blackhorse*,
    2015 WL 4096277 (E.D.Va. July 8, 2015) ................................19

*Radiance Foundation, Inc. v. N.A.A.C.P.*,
    786 F.3d 316 (4th Cir. 2015) ....................................................8

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ...................................................................7

*Roth v. United States*,
    354 U.S. 476 (1957) ...................................................................9

*Rumsfeld v. Forum for Academic and Institutional Rights*,
    547 U.S. 47 (2006) ...................................................................16

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ................................................... 4, 18, 19, 24

*San Francisco Arts & Athletics, Inc. v. United States Olympic
    Committee*,
    483 U.S. 522 (1987) ........................................................ 12, 28

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ...............................................................6, 7

*United Drug Co. v. Theodore Rectanus Co.*,
    248 U.S. 90 (1918) ............................................................... 17, 18

*United States v. Darby*,
    312 U.S. 100 (1941) ...................................................................16

*United States v. Edge Broadcasting Co.*,
    509 U.S. 418 (1993) ............................................................ 27, 28

*United States v. Morrison*,
    529 U.S. 598 (2000) ...................................................................15

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    135 S. Ct. 2239 (2015) ...............................................................19

*Willson v. Graphol Products Co.*,
    188 F.2d 498 (CCPA 1951) ................................................. 17, 18

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. I, § 8, cl. 1 ........................................... 15, 16, 26

U.S. Const. Art. I, § 8, cl. 3 .............................................. 15, 16

U.S. Const., amendment 1 ......................................... *passim*

## STATUTES

15 U.S.C. § 1051 *et seq.* (Lanham Act) ......................... *passim*

15 U.S.C. § 1052(a) ....................................................... *passim*

15 U.S.C. § 1052(f) .............................................................12

15 U.S.C. § 1064(3) ............................................................12

15 U.S.C. § 1116 ..................................................................6

15 U.S.C. § 1117(a) .............................................................6

**OTHER AUTHORITIES**

Schechter, Rational Basis of Trademark Protection,
    40 Harv. L. Rev. 813 (1927) ........................................................................11

Trademark Manual of Examining Procedure,
    § 1209.01 (July 2015) ...................................................................................10

Trademark Manual of Examining Procedure,
    § 1209.01(a) (July 2015) ...................................................................... 10, 11

Trademark Manual of Examining Procedure,
    § 1209.01(c) (July 2015) ..............................................................................12

Trademark Manual of Examining Procedure,
    § 1212 (July 2015) .......................................................................................12

## ABBREVIATIONS

| | |
|---|---|
| Appellant or Tam | Appellant Simon Shiao Tam |
| Order | This Court's Order granting *en banc* review in this case, reported at 600 Fed. Appx. 775 (Mem.) (Fed. Cir. April 27, 2015) |
| Panel Opinion | Panel Opinion issued in this case on April 20, 2015, reported at 785 F.3d 567 (Fed. Cir. 2015) (subsequently vacated by the Court's *en banc* order of April 27, 2015) |
| Views | Additional Views of Circuit Judge Moore accompanying the now-vacated Panel Opinion (Note: all citations herein are to the pages in the Court's original slip opinion) |
| Section 2(a) | 15 U.S.C. § 1052(a), but specifically limited to its disparagement provisions (*see infra* page 5 n.2). |
| First Amendment | U.S. Const., amendment 1 |
| Commerce Clause | U.S. Const. Art. I, § 8, cl. 3 |
| Spending Clause | U.S. Const. Art. I, § 8, cl. 1 |
| Examiner | Trademark Examining Attorney |
| PTO | United States Patent and Trademark Office |
| TTAB or Board | Trademark Trial and Appeal Board |
| TMEP | Trademark Manual of Examining Procedure |
| AIPLA | American Intellectual Property Law Association |
| Tam Br. | Brief On Behalf Of Appellant For *En Banc* Hearing (filed June 11, 2015) |

PFI Br.                          Brief Of Pro-Football, Inc. As *Amicus Curiae* In
                                 Support Of Appellant (filed June 18, 2015)

R/C Br.                          Brief of The Rutherford Institute and Cato Institute
                                 As *Amici Curiae* In Support Of Appellant (filed
                                 June 18, 2015)

ACLU Br.                         Brief  of the American Civil Liberties Union, the
                                 American Civil Liberties Union of Oregon, and the
                                 American Civil Liberties Union of the Nation's
                                 Capital As *Amici Curiae* In Support of Appellant
                                 (filed June 19, 2015)

FALA Br.                         Brief of First Amendment Lawyers Association As
                                 *Amicus Curiae* In Support Of Simon Shiao Tam
                                 (filed June 18, 2015)

PK Br.                           Brief Of Public Knowledge As Amicus Curiae In
                                 Support Of Neither Party (filed June 18, 2015)

INTA Br.                         Brief of Amicus Curiae International Trademark
                                 Association In Support of Neither Party (filed June
                                 18, 2015)

Hansen Br.                       Corrected Brief Of Professor Hugh C. Hansen As
                                 *Amicus Curiae* In Support Of Appellant In Hearing
                                 *En Banc* (filed June 23, 2015)

U.S. Br.                         En Banc Brief For Appellee (filed July 16, 2015)

# I.  INTEREST OF *AMICUS CURIAE*[1]

This brief is filed in support of Appellee because the arguments herein would require that the question before the Court—whether the bar on registration of disparaging marks in 15 U.S.C. § 1052(a) violates the First Amendment—be answered in the negative.  Apart from contributing to the analysis on that important question, Amicus Curiae has no interest in this particular case, and takes no position on any other factual or legal assertion of either party.

