No. 2014-1203

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
# 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

---

## IN RE SIMON SHIAO TAM,

*Appellant,*

---

Appeal *En Banc* from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 85472044.

---

**BRIEF OF AMICI CURIAE**
**SOUTH ASIAN BAR ASSOCIATION OF WASHINGTON, D.C.,**
**NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION, AND**
**FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY**
**IN SUPPORT OF APPELLEE AND AFFIRMANCE**

---

*Of counsel:*
George C. Chen
National Asian Pacific American Bar
    Association
1612 K Street NW, Suite 1400
Washington, DC 2006

Robert S. Chang
Executive Director of the Korematsu
    Center and Professor of Law
Seattle University School of Law
Sullivan Hall, 901 12th Avenue
P.O. Box 222000
Seattle, WA 98122-1090

Charanjit Brahma
    *Principal Attorney of Record*
TROUTMAN SANDERS LLP
580 California Street, Suite 1100
San Francisco, CA 94104
Tel. (415) 477-5713
Fax (415) 477-5710
Charanjit.Brahma@troutmansanders.com

*Attorney for Amici Curiae South Asian Bar Association of Washington, D.C., National Asian Pacific American Bar Association, and Fred T. Korematsu Center for Law and Equality*

July 23, 2015

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re Simon Shiao Tam
No. 2014-1203

## CERTIFICATE OF INTEREST

Counsel for Amici Curiae South Asian Bar Association of Washington, D.C., National Asian Pacific American Bar Association, and Fred T. Korematsu Center for Law and Equality certifies the following:

1.     The full name of every party or amicus represented by me is:

South Asian Bar Association of Washington, D.C.; National Asian Pacific American Bar Association; Fred T. Korematsu Center for Law and Equality.


2.     The name of the real party in interest (if the party name in the caption is not the real party in interest) represented by me is: South Asian Bar Association of Washington, D.C.; National Asian Pacific American Bar Association; Fred T. Koremastu Center for Law and Equality.


3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  Not applicable.


4.☒   There is no such corporation as listed in paragraph 3.

5.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

TROUTMAN SANDERS LLP
Charanjit Brahma
Michel Hobbs
Daniel Sharpe

July 23, 2015          /s/ Charanjit Brahma
                       Charanjit Brahma
                       Charanjit.brahma@troutmansanders.com
                       Troutman Sanders LLP
                       580 California Street, Suite 1100
                       San Francisco, CA 94104
                       Tel. (415) 477-5713
                       Fax (415) 477-5710

                       Principal Attorney of Record for
                       Amici Curiae South Asian Bar Association
                       of Washington, D.C., National Asian Pacific
                       American Bar Association, and Fred T.
                       Korematsu Center for Law and Equality

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................................i

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................1

INTRODUCTION ........................................................................................3

SUMMARY OF ARGUMENT ......................................................................5

ARGUMENT ..............................................................................................7

I.      The PTO did not restrain Mr. Tam's First Amendment right to free speech by refusing to register the mark, but merely exercised the Government's authority to choose its own speech (or silence) ........................................................................7

     A.      The Government's exercise of its Spending Clause authority to register only non-disparaging trademarks does not impose unconstitutional conditions on free speech ..................................................................10

         i.      The Government has a legitimate interest in not promulgating racial discrimination in its own speech...........................................................12

         ii.      Whether the prohibition on disparaging marks is constitutional turns on whether the PTO has restrained speech outside of the relevant Government program, not on whether the prohibition furthers a "commercial" objective .............14

         iii.      Even if Section 2(a) must advance the particular commercial objectives of the trademark system to be constitutional, prohibiting registration of disparaging marks does just that...................................16

     B.      The PTO's refusal to register the mark is an act of Government speech that cannot violate Mr. Tam's First Amendment rights..................................................18

II.      Even assuming arguendo that refusal to register a trademark is a content-based restriction on speech, the Lanham Act's prohibition on disparaging marks is viewpoint-neutral and, therefore, permissible ......................................................21

## TABLE OF CONTENTS
(continued)

**Page**

Conclusion ................................................................................................23

CERTIFICATE OF SERVICE ................................................................1

CERTIFICATE OF COMPLIANCE......................................................1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agency for Int'l Dev. v. Alliance for Open Society Intern.*,
133 S. Ct. 2321 (2013)....................................................................14, 15, 16

*Cammarano v. United States*,
358 U.S. 498 (1959) (Douglas, J., concurring)...................................11

*Cantwell v. Connecticut*,
310 U.S. 296 (1940)................................................................................12

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942)................................................................................12

*Christian Legal Soc. Chapter of the University of California, Hastings
College of the Law v. Martinez*,
561 U.S. 661 (2010)................................................................................22

*Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)..................................................................................8

*College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*,
527 U.S. 666 (1999)..................................................................................7

*In re McGinley*,
660 F.2d 481 (C.C.P.A. 1981)............................................................8, 10

*In re Tam*,
785 F.3d 567 (Fed. Cir. 2015) (Moore, J., additional views), vacated................4

*In re Tam*,
No. 85472044, 2013 WL 5498164 (TTAB Sept. 26, 2013)................9

*K Mart Corp. v. Cartier, Inc.*,
485 U.S. 176 (1988)..................................................................................7

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
469 U.S. 189 (1985)................................................................................20

