No. 14-1203
(Serial No. 85/472,044)

# United States Court Of Appeals
# for the Federal Circuit

————————

IN RE: SIMON SHIAO TAM,

————————

*Appeal From The United States Patent And Trademark Office, Trademark Trial And Appeal Board, Serial No. 85/472,044*

————————

**BRIEF OF *AMICI CURIAE* AMANDA BLACKHORSE, MARCUS BRIGGS-CLOUD, PHILLIP GOVER, JILLIAN PAPPAN, AND COURTNEY TSOTIGH IN SUPPORT OF APPELLEE THE UNITED STATES**

————————

Jeffrey J. Lopez
*(Counsel of Record)*
Jesse A. Witten
Drinker Biddle & Reath LLP
1500 K Street N.W., Suite 1100
Washington, DC  20005-1209
(202) 842-8800
*Attorneys for Amici Curiae
AMANDA BLACKHORSE, MARCUS
BRIGGS-CLOUD, PHILLIP GOVER,
JILLIAN PAPPAN, and COURTNEY
TSOTIGH*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for *amici curiae* certifies the following:

1. The full names of every party or amicus curiae represented by me are:

> Amanda Blackhorse, Marcus Briggs-Cloud, Phillip Gover, Jillian Pappan, and Courtney Tsotigh.

2. The name of the real parties in interest (if the party named in the caption above is not the real party in interest) represented by me are:   Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:   None.

4. The names of all law firms and the partners or associates appearing for the party or *amici curiae* now represented by me in the trial court or are expected to appear in this Court are:

> Jesse A. Witten
> Jeffrey J. Lopez
> Drinker Biddle & Reath LLP

Dated:        July 23, 2015        By: /s/ Jeffrey J. Lopez
              Jeffrey J. Lopez
              DRINKER BIDDLE & REATH LLP
              1500 K Street N.W.
              Suite 1100
              Washington, DC  20005-1209
              Telephone:(202) 842-8800
              Facsimile: (202) 842-8465

              Attorneys for *Amici Curiae*
              AMANDA BLACKHORSE, MARCUS
              BRIGGS-CLOUD, PHILLIP GOVER,
              JILLIAN PAPPAN, and COURTNEY
              TSOTIGH

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................1

STATEMENT OF THE CASE:  SUMMARY OF FEDERAL
TRADEMARK REGISTRATION PROGRAM ....................................2

A. Trademarks And Registrations ........................................................2

 B. USPTO Process For Reviewing And Issuing Registrations. ...........3

C. Effect Of USPTO Registration .......................................................6

SUMMARY OF ARGUMENT ...........................................................7

ARGUMENT

I.      THIS COURT SHOULD UPHOLD IN RE MCGINLEY ............................9

II.     ISSUING A TRADEMARK REGISTRATIONS IS GOVERNMENT
        SPEECH THAT IS NOT SUBJECT TO FIRST AMENDMENT
        CHALLENGE. ..........................................................................13

        A.      A USPTO Registration Certificate Is A Government Document
                And The Trademark Registries Are Government Registries. ............14
        B.      Trademark Registrations Are Government Speech Based On
                The Factors Considered In Walker. ...................................18
        C.      Trademark Registrations Are Government Speech Under The
                Fourth Circuit's Four-Factor Test. ....................................20

III.    THE UNCONSTITUTIONAL CONDITIONS DOCTRINE DOES
        NOT APPLY BECAUSE THE REGISTRATION PROGRAM SETS
        PERMISSIBLE RESTRICTIONS ON PARTICIPATION. ........................23

# TABLE OF CONTENTS
## (continued)

**Page**

IV.  EVEN IF ANALYZED AS A REGULATION OF COMMERCIAL
SPEECH, SECTION 2(A) IS VALID UNDER THE CENTRAL
HUDSON TEST. .........................................................................................26

CONCLUSION ...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. Tata*,
  742 F.3d 563 (4th Cir. 2014) ...............................................................21

*Agency for Intern. Dev. v. Alliance for Open Society, Inc.*,
  133 S.Ct. 2321 (2013)......................................................8, 24, 25, 26

*Air Transp. Ass'n of Am. V. City & Cnty. of San Francisco*,
  992 F. Supp. 1149 (C.D. Cal. 1998) ..................................................28

*B&B Hardware, Inc. v. Hargis Indus.*,
  135 S. Ct. 1293 (2015)........................................................................2

*In re Bacharach*,
  780 A.2d 579 (2001) .........................................................................10

*Bd. of Trs. of the Emps' Retirement Sys. of Balt. v. Mayor and City Council
  of Balt.*,
  562 A.2d 720 (Md. 1989) ..............................................................27, 28

*Bd. of Trs. v. Fox*,
  492 U.S. 469 (1989)......................................................................12, 29

*Blackhorse v. Pro-Football, Inc.*,
  2014 WL 2757516 (T.T.A.B. June 18, 2014).............................*passim*

*Brother Records, Inc. v. Jardine*,
  318 F.3d 900 (9th Cir 2003) .............................................................12

*by Berger v. ACLU of N.C.*,
  No. 14-35, 2015 BL 206217 (U.S. June 29, 2015)............................21

*Cent. Hudson Gas & Elec. v. Public Serv. Comm'n*,
  447 U.S. 557 (1980).........................................................................9, 27

*In re City of Houston*,
  731 F.3d 1326 (Fed. Cir. 2013) ......................................................3, 7

# TABLE OF AUTHORITIES
### (continued)

Page

*CPC Int'l, Inc. v. Skippy, Inc.*,
  214 F.3d 456 (4th Cir. 2000) ...........................................................12

*In re Fox*,
  702 F.3d 633 (Fed. Cir. 2012) ....................................................27, 29

*Johanns v. Livestock Mktg. Assn.*,
  544 U.S. 550 (2005)................................................................13, 19

*Lamparello v. Falwell*,
  420 F.3d 309 (4th Cir. 2005) ...........................................................11

*Lee v. Superior Court*,
  11 Cal. Rptr. 2d 763 (Cal. App. 1992)................................................10

*In re McGinley*,
  660 F.2d 481 (C.C.P.A. 1981) ...................................................*passim*

*Mut. of Omaha Ins. Co. v. Novak*,
  836 F.2d 397 (8th Cir. 1987) ...........................................................11

*Nat'l A-1 Adver. v. Network Solutions, Inc.*,
  121 F.Supp.2d 156 (D.N.H. 2000)....................................................10

*Park 'N Fly v Dollar Park & Fly, Inc.*,
  469 U.S. 189 (1985)................................................................11, 21

*Perry v. McDonald*,
  280 F.3d 159 (2d Cir. 2001) ...........................................................28

*Playboy Enters. v. Netscape Commc'ns. Corp.*,
  354 F.3d 1020 (9th Cir. 2004) .........................................................12

*Pleasant Grove City, Utah v. Summum*,
  555 U.S. 460 (2009)......................................................................13

*Pro-Football, Inc. v. Blackhorse*,
  1:14-cv-01043-GBL-IDD, 2015 WL 4096277 (E.D. Va. July 8, 2015) .....*passim*

# TABLE OF AUTHORITIES
## (continued)

Page

*Rust v. Sullivan,*
  500 U.S. 173 (1991)........................................................23, 24, 25, 26

*San Francisco Arts & Athletics, Inc. v. U. S. Olympic Comm.,*
  483 U.S. 522 (1987)..................................................................11, 12

*San Juan Prods. v. San Juan Pools of Kan., Inc.,*
  849 F.2d 468 (10th Cir. 1988) ...........................................................11

*Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dept. of Motor Vehicles,*
  288 F.3d 610 (4th Cir. 2002) .............................................................20

*Sorrell v. IMS Health, Inc.,*
  131 S.Ct. 2653 (2011)......................................................................27

*In re Tam,*
  2013 WL 5498164 (TTAB 2013) .......................................................23

*In re Tam,*
  785 F.3d 567 (Fed. Cir. 2015) (Moore, J. additional views) ...............3

*Test Masters Educ. Servs., Inc. v. Singh,*
  428 F.3d 559 (5th Cir. 2005) .............................................................10

*Petition of Variable for Change of Name v. Nash,*
  190 P.3d 354 (N.M. Ct. App. 2008) ..................................................10

*Volkswagenwerk Aktiengesellschaft v. Wheeler,*
  814 F.2d 812 (1st Cir. 1987)............................................................3, 7

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  135 S. Ct. 2239 (2015).................................................................*passim*

*WV Ass'n of Club Owners and Fraternal Servs., Inc. v. Musgrave,*
  553 F.3d 292 (4th Cir. 2009) .............................................................23

