No. 14-1203
(Serial No. 85/472,044)

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## *for the*
## 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

### IN RE: SIMON SHIAO TAM

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
TRADEMARK TRIAL AND APPEAL BOARD, SERIAL NO. 85/472,044

**REPLY BRIEF ON BEHALF OF APPELLANT
FOR *EN BANC* HEARING**

RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,
Simon Shiao Tam*

ON THE BRIEF:
  JOHN C. CONNELL
  DARTH M. NEWMAN

August 4, 2015

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ......................................................................................1

ARGUMENT...........................................................................................3

    I.     False Premises ...................................................................3

          A.     Trademark Registration is Not a Subsidy .................................3

          B.     Government Speech is Not at Issue Here .................................5

          C.     Section 2(a) Imposes Unconstitutional Conditions.................10

    II.    Section 2(a) Is Not Viewpoint-Neutral............................................13

    III.   No Permissible Government Interests Inform §2(a) ........................17

CONCLUSION ......................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l,*
  133 S.Ct. 2321 (2013) ...................................................................................11

*Central Hudson, Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980) ................................................................................17, 18

*Davenport v. Washington Educational Association,*
  551 U.S. 177 (2007) ................................................................................15, 16

*Edenfield v. Fane,*
  507 U.S. 761 (1993) ......................................................................................18

*Florida Bar v. Went For It, Inc.,*
  515 U.S. 618 (1995) ......................................................................................18

*In re Heeb Media, LLC,*
  89 U.S.P.Q.2d 1071 (T.T.A.B. 2008) ............................................................14

*Maher v. Roe,*
  432 U.S. 464 (1977) ..................................................................................4, 13

*In re McGinley,*
  660 F.2d 481 (C.C.P.A. 1981) .......................................................................12

*In re Old Glory Condom Corp,*
  26 U.S.P.Q.2d 216 (T.T.A.B. 1993) ................................................................9

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009) ...............................................................................6, 7, 10

*Pro-Football, Inc. v. Blackhorse,*
  No. 1:14-cv-1043, 2015 WL 4096277 (E.D.Va. July 8, 2015) .........................9

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ..................................................................................1, 17

*Regan v. Taxation With Representation of Wash.*,
461 U.S. 540 (1983).................................................................4, 14

*Ridley v. Massachusetts Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004) ................................................16

*Rust v. Sullivan*,
500 U.S. 173 (1991)................................................................4

*Senior Execs. Ass'n v. United State*s,
2013 U.S. Dist. LEXIS 43620 (D.Md. Mar. 27, 2013) ....................10

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. ___, 135 S. Ct. 2239 (2015) .......................................5, 6, 9

*Ysursa v. Pocatello Education Association*,
555 U.S. 353 (2009)................................................................15, 16

## State Statutes

Lanham Act ..............................................................................*passim*

## Constitutional Provisions

U.S. Const., First Amendment ....................................................*passim*

## INTRODUCTION

Unable to justify §2(a)'s unconstitutional abridgment of speech under any of the tests promulgated by the Supreme Court, the Patent and Trademark Office (the "government") sidesteps the issue by urging this court to create an entirely new category of speech exempt from the First Amendment: "racially offensive speech".[1] The government's proffer ignores the wealth of Supreme Court authority that consistently prohibits governmental curtailment of speech based on listener reaction. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (striking down municipal ordinance that punished the use of some racist fighting words and not others). In *R.A.V.,* the Supreme Court declined to declare the same sort of expression at issue here – racially offensive speech – unworthy of First Amendment protection. *Id.* "The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected." *Id.* at 414 (White, J., concurring) (collecting cases).[2] This Court is bound by this

---

[1] The government's characterization of the speech in question as "vile racial epithets", Govt. Br. at 1, 17, 22, 42, 43, is unquestionably a not-so-subtle exercise in government-ordained censorship of what it deems to be inappropriate speech, as in creating another yet legally-unrecognized category of speech akin to obscenity. But the government's position is ambiguous, conceding that "[t]he First Amendment limits Congress' ability to restrict the expression of ideas, including the use of racial slurs." Govt. Br. at 3.

