No. 14-1203

# United States Court of Appeals for the Federal Circuit

————————————

### IN RE: SIMON SHIAO TAM,
*Appellant*

————————————

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 85472044.

————————————

### SUA SPONTE HEARING EN BANC

————————————

### BRIEF OF THE RUTHERFORD INSTITUTE AND CATO INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF APPELLANT

————————————

John W. Whitehead
Douglas R. McKusick
**THE RUTHERFORD INSTITUTE**
1440 Sachem Place
Charlottesville, VA 22901
(434) 987-3888

Ilya Shapiro
**CATO INSTITUTE**
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-2000
i.shapiro@cato.org

Megan L. Brown
*Counsel of Record*
Joshua S. Turner
Christopher J. Kelly
Jennifer L. Elgin
Dwayne D. Sam
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
(202) 719-7000
mbrown@wileyrein.com

*Counsel for Amici Curiae*

June 18, 2015

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a), counsel for amici curiae The Rutherford Institute and the Cato Institute certifies the following:

1. The full name of every party or amicus represented by one or more of the undersigned counsel is:  The Rutherford Institute; Cato Institute.

2. The name of the real party in interest (if the party in the caption is not the real party in interest) represented by one or more of the undersigned counsel is:  Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by one or more of the undersigned counsel are:  None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by one or more of the undersigned counsel in the trial court or agency or are expected to appear in this court are:  Megan L. Brown, Joshua S. Turner, Christopher J. Kelly, Jennifer L. Elgin, and Dwayne D. Sam of Wiley Rein LLP; John W. Whitehead and Douglas R. McKusick of The Rutherford Institute; and Ilya Shapiro of Cato Institute.

Dated:  June 18, 2015                          s/  Megan L. Brown
                                                Megan L. Brown
                                                *Counsel for Amici The Rutherford Institute*
                                                *& Cato Institute*

## QUESTION PRESENTED

Does the bar on registration of disparaging marks in 15 U.S.C. § 1052(a) violate the First Amendment?

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................ i

QUESTION PRESENTED ................................................................ ii

INTEREST OF AMICI CURIAE .........................................................1

STATEMENT OF THE CASE ............................................................2

SUMMARY OF THE ARGUMENT ....................................................3

I.    FEDERAL TRADEMARK REGISTRATION AFFECTS PROTECTED
SPEECH AND CONFERS VALUABLE BENEFITS. ................................7

    A.    Trademarks Are Indisputably Protected Speech. .................................7

    B.    Trademark Registration Confers Substantial Benefits that Cannot Be
Denied Based on Protected Speech. ....................................................10

    C.    Disparagement Review Is Fickle, Unpredictable, and Yields Absurd
Results That Cannot Co-Exist With The First Amendment. ..............13

II.    THE DISPARAGEMENT BAR IS THE ULTIMATE HECKLER'S VETO
AND CANNOT SURVIVE ANY LEVEL OF FIRST AMENDMENT
SCRUTINY. .........................................................................................18

    A.    Disparaging Speech Is At The Core Of What The First Amendment
Protects. ...........................................................................................18

    B.    Strict Scrutiny Dooms The Lanham Act's  Disparagement Bar.........22

    C.    Under Any Level of First Amendment Review, Section 2(a)'s
Disparagement Clause Is Unconstitutional. .......................................26

CONCLUSION ...............................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996).................................................................8, 25

*Abrams v. United States*,
  250 U.S. 616 (1919)...................................................................29

*Agency for International Development v. Alliance for Open Society
  International*,
  133 S. Ct. 2321 (2013).............................................................2, 10

*Aluminum Fabricating Co. v. Season-All Window Corp.*,
  259 F.2d 314, 119 U.S.P.Q. 61 (2d Cir. 1958) ................................12

*Ashcroft v. American Civil Liberties Union*,
  542 U.S. 656 (2004)....................................................................23

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001)....................................................................23

*Bishop v. Tyson Foods, Inc.*,
  660 F. Supp. 2d 1004 (W.D. Ark. 2009) ..........................................9

*Boos v Barry*,
  485 U.S. 312 (1988)..................................................................3, 20

*Bose Corp. v. Consumers Union*,
  466 U.S. 485 (1984)....................................................................19

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)....................................................................21

*Carey v. Population Services International*,
  431 U.S. 678 (1977)....................................................................25

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*
447 U.S. 557 (1980).................................................................7, 25, 26, 27

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993)..............................................................................7

*City of Ladue v. Gilleo,*
512 U.S. 43 (1994)...............................................................................30

*Community for Creative Non-Violence v. Turner,*
893 F.2d 1387 (D.C. Cir. 1990) .......................................................27

*Cold War Museum, Inc. v. Cold War Air Museum, Inc.,*
586 F.3d 1352 (Fed. Cir. 2009) ........................................................12

*Davis v. Federal Election Commission,*
554 U.S. 724 (2008)............................................................................24

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
472 U.S. 749 (1985)............................................................................21

*Edenfield v. Fane,*
507 U.S. 761 (1993)............................................................................28

*Edwards v. District of Columbia,*
755 F.3d 996 (D.C. Cir. 2014) ....................................................28, 30

*In re Fox,*
702 F.3d 633 (Fed. Cir. 2012) .........................................................13

*In re Geller,*
751 F.3d 1355 (Fed. Cir. 2014) .......................................................18

*Glickman v. Wileman Brothers & Elliott, Inc.,*
521 U.S. 457 (1997).............................................................................30

*Grayned v. City of Rockford,*
408 U.S. 104 (1972)..............................................................................30

*Greater New Orleans Broadcasting Association, Inc. v. United States*,
    527 U.S. 173 (1999)........................................................................8

*In re Gyulay*,
    820 F.2d 1216, 3 U.S.P.Q.2d 1009 (Fed. Cir. 1987)........................15

*In re Heeb Media, LLC*,
    89 U.S.P.Q.2d 1071 (T.T.A.B. 2008)..............................................14

*Hoffman v. Capital Cities/ABC, Inc.*,
    255 F.3d 11806 (9th Cir. 2001).........................................................7

*In re Lebanese Arak Corp.*,
    94 U.S.P.Q.2d 1215, No. 77072261, 2010 WL 766488 (T.T.A.B. Mar. 4,
    2010) .................................................................................13, 14