For the first and likely only time in my career, a portion of one of my briefs is written in the first person.  I am an appellate attorney whose practice focuses on cases within this Court's jurisdiction, primarily those arising under the patent laws.  I have written numerous briefs for this Court and other appellate courts, including amicus briefs for private parties and bar organizations.  I have never filed an amicus brief in my own name, and never expected to do so.

As a long-time sports fan, I was aware of the controversies surrounding trademarks of certain teams like the Washington Redskins, but first learned of this case from the panel opinion.  After *en banc* review was granted, I benefited from an in-depth discussion of the case as a member of the AIPLA's Amicus Committee.  Subsequently, I continued my own research.  During a late June trip to

---

[1]  In its Order, this Court provided that briefs of amicus curiae may be filed without consent or leave of Court.  No party has authored this brief in whole or in part, and no one other than Amicus Curiae and its counsel (who are the same) has paid for the preparation or submission of this brief.

California, my in-flight reading materials were the initial *en banc* briefs, primarily urging that Section 2(a) was unconstitutional.

My California trip included a visit with my parents, during which I recounted my investigations of this case to my father. After serving 25 years as a U.S. Naval officer, my father went to law school, later serving as a prosecutor, passing the patent bar, and developing his own law practice. Now 86 years old, he is retired as a practicing lawyer, but still engaged in monitoring and opining upon current events affecting law and politics (and sports).

Breaking our decades-old mutual agreement not to debate controversial subjects around my mother, this case prompted several spirited discussions. Afterwards, my father urged me to write down my thoughts, if not for a client or myself, then for him. Upon reflection, I realized that this case presented a rare opportunity to write something from a personal perspective that would be mostly consistent with the views of my father.

Upon my return, I prepared this brief but lacked enough time for the critical review needed to get my father's consent to file in his name. So, I opted to file it under mine. Regardless of his influence and encouragement, sole responsibility for its contents is mine. The views herein are mine as of its filing and should not be attributed to any past, existing, or future client. While the brief was written in honor of my father, it is submitted as a long-time "friend of the court."

2

## II.    ARGUMENT

The First Amendment reads: "Congress shall make no law … abridging the freedom of speech." Trademarks are words or combinations of words which would otherwise be free to be used in commercial speech by everyone. Absent trademarks, all words would remain available for all non-misleading commercial contexts. In the context of the First Amendment, trademarks do not protect speech, they abridge it. Specifically, trademarks do not give their owners any speech rights that they do not already have, they exist solely as a means by which to prohibit (though injunction) and penalize (through damages) the use of the same or similar words by others.

There is no governmental abridgement of speech arising from the denial of a trademark registration. The owner is not barred from using any speech, remains free to use the unregistered mark to identify its goods or services, and retains common law rights arising from its use of the unregistered mark. The only government-sponsored regulation of speech that ever results from the recognition of trademark rights occurs when the trademark is enforced against a subsequent user for using the same words in the manner encompassed by the trademark. That should be the only trademark context where First Amendment scrutiny might attach. Absent any trademark, or whenever a trademark is not recognized or enforced, there will have been no abridgement of anyone's speech at all.

## A.    A Viewpoint-Neutral Analysis Shows Section 2(a) Is Constitutional

This Court's Order instructed that the *en banc* briefing is "strictly limited" to the single question presented; *i.e.*, whether the bar on registration of disparaging marks in 15 U.S.C. § 1052(a) violates the First Amendment.[2]  That poses solely a facial challenge to Section 2(a).  *See Rust v. Sullivan*, 500 U.S. 173, 183 (1991) ("A facial challenge to a legislative Act is, of course, the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

Hence, it is accepted that "THE SLANTS" is disparaging to persons of Asian descent and is within the scope of Section 2(a).  That finding was affirmed by the panel, and is a necessary predicate for any inquiry into the constitutionality of Section 2(a).  Any debate over "how" disparaging this or any mark may be is also irrelevant.  If Section 2(a) is deemed unconstitutional to prohibit registration of Appellant's mark, then it must also be unconstitutional to prohibit registration of the most racist, vile, insulting, demeaning, and indisputably disparaging mark that could be imagined.

---

[2]  All references to "Section 2(a)" herein refer only to its bar against disparaging marks but not to its distinct prohibitions of marks that are immoral, deceptive, or scandalous.  *See* PFI Br. 2 n.2.  Contrary to some assumptions or suggestions, (*e.g.*, FALA Br. 1-15, Views 20 n.3, R/C Br. 13 n.7), the constitutionality of those other provisions is not within the question presented or implicated by this case, and the issues and arguments will be different.

More importantly, the question presented must be evaluated without regard to who is seeking to register the disparaging mark or how or why such mark has been or is intended to be used. Specifically, the laudable purposes and positive intentions attributed to Appellant's use of "THE SLANTS" mark—as emphasized by his supporters—are and should be treated as irrelevant. The importance of maintaining a viewpoint-neutral perspective in analyzing the question presented is demonstrated by the following hypothetical.