*Perry v. Sindermann,*
  408 U.S. 593 (1972).........................................................................14

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009).........................................................................19

*Qualitex Co. v. Jacobson Prods. Co.,*
  514 U.S. 159 (1995).........................................................................17

*R.A.V. v. City of St. Paul, Minn.,*
  505 U.S. 377 (1982).........................................................8, 12, 23, 24

*Regan v. Taxation With Representation of Wash.,*
  461 U.S. 540 (1983).........................................................11, 12, 14, 15

*Shelley v. Kraemer,*
  334 U.S. 1 (1948)........................................................................4, 13

*Speiser v. Randall,*
  357 U.S. 513 (1958).........................................................................15

*Turner Broadcasting System, Inc. v. FCC,*
  512 U.S. 622 (1994)...........................................................................9

*United States v. Ebens,*
  800 F.2d 1422 (6th Cir. 1986) ............................................................3

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  135 S. Ct. 2239 (2015).....................................................................6, 19

*Zazu Designs v. L'Oréal, S.A.,*
  979 F.2d 499 (7th Cir. 1992) ............................................................20

## STATUTES

15 U.S.C. § 1051(d) .............................................................................20

15 U.S.C. § 1052(a) .........................................................................20, 21

15 U.S.C. § 1052(d) .............................................................................21

15 U.S.C. § 1052(e) .............................................................................21

15 U.S.C. § 1062..................................................................................21

15 U.S.C. § 1062(a) ....................................................................................21

15 U.S.C. § 1111 .........................................................................................21

15 U.S.C. § 1125(c) ....................................................................................17

an act of Government ...................................................................................19

Lanham Act § 22, 15 U.S.C. § 1072 ...........................................................20

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 28.1(e) ...............................................1

Federal Rule of Appellate Procedure 32(a)(5) ..............................................1

Federal Rule of Appellate Procedure 32(a)(6) ..............................................1

Federal Rule of Appellate Procedure 32(a)(7)(B) .........................................1

Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) ...................................1

First Amendment ..................................................................................passim

http://slantmusic.net/ ..................................................................................22

National Asian Pacific American Bar Association .........................................1

Racial Slur, N.Y. Times, Sept. 11, 1992, available at
    http://www.nytimes.com/1992/09/11/news/7-charged-in-death-of-
    student-who-objected-to-racial-slur.html ............................................3

Rule 29(a) .....................................................................................................1

Rule 29(c)(5)(A) ...........................................................................................1

Tamar Lewin, *Sikh Owner Of Gas Station Is Fatally Shot In Rampage*, N.Y.
    Times, Sept. 17, 2001, available at
    http://www.nytimes.com/2001/09/17/us/sikh-owner-of-gas-station-is-
    fatally-shot-in-rampage.html ...............................................................3

Unfair Competition § 2.01[2] (3d ed. 1994) ...............................................17

*Washington, D.C. and National Asian Pacific American Bar Association* .............25

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

Amici South Asian Bar Association of Washington, D.C. (SABA-DC), National Asian Pacific American Bar Association (NAPABA), and Fred T. Korematsu Center for Law and Equality ("Korematsu Center") file this brief in support of the Appellee, the Director of the U.S. Patent and Trademark Office, pursuant to Federal Circuit Rule 29(a) and this Court's Order of April 27, 2015 (Doc. 54) inviting the views of amici curiae.[1]

SABA-DC is a voluntary bar association dedicated to the needs, concerns, and interests of the South Asian American legal community in the Washington, D.C. area. Its key objectives include increasing awareness and dialogue regarding legal issues concerning South Asian Americans, improving access to legal services for the South Asian American community, and promoting a greater understanding of the legal, political, economic, and cultural environment of South Asia.

NAPABA is the national association of Asian Pacific American attorneys, judges, law professors, and law students. NAPABA represents the interests of over 40,000 attorneys and approximately 70 national, state, and local bar associations. Its members include solo practitioners, large firm lawyers, corporate counsel, legal service and non-profit attorneys, and lawyers serving at all levels of government. Since NAPABA's inception in 1988, it has promoted justice, equity, and

---

[1] Pursuant to Rule 29(c)(5)(A), Amici Curiae affirm that no counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution that was intended to fund preparation or submission of this brief. No person other than Amici Curiae, their members, or their counsel made a monetary contribution to its preparation or submission.

opportunity for Asian Pacific Americans as the national voice for Asian Pacific Americans in the legal profession. These efforts have included civil rights advocacy on various fronts. In furtherance of its mission to promote justice, equity, and opportunity for Asian Pacific Americans, NAPABA seeks to ensure that the government does not become a partner in advancing harmful racial slurs.

The Korematsu Center is a nonprofit organization based at Seattle University School of Law and works to advance justice through research, advocacy, and education. The Korematsu Center is dedicated to advancing the legacy of Fred Korematsu who defied the military orders during World War II that ultimately led to the incarceration of 110,000 Japanese Americans. The Korematsu Center has a strong interest in ensuring that our courts do not become active participants in perpetuating racism. The Korematsu Center does not, in this brief or otherwise, represent the official views of Seattle University.