**TABLE OF AUTHORITIES**
(continued)

Page

STATUTES, RULES & REGULATIONS

37 C.F.R. § 2.34 ................................................................................4

37 C.F.R. § 2.46 ................................................................................6

37 C.F.R. § 2.47 ................................................................................6

37 C.F.R. § 2.61 ................................................................3, 5, 9, 20

37 C.F.R. § 2.80 ................................................................................5

37 C.F.R. § 2.151 ..........................................................................5, 6

15 U.S.C. § 1051 ..........................................................................3, 4

15 U.S.C. § 1052 .....................................................................*passim*

15 U.S.C. § 1057 .....................................................................*passim*

15 U.S.C. § 1091 ................................................................................6

15 U.S.C. § 1115 ....................................................................6, 7, 21

15 U.S.C. § 1062 ................................................................................5

15 U.S.C. § 1063 ........................................................................5, 19

15 U.S.C. § 1064 ..............................................................................19

15 U.S.C. § 1070 ................................................................................5

15 U.S.C. § 1071 ................................................................................1

15 U.S.C. § 1125 ........................................................................3, 7

15 U.S.C. § 1127 ................................................................................2

Lanham Act, 15 U.S.C. §§ 1051 *et seq*................................................2

## TABLE OF AUTHORITIES
### (continued)

**Page**

Tex. Transp. Code Ann. § 504.801(c) ....................................................................18

**OTHER AUTHORITIES**

Esha Bandari, *'You're Not Wrong, You're Just an A\*\*hole,'* .................................13

## STATEMENT OF INTEREST

*Amici curiae* Amanda Blackhorse, Marcus Briggs-Cloud, Phillip Gover, Jillian Pappan, and Courtney Tsotigh are Native American individuals who successfully petitioned the Trademark Trial and Appeal Board ("TTAB") to cancel six trademark registrations of the Washington NFL football team. The TTAB found that the team's trademarks were ineligible for registration under Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), because they contain matter that may disparage Native Americans (the term "redskin" or a derivation of "redskin"). *See Blackhorse v. Pro-Football, Inc.,* 2014 WL 2757516 (T.T.A.B. June 18, 2014).

The team brought action in the Eastern District of Virginia, under 15 U.S.C. § 1071(b), to overturn the TTAB's decision. On July 8, 2015, the District Court granted summary judgment in favor of Ms. Blackhorse and the other *amici*. The District Court agreed with the TTAB that the team's trademarks are ineligible for federal registration under Section 2(a). *See Pro-Football, Inc. v. Blackhorse*, 1:14-cv-01043-GBL-IDD, 2015 WL 4096277, at *4, 20-21 (E.D. Va. July 8, 2015). The Court also rejected the team's argument that Section 2(a) violates the Free Speech Clause of the First Amendment. *See id.* at *8, 17.

*Amici* have an interest in ensuring that the United States Patent and Trademark Office implements Section 2(a) of the Lanham Act so that they can

avoid further insult resulting from the registration of marks that disparage them and other Native Americans.[1]

## STATEMENT OF THE CASE:  SUMMARY OF FEDERAL TRADEMARK REGISTRATION PROGRAM

As the *Blackhorse* District Court emphasized, this case involves the USPTO's refusal to issue *trademark registrations*.  It does *not* involve the invalidation of the trademark themselves.  *See Blackhorse*, 2015 WL 4096277, at *6-7.  Accordingly, a review of the federal registration program is required.

### A.     Trademarks And Registrations.

A trademark is a word, name, symbol or combination thereof, that is used in commerce to identify and distinguish the goods or services of one entity from the goods or services of others.  15 U.S.C. § 1127; *B&B Hardware, Inc. v. Hargis Indus.*, 135 S. Ct. 1293, 1300 (2015).  Trademark rights arise from use of a mark in commerce, not due to any Government action.  *See id.*

The Lanham Act, 15 U.S.C. §§ 1051 *et seq*., establishes a mechanism for the owner of a trademark to apply for a federal registration from the United States Patent and Trademark Office ("USPTO") for its mark.  A registration is *not* required for a trademark owner to use or enforce its trademark against others.

---

[1] Counsel for the *amici* listed above authored this brief in its entirety.  No party or party's counsel authored the brief in whole or in part, nor did anyone, other than *amici* or their counsel, contribute money intended to fund preparing or submitting this brief.

This Court has held that a trademark that is not eligible for registration *may be enforced* under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a).  *See In re City of Houston*, 731 F.3d 1326, 1331 (Fed. Cir. 2013) (stating that a trademark that was ineligible for registration under Section 2 of the Lanham Act may be enforced under Section 43).  Section 43 allows for both injunctive relief and damages.  15 U.S.C. § 1125(a).  Likewise, "cancellation of a trademark registration does not extinguish common law rights [to enforce the mark] that registration did not create."  *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 819 (1st Cir. 1987).[2]

### B.     USPTO Process For Reviewing And Issuing Registrations.

USPTO Examining Attorneys review registration applications to determine whether they meet federal statutory and USPTO administrative requirements for registration.  15 U.S.C. § 1051; 37 C.F.R. § 2.61.  Section 2 of the Lanham Act contains numerous statutory bars to registration.  For instance, it provides that a mark may not be registered if, among other things, it contains or comprises matter that:

---

[2] Judge Moore's Additional Views opinion suggested that an unregistrable trademark cannot be enforced under Section 43 of the Lanham Act.  *In re Tam*, 785 F.3d 567, 576 (Fed. Cir. 2015) (Moore, J. additional views).  That position is contradicted by *City of Houston*, 731 F.3d at 1331, and is contrary to the plain language of 15 U.S.C. § 1125(a).  The Brief of *Amicus Curiae* International Trademark Association in Support of Neither Party persuasively demonstrates that trademarks that are not eligible for federal registration are in fact enforceable. [Dkt. 70].

- is "immoral" or "scandalous";

- "may disparage" persons, institutions, beliefs or national symbols;

- may bring persons, institutions, beliefs or national symbols into "contempt or disrepute";

- contains a geographical indication for wine or spirits other than the place of origin of the goods;

- depicts the flag or coat of arms or other insignia of the United States, a state or a municipality, or a foreign nation, or a simulation thereof;

- consists of the name, portrait or signature of a living person without that person's consent;

- is primarily a surname; or

- is functional.

15 U.S.C. § 1052(a)-(e). (Each of these provisions would be at risk if this Court finds the disparagement prohibition of Section 2(a) unconstitutional.)

Applicants must also specify a sufficient "basis" to support registration. 15 U.S.C. § 1051; 37 C.F.R. § 2.34. They may apply, for instance, based on their current use of the mark in commerce, their "intent to use" a mark in commerce, their foreign registration certificate, or other reasons. *Id.* If an applicant does not specify a valid basis – *e.g.*, if the applicant claims "current use" but does not

provide an acceptable specimen demonstrating use of the mark in U.S. commerce – the Examining Attorney must refuse registration.  37 C.F.R. § 2.61.

If an Examining Attorney refuses registration, as occurred with Tam's application, the applicant may appeal to the TTAB.  15 U.S.C. § 1070. Alternatively, if the Examining Attorney believes that the application satisfies registration criteria, the USPTO publishes the application in the *Official Gazette,* a USPTO weekly periodical available in both print and online formats.  15 U.S.C. §1062; 37 C.F.R. §§ 2.61 & 2.80.  For 30 days following publication in the *Official Gazette*, a third party who believes it might be damaged by registration of the mark may object by filing an opposition proceeding with the TTAB.  *See* 15 U.S.C. § 1063.  The TTAB will then determine whether the opposition has merit and whether the USPTO should issue a registration certificate.

Alternatively, if there is no objection after publication in the *Official Gazette*, the USPTO will issue a Notice of Allowance or registration certificate to the applicant and will list the mark on the Principal Register.  15 U.S.C. § 1057; 37 C.F.R. § 2.151.

Following this review process, if the USPTO approves a registration application, it will issue a registration certificate. As set forth in the statute, a registration certificate is "issued in the name of the United States of America," "under the seal of the United States Patent and Trademark Office" and must be

"signed by the Director" of the USPTO.  15 U.S.C. § 1057(a).  Further, if the USPTO approves a registration application, it will publish the trademark on the federal trademark registry, which is the official record of all trademarks registered by the United States.  *See* 15 U.S.C. § 1057.  The USPTO maintains two separate registers, a "Principal Register" and a "Supplemental Register."  15 U.S.C. §§ 1057, 1091; 37 C.F.R. §§ 2.46-2.47, 2.151.  Members of the public or other trademark owners review the USPTO's registers to determine which marks have received USPTO registration.

### C.    Effect Of USPTO Registration.

Publication by the USPTO of a registration on the Principal Register leads to certain benefits for the trademark owner, such as providing constructive notice to the public of ownership, and constituting *prima facie* evidence of validity, ownership, and the exclusive right to use.  *See* 15 U.S.C. §§ 1057(b), 1115(a).  After five years, these presumptions may become "incontestable."  *See id*. §§ 1065, 1115(b).