[2] Justice White's concurring opinion in *R.A.V.* was joined by each of the Justices that did not join the opinion of the Court. In this way, a unanimous Court endorsed, again, the central First Amendment premise that speech may not be abridged because it is offensive.

controlling authority, regardless of the government's motivation in denying

registration of Mr. Tam's purportedly "disparaging" speech. Nor should this court

create new categories of "unprotectable" speech.

Seeking to evade any First Amendment scrutiny, the government also

seriously miscasts this court's dispositive *en banc* issue of whether "the bar on

registration of disparaging marks in 15 U.S.C. §1052(a) violate[s] the First

Amendment." Rather, the government reformulates the question as to whether

Congress intended to open the Register to "embrace those racial slurs as

instruments of federal law". Govt. Br. at 1. The government insists that registration

somehow transforms the government into the "owner" of registered trademarks –

which, as private commercial speech, are unquestionably a form of protected

expression – and an "underwriter" of selective enforcement of trademarks whose

content it approves.[3] This mischaracterization of the statutory scheme for

trademark registration is novel but has no basis in the Lanham Act's language,

statutory history, or case law. The government's inventiveness ultimately makes

Mr. Tam's point for him: having established a system to regulate trademarks, the

government is barred by the First Amendment from picking winners and losers –

_____

[3] Of course the government's creativity does not change the law: the government
does not underwrite the enforcement of any trademarks; it merely creates a list of
marks with access to the full protections and recourse of the Lanham Act.
Individual mark-holders remain financially responsible for maintaining and
protecting their marks, and must do so proactively.

by opening the courthouse doors for some and closing it for others – based on the viewpoint of the message that the trademark conveys.[4] Under any formulation, this is content-based infringement of speech and anathema to the Constitution.

## ARGUMENT

### I.    FALSE PREMISES

To avoid the conclusion that its position meets none of the Supreme Court's First Amendment standards, the government bases its arguments on a number of false premises. First, it argues that the Lanham Act grants successful trademark holders a government subsidy or other transfer of wealth. Second, the government asserts that under the Lanham Act trademarks are transformed into government speech. Third, the government recasts the Lanham Act as a legitimate scheme for managing offensive commercial speech. Each of these arguments fails for the reasons set forth below.

### A.    Trademark Registration is Not a Subsidy

The government's assertion that, by registering Mr. Tam's mark, the government would be granting him "a federal subsidy", Govt. Br. at 23, is baseless as a legal proposition. So too is the naked and outrageous assertion that trademarks on the Register have been "adopted … as affirmative instruments of federal law". Govt. Br. at 3. These characterizations of the Lanham Act are so inaccurate that

---

[4] There is no dispute that federal registration grants a mark holder a myriad of substantial and significant benefits that are otherwise unavailable. *See* Govt. Br. at 6-8.

they can only signal an attempt to distract the Court from the real subject of this appeal: whether the government may, without running afoul of the First Amendment, preemptively deny Mr. Tam the benefits attending enforcement of his trademark simply because it finds the message it conveys unacceptable.

In fact, Mr. Tam is not seeking a penny of taxpayer funds or even an iota of "government assistance" to enforce the rights to which he is entitled under trademark law. Absent the rare criminal prosecution for major trademark piracy, the government neither brings nor finances trademark enforcement litigation – trademark holders do. Significantly, while founding their brief on the false premise that trademark registration is a financial handout from the government, at no point does the government identify the supposed "subsidy" that flows to trademark registrants.

There is no such subsidy. The government's reliance on cases involving explicit statutory conditions on funding, and where the outcome actually affected the government's revenues – *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540 (1983) (tax exemption for non-lobbying entities); *Rust v. Sullivan*, 500 U.S. 173 (1991) (prohibition on use of federal funds for abortion services); and *Maher v. Roe*, 432 U.S. 464 (1977) (no obligation to pay for abortion services) – is entirely misplaced.

The Lanham Act contains no similar provisions because it is not a spending bill. Section 2(a) does not condition the award of money or other direct financial benefit on the doing or abating of any activity or speech. What §2(a) does do, however, is to discriminate against speech the government finds objectionable and to exempt those trademarks from the benefits inherent in the full panoply of rights and protections afforded to marks that meet the government's shifting standards of propriety based explicitly on the mark's expressive content.