*Lederman v. United States*,
    291 F.3d 36 (D.C. Cir. 2002) ..........................................................28

*Li'l' Red Barn, Inc. v. Red Barn System, Inc.*,
    322 F. Supp. 98 (N.D. Ind. 1970 .....................................................12

*Liberty Mutual Insurance Co. v. Liberty Insurance Co.*,
    185 F. Supp. 895 (E.D. Ark. 1960) ..................................................12

*Maternally Yours, Inc. v. Your Maternity Shop, Inc.*,
    234 F.2d 538 (2d Cir. 1956)............................................................12

*In re McGinley*,
    660 F.2d 481 (C.C.P.A. 1981)......................................................5, 27

*Members of City Council of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984).......................................................................24

*Miller v. California*,
    413 U.S. 15 (1973).........................................................................21

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931)........................................................................21

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*,
  475 U.S. 1 (1986)........................................................................8

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
  469 U.S. 189 (1985)...................................................................11

*Perry v. Sindermann*,
  408 U.S. 593 (1972)................................................................6, 10

*In re Reemtsma Cigarettenfabriken G.M.B.H.*,
  122 U.S.P.Q. 339 (T.T.A.B. 1959).............................................13

*Reed v. Town of Gilbert*,
  576 U.S. __, No. 13-502, 2015 WL 2473374 (June 18, 2015).........25

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997)..................................................................20

*Riley v. National Federation of Blind, Inc.*,
  487 U.S. 781 (1988)....................................................................7

*In re Riverbank Canning Co.*,
  95 F.2d 327 (C.C.P.A 1938) .......................................................13

*Rumsfeld v. Forum For Academic & Institutional Rights, Inc.*,
  547 U.S. 47 (2006)......................................................................10

*Sambo's of Ohio, Inc. v. City Council of Toledo*,
  466 F. Supp. 177 (N.D. Ohio 1979) ............................................17

*Sambo's Restaurants, Inc. v. City of Ann Arbor*,
  663 F.2d 686 (6th Cir. 1981).......................................................17

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*,
  502 U.S. 105 (1991)..............................................................23, 27

*Snyder v. Phelps*,
  562 U.S. 443 (2011)...........................................................2, 20, 23

*In re Sociedade Agricola E. Commercial Dos Vinhos Messias, S.A.R.L.*,
  159 U.S.P.Q. 275 (T.T.A.B. 1968).............................................13

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ........................................................2, 20, 25

*Speiser v. Randall*,
   357 U.S. 513 (1958) ...................................................................10

*In re Squaw Valley Development Co.*,
   80 U.S.P.Q.2d 1264 (T.T.A.B. 2006) .......................................14, 15

*Street v. New York*,
   394 U.S. 576 (1969) ...................................................................18

*In re Tam*,
   No. 85472044, 2013 WL 5498164 (T.T.A.B. Sept. 26, 2013) ............8

*In re Tam*,
   785 F.3d 567 (Fed. Cir. 2015) ............................................8, 26, 27

*Texas v. Johnson*,
   491 U.S. 397 (1989) ...................................................................18

*Thomas v. Collins*,
   323 U.S. 516 (1945) ...................................................................24

*Tinker v. Des Moines Independent Community School District*,
   393 U.S. 503 (1969) .....................................................................4

*United States v. Playboy Entertainment Group, Inc.*,
   529 U.S. 803 (2000) .....................................................................4

*United States v. Stevens*,
   559 U.S. 460 (2010) ...................................................................21

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ...................................................................29

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008) ...................................................................29

*Whitney v. California*,
   274 U.S. 357 (1927) ...................................................................21

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
471 U.S. 626 (1985) .............................................................................8

**FEDERAL STATUTES**

15 U.S.C. § 1072.................................................................................12

15 U.S.C. § 1052(a) ...............................................................3, 13, 23

15 U.S.C. § 1057(c) .............................................................................11

15 U.S.C. § 1141 .................................................................................11

15 U.S.C. § 1115(a) .............................................................................12

15 U.S.C. § 1057(b) .............................................................................12

15 U.S.C. § 1115(b) .............................................................................12

15 U.S.C. § 1065.................................................................................12

15 U.S.C. § 1117 .................................................................................11

15 U.S.C. § 1121 .................................................................................11

15 U.S.C. § 1124.................................................................................12

15 U.S.C. § 1127.................................................................................7

**RULES**

Federal Rule of Appellate Procedure 29 ...............................................1

Federal Circuit Rule 29(a).....................................................................1

Federal Circuit Rule 29(c)(5)(A)...........................................................2

Federal Circuit Rule 47.4(a) .................................................................. i

**OTHER AUTHORITIES**

Compact Oxford English Dictionary ...................................................17

Merriam Webster Dictionary ................................................................15

**TRADEMARK REGISTRATIONS AND APPLICATIONS**

CATHOLICS FOR CHOICE, U.S. Reg. No. 2,796,790 ........................................9

DYKEDOLLS, U.S. Reg. No. 3,254,737 (expired)................................................15

DYKE NIGHT, U.S. Reg. No. 4,146,588 ............................................................15

DYKES ON BIKES, U.S. Reg. No. 3,323,803....................................................15

FAGDOG, U.S. App. Ser. No. 76/454,927 (abandoned after refusal) ...................16

FAGDOG, U.S. App. Ser. No. 75/950,535 (abandoned after refusal) ...................16

FAGDOG, U.S. Reg. No. 2,828,396 (expired).....................................................16

FAGDOG, U.S. Reg. No. 3,174,475 (expired).....................................................16

FAGDOG, U.S. Reg. No. 2,926,775 (expired).....................................................16

FAGOUT!, U.S. App. Ser. No. 86/107,041 (abandoned after refusal)...................16

FAG FOREVER A GENIUS!, U.S. App. Ser. No. 86/089,512 (abandoned after refusal)......................................................................................................16

THE YIDZ, U.S. App. Ser. No. 77/784,282 (abandoned after refusal)..................17

SAMBO'S, U.S. App. Ser. No. 77/915,048 (abandoned after refusal) ..................16

PARENTS AND KIDS AGREE-IT'S SAMBO'S FOR DINNER, U.S. Reg. No. 1,107,590 ......................................................................................................16

PHAG, U.S. Reg. No. 4,135,694.........................................................................16