Assume this case did not involve Appellant's application to register "THE SLANTS" for entertainment services, but instead an application for the same mark from a band of indisputably (and likely admittedly) racist, white supremists who perform in costumes reflecting exaggerated and insulting negative caricatures of Asians. Instead of composing and performing songs designed to make Asians proud of their cultural heritage, assume that the hypothetical "SLANTS" band sings songs that ridicule and belittle persons of Asian heritage. Instead of seeking to "reclaim" or "take ownership" of Asian stereotypes, assume that the hypothetical "SLANTS" band seeks to reinforce and perpetuate those stereotypes so as to advance and bolster their perspectives regarding race.

Any decision that Section 2(a) is unconstitutional would apply equally to an application filed by the hypothetical racist "SLANTS" band because the nation's trademark system—under the Lanham Act and the common law—operates solely

to favor the first user rather than the arguably better, more sympathetic, more popular, or more politically correct user. Indeed, if such hypothetical band had been first to use "THE SLANTS" mark in commerce, Appellant's subsequent efforts to "take ownership" of that disparaging term would merely force him to defend a trademark infringement suit while facing an injunction and possible damages. *See* 15 U.S.C. §§ 1116, 1117(a).

It is assumed that those supporting Appellant would be as adamant if this constitutional challenge had been advanced by the hypothetical racist "SLANTS" band. Either way, this Court's analysis and outcome must be the same no matter who is the challenger or how noble their purpose. Any decision that "THE SLANTS" could be registered by Appellant but not by the hypothetical band dooms a facial challenge to Section 2(a). The same would be true if Section 2(a) were unconstitutional as applied against Appellant's application but constitutional as applied against the hypothetical band. Indeed, those observations strongly compel the correct outcome.

"Speech on matters of public concern … is at the heart of the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (internal quotation omitted). As exemplified by the facts of *Snyder*, matters of public concern may include speech using disparaging terms bearing on issues of politics, race, sexuality, and society. *Id*. at 448. The First Amendment reflects "a profound

6

national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 452 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). If such debate is to remain robust and wide-open, the words of that debate cannot be restricted to any one speaker, even by operation of trademarks.

Trademarks restrict the words of the mark to a single speaker within a specified field. By prohibiting disparaging marks from registration, Congress avoided disabling any side in important societal debate, including debate over the propriety of disparaging terms. Avoiding any favoritism is particularly appropriate where it would otherwise award national exclusivity to whichever side happened to first use the mark in commerce. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 392 (1992) (government "has no authority to license one side of debate to fight freestyle, while requiring the other to follow the Marquis of Queensberry rules"). It cannot matter who said or used the term first, the government must stay neutral. Rather than permitting the first user to gain the exclusion advantages of registration, Congress avoided discriminating against any viewpoint by refusing to allow disparaging trademarks to be registered by anyone.

Trademark law cannot be allowed to become a tool by which the hypothetical racist band could restrict or silence the message of Appellant's band but it also cannot be used as a means by which Appellant's band can stifle or

7

silence those speakers whose disparaging message is what Appellant seeks to combat and overcome. *See Radiance Foundation, Inc. v. N.A.A.C.P.*, 786 F.3d 316, 327-28 (4th Cir. 2015) (Lanham Act should not be transformed "into an instrument for chilling or silencing speech of those who disagree with or misunderstand a mark holder's positions"); *id.* at 332 (further observing that trademark law in general is not a proper vehicle for combatting speech with which one does not agree).

While Appellant and his supporters insist that Section 2(a)'s prohibition of disparaging marks can only be viewed as a facially-invalid regulation aimed at suppressing a disfavored viewpoint (*e.g.*, Tam Br. 29-30; R/C Br. 24), such assertions ignore the fundamental nature of trademarks as a means for suppressing and restricting the speech of others. *See* PK Br. 14-15. While it has proven too counterintuitive for many to appreciate that Section 2(a) is fully consistent with the First Amendment because Section 2(a) keeps disparaging words in marks from being reserved for the exclusive use of only one speaker, that is what Congress ensured by enacting Section 2(a).

**B.     The Lanham Act's Trademark Regime Already Correctly Balances Important First Amendment Concerns**

The First Amendment reflects the fundamental tenet that all words should be free for all persons to use for all purposes. There are well-established exceptions

which allow the government to restrict everyone's right to use certain words in certain contexts or for certain purposes. *See, e.g., Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) (fighting words); *Roth v. United States*, 354 U.S. 476 (1957) (obscenity); *Beauharnais v. Illinois*, 343 U.S. 250 (1952) (defamation).

Even greater First Amendment concerns arise when the government acts to restrict the speech of only some rather than all. The difficulty here is that is exactly what the trademark system does—by allowing for trademark rights and enabling their enforcement against others, the government burdens the speech rights of everyone except for the mark holder—and necessarily does so based on content of the second user's speech. If strict scrutiny analysis ever applies to trademarks, it should be only when a trademark is granted or enforced, not when one is denied or not registered.

The real First Amendment concern should be on the speech restrictions imposed on the public by governmental recognition of trademarks, not on the alleged "loss" of a mark owner unable to register a statutorily-excluded type of mark (here, a disparaging one) for himself. Not surprisingly, the Lanham Act already reflects that Congress's stated goals of fair and orderly commerce and consumer protection were carefully balanced against the First Amendment rights of all non-mark holders—the only speakers whose speech could possibly be abridged due to trademarks.

9

The trademark significance of words and phrases is generally categorized along a continuum, ranging from marks that are highly distinctive to matter that is indisputably generic. *See In re Merrill, Lynch, Pierce, Fenner, and Smith, Inc*., 828 F.2d 1567, 1569 (Fed. Cir. 1987) (listing the four classic categories as "generic," "descriptive," "suggestive," and "arbitrary"); TMEP, § 1209.01 (adding a fifth category of "fanciful").  As marks move across that continuum, the First Amendment stakes arising from reserving such words to the exclusive use of a single mark holder become correspondingly higher.