**INTRODUCTION**

Amici are all too familiar with the sting of slurs such as "slant," "chink," "gook," "sand nigger," and the like. These taunts are not limited to the schoolyard. Racial slurs and epithets often accompany racialized violence. In 1982, a white Detroit autoworker called Vincent Chin a "Chink" and "Nip" before beating Chin to death with a baseball bat.[2] In 1992, Luyen Phan Nguyen was killed in Coral Springs, Florida, by a group of white men who followed Nguyen from a party after Nguyen objected to the use of a racial slur.[3] In 2001, Balbir Singh Sodhi was killed in Mesa, Arizona, by a gunman who had been overheard previously at a bar saying he wanted to kill "ragheads."[4]

Private acts and expressions of racism can be terrible and damaging, but they take on a different valence when they occur with the sanction of the government. This is a lesson that the South Carolina legislature finally understood when it voted to take the Confederate flag down from its state capital.

While amici agree with the Government that Section 2(a) of the Lanham Act does not violate the First Amendment and that disparaging marks such as the one sought by Mr. Tam should be denied federal trademark registration, amici

---

[2] *United States v. Ebens*, 800 F.2d 1422, 1427 (6th Cir. 1986).
[3] 7 Charged in Death of Student Who Objected to Racial Slur, N.Y. Times, Sept. 11, 1992, available at http://www.nytimes.com/1992/09/11/news/7-charged-in-death-of-student-who-objected-to-racial-slur.html.
[4] Tamar Lewin, *Sikh Owner Of Gas Station Is Fatally Shot In Rampage*, N.Y. Times, Sept. 17, 2001, available at http://www.nytimes.com/2001/09/17/us/sikh-owner-of-gas-station-is-fatally-shot-in-rampage.html.

respectfully disagree with the government's position that federal registration does not somehow implicate the government in the disparaging mark.[5]

Consider state and county deed recording systems.  When property owners decided to encumber their property with racially restrictive covenants, these were seen as private acts of discrimination.  These racially restrictive covenants could be recorded in the county registry of deeds, putting all prospective buyers on constructive notice of the restriction.  Property law doctrine with regard to equitable servitudes was neutral as to private discrimination and permitted certain neighboring property owners, as beneficiaries of the servitudes, to enforce these restrictions.  And until *Shelley v. Kraemer*, 334 U.S. 1 (1948), these racially restrictive covenants could be enforced in a court of law.

A similar dynamic could occur if Section 2(a) of the Lanham Act were struck down.  A racist hate group could federally register "Japs Out!" placing all on notice that this group has a monopoly power on this mark, and giving the group the right to display "Registered in U.S. Patent and Trademark Office," or "Reg. U.S. Pat. & Tm. Off.," or simply ® with their mark.  This official association with the United States government by itself expresses a powerful message.  Imagine then that a counter-group sought to create and use the mark "Japs Out?" or "Japs In!" to promote a message of tolerance.  Because of its trademark registration, the hate group would be able to call upon the power of the government courts to cut off lawful speech by the counter-group aimed at subverting the message of hate.

---

[5] The government's position on this point is discussed in *In re Tam*, 785 F.3d 567, 584-85 (Fed. Cir. 2015) (Moore, J., additional views), vacated by 600 Fed. App'x 775 (Mem.) (Fed. Cir. 2015).

Amici respectfully ask that this Court do two things: (1) avoid making the federal trademark registry similar to county deed registries, where racism became recorded and authorized; and (2) avoid having our government through its courts enforce this improperly granted right.

## SUMMARY OF ARGUMENT

By refusing to add Mr. Tam's disparaging "THE SLANTS" mark to its register, the Patent and Trademark Office (PTO) has done nothing to restrain Mr. Tam's speech rights. He remains free to use the mark to promote his rock band in any place or manner he chooses. The PTO merely refuses to make the Government complicit in the diminution of millions of Americans. Just as Mr. Tam is free to use whatever mark he chooses, the Government is free not to endorse, or associate itself with, his views.

What Mr. Tam actually seeks goes far beyond the basic constitutional right of free speech. Mr. Tam would read the Constitution to <u>require</u> the Government to aid and abet him in imbuing the racial slur he chose as his mark with commercial value. Nothing in the First Amendment requires the Government to make any trademark, much less a racially disparaging one, valuable or registrable. Such a dangerous extension of the First Amendment goes far beyond the Constitution's vision of the Government as a neutral bystander to the public's weighing of speech and ideas.

The Government's decision not to speak on Mr. Tam's behalf by registering his mark does not abridge Mr. Tam's own speech rights. Just last month, the Supreme Court in *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), confirmed that when the Government speaks, its choice to take a position does not violate the free speech rights of those who disagree. Just as the Government's decision not to include disparaging symbols on government-issued license plates was held not to violate the First Amendment in *Walker*, so too should the Government's decision not to include disparaging trademarks on the government-maintained register.

Mr. Tam cannot wield his First Amendment rights as a sword to compel the Government to aid him in spreading racial epithets to every concert hall and record store in the nation or to enrich him in the process. Nor can Mr. Tam's First Amendment rights require the Government to register racial slurs that are likely to dilute the brands of other (in this case, identifiably Asian) mark holders.