In addition, in an infringement action, the owner of a registered mark may be able to recover treble profits and attorneys' fees, and registration of a mark is a factor to consider in whether a mark is "famous" such that the trademark owner can bring an "anti-dilution" claim against others.  *See id*. §§ 1117, 1125(c).  A

registration may also be filed with the Customs Service to prevent importation of infringing foreign goods. *See id*. § 1124.

The fact that a trademark is not eligible under the Lanham Act for registration does not mean the trademark is not enforceable. As noted above, the owner of an *unregistrable* mark may bring an infringement action under the Lanham Act and the common law for injunction or damages. *See* 15 U.S.C. § 1125(a); *See In re City of Houston*, 731 F.3d 1326, 1331 (Fed. Cir. 2013); *Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 819 (1st Cir. 1987).

## SUMMARY OF ARGUMENT

1.    The Court should reaffirm *In re McGinley*, 660 F.2d 481, 484 (C.C.P.A. 1981). The refusal to register a trademark does not impair the applicant's free speech rights under the First Amendment. Trademark owners remain unencumbered to use their trademarks as they wish. Section 2(a) concerns the registration of trademarks, not their use.

The argument that Section 2(a) violates the First Amendment turns trademark law on its head. The purpose of trademark law is to allow the owner of the mark to enjoin others from speaking. Refusing a registration does not prevent the trademark owner from any form of expression, but at most makes it more difficult to obtain an injunction to prevent others from speaking.

2.    The Government's decision whether to register a trademark falls within the Government speech doctrine and is therefore not subject to scrutiny under the Free Speech Clause.  A registration certificate is a Government document, "issued in the name of the United States of America," "under the seal of the United States Patent and Trademark Office" and "signed by the Director" of the USPTO.  15 U.S.C. § 1057(a).  Registration certificates and the federal Primary Register are the means by which the United States Government communicates to the public that a certain trademark is valid, the identity of the trademark owner, and the owner's right to exclusive use of the trademark.  *See id*. §§ 1057(b), 1072. The USPTO issues a registration based on criteria established by Congress.  Under *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), the USPTO's registration decisions constitute Government speech that is not subject to scrutiny under the Free Speech Clause of the First Amendment.

3.    Section 2(a) sets a permissible condition for participation in the federal trademark registration program.  Under *Agency for Intern. Dev. v. Alliance for Open Society, Inc.*, 133 S.Ct. 2321 (2013), the Government may impose restrictions on participation in a government program so long as the restriction is not used to leverage the participant's conduct outside the program (on the participant's "own time and dime").  Here, Section 2(a) does not impose any restrictions on a trademark owner's ability to speak on its own time and dime. A

trademark owner can continue to disparage anyone it wants, using any words or symbols it chooses, without losing the ability to register marks that are not themselves disparaging.

4. If Section 2(a) is viewed as a regulation of private commercial speech, it is permissible under the test established in *Cent. Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 562-64 (1980). The Government has a substantial interest in not being associated with disparaging speech, and Section 2(a) closely fits that interest.

## **ARGUMENT**

## **I.    THIS COURT SHOULD UPHOLD *IN RE MCGINLEY*.**

The argument that Section 2 restrictions on registration violate the First Amendment has been rejected by every court to consider it. In *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981), the Court explained that a refusal to register does not restrict the trademark owner's right to use the mark or to engage in any form of expression:

> With respect to [the trademark owner's] First Amendment rights, it is clear that the PTO's refusal to register [his] mark does not affect his right to use it. No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, [his] First Amendment rights would not be abridged by the refusal to register his mark.

*McGinley*, 660 F.2d at 484 (internal citation omitted).

Other courts agree with *McGinley*, and no court has held that *McGinley* was wrongly decided. *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 578 n.9 (5th Cir. 2005) ("We join our sister circuit in rejecting Singh's argument that prohibiting him from registering a mark with the PTO violates his first amendment rights."); *Nat'l A-1 Adver. v. Network Solutions, Inc.*, 121 F.Supp.2d 156, 177-78 (D.N.H. 2000) (relying on *McGinley* in holding that refusal to register vulgar internet domain names did not violate the First Amendment); *Pro-Football, Inc. v. Blackhorse*, 1:14-cv-01043-GBL-IDD, 2015 WL 4096277, at *8-9 (E.D. Va. July 8, 2015) (citing *McGinley* and stating that "cancelling the registrations of the Redskins Marks … does not implicate the First Amendment as the cancellations do not burden, restrict, or prohibit PFI's ability to use the marks").

In a similar context, a number of courts have held that there is no Free Speech violation where a state refuses to permit an individual to officially change his or her name to an offensive term. Employing the same reasoning as *McGinley*, these courts have held that that since people can continue to use whatever names they choose for themselves without official approval, a state does not violate their free speech rights by denying name change petitions. *See Petition of Variable for Change of Name v. Nash*, 190 P.3d 354, 356 (N.M. Ct. App. 2008); *In re Bacharach*, 780 A.2d 579, 583 (2001); *Lee v. Superior Court*, 11 Cal. Rptr. 2d

763, 765 (Cal. App. 1992). The *Blackhorse* Court found these name-change cases persuasive. *See Blackhorse*, 2015 WL 4096277, at *10 n.5.

The argument that Section 2(a) restricts a trademark owner's First Amendment rights is logically flawed. The argument turns trademark law on its head. Trademark law is not a device to protect the Free Speech rights of the trademark holder, but to decrease the speech rights of everyone else.

Trademark law empowers trademark owners to limit the speech of the general public. It grants owners the right to enjoin others from using words and symbols that they want to use. *See San Juan Prods. v. San Juan Pools of Kan., Inc.,* 849 F.2d 468, 474 (10th Cir. 1988) (owning a trademark is a "right to exclude"). Thus, in *Park 'N Fly v Dollar Park & Fly, Inc*., 469 U.S. 189 (1985), a trademark owner successfully enjoined others from using the words "Park and Fly" in connection with their business. In *San Francisco Arts & Athletics, Inc. v. U. S. Olympic Comm.*, 483 U.S. 522 (1987), the United States Olympic committee barred a group from using the words "Gay Olympic Games." And in *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397 (8th Cir. 1987), a trademark owner enjoined an anti-nuclear activist from selling "Mutant of Omaha" t-shirts that warned of the dangers of nuclear war. In fact, "social and commercial discourse" can be chilled or even rendered "impossible" by the mere threat of a trademark infringement lawsuit. *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005)

Because trademark law restricts the speech of the general public, "the primary cost of recognizing property rights in trademarks is the removal of words from (or perhaps non-entrance into) our language."  *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 906 (9th Cir 2003) (internal quotation omitted).  Thus, when trademarks are enforced, it is only because doing so advances a substantial Government interest sufficient to justify the speech restrictions on the public.  *See San Francisco Arts & Athletics*., 483 U.S. at 534-535; *CPC Int'l, Inc. v. Skippy, Inc.*, 214 F.3d 456, 461-62 (4th Cir. 2000); *see also Bd. of Trs. v. Fox*, 492 U.S. 469, 476 (1989) (citing trademark-law as an example of a restriction on public speech rights because trademark enforcement advances a substantial Government interest).  Thus, the Lanham Act was adopted pursuant to Congress's Constitutional power to regulate interstate commerce, not to protect First Amendment rights of trademark owners.  *See Playboy Enters. v. Netscape Commc'ns. Corp.*, 354 F.3d 1020, 1024 n.11 (9th Cir. 2004).

In a press release announcing its intention to file an *amicus* brief in *Blackhorse*, the ACLU admitted that refusing a trademark registration results in reducing the trademark owner's ability to restrict the speech of others:

> Furthermore, cancelling the Washington team's trademark may not even be effective, because cancelling a trademark doesn't prevent the team from using it.  *It does, however, make it easier for other people to disseminate it.  So the Trademark Office decision in this case might result in even more use of a distasteful term – not less.*

Esha Bandari, *'You're Not Wrong, You're Just an A\*\*hole,'* ACLU Blog of Rights (Mar. 6, 2015), https://www.aclu.org/blog/free-speech/youre-not-wrong-youre-just-ahole (emphasis added).  But making it "easier for other people" to use the words and symbols of their choice means that more speech – not less speech – is legally permitted.

In sum, the right to enjoin others from using certain words or symbols is not a right arising under the First Amendment.  It is a right arising under trademark law.  Thus, refusing a trademark registration, and thereby possibly making it more difficult for a trademark owner to obtain an injunction or other relief, will not reduce any rights protected by the First Amendment.  It will at most reduce rights enjoyed under trademark law to silence others.