### B.    Government Speech is Not at Issue Here

Acknowledging the axiomatic point that trademarks – which obviously communicate a message – are indeed speech, the government argues that registering such embodiments of expression makes them the property of the federal government. Govt. Br. at 1 ("instruments of federal law"). Not so. Trademarks belong to the entity whose goodwill is associated with them at all times that they remain in use. Mark-holders, not the government, are charged with preventing registered marks – their marks, not the government's – from becoming generic. 15 U.S.C. §1127. That is one of the many reasons why in trademark infringement suits mark-holders are plaintiffs, not the government.

Nothing in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. ___, 135 S. Ct. 2239 (2015), changes this fact or in any way supports the government's proposition that publishing a trademark in the Official Gazette *ipso*

5

*facto* converts the registrant's commercial expression into government speech –
much less the unprecedented propositions that such an act passes ownership of that
speech to the government or strips the speech of First Amendment protection.

*Walker* is distinguishable. The Court in *Walker* answered three questions in
determining that the content of a legally-mandated, government-issued license
plate – quite unlike the registration of a trademark – is government speech:

> (1) Is the speech at issue being used by the government to
> communicate something?
>
> (2) Does the government restrict the forum to only that speech with
> which it would prefer to be associated and do listeners actually
> associate the speech with the government?
>
> (3) Does the government maintain control over what speech is
> permitted?

135 S. Ct. at 2247.

In *Walker*, the Court had no difficulty concluding that an automobile license
plate is, and is appropriately perceived as, official "government approved" speech.
Accordingly, "when the government speaks it is entitled to promote a program, to
espouse a policy, or to take a position". *Id.* at 2246. Thus, the outcome in *Walker*
was entirely consistent with the principles of government approved speech. Texas
"has sole control over the design, typeface, color, and alphanumeric pattern for all
license plates". *Id.* at 2249. So too, the private parties that donated monuments in
*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), "relinquished … [a]ll rights

[they] previously possessed" when the government accepted their monuments for display in the city park. 555 U.S. at 474.

In contrast, the registration of a private trademark is not a medium of government speech.[5] The Principal Register is not a traditional "public forum", access to which requires the government to assume expressive control and the mark-holder to relinquish all rights. To the contrary, registration enhances the mark-holder's ability to enforce the rights which it exclusively maintains in the mark. *See* Govt. Br. at 1 ("Federal law does not create trademarks or trademark rights"). Accordingly, the Register is simply and plainly a list, offering inquiring parties notice of protectable marks. *See* Govt. Br. at 22, 41. Eligibility for inclusion on this list – but for the prohibition of §2(a) – is vetted to exclude only deceptive, confusing, and misleading trademarks (which speech is not granted First Amendment protection in any event). The mark is not "used" by the government to communicate anything about the government. The only legitimate function of a mark is the use by its holder in the stream of commerce, not its listing on the Register by the government.

Thus, the government does not claim, nor can it, that there is any law, regulation or procedure entitling it to deny registration to trademarks with which the government would prefer not to be associated respecting a virtually infinite

---

[5] The government acknowledges as much in admitting that "registration does not create a forum for the expression of ideas." Govt. Br. at 36.

range of expressive content contained in such marks. For example, the Register is

replete with trademarks that do not constitute "government speech", are not

"instruments of federal law", and certainly do not have any government

*imprimatur* of propriety:

> (1)  marks espousing support for a particular religion, *e.g.*, RADICALLY FOLLOWING CHRIST IN MISSION TOGETHER, U.S. Reg. No. 86,105,838; GIVE JESUS A CHANCE, U.S. Reg. No. 86,556,400; THINK ISLAM, U.S. Reg. No. 4,719,002; KNIGHTS IN SATAN'S SERVICE, U.S. Reg. No. 3,014,833 (cancelled Sept. 28, 2012);

> (2)  marks that would seem to conflict with American foreign policy, *e.g.*, SYRIA SOLIDARITY MOVEMENT, U.S. Serial No. 86,683,230 (filed July 4, 2015); RUSSIA MADE ME, U.S. Reg. No. 79,070,921; EVERYBODY MUST GET DRONED, U.S. Reg. No. 86,677,133; Hammer and Sickle image, U.S. Reg. No. 3265025; Hammer and Sickle image emblazoned with "Proletariats of all countries, unite!", U.S. Reg. No. 3505449;

> (3)  marks that conflict with the government's war on drugs, *e.g.*, ILC – I LOVE COCAINE, U.S. Reg. No. 1,243,723; GANJA UNIVERSITY, U.S. Reg. No. 4,070,160; and

> (4)  other marks that seem inconsistent with generally sound public policy, *e.g.*, JUSTPIMPINLIFE, U.S. Reg. No. 4,707,510; ALCOHOL ABUSE, U.S. Reg. No. 4,767,935.