QUEER PAL FOR THE STRAIGHT GAL, U.S. Reg. No. 4,699,581..................15

QUEER FOLK, U.S. Reg. No. 4,742,269 ............................................................15

SAMBO'S (Stylized), U.S. Reg. No. 860,232 (expired) .......................................16

SAMBO'S (Stylized), U.S. Reg. No. 927,492 (expired) .......................................16

SAMBO'S, U.S. Reg. No. 1,061,886 (expired)......................................................16

SAMBO'S & Design, U.S. Reg. No. 1,102,379 (expired).....................................16

SAMBO'S GOOD TURN PROGRAM, U.S. Reg. No. 1,118,937 (expired).........16

SAMBO'S FAMILY TABLE, U.S. Reg. No. 1,133,357 (expired) ......................16

SAMBO'S & Design, U.S. Reg. Nos. 1,247,362 (expired) ...................................16

## INTEREST OF AMICI CURIAE

Pursuant to Federal Circuit Rule 29(a), the Rutherford Institute and Cato Institute respectfully submit this brief in support of the Appellant.[1]

The Rutherford Institute is an international civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its President, John W. Whitehead, the Institute specializes in providing legal representation without charge to individuals whose civil liberties are threatened and in educating the public about constitutional and human rights issues. Attorneys affiliated with the Institute have represented parties and filed numerous amicus curiae briefs in the federal Courts of Appeals and Supreme Court. The Rutherford Institute works to preserve the most basic freedoms of our Republic, including the limits placed on government power by the First Amendment. The Rutherford Institute opposes governmental action to restrain or censor speech for the purpose of protecting the subjective sensibilities of part of the audience.

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional

---

[1] Amici file this brief pursuant to the Court's Order of April 27, 2015 (Doc. 54), and except as provided in that Order, in compliance with Federal Rule of Appellate Procedure 29 and Federal Circuit Rule 29.

government that are the foundation of liberty.  Toward those ends, the Cato Institute promotes respect for fundamental liberties, including through books, studies, conferences, and amicus briefs with courts across the country.

Amici have participated in developing the key First Amendment principles that govern this case.  *See, e.g., Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 133 S. Ct. 2321 (2013); *Sorrell v. IMS Health Inc.* 131 S. Ct. 2653 (2011); *Snyder v. Phelps*, 562 U.S. 443 (2011).  This dispute is important because the en banc court can address an obvious violation of the right to constitutionally protected speech and can bring earlier, erroneous precedent in line with Supreme Court jurisprudence.  Through this proceeding, this Court has the opportunity to stop the use of trademark law, however well intentioned, to restrict free expression in the marketplace of ideas.[2]

## STATEMENT OF THE CASE

Amici adopt by reference the statement included in the Appellant's Brief.

---

[2]    Pursuant to Rule 29(c)(5)(A), Amici Curiae affirm that no counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution that was intended to fund preparation or submission of this brief.  No person other than Amici Curiae, their members, or their counsel made a monetary contribution to its preparation or submission.

- 2 -

# SUMMARY OF THE ARGUMENT

It is rare that a First Amendment case presents such an obvious example of both content and viewpoint discrimination by the government. The disparagement clause of § 2(a) of the Lanham Act provides, among other things, that the Patent and Trademark Office (PTO) may refuse to register a trademark that "[c]onsists of . . . matter which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a). The PTO may also cancel registrations under this standard if, for example, a party claiming offense asks the PTO to find that a mark was disparaging at the time of registration. The Lanham Act's disparagement bar, and its application by the government, openly require the government to discriminate based on the content of speech, and cannot co-exist with the First Amendment.

The concept at issue is so fundamental it scarcely bears repeating: our Constitution is designed to protect offensive and unpopular speech from the whims and sensitivities of government regulators, even—or perhaps especially—when the government is purporting to protect individuals or groups from "offense." The Constitution makes it exceedingly difficult to regulate communications based on the "impact that speech has on its listeners." *Boos v Barry*, 485 U.S. 312, 321 (1988). "Where the designed benefit of a content-based speech restriction is to

shield the sensibilities of listeners, the general rule is that the right of expression prevails." *United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 813 (2000). The First Amendment requires the government to "show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969). But the avoidance of discomfort and offense are precisely the goals the government seeks to attain under § 2(a)'s disparagement prong.

Indeed, content-based restrictions on speech so plainly offend the First Amendment that this case would not have presented any difficulty or risen to en banc review if it were not for a historical oddity—the failure of courts to recognize the First Amendment implications of trademark regulation. It is time to correct this error. Trademarks meet all of the criteria of protected speech and should be treated as such. Applicants and beneficiaries intend to communicate. Trademarked material—a name, word, phrase, logo, or design—can inform and persuade potential customers, but it also can do far more. Trademarked names, phrases, and mottos can define a group's identity, express a political opinion, convey artistic ideas, or spark useful debate and controversy.

This case perfectly illustrates the power of trademarks to communicate ideas. Appellant Simon Tam, the "front man" for an Asian-American rock band known as The Slants, was denied registration for the mark THE SLANTS. Why? Not because the proposed mark was inaccurate or misleading or violated someone's intellectual property interests. The government denied Mr. Tam the beneficial trademark status routinely afforded others solely on the basis that the government considers THE SLANTS, as used by Mr. Tam, to be "disparaging" to some subset of Asian-Americans. Thus the very purpose of § 2(a) as applied in this matter is to restrict Mr. Tam's right to speak in a certain manner because some subset of the population may suffer offense at his speech.

This Court concluded years ago that the Lanham Act does not implicate the First Amendment because denial of registration does not bar applicants otherwise from using a desired mark. *In re McGinley*, 660 F.2d 481, 484 (C.C.P.A. 1981). *McGinely*, decided nearly thirty-five years ago—and not critically examined by this Court since—misapprehended the point of the First Amendment. While § 2(a) does not prevent applicants from otherwise using marks the government deems "offensive," the First Amendment applies to more than simple prohibitions. It also prohibits the government from *burdening* expression, either directly or by denying access to a benefit based on speech's disfavored content. *Perry v. Sindermann*,

- 5 -

408 U.S. 593, 597 (1972). Trademark law is being used, by the trademark office on its own and at the urging of entities that claim offense, to burden and disfavor certain speakers. This Court should heed recent First Amendment guidance from the Supreme Court and get the Trademark Office and Lanham Act out of the business of policing political and social offense.