A "fanciful" mark comprises a term invented to function as a trademark and thus comprise words that are either unknown (*e.g.*, PEPSI, KODAK, and EXXON) or out of common usage (*e.g.*, FLIVVER).  *See* TMEP, § 1209.01(a) (listing those examples).  Where trademark-based restrictions on the public's speech relate to a newly coined or unused word, there are no First Amendment concerns in preventing others from using it because no one had been using the word anyway and it has no known meaning apart from identifying the source of the associated goods and services.

An "arbitrary" mark comprises words that are in common linguistic use but, when used to identify particular goods or services, do not suggest or describe a significant ingredient, quality, or characteristic of those goods or services.  TMEP, § 1209.01(a); *see Nautilus Group, Inc. v. Icon Health & Fitness, Inc*., 372 F.3d

1330, 1340 (Fed. Cir. 2004) (arbitrary mark is "a known word used in an unexpected or uncommon way").  A universally-known example is using APPLE for computers.  TMEP, § 1209.01(a).  While "apple" is generic for the fruit, it had no prior recognized meaning for computers.

It has been long recognized that trademarks concerning coined, arbitrary, or fanciful words "have been added to rather than withdrawn from the human vocabulary by their owners."  *See* Schechter, Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813, 828-29 (1927) (as quoted in *Moseley v. V Secret Catalogue, Inc*., 537 U.S. 418, 429 n.10 (2003)).  Nevertheless, as marks move along the continuum toward using words having known definitions, the imposition on the public's speech increases.

Suggestive marks are those that require imagination, thought, or perception to reach a conclusion as to the nature of the associated goods or services.  *See* TMEP, § 1209.01(a) (listing examples).  Trademark recognition for suggestive terms is acceptable under the First Amendment because competitors are left with many other words for describing competing goods or services.

When a mark is merely descriptive, however, the Lanham Act does not allow its words to be reserved for the exclusive use of one unless it can be proven that those terms have achieved "acquired distinctiveness," or "secondary meaning," in the particular context of the associated good and services.  *See* 15

11

U.S.C. § 1052(f); TMEP, § 1212.  The Act requires words in a descriptive mark to have attained a brand new meaning as a source identifier due to the mark owner's efforts before the resulting intrusion on the public's speech can be tolerated under the First Amendment.

If a proposed mark is generic of the goods or services, *e.g.*, *In re Northland Aluminum Products, Inc*., 777 F.2d 1556 (Fed. Cir. 1985), or if an existing mark becomes generic for its goods or services, *e.g.*, *DuPont Cellophane Co. v. Waxed Products Co*., 85 F.2d 75 (2d Cir. 1936), the Lanham Act does not allow any trademark rights to attach or remain.[3]  No exclusive rights can attach because such terms cannot denote source and because the public must be free to use those words when describing the goods or services.  *See* TMEP, § 1209.01(c).

If the Lanham Act did not expressly provide that generic terms cannot be trademarks, enforcement of such marks would be ripe for a successful First Amendment challenge.  *See San Francisco Arts & Athletics, Inc. v. United States*

---

[3]  A registered mark that subsequently becomes generic of the associated goods or services will be cancelled, 15 U.S.C. § 1064(3), regardless of the passage of time, the owner's investment and efforts to promote or preserve the mark, or any effect on the owner's business and goodwill.  *See*, *e.g.*, *Murphy Door Bed Co. v. Interior Sleep Systems, Inc*., 874 F.2d 95, 100-02 (2d Cir. 1989).  As with generic terms, the First Amendment should not prevent Congress from barring registration of disparaging marks, despite any similar collateral effects.  *See In re Pennington Seed Co.*, 466 F.3d 1053, 1058-59 (Fed. Cir. 2006).  Moreover, despite contrary suggestions (*e.g*., PFI Br. 10-12, ACLU Br. 4), language does evolve, word meanings do change, and the public can over time come to understand existing marks as being either generic or disparaging.

*Olympic Committee*, 483 U.S. 522, 531-32 (1987) (discussing but not resolving whether Congress would be prohibited by the First Amendment from granting a private entity exclusive use of a generic word). Absent the exemption of generic terms from trademark protection, the Lanham Act and trademark law in general would constitute government regulation abridging the speech of everyone other than the generic mark owners.

The Supreme Court in *Friedman v. Rogers*, 440 U.S. 1, 11 (1970), observed that one seeking to use a trade name usually "does not wish to editorialize on any subject, cultural, philosophical, or political." As Judge Moore recognized, such a non-political purpose certainly is not applicable to Appellant, who intentionally selected "THE SLANTS" to reclaim and take ownership of Asian stereotypes. Views 5. Maybe that is the problem. No one can or should "own" such terms, whether in the trademark sense or otherwise. The real First Amendment danger is allowing words or phrases needed for discussing and educating and editorializing on important public issues to become restricted in any manner—much less reserved exclusively to a single entity—through trademarks or any other governmental regulation.