Finally, even if refusal to register a disparaging trademark could be considered a content-based restraint on constitutionally protected speech, this case demonstrates that the PTO's application of the statute is precisely the type of viewpoint-neutral act that the Supreme Court has clarified is permissible. In weighing the "disparaging" nature of the mark, the PTO treated Mr. Tam's attempt to "own" a racial slur no differently than it would treat an applicant who sought to use the same slur in a more traditional manner. While Mr. Tam's use of this racial slur may be well-intended—to the extent the use of a slur can ever be so—if the PTO cannot refuse to register Mr. Tam's disparaging mark, there will be no

6

viewpoint-neutral way for it to refuse to register racially disparaging marks with far more malignant intent.

## ARGUMENT

**I. The PTO did not restrain Mr. Tam's First Amendment right to free speech by refusing to register the mark, but merely exercised the Government's authority to choose its own speech (or silence).**

Even assuming that "THE SLANTS" can be considered constitutionally protected speech, Mr. Tam provides no example of how his right to use that epithet as a trademark has been abridged.

"Trademark law, like contract law, confers private rights, which are themselves rights of exclusion." *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 185 (1988) (concluding that the trademark owners' right to enforce a trademark to exclude unauthorized imports did not constitute a government embargo); *see also College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 673 (1999) (differentiating Lanham Act's trademark provisions, which confer to the owner the right to exclude others, from its false advertising provisions, which do not). But while the grant of a trademark may, if the trademark is enforced, restrict the speech of others, the *refusal to register a trademark restricts no one's speech*:

> With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark does not affect his right to use it. ... No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark.

*In re McGinley*, 660 F.2d 481, 484 (C.C.P.A. 1981) (citation omitted).  Mr. Tam has the same right to use "THE SLANTS" mark today that he did before the PTO refused to add it to the federal Principal Register.  The PTO's refusal to register that mark does not destroy or prohibit it.

The cases Mr. Tam cites as prohibiting the Government from proscribing speech or even expressive conduct are fundamentally distinguishable in that regard.  For example, in *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1982), the Supreme Court addressed the unconstitutionality of a city ordinance banning cross-burning *by private actors*.  While the City in *R.A.V.* could not prohibit private conduct tantamount to "fighting words," nothing in that decision suggests that the City could not choose not to aid such conduct by, for example, refusing to distribute free match sticks to those intending to commit such acts.  Likewise, in *Sorrell v. IMS Health Inc.*, the Supreme Court addressed a state statute that limited a private-party seller's sale of data based on the type of speech ("academic" vs. "marketing") in which the private-party purchaser intended to use the data.  131 S. Ct. 2653, 2664 (2011).  Because the data in question would overwhelmingly be purchased by branded pharmaceutical companies, the statute had the effect of proscribing those companies' private speech based on their viewpoint.  *Id.* at 2663-64.  But again, nothing in Sorrell bars the Government from choosing to limit or differentiate access to data the Government itself collects based on a recipient's intended use.  And in *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), the Supreme Court addressed a city ordinance prohibiting *private* parties from installing news racks on public property to distribute their commercial handbills.

Mr. Tam, on the other hand, may use his mark in whatever context he chooses, even though it is not federally registered.

Moreover, while the Supreme Court decision in *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994), also deals with a distinguishable restraint on private speech, the reasoning of the decision supports the PTO's action in this case. *TBS* dealt with a federal requirement that *private* cable operators take part in speech in the form of carrying broadcast channels. That restriction on a private party's ability to choose not to take part in speech stands in stark contrast to the present case, where Mr. Tam remains free to engage in whatever lawful use of the trademark he chooses and is not required by the Government to say anything for or against the disparaging mark.

But, the *TBS* decision also is instructive because it *upheld* the federal carrying requirement, noting that the requirement was neutral as to the viewpoints expressed in the broadcast content. *Id.* at 646-48. As explained in greater detail below in Section II, the PTO's prohibition on registering disparaging marks is similarly viewpoint-neutral. Just as Mr. Tam is prohibited from registering a trademark in an effort to "own" a racial slur[6], so would those who would use the same slur to attack those of Asian heritage. The PTO has treated Mr. Tam's

---

[6] The suggestion that the term "slant" is not a slur because it has other meanings in other contexts is irrelevant for purposes of this appeal, which broadly asks whether the Government can prohibit disparaging marks without violating the First Amendment. The reaction to Mr. Tam's choice of mark confirms that this slur retains its injurious force. *In re Tam*, No. 85472044, 2013 WL 5498164, at *2-3 (TTAB Sept. 26, 2013) (citing J.A. 45, 51, 94-98, 100 (cancellation of Mr. Tam's band's performance at a conference for Asian youth). Indeed, if "slant" was no longer a slur, there would be no need for Mr. Tam and his band to "own" or attempt to reappropriate the term.

application no differently than it would a band composed of Caucasian members made up to "look" Asian that called itself "THE SLANTS" to promote songs promoting racial stereotypes of Asians.[7]

**A.    The Government's exercise of its Spending Clause authority to register only non-disparaging trademarks does not impose unconstitutional conditions on free speech.**

Without an actual restraint on his speech, Mr. Tam suggests that the PTO's refusal to register his disparaging trademark impermissibly imposes conditions that have a "chilling effect" on free speech, and that the *McGinley* precedent fails to account for that effect in holding that the PTO has authority under the Spending Clause to refuse to register trademarks. Appellant's Op. Br. at 18. But even under a Spending Clause analysis, the First Amendment does not prohibit Government from imposing conditions on the marks it approves for registration. Here, the Government-imposed condition—that a trademark not disparage a race—is tied directly to the benefit received—federal trademark registration—and does not affect Mr. Tam's ability to use the mark in its non-registered form. Because the condition is squarely within the scope of the Government's trademark registration program, it does not violate the First Amendment. Mr. Tam's suggestion that the Government's motivation for applying the condition of non-disparagement must be