For these reasons, *McGinley* was correctly decided.

## II.   ISSUING A TRADEMARK REGISTRATIONS IS GOVERNMENT SPEECH THAT IS NOT SUBJECT TO FIRST AMENDMENT CHALLENGE.

Under the Government speech doctrine, "[w]hen the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S.Ct. 2239, 2245 (2015); *see also Johanns v. Livestock Mktg. Assn.*, 544 U.S. 550, 553, (2005).  "The Free Speech Clause restricts government's regulation of private speech; it does not regulate government speech."  *Pleasant Grove City, Utah v. Summum*,

13

555 U.S. 460, 467 (2009).  When the Government expresses a message, the statements, actions and programs that it uses "do not normally trigger the First Amendment Rules designed to protect the marketplace of ideas." *Walker*, 135 S.Ct. at 2245-46.  Because the Government "is entitled to promote a program, to espouse a policy, or to take a position" through its speech, when the Government speaks it can discriminate between viewpoints.  *Id.* at 2246.

### A.     A USPTO Registration Certificate Is A Government Document And The Trademark Registries Are Government Registries.

The Lanham Act requires that a USPTO registration certificate be issued in the name of the United States of America, under the seal of the USPTO, and that it be signed by the Director of the USPTO.  15 U.S.C. § 1057(a).  The statute further requires that the registration certificate "shall reproduce the mark" and "state that the mark is registered on the principal register."  *Id.*   By way of example, an image of a recently issued registration certificate is below:



# GOOGLE

Reg. No. 4,525,914

**Registered May 6, 2014**

Int. Cl.: 35

**SERVICE MARK**

**PRINCIPAL REGISTER**

GOOGLE INC. (DELAWARE CORPORATION)
1600 AMPHITHEATRE PARKWAY
MOUNTAIN VIEW, CA 94043

FOR: ON-LINE RETAIL STORE SERVICES FEATURING CONSUMER GOODS OF OTHERS; ADVERTISING AND PROMOTING THE GOODS AND SERVICES OF OTHERS VIA A GLOBAL COMPUTER NETWORK; PROMOTING THE GOODS AND SERVICES OF OTHERS BY PROVIDING A WEBSITE FEATURING COUPONS, OFFERS, REBATES, REWARD CARDS, CONSUMER REVIEWS, LINKS TO THE RETAIL WEBSITES OF OTHERS, ONLINE CATALOGS FEATURING A WIDE VARIETY OF CONSUMER GOODS OF OTHERS, COMPARISON SHOPPING, AND DISCOUNT INFORMATION; PROVIDING COMMERCIAL ASSISTANCE TO ADVERTISERS IN CREATING, MANAGING, AND ORGANIZING ONLINE ADVERTISING AND ONLINE PRODUCT LISTINGS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 5-0-2011; IN COMMERCE 5-0-2011.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 86-116,485, FILED 11-12-2013.

KRISTIN CARLSON, EXAMINING ATTORNEY



*Michelle K. Lee*

**Deputy Director of the United States**
**Patent and Trademark Office**

*See* Declaration of Jeffrey J. Lopez (attached) ("Lopez Decl.") Ex. 1.

If this Court rules that Section 2(a) of the Lanham Act is unconstitutional, the USPTO would need to issue registration certificates "in the name of the United States," "under the seal of the USPTO" that are "signed by the Director" with ugly racist, disparaging images.  15 U.S.C. § 1057(a).  The following page provides examples of racist trademarks that were registered before enactment of the Section 2(a) prohibition against disparaging marks.



*See* Lopez Decl. Exhibits 2-10.

The Free Speech Clause does not obligate the Government to issue registration certificates placing the United States name, the USPTO seal, and the Director's signature over hateful words and symbols, such as these.

**B.** **Trademark Registrations Are Government Speech Based On The Factors Considered In *Walker*.**

In *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), the Court rejected a Free Speech Clause challenge to the State of Texas's refusal to issue specialty license plates featuring the Confederate battle flag. The Texas statute provided that the relevant State agency could refuse to create a specialty license plate "if the design might be offensive to any member of the public." Tex. Transp. Code Ann. § 504.801(c); *Walker*, 135 S. Ct. at 2244-45. The Supreme Court held that the refusal to issue a possibly offensive specialty license plate was an exercise of Government speech and therefore not subject to challenge on Free Speech Clause grounds. *Walker*, 135 S. Ct. at 2246, 2252-53.

In *Walker*, the Court did not establish a specific test for courts to apply in assessing the Government speech doctrine. Rather, whether the doctrine applies depends on the particular facts and circumstances presented and is decided on a case by case basis. The Court found that three factors weighed in favor of Government speech in the context of the Texas specialty license plate program. First, the Court found that license plates had historically communicated government messages. *Walker*, 135 S.Ct. at 2248. Second, the Court found that the public closely associates the messages on license plates with the government, in part because the name of the issuing state is a part of every plate. *Id.* Finally, the Court found that the state had "effectively controlled" the messages it

18

conveyed by having "final approval authority" over the messages. *Id.* at 2249 (quoting *Johanns*, 544 U.S. at 560-61).

As the *Blackhorse* District Court found, each of the three factors supports finding that trademark registrations are Government speech. *Blackhorse* , 2015 WL 4096277, at *12-13. First, a trademark registration and the federal trademark registries are the means by which the USPTO communicates to the public that the trademark is valid, the identity of the owner, and that the owner has the exclusive right to use the mark, subject to any limitations that the USPTO also communicates via the registration certificate. *Id.* § 1057(b).

Second, a registration certificate – unlike the underlying trademark itself – satisfies the second factor in Walker, that the certificate be associated with the Government. As noted, registration certificates are "issued in the name of the United States of America, under the seal of the United States Patent and Trademark Office, and shall be signed by the Director or have his signature placed thereon." *Id.* Like license plates that print the name of the issuing state, a certificate reveals on its face that it is a Government document. *See* Lopez Decl. Ex. 1. Indeed, when parties seek to oppose or cancel the registration of another party's trademark, they must petition the Trademark Trial and Appeal Board for the obvious reason that a registration certificate is a Government communication and the Principal Register is a Government database. *See* 15 U.S.C. §§ 1063-64.

The third *Walker* factor also weighs in favor of finding that USPTO registrations are Government speech.  Congress created the standards for registration in Section 2 of the Lanham Act, and the USPTO exclusively administers the registration program.  The Government thus possesses "final approval authority" over what is included in the Principal Register and which registration certificates it issues.  Just as the State of Texas retained authority to refuse to create license plate designs that "might be offensive to any member of the public" in *Walker*, Congress retained the right to deny federal trademark registrations to those trademarks that "may disparage."

## C.    Trademark Registrations Are Government Speech Under The Fourth Circuit's Four-Factor Test.

Of all the Circuit Courts, the Fourth Circuit has formulated the most-developed standard for analyzing the Government speech doctrine.  The Fourth Circuit has identified four "instructive" factors to consider in whether speech is that of the Government or a private party: (1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech.  *See Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dept. of Motor Vehicles*, 288 F.3d 610, 618 (4th Cir. 2002).  These factors are to be considered as part of a "flexible

approach" and are neither "exhaustive nor always uniformly applicable." *ACLU v. Tata*, 742 F.3d 563, 569 (4th Cir. 2014)), *judgment vacated and case remanded by Berger v. ACLU of N.C.*, No. 14-35, 2015 BL 206217 (U.S. June 29, 2015) (internal quotation omitted) (finding that "Choose Life" license plate was private speech vacated in light of *Walker*). Here, each of the four factors weighs in favor of concluding that trademark registration and cancellation decisions constitute Government speech.

First, the "central purpose" of the registration program is to advance traditional governmental functions – consumer protection and the protection of private property. *See Park 'N Fly*, 469 U.S. at 207. The objective of the Lanham Act is "the protection of trade-marks, securing to the owner the goodwill of his business, and protecting the public against spurious and falsely marked goods." S. Rep. No. 79-1333, at 3 (1946) *reprinted in* 1946 U.S.C.C.A.N. 1274. Furthermore, the message conveyed by a registration is a Governmental message, not a private message. A registration communicates certain evidentiary presumptions about a mark, namely, *prima facie* evidence that the mark is valid, that the registrant owns the mark, and that the owner has an exclusive right to use the registered mark in commerce. *See* 15 U.S.C. §1057(b), 1115(a). Only the Government can establish or cancel evidentiary presumptions, and it is the Government that communicates to

21

the public whether it has granted the evidentiary presumptions though the Principal Register.