If in fact a registered mark comprised government speech, then the

government's role would be understood as the author of such speech, rather than

the gate-keeper. But, under the registration scheme of the Lanham Act, inclusion

on the Register and use of the registered trademark notice, i.e., "®", expresses

nothing but a *prima facie* acknowledgment that a trademark, originated and used

exclusively by the holder, has been granted access to the rights and responsibilities

attendant registration. Unlike the legally-required license plates at issue in *Walker*, there is neither a factual nor legal basis for the government's assertion that the public associates registered trademarks, or the messages they convey, with the government. The law, in fact, is quite the opposite, as the Trademark Trials and Appeal Board instructed when it held in *In re Old Glory Condom Corp*, 26 U.S.P.Q.2d 216, 1219 n.3 (T.T.A.B. 1993), that "the act of registration is not a government *imprimatur* or pronouncement that the mark is a 'good' one in an aesthetic, or any analogous, sense", an authority left unmentioned in the government's brief.[6] The same applies to moral, cultural or political "goodness," because the public associates trademarks with their owners, not the government. To be sure, this is an axiom of trademark law, the *sine qua non* of a trademark's existence, and the premise, stated and implied, of the Lanham Act – to preserve words and phrases as clear and useful source identifiers, not to create government speech or to officially designate only certain content as compliant with a government-approved civility code.

---

[6] While the government unconditionally states that "the USPTO does not endorse any particular product, service, mark, or registrant", it continues to cling to the unfounded notion that registration indicates that the United States "embrace[s] … racial slurs as instruments of federal law", Govt. Br. at 1, and "would convey to the public that the United States regards racial slurs as appropriate source identifiers". Govt. Br. at 44 (citing *Pro-Football, Inc. v. Blackhorse*, No. 1:14-cv-1043, 2015 WL 4096277, *14 (E.D.Va. July 8, 2015) (registration is a "declaration by the federal government that it has approved the mark"). The government cannot have it both ways.

The government may not perform an end run around the First Amendment merely by publishing the results of their censorship pursuant to the government's viewpoint discrimination. *See Senior Execs. Ass'n v. United State*s, 2013 U.S. Dist. LEXIS 43620, *47 (D.Md. Mar. 27, 2013) (describing agency publication of financial reports "a nondiscretionary, ministerial act involving no decision making that the Government must execute in accordance with express statutory mandate"). Any contrary holding would be absurd. Imagine a world in which the government could discriminate against a group seeking to hold a rally or public event in a public space simply by publishing a list of all "approved" groups. *Summum*, 555 U.S. at 469 (viewpoint restrictions prohibited in public streets and parks). Under the theory articulated by the government, such viewpoint discrimination would be insulated from the First Amendment because the list of approved speakers would be subsumed as government speech.

Section 2(a) clearly does not implicate government speech.

## C.    Section 2(a) Imposes Unconstitutional Conditions

Faced with its most serious challenge, *i.e.*, the doctrine of unconstitutional conditions[7], the government denies the application of that doctrine, Govt. Br. at 32,

---

[7] The government does not deny the considerable benefits of registration. *See* Govt. Br. at 2 ("federal benefits" of registration), 14 ("the benefit of certain presumptions"), 6-9 (extensive discussion of numerous benefits of registration under the Lanham Act), 15 ("registration … encourages enforcement"), and 20 ("benefits associated with registration"). Yet, somehow, the government

and attempts to redefine the trademark registration system enacted by Congress as a regime for excluding certain categories of speech, thereby setting §2(a)'s regulation of speech *inside* the contours of the program. Govt. Br. at 14, 32-35.[8] Contrary to the government's interpretation, Congress has already defined the purposes of the Lanham Act:

> The intent of this Act is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of

---

incredulously claims that, on the one hand, "government may not place obstacles in the path of a person's exercise of freedom of speech", Govt. Br. at 27, but on the other hand, the government's denial of these considerable benefits to Tam "are not of the government's creation" and do not constitute "obstacles to Tam's expression". Govt. Br. at 27. No one other than the government vis-à-vis the USPTO makes the determination to deny such benefits, so it is unclear who other than the government would deny those benefits; that denial is an obstacle to Tam's expression.