## ARGUMENT

## I. FEDERAL TRADEMARK REGISTRATION AFFECTS PROTECTED SPEECH AND CONFERS VALUABLE BENEFITS.

### A. Trademarks Are Indisputably Protected Speech.

Trademarks are any combination of expression—such as words, symbols, colors or package designs—used to identify and distinguish a good or service produced by one source from the goods or services of other sources. *See* 15 U.S.C. § 1127 (1994). While there can be some debate over what level of protection should be afforded, trademarks clearly qualify as "speech" protected by the First Amendment.

Traditional advertising is classified as "commercial" speech. *See, e.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422–23 (1993) ("Core" commercial speech is characterized by a "proposal of a commercial transaction"). Thus, if a trademark does nothing more than identify and distinguish goods or services for a commercial transaction, review might well be conducted under *Central Hudson*. However, the Supreme Court has opined that, where "the component parts of a single speech are inextricably intertwined . . . we apply our test for fully protected expression." *Riley v. Nat'l Fed'n of Blind, Inc.*, 487 U.S. 781, 796 (1988); *accord*, *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185–86 (9th Cir. 2001) (finding that if speech is not "purely commercial"—that

- 7 -

is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection).[3]

The present case shows how trademarks serve more than mere commercial transaction purposes. There is no question that Mr. Tam selected the mark THE SLANTS in order to "own" the stereotype it represents. *In re Tam*, 785 F.3d 567, 569 (Fed. Cir. 2015); *In re Tam*, No. 85472044, 2013 WL 5498164, at *2 (T.T.A.B. Sept. 26, 2013) ("We want to take on these stereotypes that people have about us, like the slanted eyes, and own them. We're very proud of being Asian— we're not going to hide that fact") (citing applicant). In this sense, the mark was adopted and used to make a political statement about racial pride and stereotypes— not merely to sell CDs.

Trademarks often are used for more than mere commercial transaction purposes. As explained below, trademarks have been sought to establish gay,

---

[3]     The Supreme Court has acknowledged on several occasions that the definition of commercial speech can be confusing and vague. *See, e.g.*, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 184 (1999); *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 637 (1985). The line between commercial speech and political speech can be difficult to draw. *See, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 10–11 (1986). Is an advertisement for ethically-sourced coffee or goods made without child labor a purely commercial statement? Where fully protected speech is mixed with commercial speech, the higher level of scrutiny should apply. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996).

Jewish, Muslim, African-American and other identities.  Marks routinely serve to establish and communicate group identity.  For example, "American Civil Liberties Union," "ACLU," "National Association for the Advancement of Colored People," and "NAACP" all are federally registered trademarks that convey a message about the values and identity of the groups holding those marks.  That some might take offense to use of these marks is hardly justification for refusal of registration.  *See, e.g.*, *Bishop v. Tyson Foods, Inc.*, 660 F. Supp. 2d 1004, 1010 (W.D. Ark. 2009) (person considered t-shirt emblazoned with the NAACP as "offensive clothing").

Political groups trademark logos and slogans. Religious groups—and those that dissent—also can register trademarks.  Consider for instance, Catholics for Choice, a pro-choice, dissenting Catholic organization whose mission is "to serve as a voice for Catholics who believe that the Catholic tradition supports a woman's moral and legal right to follow her conscience in matters of sexuality and reproductive health."[4]  Some Catholics could, and do, take grave offense at that suggestion.  Could the Trademark Office, consistent with the First Amendment,

---

[4]     *About        Us*,        CATHOLICS        FOR        CHOICE, http://www.catholicsforchoice.org/about/default.asp (last visited June 11, 2015). *See* Reg. No. 2,796,790—CATHOLICS FOR CHOICE, for "[p]romoting public awareness of political and ethical issues in the fields of reproductive rights, women's rights, family planning, and sexually transmitted diseases."

deny registration to Catholics for Choice—a patently politically infused mark—on the basis that it might "disparage or falsely suggest a connection with" Catholicism or bring Catholic doctrine or faith "into contempt, or disrepute?"  The answer, most assuredly, should be "no."  But as explained below, the Lanham Act empowers the Trademark Office to evaluate the group's speech, and burden it based on the subjective, potential reaction of third parties that might take offense.

In light of the diversity of trademark uses, it is clear that in many instances, commercial speech is inextricably intertwined with core First Amendment speech and is entitled to the highest level of protection.

### B.    Trademark Registration Confers Substantial Benefits That Cannot Be Denied Based On Protected Speech.

Under the "unconstitutional conditions" doctrine, the government may not deny access to a benefit because of the recipient's exercise of constitutionally protected speech.  *Perry*, 408 U.S. at 597.  To do so is tantamount to punishing the speaker because of such speech.  *Speiser v. Randall*, 357 U.S. 513, 518 (1958).  In recent years, the Supreme Court has not shied away from confirming that the First Amendment imposes limits on government power, even where the government is granting benefits to which the recipient otherwise "has no entitlement."  *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 133 S. Ct. 2321, 2328 (2013) (citation omitted); *accord Rumsfeld v. Forum For Acad. & Inst. Rights, Inc.*, 547 U.S. 47,

59 (2006) ("'[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'") (citations and quotations omitted).

It is axiomatic that, at common law, trademark rights in the United States arise in a mark's geographic area of use and not from registration. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 199–200 (1985). Optional registration of a trademark on the Principal Federal Register, however, confers many valuable statutory benefits over common law rights.

Perhaps the most important benefit of Principal Register registration arises from a reversal of the common law use-based presumption. Under 15 U.S.C. §§1057(c) and 1141, filing an application for registration on the Principal Trademark Register after November 16, 1989—including an intent-to-use application—constitutes constructive nationwide use of the mark upon the maturation of the application into a registration.

Other benefits of a federal registration on the Principal Register include: (1) Original jurisdiction in federal courts for infringement claims, 15 U.S.C. § 1121; (2) Recovery of profits, damages and costs, as well as treble damages and attorney's fees in infringement actions, 15 U.S.C. § 1117; (3) Prima facie evidence

of the validity,[5] registration, registrant's ownership and exclusive right to use the registered mark, 15 U.S.C. §§ 1115(a), 1057(b); (4) Conclusive evidence of the exclusive right to use of the mark, subject to certain statutory defenses, for "incontestable" marks, 15 U.S.C. §§ 1115(b), 1065; (5) Elimination of defenses of good faith adoption and use made after the date of registration, 15 U.S.C. § 1072; and (6) Registration with U.S. Customs to prevent the importation of articles bearing an infringing mark into the United States, 15 U.S.C. § 1124.[6] These are meaningful, tangible benefits.