In *Cohen v. California*, 403 U.S. 15, 17 (1971), the Supreme Court famously invoked the First Amendment to reverse Cohen's "breach of the peace" conviction for walking through a courthouse wearing a jacket bearing the words "Fuck the

Draft" which he had knowingly done to inform the public of his feelings against the Vietnam War and the draft. It would not be difficult to find the phrase on Cohen's jacket to be disparaging of Congress or the nation's military. Imagine that Appellant's desired trademark regime existed in 1971, and that a manufacturer had registered that phrase as a trademark for clothing, such that Cohen was at the courthouse to defend a trademark suit seeking to enjoin him from using his jacket to convey his political message. While Cohen might have a fair use defense or even one under the First Amendment, it was not illogical for Congress to have enacted Section 2(a) to avoid allowing trademarks to suppress public debate and to keep such lawsuits from even being filed in federal court.

More recently, this Court affirmed the PTO's refusal to register "STOP THE ISLAMISATION OF AMERICA" for the services of "understanding and preventing terrorism" on grounds that the mark "may disparage" in violation of Section 2(a). *In re Geller*, 751 F.3d 1355 (Fed. Cir. 2014). If the proposed mark in *Geller* had not been disparaging, an even stronger argument might exist that such mark is generic of the basic idea sought to be reserved through trademark law to a single entity under the guise of providing information services.

Whenever marks are used to convey messages (political, disparaging, or otherwise), there will be a high risk that the associated enforcement and infringement remedies could be used to stifle public debate. Many phrases,

slogans, or expressions addressing important and highly-charged cultural, philosophical, or political topics will not be disparaging as in *Geller* (*e.g.*, "CLOSE OUR BORDERS" or "NO NEW TAXES"), but also should not be reserved for the exclusive use of any one entity through trademarks.   Whether such trademarks should be found generic is not the issue here, but it highlights that allowing unrestricted discourse on subjects of important public concerns is truly what the First Amendment must always protect.

## C.    The Lanham Act And Section 2(a) Are Legitimate Exercises Of Congress's Constitutional Power

The Lanham Act arises from Congress's authority under the Commerce Clause.   Tam Br. 19; Views 16; *see* 15 U.S.C. § 1127.   Amidst the debate over whether Section 2(a) is valid under the Spending Clause, no one has suggested that the Lanham Act, including Section 2(a), exceeded Congress's Commerce Clause powers.   *See United States v. Morrison*, 529 U.S. 598, 607 (2000) (courts require a "plain showing" that Congress acted irrationally).

The Supreme Court has upheld federal legislation completely barring any racial discrimination involving interstate commerce.   *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964); *Katzenbach v. McClung*, 379 U.S. 294 (1964).   Congress thus surely had the Commerce Clause authority to enact Section 2(a) to discourage use of disparaging marks as tools of racial discrimination and

social disenfranchisement and to reduce their effect as obstacles to fair business practices and open interstate commerce.

Absent any First Amendment issue, that would end the constitutional inquiry. *See United States v. Darby*, 312 U.S. 100, 115 (1941) ("regulations of commerce which do not infringe some constitutional prohibition are within the plenary power conferred on Congress by the Commerce Clause"). If Section 2(a) is valid under the Commerce Clause, then separate examination of whether it is proper under the Spending Clause is unnecessary. *See National Fed. of Indep. Business v. Sebelius*, 132 S. Ct. 2566, 2061 (2012). Nevertheless, before addressing the First Amendment analysis for commercial speech, certain Spending Clause issues are briefly discussed below.

Relying on the "unconstitutional conditions" doctrine, *see Rumsfeld v. Forum for Academic and Institutional Rights*, 547 U.S. 47, 59 (2006), Appellant's side decries Section 2(a) as forcing mark holders to choose between foregoing free speech and foregoing valuable government benefits. However, no such Hobson's choice is either offered or required.

First and foremost, the mark owner is not forced to forego any speech. The First Amendment protects words used as speech, but it does not protect any right to use words as trademarks. While the First Amendment protects some commercial speech, it does not require either trademarks or any manner or degree of trademark

protection. The First Amendment does not require that any mark, disparaging or otherwise, be registered. *See In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1368 (Fed. Cir. 1999) ("There is no constitutionally protected right to federal registration of any mark."). Moreover, denial of registration is not so coercive that the owner has no choice but to abandon its mark. *See Grove City College v. Bell*, 465 U.S. 555, 575-76 (1984).

Second, the Lanham Act does not create any substantive rights that the mark owner did not already have.

> A trademark is not a grant, does not spring up through registration as do patents and copyrights, but is a right growing out of use. *United Drug Co. v. Theodore Rectanus Co.*, [248 U.S. 90, 99 (1918)]. The federal trademark statutes did not attempt to create exclusive rights in marks, but attempted to provide appropriate procedure and to give protection and remedies for rights that already existed. … Thus federal registration was not such constructive notice as to make it impossible for a later good faith user to gain rights in the mark in an area into which the registrant's trade had not extended. To have held otherwise would have given federal registration the effect of a grant, a grant to the registrant of trademark rights beyond the common law rights he had acquired by use.

*Willson v. Graphol Products Co.*, 188 F.2d 498, 501-02 (CCPA 1951). Because the Lanham Act does not confer any trademark rights beyond what the owner already had, denial of registration—whether for a likelihood of confusion or any other reason including Section 2(a)—cannot cause the loss of any rights.

Nothing in *B & B Hardware, Inc. v. Hargis Indus.*, Inc., 135 S. Ct. 1293, 1300 (2015), could or did change that. While the Court cited the "benefits of

registration" and described the Lanham Act as conferring "important legal rights and remedies" on owners who register, *id.*, such registration only gives access to the Act's procedural devices such as constructive notice of ownership, prima facie evidence of validity and ownership, and a possible incontestable right to use the registered mark (subject to exceptions). *See Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 319-20 & n.6 (CCPA 1976).[4]  None of those provisions change the source or nature of trademark rights, but merely make it easier to use federal mechanisms (district courts and customs) to prove or obtain remedies for the rights that the owner already had. *See United Drug*, 248 U.S. at 99.