---

[7] In contrast, the trademark "N.W.A." was successfully registered (Reg. No. 2,522,163) in connection with prerecorded music. Even though the "N" in the name of the eponymous rap music group from the 1980s and 1990s stood for a racial slur, the slur itself was not part of the mark. Notably, the group's "embracing" of the "N-word" has done little to dampen its power to belittle.

consistent with the commercial motivation for the entire Lanham Act in order for the condition to be constitutional is not supported by the relevant precedent.

As Mr. Tam notes, federal registration brings with it several private legal rights that may, if properly used by the mark owner, be commercially valuable. Appellant's Op. Br. at 9-10.  Nevertheless, the PTO is permitted to limit the marks upon which those "benefits" are conferred without running afoul of the First Amendment.  "We again reject the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'"  *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 546 (1983) (quoting *Cammarano v. United States*, 358 U.S. 498, 515 (1959) (Douglas, J., concurring)).

*Regan* crystallizes the competing considerations in balancing the Government's right to impose conditions on the receipt of benefits under the Spending Clause and an individual's right to free speech under the First Amendment.  "This Court has never held that Congress must grant a benefit … to a person who wishes to exercise a constitutional right."  *Id.* at 545.  In *Regan*, the Government was held not to have violated the First Amendment when it conditioned the benefit of 501(c)(3) tax-exempt status on forbearance from lobbying activities.  *Id.* at 545-46.  The Court noted that organizations were still free to accept tax-deductible contributions for their non-lobbying activities and that the tax code provision did not "deny [an organization] any independent benefit on account of its intention to lobby."  *Id.* at 545.  Thus, the Government was free to "refuse[] to pay for the lobbying out of public moneys."  *Id.*

Like the organizations in *Regan* that remained free to speak as lobbyists even though they would have to forego tax-exempt status as a result, Mr. Tam remains free to use the particular disparaging racial slur he decided upon as a trademark for his band, even though he will have to forego the benefits of federal registration as a result. Putting Mr. Tam to that choice is no violation of Mr. Tam's First Amendment rights. It merely reflects that when the Government speaks by providing benefits like federal registration, it speaks for all Americans, including those of Asian descent.

### i. The Government has a legitimate interest in not promulgating racial discrimination in its own speech.

Section 2(a) of the Lanham Act was enacted in 1946, the same time frame as the Supreme Court's "fighting words" decisions in *Cantwell v. Connecticut*, 310 U.S. 296 (1940), and *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), and its language mirrors the generality of the ordinance approved in *Chaplinsky* in its scope of prohibited disparagement. "'[F]ighting' words … by their very utterance inflict injury or tend to incite an immediate breach of the peace. *Chaplinsky*, 315 U.S. at 572. These cases originally broadly stated that "[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Cantwell*, 310 U.S. at 309-10.

As discussed below in Section II, the more recent *R.A.V.* decision has clarified that even fighting words may be prohibited by the Government only in view-point neutral ways. And the "fighting words" cases are distinguishable in the

sense that it is difficult to tell in the abstract how Mr. Tam (or a differently motivated applicant) might use "THE SLANTS" trademark if it were registered and whether such a commercial use could incite imminent violence. The Court need not conduct a "fighting words" analysis here, because the Government is not affirmatively prohibiting Mr. Tam's speech by refusing to register his trademark,

Nonetheless, the "fighting words" cases are important in the analysis of the PTO's action as Government speech, because the cases uniformly acknowledge that Government rightfully can, and does, recognize the hurtful and violence-inducing impact of racial epithets and other "fighting words." It would be strange indeed to interpret the First Amendment to allow Government to jail people who cast such slurs at others on the street corner, yet require the same Government to speak such slurs in its own publications.

The Government's interest in not fostering discrimination by putting an official stamp of approval on private actions or requiring federal courts to adjudicate private discriminatory claims has been clarified in other contexts. For example, in *Shelley v. Kraemer*, the Supreme Court held that racially restrictive covenants prohibiting private parties from selling land to minorities were unenforceable. 334 U.S. 1, 20-21 (1948). Those covenants gave private individuals "the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights…." *Id.* at 19. Federal registration of "THE SLANTS" would similarly give a private individual the full coercive power of government to prevent others from using that term in a commercial context through enforcement actions in federal court. While Mr. Tam

suggests he would wield that slur in a positive manner, one can easily foresee the torrent of more hateful mark registrations that would follow. Moreover, giving Mr. Tam the weight of federal government authority to prevent others who also may intend to use the slur/mark to weaken it is inconsistent with Mr. Tam's stated intention of reappropriating the slur.

> ### ii. Whether the prohibition on disparaging marks is constitutional turns on whether the PTO has restrained speech outside of the relevant Government program, not on whether the prohibition furthers a "commercial" objective.