As to the second factor, the Government has absolute "editorial control" over what is published in the Principal Register, *i.e.*, over the marks that are registered.  As noted, Congress enacted a statute providing the Government editorial control over the Principal Register and the criteria for registration.  *See* 15 U.S.C. § 1052; *see also Walker*, 135 S. Ct. at 2249 (Texas had absolute editorial control over specialty license plates where state statute set standards and state agency administered program).  USPTO employees, Examining Attorneys and Administrative Trademark Judges decide which marks will be registered and published on the Principal Register based on the extensive statutory criteria of 15 U.S.C. § 1052.

Third, the Government is the "literal speaker."  The USPTO is the publisher of the Principal Register and is the agency that makes registration and cancellation decisions.  The registration certificate, which is offered as proof of the evidentiary presumptions that come with registration, is issued in the name of the United States of America under the seal of the United States Patent and Trademark Office, is signed by the USPTO Director, and a record of it is kept in the USPTO.  15 U.S.C. § 1057.  Likewise, USPTO is the speaker when it refuses or cancels registrations, such as when the TTAB issued its opinion explaining why Tam's trademark is

ineligible for registration.  *See In re Tam,* 2013 WL 5498164 (TTAB 2013).

Fourth, the Government bears ultimate responsibility for the content of the registration certificate and the Principal Registry.  Congress enacted the Lanham Act, including the content of a registration certificate and the establishment of the Principal Registry.  15 U.S.C § 1057.  Congress also established the criteria for registration eligibility.  15 U.S.C. § 1052.  And the USPTO is responsible for applying the criteria, issuing certificates, and maintaining the Principal Register.  If the public objects to the registration program or its administration, it can press its elected officials for a change.  *See WV Ass'n of Club Owners and Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 299 (4th Cir. 2009) ("The fact that the state is conveying a message for which it is politically accountable suggests that the speech at issue is government speech.").

Thus, applying the Fourth Circuit test for Government speech, Section 2(a) is not subject to review under the Free Speech Clause.

## III.   THE UNCONSTITUTIONAL CONDITIONS DOCTRINE DOES NOT APPLY BECAUSE THE REGISTRATION PROGRAM SETS PERMISSIBLE RESTRICTIONS ON PARTICIPATION.

In addition, Section 2(a) does not violate the Free Speech Clause because the federal trademark registration program sets permissible limits on participation.

In *Rust v. Sullivan*, 500 U.S. 173, 194 (1991), the Court explained that when the Government creates and manages a program, it may determine the content and

limits of that program.  The Court in *Rust* upheld regulations that restricted the

speech of recipients of federal grants for family planning projects.  Under the

regulations, as part of federally funded family planning projects, grant recipients

were barred from counseling about abortion, making referrals to abortion

providers, or providing information about abortion as a method of family planning.

*See Rust*, 500 U.S. at 193.  The Court held that because the Government was free

to define the limits of the program it was supporting, it could bar grant recipients

from promoting abortion as a family planning method within the federally funded

programs.  *See id*. at 193-94.

In *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct.

2321, 2330 (2013) ("*Open Society*"), the Court further clarified that the

Government may impose speech conditions on parties who wish to participate in

Government programs.  The Court explained that the Government *may restrict*

participants in programs from engaging certain speech but *may not leverage*

*participation* in the program as a means of restricting the participant's speech

outside the program.  "[T]he relevant distinction … is between conditions that

define the limits of the government spending program – those that specify the

activities that Congress wants to subsidize – and conditions that seek to leverage

funding to regulate speech outside the contours of the program itself."  *Id*. at 2328.

The Court distinguished "between conditions that define the federal program [permissible] and those that reach outside it [impermissible]." *Id*. at 2330.

In *Open Society*, the Court considered requirements that to receive federal grants to combat HIV/AIDS around the world, grant applicants must: (i) not use funds to advocate the legalization of prostitution or sex trafficking and  (ii) adopt a "policy explicitly opposing prostitution and sex trafficking" (the "Policy Requirement"). *Id*. at 2324.  There was no challenge as to the first requirement barring grant recipients from using federal funds to advocate the legalization of prostitution; the first requirement is permissible under *Rust*.  *Id*. at 2330.  In *Open Society*, the Court held the second requirement violated the First Amendment because it imposed a speech restriction that went beyond the federal program.  *Id*. at 2332.  As the Court explained, "[a] recipient cannot avow the belief dictated by the Policy Requirement when spending [Government] funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime.  By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient." *Id*. at 2330.

The federal registration program qualifies as permissible Government speech under *Open Society*.  The Lanham Act's registration criteria *define* the Government's program and do not limit anyone's freedom of expression when

"participating in activities on [their] own time and dime." *See id*. at 2330. These are the requirements of the registration program, not devices to leverage speech outside of the program.

The relevant question under *Open Society* is whether, when the Government issues a trademark registration, it compels the trademark owner to speak or to refrain from speaking in any way. The answer to that question is "no." A trademark owner can continue to disparage anyone it wants, using any words or symbols it chooses, without losing the ability to register marks that are not themselves disparaging. In sum, the federal registration program's eligibility criteria are "well within the constitutional boundaries set forth in *Rust* and reaffirmed in *Open Society*." *Blackhorse*, 2015 WL 4096277, at *16.[3]

## IV.  EVEN IF ANALYZED AS A REGULATION OF COMMERCIAL SPEECH, SECTION 2(A) IS VALID UNDER THE *CENTRAL HUDSON* TEST.

As explained above, Section 2(a) does not abridge the First Amendment rights of trademark owners. In addition, decisions to grant, refuse, or cancel

---

[3] Appellant argues that the Government can only set conditions for participating in programs that are "spending" programs in which the Government grants money to recipients. *See* Appellant's En Banc Brief at 18-20 [Dkt. _____].  This argument lacks merit.  As the United States explains, the Government may set conditions for programs regardless of the enumerated power exercised by Congress. *See* [Dkt. 128] En Banc Brief of Appellee at 28-31 [Dkt. 128].  Further, the fact that registration applicants are charged fees intended to equal the USPTO's operating costs is not relevant to the analysis of whether the conditions of a government program are permissible. *See id*.

registrations are Government speech, not private speech, and are permissible

conditions of a Government program.

Even if Section 2(a) were reviewed under the test for commercial speech

regulation, however, it is permissible.  Regulation of commercial speech passes

First Amendment muster if the regulation "directly advances a substantial

government interest and the measure is drawn to achieve that interest." *Sorrell v.*

*IMS Health, Inc.*, 131 S.Ct. 2653, 2667-68 (2011).  *See also Central Hudson Gas*

*& Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 564 (1979) ("The State must assert

a substantial interest to be achieved by restrictions on commercial speech . . . [and]

the regulatory technique must be in proportion to that interest.").  Here, the Section

2(a) prohibition against registering marks that may disparage satisfies the test.

While it may have other substantial interests as well, the government

certainly has a substantial interest in dissociating itself from commercial

trademarks that may disparage fellow American citizens or others, especially

marks that may disparage based on ethnicity or race.  *See* Lopez Decl. Exs. 2-10;

*see also  In re McGinley*, 660 F.2d at 486 (describing Congress's desire that the

United States Government not associate with disparaging trademarks through the

registration program); *In re Fox,* 702 F.3d 633, 640 (Fed. Cir. 2012).

In *Bd. of Trs. of the Emps' Retirement Sys. of Balt. v. Mayor and City*

*Council of Balt.*, 562 A.2d 720 (Md. 1989), the Maryland Court of Appeals

explained Baltimore's interest in disassociating itself from racial discrimination as it upheld an ordinance requiring divestiture from companies doing business in South Africa during apartheid:

> [I]t is indisputable that the Ordinances effectuate legitimate, local public interests. . . . They permit the City and its citizens to distance themselves from the moral taint of coventuring in firms that, in the view of many, help to maintain South Africa's system of racial discrimination. Finally, they express the City's sensitivity to the deep feeling of its citizenry on this matter of fundamental human dignity.

*Id.* at 143.

Just as Baltimore wanted to avoid the "moral taint" of associating with firms that did business in South Africa and wanted to express sensitivity to the feelings of its citizens on a "matter of fundamental human dignity," Congress wanted to avoid the moral taint from registering marks that may disparage. *See also Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir. 2001) (recognizing Vermont's interest in "not associating the State with such [offensive] speech" when it issues vanity license plates); *Air Transp. Ass'n of Am. V. City & Cnty. of San Francisco*, 992 F. Supp. 1149, 1164 (C.D. Cal. 1998) (holding that San Francisco had an interest in dissociating itself from contractors whose employee benefit plans discriminated between employees with opposite-sex spouses and employees with same-sex domestic partners). Although these cases arose in the Dormant Commerce Clause context, the point that the Government has a substantial interest in disassociating itself from disparaging messages applies equally to the First Amendment context.