[8] The government hints that the "optional" nature of registration somehow confers "broad authority to define the limits of a federal program", Govt. Br. at 14, and allowing the holder complete expressive freedom "on his own time and dime … without any restriction or interference". Govt. Br. at 34, 35. This misses the point. As the Supreme Court has made clear, while a party objecting to a condition for receipt of optional government benefits may simply decline those benefits, "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 133 S.Ct. 2321, 2328 (2013) (Roberts, C.J.) (emphasis added) (internal quotations omitted). The government is not free to condition the receipt of registration benefits to abridgement of protected speech deemed to express an offensive viewpoint, yet the government concedes the application of such conditions here in admitting that §2(a) "select[s] particular activities to facilitate". Govt. Br. at 32.

registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. §1127.

In short, the Lanham Act, and the program of federal trademark registration it created, are not designed to filter expression or give the government power over speech at all. Rather, the Act's sole function is to control and enhance commerce by establishing legal rights and remedies available to holders of trademarks that are neither deceptive nor misleading.[9] To the extent that §2(a) purports to authorize the government to leverage this program against speech disfavored by the government, such leverage imposes the pre-condition of content propriety on registrable marks, without which otherwise-qualified marks are denied the significant benefits of the Act. This is constitutionally offensive as an abridgement of speech, and the government offers no contrary substantive analysis.[10]

Yet, the government insists that the "registration program does not drive disfavored ideas or viewpoints from the marketplace." Govt. Br. at 36. After (1)

----

[9] The government actually acknowledges this elsewhere in its submission. *See, e.g.*, Govt. Br. at 17-18 (describing the Lanham Act as protecting consumers and mark holders from misleading and pirate advertising and not a tool for excising offensive or racist speech from national commerce). *Amicus* Blackhorse echoes this point as well. *See* Blackhorse Br. at 21.

[10] The government is left to uncritically invoke the authority of *In re McGinley*, 660 F.2d 481 (C.C.P.A. 1981), Govt. Br. at 17 & 30, as to which this court has directed the instant review.

asserting its resistance to extending registration and its benefits to the "most vile racial epithets", Govt. Br. at 1-2, 23, (2) denying any obligation to offer the benefits of registration to those marks whose content it disapproves, Govt. Br. at 14, (3) affirmatively "declin[ing] to facilitate the private enforcement of disparaging marks … in commerce", Govt. Br. at 39, and (4) doing so pursuant to "the State's power to encourage actions deemed to be in the public interest", Govt. Br. at 24 (quoting *Maher v. Roe*, 432 U.S. 464, 474-76 (1977)), one wonders what purpose is served by denial of registration for disparagement under §2(a) other than to effectively drive certain viewpoints from the marketplace. If, as the government concedes, Govt. Br. at 15, "registration encourages … enforcement", the effect of denial of registration can only be to discourage use in commerce giving rise to the need for such enforcement. Either way, protected speech is abridged.

## II.    SECTION 2(a) IS NOT VIEWPOINT-NEUTRAL

The government mistakenly argues that the government's application of §2(a) is viewpoint-neutral, Govt. Br. at 40, despite the wealth of evidence that it most certainly is not. On its face, §2(a) explicitly requires the government, in the manner of a government censor, to sort and treat differently marks whose content it determines are offensive from those it does not. As applied, the government's efforts to align itself with the political correctness of the moment in adjudging the

expression embodied in trademarks by means of a confused and inconsistent application of §2(a) has led to a mishmash of registered and rejected marks reflecting a policy that is anything but content-neutral. *See, e.g.*, ALCU Br. at 22-23 and *compare DYKES ON BIKES*, U.S. Reg. No. 3323803 (permitting registration because disparaging term had been "reclaimed") *with In re Heeb Media, LLC*, 89 U.S.P.Q.2d 1071 (T.T.A.B. 2008) (rejecting putatively disparaging mark because it had not yet been "reclaimed").[11]