Critically, while trademark registration is optional for the holder, accepting the registration is also discretionary on the part of the government. The PTO is directed to evaluate registration applications and determine whether they should be accepted based on a variety of criteria. Denial of registration indisputably has the effect of placing applicants at a legal and financial disadvantage.

_____

[5]     *Aluminum Fabricating Co. v. Season-All Window Corp.*, 259 F.2d 314, 119 U.S.P.Q. 61, 63 (2d Cir. 1958) (finding that a registration confers a strong presumption of validity).

[6]     Courts have found additional benefits from a registration. *See, e.g.*, *Liberty Mut. Ins. Co. v. Liberty Ins. Co.*, 185 F. Supp. 895, 902 (E.D. Ark. 1960) (prima facie evidence that the mark is not confusingly similar to other registered marks and that the mark has acquired secondary meaning); *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009) (presumption of acquired distinctiveness); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538 (2d Cir. 1956) (use in interstate commerce prior to the date of registration); *accord, Li'l' Red Barn, Inc. v. Red Barn Sys., Inc.*, 322 F. Supp. 98 (N.D. Ind. 1970), *aff'd per curiam*, 174 U.S.P.Q. 193 (7th Cir. 1972).

- 12 -

**C.    Disparagement Review Is Fickle, Unpredictable, And Yields Absurd Results That Cannot Co-Exist With The First Amendment.**

Section 2(a) of the Lanham Act prohibits, in part, registration of marks that "may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a).[7] When it comes to disparagement review, the PTO's task is unenviable. A government employee is obligated to police trademark applications for indications of potential offense and evaluate that potential in light of, among other things, the applicant's characteristics, the message being sent, overall context, and the likely feelings of a

---

[7]    The Court's order is limited to the disparagement clause. Amici respectfully note that similar, relevant infirmities plague the "scandalous" clause of § 2(a). The main difference is the reference point for offensiveness: scandalousness is measured by reference to a substantial composite of *the general public*, rather than to a substantial composite of *the referenced sub-group*. *In re Fox*, 702 F.3d 633, 638 (Fed. Cir. 2012). This is relevant because it appears the Trademark Board has used scandalousness analysis as a proxy for disparagement. In years past, the Trademark Board decided a number of cases on scandalousness grounds. *See In re Sociedade Agricola E. Commercial Dos Vinhos Messias, S.A.R.L.*, 159 U.S.P.Q. 275 (T.T.A.B. 1968); *In re Reemtsma Cigarettenfabriken G.M.B.H.*, 122 U.S.P.Q. 339 (T.T.A.B. 1959); *In re Riverbank Canning Co.*, 95 F.2d 327 (C.C.P.A. 1938), conceding later that the cases are really about disparagement, *see*, *In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215, No. 77072261, 2010 WL 766488 at, **2–3 (T.T.A.B. Mar. 4, 2010) ("it has become clear that the proper ground for refusing marks which would offend the sensibilities of an ethnic or religious group is that the matter is disparaging to the members of that group, rather than that the matter is offensive or scandalous"). This shows the mischief that ensues when the government must make judgments under such loose and subjective standards.

subsection of the group to be protected from offense.  Not surprisingly, given the slippery and subjective concepts at issue, "disparagement" trademark review has yielded widely divergent approaches, linked by a common denominator: subjective and paternalistic review by government employees of the potential for offense from the message to be conveyed in the trademark.  This illustrates the foolishness of the endeavor and its poor fit in our system of limited, content-neutral government.

The Trademark Board applies a two-part test to determine if a designation used as a mark is barred from registration as being "disparaging" under § 2(a): (1) What is the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services?; and (2) Is that meaning disparaging to a substantial composite of the referenced group?[8]  During the examination process, the government's examining attorney sets forth a prima

---

[8]    *In re Squaw Valley Dev. Co.*, 80 U.S.P.Q.2d 1264 (T.T.A.B. 2006) (holding SQUAW for clothing barred from registration as disparaging of Native American women, but not barred when used as a mark for ski-related goods as it would be understood to refer to a famous ski resort at Squaw Valley, California); *In re Heeb Media, LLC,* 89 U.S.P.Q.2d 1071 (T.T.A.B. 2008). *See In re Lebanese Arak Corp.*, 94 U.S.P.Q.2d 1215 (T.T.A.B. 2010) (dissent argued that focus should be on the term's meaning to the U.S. population and not members of the disparaged group).

facie case, then the burden shifts to the applicant to come forward with evidence to rebut the prima facie case with "competent evidence." *See, e.g.*, *In re Gyulay*, 820 F.2d 1216, 3 U.S.P.Q.2d 1009, 1010 (Fed. Cir. 1987); *see also Squaw Valley*, *supra*.

The PTO's examination experience reveals a high level of confusion, bordering on incoherence, which results from a highly subjective application of standards that are themselves built on shifting views and attitudes. PTO records are rife with examples of marks once deemed disparaging that now are registered routinely; marks containing words deemed unregistrable despite being legally equivalent to registrable terms; terms defined in dictionaries as disparaging that are not found disparaging by the PTO; and terms that the PTO now finds disparaging despite past findings to the contrary.

For example, Merriam Webster Dictionary notes that the terms DYKE, QUEER and FAG are "often" or "usually" used as disparaging terms for homosexuals. However, the PTO has registered marks such as DYKE NIGHT,[9] DYKES ON BIKES,[10] DYKEDOLLS,[11] QUEER FOLK,[12] and QUEER PAL FOR

---

[9]    Reg. No. 4,146,588 issued May 22, 2012.
[10]    Reg. No. 3,323,803 issued Oct. 30, 2007
[11]    Reg. No. 3,254,737 issued June 26, 2007 (cancelled Jan. 31, 2014 for failure to file a Declaration of Continued Use).
[12]    Reg. No. 4,742,269 issued May 26, 2015.