More importantly, the recognition in *Willson* that the federal trademark statutes just provide "procedure" and "protection" for rights that already existed confirms that the Lanham Act, including Section 2(a), does not violate the First Amendment.  As established in *Rust*, 500 U.S. at 194, "when the Government appropriates federal funds to establish a program it is entitled to define the limits of

---

[4]  Undoubtedly that is why *Holiday Inn* was cited in *In re McGinley*, 660 F.2d 481, 484 (CCPA 1981).  As further explained in *Holiday Inn*, "the Trademark Act does not give the federal government power to grant positive rights to use marks and … a certificate of registration is no more than prima facie evidence, and evidence only of an exclusive right, which right (as in the case of patents) means a right to exclude others, not a positive right to use."  534 F.2d at 319.  If Congress did not have the power to create a positive right to use (and the Lanham Act does not), and if denial of registration does not affect any common law rights arising from use, *Int'l Flavors*, 183 F.3d at 1368, a mark owner unable to obtain registration is not denied any federal trademark rights because none were created.

that program." Hence, "*Rust* stands for the principle that when the government creates and manages its own program, it may determine the contents and limits of that program." *See Pro-Football, Inc. v. Blackhorse*, 2015 WL 4096277, at *16 (E.D.Va. July 8, 2015) (quoting *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 796 (4th Cir. 2004)).[5]

In enacting the Lanham Act, Congress created a federal program managed by the PTO which provides separate procedure, protections, and remedies for pre-existing trademark rights that independently arise from use. Having created and undertaken to manage its own program for existing trademark rights, Congress can determine its program's contents and limits, including which types of marks can be registered under it. Moreover, nothing in the federal trademark program seeks to leverage the Act's coverage to regulate any speech outside of the contours of the program, *see Agency for Int'l Development v. Alliance for Open Society Int'l. Inc.*, 133 S. Ct 2321, 2328 (2013), because Section 2(a) regulates no speech outside the program because owners remain free to use any mark.

---

[5] In *Pro-Football*, 2015 WL 4096277, at *11-15, the district court also ruled that the federal trademark registration system is government speech under *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), and thus exempt from First Amendment scrutiny. *See* U.S. Br. 41-46.

**D.      Section 2(a) Satisfies The *Central Hudson* Test For Permissible Governmental Regulation Of Commercial Speech**

Even if Section 2(a) is deemed to regulate any speech of the owner who can still use its mark for all purposes, the Supreme Court uses a four-part analysis for evaluating the constitutionality of governmental restrictions on commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 566 (1980).   That analysis establishes that Section 2(a) is constitutional both facially and as applied to Appellant.

**1.      Because Many Disparaging Marks Cannot Satisfy The First Requirement Of *Central Hudson*, Section 2(a) Is Not Facially Invalid**

The first requirement of *Central Hudson* determines if the commercial expression is protected by the First Amendment.   Contrary to Judge Moore's approach, it is not sufficient merely to conclude that "[b]ecause a trademark identifies the source of a product or service for users, it is protected commercial speech." Views 4.  Before commercial speech can come within the protections of the First Amendment, it first "must concern lawful activity and not be misleading." 447 U.S. at 566.

So far, insufficient attention has been paid to those two conditions in the context of trademarks.   Only if both conditions are satisfied does a court even reach the other three requirements.   If both are not met, there is no First Amendment protection.

There is nothing inherently illegal about having a band or providing entertainment services (the activities for which Appellant's registration is sought). *See Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 389 (1973). While Judge Moore stated that there is "nothing illegal about a disparaging trademark" (Views 18), that mistakenly treats the relevant activity as selecting or using a trademark. Here, "THE SLANTS" is disparaging, but neither the mark nor the associated services are illegal.

The second initial condition—that the commercial speech not be misleading—has more significance than Appellant and his supporters acknowledge. First Amendment protection is accorded to non-misleading commercial speech to enable businesses to advertise or convey factual information to consumers, such as the goods and services being offered, price information, price comparisons, etc. *See* 447 U.S. at 563 & n.6 (explaining why commercial speech can be subjected to content-based regulation). If commercial speech is misleading (*e.g.*, a store advertises false prices), then the First Amendment does not prevent the government from regulating, restricting, penalizing, or even banning such speech.

The second initial component of *Central Hudson* means that a misleading trademark has no First Amendment protection even if it concerns lawful activity. Many trademarks do not mislead. A fanciful mark consisting of a newly-minted

word which had no known meaning and did not even exist before becoming a mark cannot possibly mislead. Likewise, a word or phrase used as a suggestive mark or even as a descriptive mark is not likely to be misleading for purposes of *Central Hudson*, given that such marks are selected to convey an accurate suggestion or description of the underlying goods and services.

Other trademarks, including many arbitrary marks, may be misleading for First Amendment purposes under *Central Hudson*, even if otherwise unobjectionable for registrability purposes under the Lanham Act. Because an arbitrary mark is "a known word used in an unexpected or uncommon way," *Nautilus*, 372 F.3d at 1340, an arbitrary mark can easily mislead a consumer who knows only of its ordinary definition. The now well-known arbitrary mark of "APPLE" for computers likely misled the initial consumers first exposed to that new usage for the term. Of course, "APPLE" for computers is not disparaging and thus creates no need to invoke the First Amendment to defend such usage or avoid Section 2(a).