Mr. Tam argues that the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech," Appellant's Op. Br. at 20 (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)), and that "the constitutionality of a regulation turns on whether the receipt of government benefits is conditioned on requirements imposed within or without *the limits of the government program itself.*" *Id.* at 22. While those fundamental propositions seem unremarkable, Mr. Tam misapplies *Perry* and *Alliance*. Whether a Government-imposed condition reaches outside the limits of a government program into the realm of a constitutional right does not turn on the Government's objective in instituting the program, as Mr. Tam contends. *Id.* at 22-23. Rather, a Government-imposed condition is unconstitutional only if it is used to deny constitutional rights beyond the benefit the government is conveying.

In *Regan*, the Supreme Court clarified that whether conditions on Government benefits cross the line into impermissible abridgement of the First

Amendment hinges on a fundamental distinction:  whether the Government is actually restricting or requiring speech rather than merely refusing to spend public monies to promote speech.  461 U.S. at 546.  Following this line of demarcation, the *Regan* Court explained, the Supreme Court decision in *Speiser v. Randall*, 357 U.S. 513 (1958), held it was improper for a State to require an individual seeking a property tax exemption to sign a declaration stating that he did not advocate the forcible overthrow of the Government of the United States, *i.e.*, to require the individual to express a particular view in affirmative speech.  *Regan*, 461 U.S. at 545 (citing *Speiser*, 357 U.S. at 318).

The cases Mr. Tam cites as striking down unconstitutional conditions on Government benefits serve to reinforce the propriety of Section 2(a) of the Lanham Act and the PTO's refusal to register disparaging trademarks.  For example, in *Agency for Int'l Dev. v. Alliance for Open Society Intern.*, 133 S. Ct. 2321 (2013), a Government condition "compelling a grant recipient to adopt a particular belief [concerning the need to "eradicate" prostitution and sex trafficking] as a condition of funding" was found unconstitutional.  *Id.* at 2330.  But in reaching that conclusion, the *Alliance* Court contrasted two other conditions that are more analogous to the case at bar.

First, the Court based its holding on the fact that, in the view of the majority, the unconstitutional condition went beyond what the dissent characterized it as: "simply a selection criterion by which the Government identifies organizations 'who believe in its ideas to carry them to fruition.'"  *Id.* (quoting Scalia dissent at 2332).  But in this case, that is all Section 2(a)'s prohibition on registering

disparaging trademarks is—a Government selection criterion for inclusion on the Principal Register.

Second, the *Alliance* Court distinguished the condition at issue in *Rust v. Sullivan*, in which the Supreme Court deemed constitutional an Act that "prohibited the Title X federal funds from being 'used in programs where abortion is a method of family planning'" and enabling agency regulations that "barred Title X *projects* from advocating abortion as a method of family planning." *Alliance*, 133 S. Ct. at 2329 (citing *Rust*, 500 U.S. 173, 178 and 180-81 (1991)) (emphasis added). Neither the Act nor the regulation ran afoul of the First Amendment, because the Title X grantee could "continue to ... engage in abortion advocacy … through programs that are separate and independent from the project that receives Title X funds." *Id.* at 2330 (quoting *Rust*, 500 U.S. at 196). Similarly in this case, Mr. Tam can use his disparaging mark in its federally unregistered form, even side-by-side with non-disparaging marks that receive the full benefits of federal registration.

### iii. Even if Section 2(a) must advance the particular commercial objectives of the trademark system to be constitutional, prohibiting registration of disparaging marks does just that.

Even assuming Mr. Tam is correct that the PTO's non-disparagement condition on registered marks is constitutional only if it advances the "commercial objectives of the program of trademark registration," that standard is met here. Mr. Tam's fails to fully capture the Government's objectives in instituting the federal trademark system when he defines its goal (without citation to any legislative

history, statutory clause or case law) as simply "to preserve trademarks as a useful and clear form of commercial speech free from deception and confusion."

A foundational objective of the federal trademark system is to "help[] assure a producer that it … will reap the financial, reputation-related rewards associated with a desirable product." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995) (quoting J. McCarthy, McCarthy on Trademarks and Unfair Competition § 2.01[2], p. 2-3 (3d ed. 1994)). Thus, for example, the Federal Trademark Dilution Act prohibits use of a trademark in a manner that would dilute the value of another's famous trademark by "tarnishing [it] with negative associations." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002) (citing 15 U.S.C. § 1125(c)); *see also Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003) (noting statement by Senator Orrin Hatch in legislative history that Federal Trademark Dilution Act "was intended 'to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it'").

While the trademark dilution claim targets reputational harm to a specific mark through a specific similar use, the overarching objective of that provision is similar the Government's objective in prohibiting the federal registration of racial slurs as trademarks. Registration of a racially disparaging slur as a trademark helps to elevate and mainstream the slur and thereby strengthen the mental linkage between members of the race and tarnishing racial stereotypes that imply inferiority in the minds of consumers. Making the slur more prominent and acceptable, in turn contributes to confusion about the quality of products and

services offered by members of the disparaged racial group, and hampers consumers from objectively evaluating their products and services.