28

Finally, Section 2(a) closely fits the government's interest in avoiding any further association with these sorts of disparaging marks. Refusing to register these marks ensures that "such marks not occupy the time, services, and use of funds of the federal government" without reducing common law protections or restricting the right to use the marks. *In re McGinley*, 660 F.2d at 486; *see also In re Fox,* 702 F.3d 633, 640 (Fed. Cir. 2012); *PFI v. Blackhorse*, 2015 WL 4096277, at *17. A refusal to register marks that "may disparage" persons, closely fits the government's interest in dissociating from words and symbols, like the ones shown above, that may harm members of the public. See *Bd. of Trs., State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring a reasonable fit, proportionate to the interest served).

## **CONCLUSION**

For these reasons, the Court should find that the bar on registration of

disparaging marks in 15 U.S.C. § 1052(a) does not violate the First Amendment.


Dated:        July 23, 2015                          By: /s/ Jeffrey J. Lopez

                                                    Jeffrey J. Lopez
                                                    Jesse A. Witten
                                                    DRINKER BIDDLE & REATH
                                                    LLP
                                                    1500 K Street N.W., Suite 1100
                                                    Washington, DC  20005-1209
                                                    Telephone:(202) 842-8800
                                                    Facsimile: (202) 842-8465

                                                    Attorneys for *Amici Curiae*
                                                    AMANDA BLACKHORSE, MARCUS
                                                    BRIGGS-CLOUD, PHILLIP GOVER,
                                                    JILLIAN PAPPAN and COURTNEY
                                                    TSOTIGH

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

IN RE SIMON SHIAO TAM,

              Appellant,

Case no. 2014-1203

---

**DECLARATION OF JEFFREY J. LOPEZ
IN SUPPORT OF BRIEF OF AMICI CURIAE
AMANDA BLACKHORSE, MARCUS BRIGGS-CLOUD,
PHILLIP GOVER, JILLIAN PAPPAN, AND COURTNEY TSOTIGH**

I, JEFFREY J. LOPEZ, declare:

1.      I am a partner in the Washington, DC, office of Drinker Biddle & Reath LLP, counsel for amici in the above-captioned proceeding.  I represented amici before both the Trademark Trial and Appeal Board and the Eastern District of Virginia regarding their successful petition to cancel the registration of certain trademarks using the word "redskins" or variations thereof.

2.      The record in those proceedings incorporated the record from a previous proceeding challenging the registration of marks using the word "redskins" or variations thereof, *Harjo et al. v. Pro Football, Inc.*, Case No. 21,069 (T.T.A.B.).  Exhibits 2 through 10 were part of the record in the *Harjo* proceeding.  I have personal knowledge of the facts set forth herein and would testify under oath consistent with this Declaration if called upon to do so.

3.      **Exhibit 1** is an image of the registration certificate for U.S. Federal Registration No. 4,525,914, downloaded from the USPTO Trademark Status & Document Retrieval system.

4.      **Exhibit 2** is a certified copy of the registration certificate for U.S. Federal Registration No. 57,575.

5.      **Exhibit 3** is a certified copy of the registration certificate for U.S. Federal Registration No. 158,452.

6.      **Exhibit 4** is a certified copy of the registration certificate for U.S. Federal Registration No. 160,641.

7.      **Exhibit 5** is a certified copy of the registration certificate for U.S. Federal Registration No. 136,444.

8.      **Exhibit 6** is a certified copy of the registration certificate for U.S. Federal Registration No. 178,611.

9.      **Exhibit 7** is a certified copy of the registration certificate for U.S. Federal Registration No. 221,097.

10.     **Exhibit 8** is a certified copy of the registration certificate for U.S. Federal Registration No. 301,747.

11.     **Exhibit 9** is a certified copy of the registration certificate for U.S. Federal Registration No. 186,950.

12.     **Exhibit 10** is a certified copy of the registration certificate for U.S. Federal Registration No. 217,067.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on July 23, 2015 in Washington, D.C.

/s/    Jeffrey J. Lopez

Jeffrey J. Lopez

# Exhibit 1

# United States of America

## United States Patent and Trademark Office

# GOOGLE

**Reg. No. 4,525,914**

**Registered May 6, 2014**

**Int. Cl.: 35**

**SERVICE MARK**

**PRINCIPAL REGISTER**

GOOGLE INC. (DELAWARE CORPORATION)
1600 AMPHITHEATRE PARKWAY
MOUNTAIN VIEW, CA 94043

FOR: ON-LINE RETAIL STORE SERVICES FEATURING CONSUMER GOODS OF OTHERS; ADVERTISING AND PROMOTING THE GOODS AND SERVICES OF OTHERS VIA A GLOBAL COMPUTER NETWORK; PROMOTING THE GOODS AND SERVICES OF OTHERS BY PROVIDING A WEBSITE FEATURING COUPONS, OFFERS, REBATES, REWARD CARDS, CONSUMER REVIEWS, LINKS TO THE RETAIL WEBSITES OF OTHERS, ONLINE CATALOGS FEATURING A WIDE VARIETY OF CONSUMER GOODS OF OTHERS, COMPARISON SHOPPING, AND DISCOUNT INFORMATION; PROVIDING COMMERCIAL ASSISTANCE TO ADVERTISERS IN CREATING, MANAGING, AND ORGANIZING ONLINE ADVERTISING AND ONLINE PRODUCT LISTINGS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 5-0-2011; IN COMMERCE 5-0-2011.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 86-116,485, FILED 11-12-2013.

KRISTIN CARLSON, EXAMINING ATTORNEY



*Deputy Director of the United States
Patent and Trademark Office*

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# Exhibit 2



# THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION     57,575 IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM *November 13, 1906*

SAID RECORDS SHOW TITLE TO BE IN:

*AUGHINBAUGH CANNING COMPANY*

*A BALTIMORE COMPANY*

By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

MICHELLE GRIFFIN

Certifying Officer

31.002

RENEWED

# UNITED STATES PATENT OFFICE.

## AUGHINBAUGH CANNING COMPANY, OF BALTIMORE, MARYLAND.

### TRADE-MARK FOR OYSTERS AND SHRIMP.

**No. 57,575.**      Statement and Declaration.      **Registered Nov. 13, 1906.**

Application filed May 11, 1906. Serial No. 19,459.

#### STATEMENT.

*To all whom it may concern:*

Be it known that the AUGHINBAUGH CANNING COMPANY, a corporation duly organized under the laws of the State of Maryland, and located in the city of Baltimore, in said State, and doing business at foot of Clement street, has adopted for its use the trade-mark shown in the accompanying drawing.

The trade-mark has been continuously used in our business since June 19, 1883.

The class of merchandise to which the trade-mark is appropriated is Class 54, Sea foods, and the particular description of goods comprised in said class upon which said trade-mark is used is oysters and shrimp hermetically sealed in tin or glass.

The trade-mark is displayed on the packages containing the goods by placing thereon a printed label on which the same is shown, and usually by printing or stenciling the same on the exterior of the wooden cases in which the goods are shipped.

AUGHINBAUGH CANNING COMPANY.

By F. A. TORSCH,
*Sec'y.*

#### DECLARATION.

State of Maryland, city of Baltimore, ss:

FREDERICK A. TORSCH, being duly sworn, deposes and says that he is the secretary of the corporation, the applicant named in the foregoing statement; that he believes the foregoing statement is true; that he believes said corporation is the owner of the trade-mark sought to be registered; that no other person, firm, corporation, or association, to the best of his knowledge and belief, has the right to use said trade-mark, either in the identical form or in any such near resemblance thereto as might be calculated to deceive; that said trade-mark is used by said corporation in commerce among the several States of the United States, and between the United States and foreign nations or Indian tribes, and particularly with the Dominion of Canada, Mexico and England; and that the description, drawing, and specimens presented truly represent the trade-mark sought to be registered.

F. A. TORSCH.

Subscribed and sworn to before me, a notary public, this 10th day of January, 1906.
[L. S.]
JOHN W. HEWES,
*Notary Public.*

# TRADE-MARK.

No. 57,575.

REGISTERED NOV. 13, 1906.

## AUGHINBAUGH CANNING COMPANY.
### OYSTERS AND SHRIMP.
APPLICATION FILED MAY 11, 1906.



*Aughinbaugh Canning Company*

*Proprietor*

By *C B Forsch*
Vice President.

# Exhibit 3



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS, SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION  *158,452* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM  *September 05, 1922*

SAID RECORDS SHOW TITLE TO BE IN:

   *A HARTER MFG. COMPANY*

   *A ILLINOIS COMPANY*

By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

MICHELLE GRIFFIN

Certifying Officer

31.004

Registered Sept. 5, 1922.

T. M. 158,452

BEST AVAILABLE COPY

# UNITED STATES PATENT OFFICE.

HARTER MFG. COMPANY, OF CHICAGO, ILLINOIS.