The government also urges this court to refrain from requiring the government to give "assistance" to the trademark enforcement efforts of holders of "offensive" marks – based, again, on the content expressed by those marks and under standards erected by the government. *See* Govt. Br. at 3. But the government does not provide "assistance" to mark holders engaged in private enforcement. As noted above with respect to the burden placed on mark-holders under 15 U.S.C. §1127, the Lanham Act confers benefits on holders of registered marks through the creation of rights, responsibilities, and procedures. In all cases, it leaves to the

---

[11] Ironically, as pointed out by *Amicus* ACLU, the government's attempt to burden non-reclaimed disparaging terms only serves to delay or prevent the reclamation of these terms. *See* ACLU Br. at 15-16. It is also worth noting that notwithstanding the decision in *Heeb Media*, another HEEB trademark registration – granted in a time of different political sensibilities – remains on the Principal Register. U.S. Reg. No. 2858011. Thus, any reclamation analysis as a ground for §2(a) qualified speech necessarily entails examination and approval of the content of that speech, with inconsistent results.

individual mark owners all of the costs and burdens of exercising those rights and responsibilities at their own expense.

The government cites *Davenport v. Washington Educational Association*, 551 U.S. 177 (2007), and *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009), for the proposition that the First Amendment permits the government to refrain from giving assistance to private speakers. However, neither *Davenport* nor *Ysursa* reach that far. In *Davenport*, the Court let stand a Washington State law which required unions to obtain the affirmative consent of non-members before spending non-member money for "election related purposes." 551 U.S. at 180. As the Court described, the restriction is a limitation on "the union's extraordinary *state* entitlement to acquire and spend *other people's* money." *Id.* at 187 (emphasis in original). The law imposed no burden on the union's ability to spend its own money or on its activities generally, but only on its ability to spend non-member money *without consent. Id.* Similarly, while the government suggests that in *Ysursa* the State refused to assist *all* political speech, what actually occurred was that the Supreme Court upheld Idaho's prohibition on the use by unions of involuntary payroll deductions to promote political speech.[12] 555 U.S. at 355.

Section 2(a)'s restriction of speech is not analogous. Unlike in *Davenport*, Mr. Tam does not seek to collect or spend any private or government money.

---

[12] Importantly, in *Ysursa*, there was no dispute that the State's attempt to prohibit private companies from using payroll deductions was unconstitutional. *Id.* at 357.

Unlike in *Ysursa*, the government has not "refused to assist" all political speech. Instead, to the extent registration can be considered "assistance" at all, the government withholds that "assistance" from only the speech it disfavors. In contrast to the prohibition against all political speech at issue in *Ysursa*, the government does not refuse to register an entire *category* of speech, *i.e.*, all political speech or all commercial speech. Instead, the government misuses §2(a) to pick winners and losers based solely on the specific content of the mark-holder's viewpoint.

The government again misidentifies the dispositive *en banc* issue as whether it has an obligation to enhance speech, Govt. Br. at 29, as opposed to whether it has the obligation not to abridge speech, by imposing burdensome conditions on and subjecting expressive content to the government's approval. The government cites *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 90-91 (1st Cir. 2004), for the proposition that it "is not attempting to give one group an advantage over another in the marketplace of ideas", Govt. Br. at 40, but contradicts itself in claiming the right to "select[] particular commercial activities to facilitate". Govt. Br. at 32. That is blatant viewpoint-specific infringement of speech in violation of the First Amendment: "The government may not regulate use based on hostility – or favoritism – towards the underlying message expressed." *R.A.V.*, 505 U.S. at 386. Nor may "[l]isteners' reactions" or the "emotive impact" of particular content

justify the abridgment of speech. *Id.* at 394 (internal quotation and citation omitted). Yet, this is exactly what the government claims the authority to do under §2(a), and it is exactly the rationale given by the government in refusing to register THE SLANTS. That is not constitutionally acceptable.

### III.   NO PERMISSIBLE GOVERNMENT INTERESTS INFORM §2(a)

The government identified only two interests that might possibly justify the existence of §2(a): public policy against racially offensive speech and the desire to permit the States to discriminate against offensive trademarks. Neither withstands constitutional scrutiny.