- 15 -

THE STRAIGHT GAL.[13]  The Office seems divided on the term FAG—it recently refused registration of the marks FAGOUT! and FAG FOREVER A GENIUS![14] under the disparagement clause of § 2(a), but approved the mark PHAG[15] for registration.  Similarly, the Office has registered the mark FAGDOG three times, and has refused it twice—at least once under section 2(a).[16]

The history of the term SAMBO'S is illustrative of a term that was once evidently considered non-disparaging that is now refused by the PTO—the Office recently refused registration of the mark SAMBO'S for restaurants, contradicting earlier findings that the mark is registrable for the same services.[17]  Two courts, however, have found that conditioning the right to receive government approval of construction permits on an agreement not to use SAMBO'S as the name of a

---

[13]    Reg. No. 4,699,581 issued Mar. 10, 2015.

[14]    Application Serial Nos. 86/107,041, filed Oct. 31, 2013, and 86/089,512, filed Oct. 11, 2013.

[15]    Reg. No. 4,135,694 issued May 1, 2012.

[16]    *Compare* Reg. Nos. 2,926,775 issued Feb. 15, 2005 (cancelled Sept. 16, 2011 for failure to file a Declaration of Continued Use) and 2,828,396 issued Mar. 30, 2004 (cancelled November 5, 2010 for failure to file a Declaration of Continued Use); Reg. No. 3,174,475 (cancelled June 28, 2013 for failure to file a Declaration of Continued Use) *with* App. Ser. Nos. 76/454,927 (abandoned after section 2(a) refusal) and 75/950,535 (abandoned).

[17]    *Compare* Reg. Nos. 1,247,362- SAMBO'S; 1,118,937 - SAMBO'S GOOD TURN PROGRAM; 1,133,357 - SAMBO'S FAMILY TABLE; 1,107,590 - PARENTS AND KIDS AGREE-IT'S SAMBO'S FOR DINNER; 1,061,886 - SAMBO'S; 1,102,379 - SAMBO'S; 927,492 - SAMBO'S; 860,232 - SAMBO'S *with* App. Ser. No. 77/915,048 – SAMBO'S (refused).

restaurant violated the First Amendment. *Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F.2d 686 (6th Cir. 1981); *Sambo's of Ohio, Inc. v. City Council of Toledo*, 466 F. Supp. 177 (N.D. Ohio 1979).

The fickleness of the PTO's 2(a) disparagement refusals is highlighted by an application for THE YIDZ for: "Entertainment, namely, live performances by a musical band."[18] The PTO refused the mark, finding it "merely descriptive" because it describes an ingredient, quality, characteristic, function, feature, purpose or use of the specified goods and/or services and "The applicant's musical band comprises Jewish people."[19] In support, the PTO attached a definition from the online Compact Oxford English Dictionary defining the term YID as "*informal offensive* A Jew." And yet, the PTO raised no objection under § 2(a) to the application. THE YIDZ is no different in any respect from THE SLANTS—both are the names of musical bands; both include arguably pejorative terms for a group of people—yet the marks were afforded completely inconsistent treatment.

---

[18] App. Ser. No. 77/784,282 (refused on different grounds). The applicant chose not to respond to the refusal and the application was abandoned.

[19] Yet, there is absolutely no indication in the file wrapper of the applicant's religious background.

## II. THE DISPARAGEMENT BAR IS THE ULTIMATE HECKLER'S VETO AND CANNOT SURVIVE ANY LEVEL OF FIRST AMENDMENT SCRUTINY.

### A. Disparaging Speech Is At The Core Of What The First Amendment Protects.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The Supreme Court has repeatedly emphasized this, holding that in its most critical applications, the First Amendment is here to protect speech that others may find offensive. *See, e.g.*, *Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."). Indeed, it is *precisely* when speech holds the power to offend that First Amendment protection, becomes most critical because this is the type of speech that invites regulation in the first instance. Without the freedom to offend, freedom of expression ceases to exist.

Under Federal Circuit precedent, however, a mark can be deemed disparaging if "a substantial composite" of the group to which the mark refers might be offended. *In re Geller*, 751 F.3d 1355, 1358 (Fed. Cir. 2014). The inquiry by the Examining Attorney in this case, as described by the government,

demonstrates how the disparagement inquiry subverts First Amendment values. Here, the Examining Attorney looked to "several websites" and commentary from a "civil-rights organization" to provide the "likely meaning" of the proposed mark. Gov. Br. 3 (Doc. 36) (Aug. 4, 2014).[20]  The government notes that "several people actually had taken offense" at the name.  *Id.*  at 7.  And in the face of "Asian individuals and groups objecting" to the use of the term, *id.* at 12, Mr. Tam somehow failed to meet his "burden" to show that these unscientifically-selected individuals "no longer find the word 'slant' disparaging."  *Id.* at 8.

According to the government, the Trademark Board based its conclusions on the content of core communication, *see id.* at 17 (citing use of "Asian imagery in connection with advertising" and the band's "public discussions"), as well as impact on the listener, *see id.* (citing website showing "public" perception).  It is hard to imagine a more arbitrary and subjective inquiry than elevating objecting individuals' views over the expressive intent of the speaker.  *See id.* at 24 (faulting Mr. Tam for not presenting contrary evidence about how Asians view the mark);

---

[20]    This search for offense in varied and questionable sources illustrates the need for "independent" review of constitutionally significant facts, because the First Amendment "imposes a special responsibility on judges" confronted with claims that communication is not deserving of protection.  *Bose Corp. v. Consumers Union*, 466 U.S. 485, 505 (1984).

and *id.* at 27–28 (disavowing the need for PTO to conduct a survey because of "limited resources"). The double standard is breathtaking.