On the other hand, the mark "Redskins" for a sports team could be deemed misleading under *Central Hudson* if the team is not composed of Native American players. If so, then the First Amendment inquiry under *Central Hudson* would end, leaving no First Amendment salvation for any such misleading mark that is in fact disparaging. While it might be similarly misleading to describe a team as the

22

"Chicago Cubs" if it utilizes no young bears or one as the "New York Jets" if the associated goods and services have nothing to do with fast airplanes, there again is no issue of disparagement either preventing federal registration or implicating the First Amendment.

Here, Appellant seeks registration of "THE SLANTS" for his band comprised of Asian-Americans who embrace the name as self-descriptive, so this particular mark may not be misleading under *Central Hudson* (merely disparaging under Section 2(a)).[6] However, if the aforementioned hypothetical band comprised of non-Asians dressed as insulting Asian caricatures were the ones seeking to register "THE SLANTS," their use of that mark could easily be found to be misleading and thus entitled to no First Amendment protection as commercial speech under *Central Hudson*.

The potentially disparate treatment of those two different applicants for the same mark for the same services merely reflects that a "self-disparaging" mark may require a First Amendment analysis that goes beyond the first requirement of *Central Hudson*.  Appellant's case thus presents a better vehicle for examining the

---

[6]  While Judge Moore stated that "Mr. Tam does not challenge the Lanham Act's proscription on the registration of misleading marks" (Views 18), it is *Central Hudson*, not the Act, that requires commercial speech not be "misleading" as a prerequisite to any First Amendment protection (although the Act bars registration of deceptive marks (*see* 15 U.S.C. § 1052(a)).  It is not Appellant's burden to challenge either requirement as his position is surely that "THE SLANTS" as applied to his band is neither misleading nor deceptive.

constitutionality of Section 2(a) than the hypothetical band or even the Washington Redskins.  Unlike self-disparaging marks, many disparaging marks will never get past the first requirement of *Central Hudson*.

Without more, the facial challenge to Section 2(a) under the First Amendment must be rejected.  *See Rust*, 500 U.S. at 183.  Moreover, when the other requirements of *Central Hudson* are examined, they demonstrate that Section 2(a) is also constitutionally valid "as applied" to Appellant.

**2.    The Government Has A Substantial Interest In Discouraging Use Of Disparaging Marks**

The second requirement of *Central Hudson* examines whether the asserted governmental interest is substantial.  447 U.S. at 566.  Appellant asserts that the only possible interests to consider are those recited in the Lanham Act itself, such as protecting consumers and mark owners, and encouraging competition.  Tam Br. 11-13.  Appellant quotes *Edenfield v. Fane*, 507 U.S. 761, 768 (1993), for its statement that a court cannot "supplant the precise interest put forward by the State with other suppositions," Tam Br. 26, but nothing in *Edenfield* limits the government's interests supporting a regulation of commercial speech only to what is recited in the statute or was advanced when it was enacted.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 70-71 (1983).

Appellant's unwavering insistence is that there is "no constitutionally legitimate interest in regulating the tastefulness or desirability of speech."  Tam Br.

28; *see* PFI Br. 25 ("suppression of purportedly offensive speech will ***never*** qualify as a legitimate government interest"). Even for purely non-commercial speech, such blanket assertions cannot be correct. Otherwise, the First Amendment would have prevented governmental regulation of the indisputably offensive speech inherent in fighting words, obscenity, or defamation.

Judge Moore concluded that discouraging use of disparaging marks "is not a legitimate governmental interest … [because] 'the fact that protected speech may be offensive to some does not justify its suppression.'" Views 20 (quoting *Bolger*, 463 U.S. at 71). That analysis also improperly assumes its conclusion. Views 24. Even where the Supreme Court has invalidated regulations of commercial speech on First Amendment grounds, the Court has nevertheless properly recognized that the government's interests were substantial. Indeed, it did so in *Bolger*. *See* 463 U.S. at 73.[7]

Here, the Government has advanced its interests as avoiding facilitating use of disparaging marks as source identifiers in interstate commerce and allowing States to make their own determinations regarding whether disparaging trademarks

---

[7] *See also Edenfield*, 507 U.S. at 770 (ban against in-person solicitation by accountants held unconstitutional even though government interests in maintaining CPA independence and ensuring against conflicts of interest were substantial); *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 475-76 (1989) (ban of private enterprises from state university facilities held unconstitutional even though government interests in promoting education, safety, and security were substantial).

should be enforced.[8]  *See* U.S. Br. 41-46.  For the reasons advanced by the Government and herein, the *en banc* Court should hold that such interests are "substantial" for purposes of *Central Hudson*.  Whether Section 2(a) fulfills those substantial interests in a constitutional manner must then be determined using the third and fourth requirements of *Central Hudson*, not by using the second one to short-circuit the analysis.

### 3.    Section 2(a) Is Narrowly Tailored To Serve The Government's Interests

If the first two inquiries under *Central Hudson* are positively answered, the court then examines whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.  *See* 447 U.S. at 566.  Those last two steps "basically involve a consideration of a 'fit' between the legislature's ends and the means chosen to accomplish those ends."  *Posadas de Puerto Rico Associates v. Tourism Co. of P. R.*, 478 U.S. 328, 341 (1986).