It may be hard to envision how registering "THE SLANTS" helps to mainstream the slur "slant" and its associated stereotypes of those of Asian heritage, because Mr. Tam's band is hardly a household name, while several established Asian companies, like Toyota, are generally held in high regard.  But perhaps a more concrete example lies in the use of the trademark "SAMBO'S" (Reg. No. 1,061,886 for restaurant services), which for decades helped to link African-Americans with a servile image (and which has since been abandoned). The trademark reinforced racial stereotypes in a manner that tarnished the trademarks associated with the Tuskegee Airmen and historically black colleges, like Howard University and Spelman College.  And while the "SAMBO'S"  mark arguably may not have sunk to the level of a racial slur that would have been barred under the disparagement provision of Section 2(a), it makes the tarnishing effect of racially disparaging marks clear.

Even if this Court were to adopt Mr. Tam's improperly expansive view of the "unconstitutional conditions" doctrine, the Section 2(a) prohibition on registration of racial slurs like "THE SLANTS" as trademarks advances the fundamental objectives of federal trademark policy.  Thus, even under Mr. Tam's view, the Government can and should be permitted to condition the registration of a mark on its not racially disparaging others or, by implication, their marks.

## B.     The PTO's refusal to register the mark is an act of Government speech that cannot violate Mr. Tam's First Amendment rights.

In the name of the First Amendment, Mr. Tam actually asks this Court to curtail Government speech, not protect his own speech. The Supreme Court has repeatedly held that the Government's decision to take a position in its own speech does not violate the First Amendment rights of those who take an opposing view.

The distinction between Government speech and Government regulations proscribing speech was most recently clarified in *Walker*. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker*, 135 S. Ct. at 2241 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-468 (2009)). Thus, in *Walker*, the Court held that a Texas state agency did not violate the First Amendment rights of the Sons of Confederate Veterans when it rejected that group's design for a specialty license plate featuring an image of the Confederate flag. *Id.* at 2253.

*Walker* and *Summum* establish a three-factor test for identifying Government speech: (1) whether history demonstrates that the form of speech—here, the Government's addition of a mark to the Principal Register—has been used by Government to communicate a message; (2) whether the form of speech is "often closely identified in the public mind with the [Government]"; and (3) whether the Government "maintains direct control over the messages conveyed." *Walker*, 135 S. Ct. at 2242. In this case, all three factors favor treating the PTO's decision on whether or not to register a mark as Government speech.

First, as Mr. Tam acknowledges, the addition of a mark to the Principal Register has historically been intended by the Government to communicate a message to the public, namely that the mark has received the Government's approval and is owned by the registrant. *See* Appellant's Op. Br. at 9-10 (noting that registration serves as "constructive notice of ownership of the mark" and, after a period of time over which the mark become incontestable, "conclusive evidence of ownership and validity"); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 202 (1985) ("Registration of a mark provides constructive notice throughout the United States of the registrant's claim to ownership," citing Lanham Act § 22, 15 U.S.C. § 1072); *Zazu Designs v. L'Oréal, S.A.*, 979 F.2d 499, 504 (7th Cir. 1992) (holding that less commercial use is sufficient to support ownership of a registered mark versus an unregistered mark because "the registration gives notice to latecomers, which token use alone does not. Firms need only search the register before embarking on development."). Furthermore, because the Lanham Act positioned the PTO as a gatekeeper to federal registration, placing and maintaining a mark on the Principal Register has become a *de facto* Government communication of a host of conclusions the PTO has reached through the examination process—not only that the mark is not "disparaging" in the Government's view under 15 U.S.C. § 1052(a), but also that it has been found by the PTO, *inter alia*:

- to have been adequately shown to have been "in use in commerce" in connection with "goods or services specified in the notice of allowance" under 15 U.S.C. § 1051(d);

- to not be "immoral, deceptive, or scandalous" or "falsely suggest[ive of] a connection with persons, living or dead, institutions, beliefs, or national symbols" under 15 U.S.C. § 1052(a);

- to not be "likely … to cause confusion, or to cause mistake, or to deceive" under 15 U.S.C. § 1052(d); and

- to not be "merely descriptive or deceptively misdescriptive," "merely a surname," or "functional" under 15 U.S.C. § 1052(e).

Thus, the act of registration itself has historically served as a form of Government communication concerning various attributes of trademarks.

Second, the registration of trademarks is inherently associated with Government, because the Principal Register is maintained by the Government, which accepts and examines applications for adding marks (15 U.S.C. § 1062), opposing the registration of marks (§ 1063) and cancelling registrations (§ 1064). When a mark is added to the Principal Register, "the Director shall cause the mark to be published in the Official Gazette of the Patent and Trademark Office." 15 U.S.C. § 1062(a). The trademark statute also encourages holders of federally registered marks to denote that status by including the "®" symbol, without which the mark owner may not collect damages in a federal enforcement action absent actual knowledge of the registration. 15 U.S.C. § 1111. As a result, federal registration of a trademark is tightly intertwined with Government action and approval in the mind of the public, which further supports treating the act of registration as Government speech.

Third, the Government substantively examines trademark applications to determine if they meet the criteria mentioned above before permitting them to be registered. Thus, Government control of the registration process further supports

treating this act as Government speech that does not implicate Mr. Tam's First Amendment free speech right.

## II.    Even assuming arguendo that refusal to register a trademark is a content-based restriction on speech, the Lanham Act's prohibition on disparaging marks is viewpoint-neutral and, therefore, permissible.