TRADE-MARK FOR ELECTRIC-LAMP SOCKETS, ELECTRIC-LAMP COVER SOCKETS, AND ELECTRIC-LAMP PLUGS.

ACT OF FEBRUARY 20, 1905.

Application filed March 26, 1921.   Serial No. 145,264.



## STATEMENT.

*To all whom it may concern:*

Be it known that HARTER MFG. COMPANY, an Illinois corporation located and doing business at 1856 Fulton St., Chicago, Illinois, has adopted and used the trade mark shown in the accompanying drawing, for electric-lamp sockets, electric-lamp cover sockets, and electric-lamp plugs, in Class No. 21, Electric apparatus, machines, and supplies.

The trade mark has been used continuously in the business of said corporation since February 28th, 1921.

The trade mark is applied or affixed to the goods or to packages containing the goods by placing thereon a printed label on which the trade mark is shown.

HARTER MFG. COMPANY,
By GUSTAV A. HARTER,
*President.*

# Exhibit 4



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION  *160,641* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM  *October 24, 1922*

SAID RECORDS SHOW TITLE TO BE IN:

*REEVES COAL AND DOCK CO.*

*OF MINNESOTA*

By Authority of the

**COMMISSIONER OF PATENTS AND TRADEMARKS**

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

**MICHELLE GRIFFIN**

Certifying Officer

31.005

Registered Oct. 24, 1922.

T. M. 160,641

BEST AVAILABLE COPY

# UNITED STATES PATENT OFFICE.

### REEVES COAL AND DOCK CO., OF MINNEAPOLIS, MINNESOTA.

#### TRADE-MARK FOR COAL.

#### ACT OF FEBRUARY 20, 1905.

Application filed June 1, 1922. Serial No. 164,789.



## STATEMENT.

*To all whom it may concern:*

Be it known that REEVES COAL AND DOCK Co., a corporation organized under the laws of the State of Virginia, and located in the city of Minneapolis, county of Hennepin, State of Minnesota, and doing business at 104 Lumber Exchange, in said city and State, has adopted and used the trade-mark shown in the accompanying drawing, for coal, in Class 1, Raw or partly-prepared materials, no claim being made for the word " Coal " except as associated with the rest of the mark.

The trade-mark has been continuously used in the business of said corporation since the 1st day of Oct., 1910.

The trade-mark is applied by printing or stenciling it upon the wagons used in transporting the goods, or by printing or stenciling it upon the sacks in which the coal is packed.

REEVES COAL AND DOCK CO.,
By G. H. REEVES,
*President.*

# Exhibit 5



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION  *136,444* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM  *November 02, 1920*

SAID RECORDS SHOW TITLE TO BE IN:

*GEORGE W. GRAHAM*

*OF NEW YORK*

By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

**MICHELLE GRIFFIN**

Certifying Officer

31.003

# UNITED STATES PATENT OFFICE.

GEORGE W. GRAHAM, OF NEW YORK, N. Y.

TRADE-MARK FOR STOVE-POLISH.

ACT OF FEBRUARY 20, 1905.

**136,444.**                                    **Registered Nov. 2, 1920.**

Application filed January 8, 1920. Serial No. 126,928.

## STATEMENT.

*To all whom it may concern:*

Be it known that I, GEORGE W. GRAHAM, a citizen of the United States of America, residing at Arlington, county of Hudson, and State of New Jersey, and doing business as GRAHAM PRODUCTS LABORATORIES, INC., at No. 109 Lafayette street, in the city of New York, borough of Manhattan, and State of New York, have adopted and used the trade-mark shown in the accompanying drawing,

for stove-polish, in Class No. 4, Abrasives, detergents, and polishing materials.

The trade-mark has been continuously used in my business since Oct. 30th, 1919.

The trade-mark is applied or affixed to the goods, or to the packages containing the same, by placing thereon a printed label on which the trade-mark is shown.

GEORGE W. GRAHAM.



## DECLARATION.

City of New York borough of Manhattan and State of New York ss:

GEORGE W. GRAHAM, being duly sworn, deposes and says that he is the applicant named in the foregoing statement; that he believes the foregoing statement is true; that he believes himself to be the owner of the trade-mark sought to be registered; that no other person, firm, corporation or association, to the best of his knowledge and belief, has the right to use said trade-mark in the United States, either in the identical form or in any such near resemblance thereto as might be calculated to deceive; that said trade-mark is used by him in commerce among the several States of the

United States and between the United States and foreign nations or Indian tribes, and particularly with England and France; that the description and drawing presented truly represent the trade-mark sought to be registered; and that the specimens show the trade-mark as actually used upon the goods.

GEORGE W. GRAHAM.

Subscribed and sworn to before me, a notary public, on this 31st day of December, 1919.

[L. s.]                         GEO. H. DEGÉ,
                                *Notary Public.*

# Exhibit 6



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

**United States Patent and Trademark Office**

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION  *178,611* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM  *January 15, 1924*

SAID RECORDS SHOW TITLE TO BE IN:

*ALEXANDRE RANNOU & CIE*

*OF FRANCE*

By Authority of the

**COMMISSIONER OF PATENTS AND TRADEMARKS**

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

**MICHELLE GRIFFIN**

Certifying Officer

31.006

Registered Jan. 15, 1924.

# Trade-Mark 178,611

# UNITED STATES PATENT OFFICE.

ALEXANDRE RANNOU & CIE., OF MARSEILLE, FRANCE.

ACT OF FEBRUARY 20, 1905.

Application filed January 22, 1923.   Serial No. 174,874.



## STATEMENT.

*To all whom it may concern:*

Be it known that we, Alexandre Rannou & Cie., a firm domiciled at Chemin Sainte-Marthe No. 74, in the city of Marseille, France, and doing business at Chemin de Sainte-Marthe No. 74, in said city of Marseille, have adopted for our use the trade-mark shown in the accompanying drawing, no claim being made to the following: "Brand, Dattes Muscades, Alexandre Rannou & Cie., Marseille," apart from the mark shown in the drawing.

The trade-mark has been continuously used in our business since the 1st November, 1913.

The class of merchandise to which the trade-mark is appropriated is Class 46, Foods and ingredients of foods, and the particular description of goods comprised in said class upon which said trade-mark is used is DATES.

The trade-mark is usually displayed on the packages containing the goods, by placing thereon a printed label on which the mark is shown.

Said trade-mark has been registered in France. No. 21,990, dated as of the 26th day of Oct., 1922, on an application filed the 26th day of Oct., 1922.  Otto Munk, whose postal address is 41 Park Row, city of New York, State of New York, is designated, on whom process or notice of proceedings affecting the right to ownership of said trade-mark brought under the laws of the United States may be served.

ALEXANDRE RANNOU & CIE.,
By ALEXANDRE RANNOU.
*A Member of the Firm.*

# Exhibit 7



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION  *221,097* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM  *November 23, 1926*

SAID RECORDS SHOW TITLE TO BE IN:

*PHILPOT BROKERAGE CO.*

*OF CALIFORNIA*

By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

MICHELLE GRIFFIN

Certifying Officer

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

31.011

Registered Nov. 23, 1926.

# Trade-Mark 221,097

BEST AVAILABLE COPY

# UNITED STATES PATENT OFFICE.

### PHILPOT BROKERAGE CO., OF SAN FRANCISCO, CALIFORNIA.

#### ACT OF FEBRUARY 20, 1905.

Application filed June 21, 1926.   Serial No. 233,574.



NIGGER HEAD

## STATEMENT.

*To the Commissioner of Patents:*

Philpot Brokerage Co., a corporation duly organized under the laws of the State of California, and located at San Francisco, California, and doing business at 53 Drumm Street, San Francisco, California, has adopted and used the trade-mark shown in the accompanying drawing, for G O L F I N G TEES, CLUBS, AND GRIPS, in Class 22, Games, toys, and sporting goods, and presents herewith five specimens showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the act of February 20, 1905, as amended.

The trademark has been continuously used and applied to said goods in applicant's business since March 23, 1926.

The trademark is applied to the goods by printing the mark directly on the packages containing the same.

Exclusive use of the picture representations of a golf tee is disclaimed apart from the mark as shown.

PHILPOT BROKERAGE CO.,
By THOMAS G. PHILPOT,
*Vice-President.*

# Exhibit 8



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION   301,747 IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM  *March 14, 1933*
SAID RECORDS SHOW TITLE TO BE IN:

   *PLES B. KENNERLY, DOING BUSINESS AS SWEETHEART ICE CREAM COMPANY*
   *A TEXAS COMPANY.*

By Authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

MICHELLE GRIFFIN
Certifying Officer

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

31.010

Registered Mar. 14, 1933

Trade-Mark 301,747

# UNITED STATES PATENT OFFICE

PLES B. KENNERLY, DOING BUSINESS AS SWEETHEART ICE CREAM COMPANY, OF
HOUSTON HEIGHTS, HOUSTON, TEXAS

ACT OF FEBRUARY 20, 1905

Application filed March 28, 1932.  Serial No. 325,582.