Indeed, the government's proffered interests fall short even under the intermediate scrutiny test set forth in *Central Hudson*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 562-64 (1980).[13] As an initial matter, under *Central Hudson*, any government interests must be "substantial." As set out in Mr. Tam's Brief, the law is long-settled that a policy premised on protecting the public from offensive speech is not a "substantial" interest. *See* Tam Br. at V(B). Even if it were otherwise, §2(a) still fails to meet the *Central Hudson* standard, because the challenged regulation (1) must directly advance the government interest and "alleviate [the alleged harms] to a material degree", *id; see Florida*

---

[13] The government gives this seminal authority only fleeting reference. Govt. Br. at 46.

*Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995), and (2) must not be more extensive than necessary to serve the government's interest. *Cent. Hudson*, 447 U.S. at 562-64.

The government's interest in the supression of racially offensive speech fails both of these remaining elements of the test. *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) ("It is well established that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it"). Section 2(a) is underinclusive. The government has made no showing that refusing to register offensive marks alliviates racial intolerance or even protects the public from exposure to offensive commercial speech. The government has admitted it does no such thing. *See* Govt. Br. at 26 (acknowledging that Mr. Tam remains free to use "THE SLANTS" in commerce). Thus, refusing to register Mr. Tam's chosen mark does not materially alleviate the harms identified by the government. *See Florida Bar*, 515 U.S. at 626.

Section 2(a)'s bar against offensive marks is also overinclusive because it is not limited to racially offensive marks. The government's proffered interest, which is related only to racially-offensive speech, cannot save §2(a)'s ineffectiveness or overbreadth. Being unable to satisfy intermediate scrutiny, the government's proffered interst would also fail strict scrutiny. Moreover, allowing the individual States to decide for themselves whether or not also to abridge Mr. Tam's speech is

no justification for the federal government's abridgment. However the court rules in this case, the States remain free, within the confines of the Constitution, to create and confer any additional trademark protection they deem appropriate.[14]

The government's proffered interests cannot support §2(a)'s unconstitutional burden on speech and this court should strike down §2(a) as unconstitutional.

---

[14] Of course, the government also failed to satisfy its burden with respect to this interest by not coming forward with evidence that any State's efforts to discriminate against offensive trademarks would actually be frustrated by this court finding §2(a)'s prohibition against offensive marks unconstitutional.

## <u>CONCLUSION</u>

For all the foregoing reasons, and the reasons set out in Mr. Tam's Brief,

Appellant, Mr. Tam, respectfully submits that the bar on registration of disparaging

marks in §2(a) of the Lanham Act, 15 U.S.C. §1052(a), violates the First

Amendment and, as a consequence, the TTAB's September 26, 2013 decision on

appeal should be reversed.

Respectfully submitted,

*/s/ Ronald D. Coleman*
RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,*
*Simon Shiao Tam*

Dated: August 4, 2015
112782661v1

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

**Certificate of Compliance With Type-Volume
Limitation, Typeface Requirements, and
Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed.R.App.P.
32(a)(7)(B) because:

> this brief contains 4,980 words, excluding the parts of the brief
> exempted by Fed.R.App.P. 32(a)(7)(B)(iii) and Fed.Cir.R. 32(b).

2.    This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5)
and the type style requirements of Fed.R.App.P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using
> Microsoft Word 2007 in Times New Roman with a font size of 14.

*/s/ Ronald D. Coleman*
RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,
Simon Shiao Tam*

Dated: August 4, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2015, I caused to be electronically filed the foregoing Reply-Brief for Appellant-Applicant, Simon Shiao Tam, with the Court's CM/ECF filing system, which constitutes service, pursuant to Fed.R.App.P. 25(c)(2), Fed.Cir.R. 25(a) and the Court's Administrative Order regarding Electronic case filing 6(A) (May 17, 2012).

*/s/ Ronald D. Coleman*
RONALD D. COLEMAN
JOHN C. CONNELL
DARTH M. NEWMAN
JOEL G. MACMULL
**ARCHER & GREINER, P.C.**
ONE CENTENNIAL SQUARE
P.O. BOX 3000
HADDONFIELD NJ 08033
(856) 795-2121

*Attorneys for Appellant-Applicant,*
 *Simon Shiao Tam*

112782661v1

22