The government's reasoning, and the use of § 2(a) generally, is a chilling example of the long-forbidden "heckler's veto." *Reno v. ACLU*, 521 U.S. 844, 880 (1997).[21] But the Supreme Court has repeatedly and emphatically rejected laws that "confer broad powers of censorship, in the form of a 'heckler's veto.'" *Id.*

A heckler's veto is prohibited because "[s]peech remains protected even when it may 'stir people to action,' 'move them to tears,' or 'inflict great pain.'" *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2670 (2011) (citation omitted). The First Amendment forbids the government from "react[ing] to that pain by punishing the speaker." *Snyder v. Phelps*, 562 U.S. 443, 461, (2011). "[I]n public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Boos v. Barry,* 485 U.S. 312, 322, (1988). Even in economic regulation, "[t]he State may not burden the speech of others in order to tilt the public debate in a preferred direction." *Sorrell*, 131 S. Ct. at 2671. As Justice Louis Brandeis famously wrote, the answer to speech that some may view as

---

[21] The "heckler's veto" is equally evident in trademark *cancellation* actions, where aggrieved individuals or groups can invoke the "disparagement" bar to subject trademark holders to additional, unbalanced proceedings, long after registration.

objectionable "is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

"Disparaging" speech is not subsumed in any existing category of unprotected speech, and this Court should reject the creation of a new one. Speech categories exempted from First Amendment protection are few, narrow, and well-defined. These include obscenity, *see, e.g.*, *Miller v. California*, 413 U.S. 15 (1973), defamation, *see, e.g.*, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), incitement, *see, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444 (1969), or situations presenting some grave and imminent danger the government has the power to prevent, *see, e.g.*, *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931). All other forms of speech—including disparagement—are protected, and the Supreme Court has been skeptical of attempts to invent other categories. *See United States v. Stevens*, 559 U.S. 460, 472 (2010).

*Stevens* involved a federal law that criminalized the sale or possession of depictions of unlawful animal cruelty. *Id.* at 464. In defense of the law, the government argued that depictions of unlawful animal cruelty were analogous to child pornography, and that the Court should not apply ordinary First Amendment scrutiny. *Id.* The Supreme Court rejected this argument.

Federal courts do not have a "freewheeling authority to declare new categories of speech outside the scope of the First Amendment" on the basis of "an ad hoc balancing of relative social costs and benefits." *Id.* at 470, 472. The appropriate inquiry is whether the category of speech has historically been treated as unprotected. *Id.* at 472. The Supreme Court asked whether depictions of unlawful animal cruelty had been historically unprotected and, finding no such history, applied First Amendment scrutiny. *Id.* This approach was reaffirmed in *Brown v. Entertainment Merchants*, which invalidated a ban on the sale or rental of violent video games to minors. 131 S. Ct. 2729, 2734 (2011) ("[N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated.").

The rule is straightforward: unless there is a tradition of treating a category of speech as unprotected, that speech is fully protected. There is no evidence that disparaging speech has been historically unprotected. To the contrary, the First Amendment has long protected unpleasant, offensive speech from officious government meddling.

### B.    Strict Scrutiny Dooms The Lanham Act's Disparagement Bar.

If ever there were a statute to which strict scrutiny applies, the disparagement clause in § 2(a) of the Lanham Act is it. Section 2(a) is a classic

example of an illegitimate content-based restriction on speech. Laws that "impose[] a financial disincentive only on speech of a particular content" are "presumptively inconsistent with the First Amendment." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115, 116 (1991). The Act imposes a financial burden and disincentive (in the form of withheld benefits of trademark registration) on people whose speech the government believes others may find disparaging. 15 U.S.C. § 1052(a). The law unapologetically singles out certain topics—that are of public concern[22] and everyday discourse—and burdens particular speech on those topics because of its content. There is perhaps no category of law toward which the Supreme Court has been more hostile. *See Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

The disparagement clause of § 2(a) is also content-based because it cannot be "justified without reference to the content of the regulated speech." *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (citation omitted). The statute seeks to ensure that only non-offensive marks receive the government's blessing through

---

[22]    Speech is of public concern, "at the heart of the First Amendment," whenever "it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 451–52, 53 (internal quotations and citation omitted). A trademark that reflects a political statement or commentary on racial, ethnic, or other stereotypes, undeniably is speech on a matter of public concern.

- 23 -

trademark registration.  The Act is plainly aimed at improving the "quality" (as determined by the government) of what applicants say—a goal that is both content-based and, when applied to core First Amendment speech, deeply troubling.  *See*, *e.g.*, *Davis v. FEC*, 554 U.S. 724, 743 n.8 (2008) ("[I]t would be dangerous for the Government to regulate core political speech for the asserted purpose of improving that speech.").  "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion."  *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

Perhaps worst of all, § 2(a) compels viewpoint discrimination—a particularly suspect form of content discrimination.  *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.").  Here, § 2(a)'s prohibition of disparaging marks is aimed at suppressing a disfavored viewpoint.  The statute permits registration of trademarks that refer positively to a certain group, but prohibits registration of those that (arguably) refer negatively to the same group, based on whether some people would consider the proposed mark offensive.

- 24 -

This should end the analysis because "it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell*, 131 S. Ct. at 2667. Laws giving the government the power to discriminate among who may speak and who may not—based solely on the content of that speech—are anathema to the First Amendment. Because that is exactly what § 2(a) does, it is subject to the most stringent judicial review. *See e.g., Reed v. Town of Gilbert*, 576 U.S. __, No. 13-502, 2015 WL 2473374, at *6 (June 18, 2015) (regulation of "particular speech because of the topic discussed or the idea or message expressed" is subject to "strict scrutiny"). Section 2(a)'s disparagement regime is based so obviously and intentionally on the perceived content of the message and the viewpoint expressed, it is doomed under strict scrutiny, and further analysis should be unnecessary. [23]

---

[23]    Whether labeled commercial speech or otherwise, § 2(a)'s disparagement bar should be subject to strict scrutiny. *See Sorrell*, 131 S. Ct. at 2664 ("[H]eightened scrutiny" is required "*whenever* the government creates a regulation of speech because of disagreement with the message it conveys.") (emphasis added) (internal quotations and citation omitted); *44 Liquormart*, 517 U.S. at 501; *Cent. Hudson*, 447 U.S. at 566 n.9; *see also Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 n.28 (1977) (refusing to distinguish commercial from non-commercial speech).

**C.     Under Any Level Of First Amendment Review, Section 2(a)'s Disparagement Clause Is Unconstitutional.**

Even if § 2(a) were construed merely as a limitation on commercial speech, subject to intermediate scrutiny (an impossible task in amici's view), however, the government still could not meet its burden to justify the intrusion.

Under *Central Hudson*, the government may regulate truthful, non-misleading commercial speech about lawful activity if the regulation serves a substantial government interest, directly advances the government interest, and is no more extensive than necessary.  447 U.S. 557, 566 (1980).  Here, the parties do not challenge the mark's veracity, and there is nothing misleading about the mark THE SLANTS.