---

[8]  The Government also cites its interest in not having disparaging marks "occupy the time, services, and use of funds of the federal government."  U.S. Br. 30 (quoting *McGinley*, 660 F.2d at 486).  The oft-repeated refrain that all such marks should be registered because it costs more to defend their denials than to register them (*e.g.*, Tam Br. 17 n.6, PFI Br. 27, R/C Br. 27; ACLU Br. 18) is not unlike the "cheaper to give us what we want rather than to litigate with us" business model attributed to so-called "patent trolls."  That refrain's only relevance is to confirm that implementing the Lanham Act implicates the Spending Clause, and that Congress's choices for its trademark program are for Congress to make.  *See* U.S. Br. 29-31.

*United States v. Edge Broadcasting Co.*, 509 U.S. 418 (1993), is instructive. In *Edge*, the Supreme Court held that federal statutes prohibiting lottery advertising by radio licensees in non-lottery states validly regulated commercial speech without violating the First Amendment "as applied" to Edge, a licensee located in a non-lottery state near its border with a lottery state. The Court explained that the third *Central Hudson* factor examines only the statute's general application to others. 509 U.S. at 427.

As in *Edge*, there is "no doubt" that Section 2(a) directly advances the asserted government interest. Appellant's supporters assert that the inability to register disparaging marks will "force" people to change marks or at least cause fewer people to use such marks (PFI Br. 15; ACLU Br. 12), which proves that the third requirement is satisfied. Some of those supporters also argue the opposite, asserting that Section 2(a) will not "materially affect the overall use of offensive and disparaging speech."[9]  PFI Br. 29-30; *see* R/C Br. 28-29. However, the latter positions improperly change the government's asserted interest from discouraging use of disparaging marks to the incorrect (and never advanced) interest of discouraging use of disparaging speech.

---

[9]  The two cases cited as support did not involve registration denials under Section 2(a), but government actions that barred use of the marks in question. *See* PFI Br. 30.  No prohibition of any speech or any mark is at issue here.

The Court in *Edge* also explained that an "as applied" challenge did not require the government to prove that its interests were advanced by applying its regulation in the party's particular case. *See* 509 U.S. at 430-31 (citing *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 462 (1978), and *Edenfield*, 507 U.S. 761). Hence, it is irrelevant whether Appellant himself was discouraged from using a disparaging mark. *See* 509 U.S. at 434 ("Nor do we require that the Government make progress on every front before it can make progress on any front."). Just as the Government advanced its purpose in *Edge* by substantially reducing lottery advertising without eradiating it (*id.*), the Government's purpose for Section 2(a) is advanced even if use of disparaging marks is not entirely eliminated.

As a result, the fourth *Central Hudson* requirement looks here only to "whether the regulation is more extensive than is necessary to serve the governmental interest." *See* 509 U.S. at 429 (commercial speech cases require a fit that "is not necessarily perfect, but reasonable"); *Fox*, 492 U.S. at 477-78 (the fourth requirement is not "a least-restrictive-means" standard).

Section 2(a) is "narrowly tailored" and not "more extensive than necessary" to serve the substantial governmental interests. *See San Francisco Arts*, 483 U.S. at 539 (upholding restrictions placed on commercial speech by the Lanham Act that were "not broader than Congress reasonably could have determined to be necessary"). Section 2(a) does not prohibit or restrict any speech. Section 2(a)

does not limit the owner's right or ability to use a disparaging term to identify its goods or services.  Nothing in the Lanham Act prohibits use of disparaging marks.  The Act also does not criminalize or penalize the use of disparaging marks, nor does it tax or impose any fees on the use or the user of disparaging marks.  Because Section 2(a) could not be much less restrictive and still directly advance the government's interests, the fourth requirement of *Central Hudson* confirms Section 2(a) is constitutional.

## III.   CONCLUSION

For the reasons stated, Section 2(a) does not violate the First Amendment.


Dated:  July 23, 2015                    Respectfully submitted,


                                         By:  /s/ Richard L. Stanley

                                         Counsel for Amicus Curiae

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 37(a)(7)(C), the undersigned counsel hereby certifies that the foregoing BRIEF OF AMICUS CURIAE RICHARD L. STANLEY AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE was generated using the word-processing program Microsoft Word 2010, which states that the portion of the brief not excluded by Fed. R. App. P. 37(a)(7)(iii) and Fed. Cir. R. 32(b) contains 6,971 words.

/s/ Richard L. Stanley

# CERTIFICATE OF SERVICE

In accordance with Federal Circuit Rule 25 and the Court's Administrative Order Regarding Electronic Case Filing, I certify that the foregoing BRIEF OF AMICUS CURIAE RICHARD L. STANLEY AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE was filed on July 23, 2015, using the Court's CM/ECF system, which will provide notification to all registered users, including the following counsel of record for the principal parties:

> Ronald D. Coleman
> ARCHER & GREINER, P.C.
> One Centennial Square
> P.O. Box 3000
> Haddonfield, NJ  08033
> Telephone:  (856) 795-2121

Counsel for Appellant Simon Shiao Tam.


> Thomas W. Krause, Acting Solicitor
> United States Patent and Trademark Office
> Office of the Solicitor
> P.O. Box 1450
> Mail Stop 8
> Alexandria, VA  22313
> Telephone:  (571) 272-9035

Counsel for Appellee.



Dated:  July 23, 2015                    /s/ Richard L. Stanley_____