There is no question that the racial slur "slant" connotes negative racial stereotypes about people of Asian heritage.[8]  Although the PTO relied on Mr. Tam's own statements about wanting to "own" the stereotype that Asians have "slanted eyes" to link the mark with its racially disparaging meaning, this does not mean that the PTO engaged in impermissible viewpoint discrimination.

Viewpoint neutrality does not demand that the PTO turn a blind eye to the possible disparaging meaning of a mark whose elements may also be construed in a non-disparaging way.  Here, by Mr. Tam's own admission, "THE SLANTS" was intended to invoke the disparaging "slant" racial slur.

Instead, viewpoint neutrality requires that the PTO treat Mr. Tam, who ostensibly (and misguidedly) sought to use this disparaging mark to lessen the stigma of that slur, just as it would an applicant who sought to use the same mark for its overtly racially pejorative purpose.  *See, e.g.*, *Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S.

---

[8] While Mr. Tam is correct that the term "slant" has other meanings that are not racially disparaging, Mr. Tam's application made clear the intentional use of the term as a racial slur.  The PTO has previously considered a trademark application for a musical group called "SLANT" (Trademark Application No. 78/568,100), but that application did not tie the term in any way to a racial group.  Although that application was rejected for other reasons and ultimately abandoned, the group continues to perform, including apparently as part of the "Hope Created European Tour 2015" of U.S. military bases in Europe put together by Armed Forces Entertainment.  (http://slantmusic.net/)

661 (2010) (finding viewpoint neutral, and therefore constitutional, a public university's policy requiring student organizations, including a Christian student organization, to accept all students, including non-Christians, in order to receive funding from the school).

The Lanham Act's broad prohibition on disparaging marks of all types is precisely the type of content-neutral and viewpoint-neutral standard the Supreme Court endorsed in *R.A.V.*  In that case, the Supreme Court faulted the ordinance against the use of "fighting words" in question because

> the ordinance applies only to "fighting words" that insult, or provoke violence, "on the basis of race, color, creed, religion or gender."  Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics.  Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered.  …

> In its practical operation, moreover, the ordinance goes even beyond mere content discrimination, to actual viewpoint discrimination.  Displays containing some words—odious racial epithets, for example—would be prohibited to proponents of all views.  But "fighting words" that do not themselves invoke race, color, creed, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents.  One could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion."

505 U.S. at 391-92.  Thus the *R.A.V.* Court clarified that "the exclusion of 'fighting words' from the scope of the First Amendment simply means that … the unprotected features of the words are, despite their verbal character, essentially a

'nonspeech' element of communication," not that the use of "fighting words" takes the underlying speech out of the purview of the First Amendment. The Court therefore likened "fighting words" to a "noisy sound truck":

> both can be used to convey an idea; but neither has, in and of itself, a claim upon the First Amendment. As with the sound truck, however, so also with fighting words: The government may not regulate use based on hostility—or favoritism— towards the underlying message expressed.

505 U.S. at 386.

Just as *R.A.V.* prescribes, the Lanham Act's prohibition of all disparaging marks is written broadly to bar all terms of disparagement, whether against groups or individuals, and regardless of the basis, no matter how used. To the PTO, it does not matter whether the applicant is pro- or anti-slur; all that matters is that the mark embodies the slur.

## CONCLUSION

It is one thing for Mr. Tam to use a racial slur as his trademark, but quite another to compel the Government to aid him in deriving commercial value from that slur. As explained above, the PTO's refusal to register "THE SLANTS" under Section 2(a) of the Lanham Act does not violate Mr. Tam's First Amendment rights. Rather Section 2(a) permits the Government to retain control over its own speech and administer the federal trademark register in a viewpoint-neutral manner. For the foregoing reasons, amici urge the Court to AFFIRM the judgment below.

DATED:  July 23, 2015                Respectfully submitted,

TROUTMAN SANDERS LLP


By:  */s/ Charanjit Brahma*
     Charanjit Brahma
     *Principal Attorney of Record*
     TROUTMAN SANDERS LLP
     580 California Street, Suite 1100
     San Francisco, CA 94104
     Tel. (415) 477-5713
     Fax (415) 477-5710
     Charanjit.Brahma@troutmansanders.com

     *Attorneys for Amici Curiae*
     *South Asian Bar Association of Washington, D.C., National Asian Pacific American Bar Association, and Fred T. Korematsu Center for Law and Equality*

     Of counsel:
     George C. Chen
     National Asian Pacific American Bar Association
     1612 K Street NW, Suite 1400
     Washington, DC 2006

     Robert S. Chang
     Executive Director of the Korematsu Center and Professor of Law
     Seattle University School of Law
     Sullivan Hall, 901 12th Avenue
     P.O. Box 222000
     Seattle, WA 98122-1090

## CERTIFICATE OF SERVICE

I, Charanjit Brahma, hereby certify that, on July 23, 2015, I caused to be served true and correct copies of the foregoing BRIEF OF AMICI CURIAE SOUTH ASIAN BAR ASSOCIATION OF WASHINGTON, D.C., NATIONAL ASIAN PACIFIC AMERICAN BAR ASSOCIATION, AND FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY IN SUPPORT OF APPELLEE AND AFFIRMANCE on all attorneys of record by electronic filing via the CM/ECF system.

Dated July 23, 2015          By:    */s/ Charanjit Brahma*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 6,448 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Dated July 23, 2015                    By:    _/s/ Charanjit Brahma_____