## STATEMENT

*To the Commissioner of Patents:*

Ples B. Kennerly, a citizen of the United States of America, residing at Houston, Texas, and doing business as Sweetheart Ice Cream Company at 316 West 19th Avenue, Houston Heights, Houston, Texas, has adopted and used the trade-mark shown in the accompanying drawing, for a NOVELTY CONFECTION CONSISTING OF CHOCOLATE-COVERED MOLDED ICE CREAM, in Class 46, Foods and ingredients of foods, and presents herewith five specimens showing the trade-mark as actually used by applicant upon the goods, and re-

quests that the same be registered in the United States Patent Office in accordance with the act of February 20, 1905. The trade-mark has been continuously used and applied to said goods in applicant's business since April 1, 1931. The trade-mark is applied or affixed to the goods or to the packages containing the same by printing such trade-mark on the outside of paper bags in which the confection is delivered. The words "Prize" and "Ice Cream", and the representation of the goods are hereby disclaimed apart from the mark as shown in the drawing.

PLES B. KENNERLY.

# Exhibit 9



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION *186,950* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM *July 22, 1924*

*1ST* RENEWAL FOR A TERM OF *20* YEARS FROM *July 22, 1944*

SECTION 8

REPUBLISHED SECTION 12C

SAID RECORDS SHOW TITLE TO BE IN:

*W. B. RODDENBERY CO.,*

*OF GEORGIA*

By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

MICHELLE GRIFFIN

Certifying Officer

31.007

AFFIDAVIT SEC. 8
ACCEPTED

Registered July 22, 1924                         Trade-Mark 186,950

REPUBLISHED
Under Sec. 12 (c) 1946 Act   3-31-49

186,950.  NIGGER IN DE CANE PATCH.  CANE SIRUP
FOR FOOD PURPOSES.  Registered July 22, 1924.
WALTER BLAIR RODDENBERY.  Renewed July 22, 1944, to
W. B. Roddenbery Co., Cairo, Ga., a co-partnership,
assignee.

# UNITED STATES PATENT OFFICE.

WALTER BLAIR RODDENBERY, OF CAIRO, GEORGIA.

ACT OF FEBRUARY 20, 1905.

Application filed February 16, 1924.  Serial No. 192,431.



## STATEMENT.

*To all whom it may concern:*

Be it known that I, Walter Blair Rodden-bery, a citizen of the United States of America, residing at Cairo, Georgia, and doing business at Cairo, Georgia, have adopted and used the trade-mark shown in the accompanying drawing, for CANE SIRUP FOR FOOD PURPOSES, in Class 46, Foods and ingredients of foods, and presents herewith five specimens or facsimiles showing the trade-mark as actually used by applicant upon the goods, and requests that the same be registered in the United States Patent Office in accordance with the act of February 20, 1905, as amended.

The trade-mark has been continuously used and applied to said goods in applicant's business since December, 1899.

The trade-mark is applied or affixed to the goods, or to the packages containing the same by placing thereon a printed label on which the trade-mark is shown.

The undersigned hereby appoints Lee W. Mida and Arthur E. Wallace under the firm name of Mida & Wallace (attorneys of Mida's Trade-Mark & Patent Bureau) registration No. 11,626. whose postal address is 537 S. Dearborn Street. Chicago, Illinois, his attorneys, to prosecute this application for registration, with full powers of substitution and revocation, and to make alterations and amendments therein, to receive the certificate, and to transact all business in the Patent Office connected therewith.

WALTER BLAIR RODDENBERY.

# Exhibit 10



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

February 12, 1997

THE ATTACHED U.S. TRADEMARK REGISTRATION  *217,067* IS CERTIFIED TO BE A TRUE COPY OF THE REGISTRATION ISSUED BY THE UNITED STATES PATENT AND TRADEMARK OFFICE AND SUBSEQUENTLY NOT RENEWED.

REGISTERED FOR A TERM OF *20* YEARS FROM  *August 24, 1926*

*1ST* RENEWAL FOR A TERM OF *20* YEARS FROM  *August 24, 1946*

SAID RECORDS SHOW TITLE TO BE IN:

*STANDARD GROWERS EXCHANGE*

*A FLORIDA CORP.*

By Authority of the

COMMISSIONER OF PATENTS AND TRADEMARKS

MICHELLE GRIFFIN

Certifying Officer

Harjo, et al. v.
Pro-Football, Inc.
Case No. 21,069
Petitioners' Ex.

31.008

217,067. "NIGGER BABY" ETC. AND DRAWING.
FRESH ORANGES AND GRAPEFRUIT. Registered
Aug. 24, 1926. STANDARD GROWERS EXCHANGE, Orlando,
Fla. Renewed Aug. 24, 1926, to Di Giorgio Fruit Cor-
poration, San Francisco, Calif., a corporation of Dela-
ware. Class 46.

Registered Aug. 24, 1926

**RENEWED**

Trade-Mark 217,067

# UNITED STATES PATENT OFFICE.

STANDARD GROWERS EXCHANGE, OF ORLANDO, FLORIDA.

ACT OF FEBRUARY 20, 1905.

Application filed March 26, 1925.    Serial No. 211,718.



## STATEMENT.

*To the Honorable Commissioner of Patents:*

Standard Growers Exchange, a corpora-
tion duly organized under the laws of the
State of Florida, located and doing business
at Orlando, county of Orange, and State
of Florida, has adopted and used the trade-
mark shown in the accompanying drawing,
for FRESH ORANGES AND GRAPE-
FRUIT, in Class 46, Foods and ingredients
of foods, and presents herewith five speci-
mens showing the trade-mark as actually
used by applicant upon the goods and re-
quests that the same be registered in the
United States Patent Office in accordance
with the act of February 20, 1905, as
amended.

The trade mark has been continuously
used and applied to said goods in the busi-
ness of applicant and its predecessor since
September, 1914. The trade mark is ap-
plied or affixed to the goods or to the pack-
ages containing the same by placing thereon
a printed label on which the trade mark is
shown.

No claim is made herein to the registra-
tion of the words "Turn on the Juice",

"Brand", "4⅘ Bushels Net Contents",
"Standard Growers Exchange" and the rep-
resentation of the fruit apart from the mark
shown in the drawing. The colors as shown
on the specimens filed are as follows: the
solid circle and the central portion of the
outer border are dark blue; the double
pointed arrow and the triangle in each cor-
ner are red. The representation of the baby
sitting among the fruit is fanciful.

And your petitioner hereby appoints D.
Anthony Usina of No. 71 Broadway, New
York city, New York, its attorney to prose-
cute this application for registration, with
full power of substitution and revocation,
to make alterations and amendments there-
in, to sign the drawing, to receive the cer-
tificate of registration when issued, and to
transact all business in the Patent Office
connected therewith.

Signed at Orlando, Fla., this 17 day of
March, 1925.

[L. S.]        STANDARD GROWERS EXCHANGE.
                    By V. B. NEWTON,
                        *Vice President.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served a copy of the **BRIEF OF *AMICI CURIAE* AMANDA BLACKHORSE, MARCUS BRIGGS-CLOUD, PHILLIP GOVER, JILLIAN PAPPAN, AND COURTNEY TSOTIGH IN SUPPORT OF THE UNITED STATES** on counsel of record on July 23, 2015 by Electronic Means (CM/ECF).

Dated:      July 23, 2015

By: /s/ Jeffrey J. Lopez
Jeffrey J. Lopez
DRINKER BIDDLE & REATH LLP
1500 K Street N.W., Suite 1100
Washington, DC  20005-1209
Telephone:(202) 842-8800
Facsimile: (202) 842-8465

Attorneys for *Amici Curiae*
AMANDA BLACKHORSE, MARCUS BRIGGS-CLOUD, PHILLIP GOVER, JILLIAN PAPPAN and COURTNEY TSOTIGH

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e). The brief contains 6758 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

Dated:       July 23, 2015          By: /s/ Jeffrey J. Lopez
                                     Jeffrey J. Lopez
                                     DRINKER BIDDLE & REATH
                                     LLP
                                     1500 K Street N.W.
                                     Suite 1100
                                     Washington, DC  20005-1209
                                     Telephone:(202) 842-8800
                                     Facsimile: (202) 842-8465

                                     Attorneys for *Amici Curiae*
                                     AMANDA BLACKHORSE, MARCUS
                                     BRIGGS-CLOUD, PHILLIP GOVER,
                                     JILLIAN PAPPAN and COURTNEY
                                     TSOTIGH