Any attempt to satisfy the *Central Hudson* standard would founder at each step of the analysis.  The goals allegedly served by § 2(a)'s bar against disparaging marks fall far short of substantial, and indeed, confirm the regime's affront to the First Amendment.  The government has asserted interests in: (1) discouraging the use of disparaging marks that may be offensive to persons, institutions, beliefs, or national symbols, *In re Tam*, 785 F.3d at 583; (2) not having disparaging marks "occupy the time, services, and use of funds of the federal government," *id.*; (3) "maintaining a well-functioning trademark system that harmonizes state and federal trademark law," *id.* at 584; and (4) the government not being seen as giving

THE SLANTS its stamp of approval, *id.* None of these interests is substantial, and several are not legitimate governmental functions under the First Amendment.

The first interest is essentially in preventing offense, and is so anathema to the First Amendment that the Supreme Court has repeatedly "found it so 'obvious' as to not require explanation." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115–16 (1991) (citation omitted). The second interest is risible because the government spends substantial resources conjuring evidence of potential hurt feelings, as well as in defending refusals. *See McGinley*, 660 F.2d at 487 (Rich, J., dissenting). Third, there is no interest in harmonizing state and federal trademark law here because, historically, states have not banned disparaging marks. *In re Tam*, 785 F.3d at 584. Fourth, angst over the perception that the government would be lending its imprimatur by granting a trademark to disparaging marks is baseless. Trademarks are *private* speech, not government expression. *See id.* at 584–85 (citing cases).

Lacking a cognizable, substantial interest for § 2(a)'s ban on disparagement, the Court could stop here. *See Cent. Hudson*, 447 U.S. at 566; *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990) ("[T]he failure to satisfy any prong of the [intermediate scrutiny] test invalidates a regulation."). But

even if the asserted interests were substantial, § 2(a)'s disparagement clause fails under the rest of the analysis.

Under any standard of First Amendment review, the government has an affirmative burden to present evidence that a challenged restriction is protecting the public from a real harm. When dealing with content-neutral laws, courts demand evidence that the law is narrowly tailored to serve a legitimate government interest. *See*, *e.g.*, *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) (noting that courts "closely scrutinize challenged speech restrictions to determine if they indeed promote[] the Government's purposes in more than a speculative way" (quotation marks and citation omitted)). Courts demand evidence that a law advances an asserted interest "in a direct and material way." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). The government does not even come close. A few observations underscore the capable arguments made elsewhere. *See* Appellant's Br. at 26–27.

A core defense of the regime is that parties remain free to use marks without registration. But this shows that the government cannot possibly be advancing its claimed interest in preventing disparagement in a manner adequate to justify the intrusion. *See Edwards v. District of Columbia*, 755 F.3d 996, 1005 (D.C. Cir.

2014) (holding that the government's interests were not furthered where the offending parties had "carte blanche" to say whatever they wanted).

Furthermore, the disparagement clause's overbreadth and underinclusiveness render it hopelessly incoherent. In the First Amendment context, a law is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotations and citation omitted). The Supreme Court has "provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The Court went on to explain that "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case-litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.*; *cf. Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J. dissenting) ([T]he ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market."). Under this regime, a company, musical band, comedian, advocacy group must think twice

before choosing a mark, logo or slogan that is even remotely controversial, and may not have resources to fight the PTO. Indeed, that acquiescence seems to be the government's goal. The First Amendment does not countenance this.

The unintelligibility and inconsistent application of § 2(a)'s disparagement clause confirm the statute's underinclusiveness. Two circumstances render a regulation fatally underinclusive. The first is when "an exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (internal quotations and citation omitted). The other is triggered where, as here, there is an arbitrary exemption from, or "underinclusiveness of[,] the scheme chosen by the government [that] may well suggest . . . the asserted interests either are not pressing or are not the real objects animating the restriction on speech." *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 493 (1997). Indeed, courts have expressed doubt as to whether such an incoherent law could withstand even rational basis review. *See Edwards*, 755 F.3d at 1000 n.3. As explained in section I.C., *supra*, PTO records are replete with examples of terms defined in dictionaries as disparaging that are not found disparaging by the PTO. Such arbitrary application renders § 2(a) fatally underinclusive and incoherent. It also renders the

disparagement clause unconstitutionally vague, as it allows the PTO to exercise a virtually unconstrained "chancellor's veto" over speech it dislikes. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

In the end, there is, simply put, no evidence or logic to support § 2(a)'s ban on disparaging marks, and for that reason, the statute cannot survive any level of First Amendment scrutiny.

## CONCLUSION

This en banc Court should hold that the disparagement clause of § 2(a) of the Lanham Act is facially unconstitutional to the extent it permits the benefits of trademark registration to be denied to a speaker on the ground that the government believes the communication would offend.

Respectfully submitted,

John W. Whitehead
Douglas R. McKusick
**THE RUTHERFORD INSTITUTE**
1440 Sachem Place
Charlottesville, VA 22901
(434) 987-3888

Ilya Shapiro
**CATO INSTITUTE**
1000 Mass. Ave. NW
Washington, DC 20001
(202) 842-2000
i.shapiro@cato.org

Megan L. Brown
    *Counsel of Record*
Joshua S. Turner
Christopher J. Kelly
Jennifer L. Elgin
Dwayne D. Sam
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
(202) 719-7000
mbrown@wileyrein.com
*Counsel for Amici Curiae*

June 18, 2015

- 31 -

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(c)(7), I certify the following:

This brief complies with the type volume limitations of Rule 32(a)(7)(B) because the brief contains 7,000 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b). This certificate was prepared in reliance on the word count of the word-processing system (Microsoft Word 2010) used to prepare this brief.

The undersigned further certifies that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated: June 18, 2015

s/  Megan L. Brown
Megan L. Brown
*Counsel for Amici The Rutherford Institute*
*& Cato Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2015, I electronically filed the original of

the foregoing document with the Clerk of this Court by using the CM/ECF system,

which will send notice of such filing to the principal counsel for each party.


Dated:  June 18, 2015                    s/  Megan L. Brown
                                         Megan L. Brown
                                         *Counsel for Amici The Rutherford Institute*
                                         *& Cato Institute*